IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES C. SHERROD,<br>　　　　　　　**Plaintiff**<br>vs.<br>BOOKER T. WASHINGTON CENTER,<br>　　　　　　　**Defendant** | Civil Action No.  C.A. 04 – 208 ERIE<br><br>Magistrate Judge Susan Paradise Baxter<br><br>**JURY TRIAL DEMANDED** |

## **DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

AND NOW, comes the Defendant, Booker T. Washington Center ("BTWC"), by and through its attorneys, Quinn Buseck Leemhuis Toohey & Kroto, Inc., and files the within Statement of Undisputed Material Facts in support of it's Motion for Summary Judgment, of which the following is a statement:

1. The Plaintiff, James Sherrod ("Sherrod") is African-American.  Complaint. ¶4.

2. Sherrod was hired as the Executive Director of BTWC effective November 9, 1998. Exhibit 1.

3. Sherrod was hired as an at-will employee who served "at the will and discretion of the Board of Directors," which reserved the right "to terminate [his] employment with or without cause."  Exhibit 1.

4. Sherrod served as Executive Director until August 12, 2002.  Exhibit 5.

5. As Executive Director, Sherrod's duties included "[O]verall conduct and management of the affairs and operations of BTWC" and formulating "plans, policies and procedures," as well as the supervision of "all hiring, training, evaluation, promotion and termination of agency staff."  Exhibit 3.

6. On August 6, 2002, it was reported at the end of the business day that a child had been left behind on a BTWC sponsored activity, and had walked from the Millcreek Mall to the home of a relative, a distance of several miles. Exhibit 4.

7. Sherrod was on vacation that day and had left the controller, Brian Bessetti ("Bessetti") in charge of the facility. Exhibits 4-7.

8. Bessetti is Caucasian. Complaint ¶10, Exhibits 4-7.

9. Bessetti did not have the authority to hire or fire employees. Exhibit 5.

10. Bessetti was not responsible for establishing policy or other non-financial procedures for BTWC, including "hiring, training, evaluation, promotion and termination of agency staff." Exhibit 5.

11. Bessetti was not responsible for investigating the incident of August 6, 2002. Exhibit 4-7.

12. Although Sherrod was on vacation on that date, he was in town and had been made aware of the situation. Exhibit 4-7.

13. In fact, Sherrod was made aware of the situation before Bessetti. Exhibit 4.

14. At the direction of Sean Coleman, vice-president of the BTWC Board of Directors ("Coleman"), Sherrod came to work the next day to interview involved employees. Exhibits 5-7.

15. Sherrod did not interview Bessetti, with or without Coleman, on August 7, 2002 or at any other time. Exhibit 5.

16. Although disputed by Coleman, Sherrod contends that in subsequent discussions, Coleman told him to "fire all those niggers." For purposes of the Defendant's Motion for Summary Judgment, it is accepted that Coleman made this, or some similar, statement.

17. Sherrod understood this to mean the three African-American employees involved in the field-trip situation. Exhibit 5.

18. Coleman is African-American. Exhibit 6.

19. Sherrod did not, at that time, question or challenge Coleman's purported statement. Exhibit 5.

20. Instead, he terminated the three African-American employees involved. Exhibit 5.

21. Sherrod never took, or even recommended, any disciplinary action against Bessetti. Exhibits 4-7.

22. There is no evidence that Bessetti received preferential treatment because he was Caucasian. Exhibit 5.

23. A meeting of the BTWC Board of Directors was held on August 12, 2002, at which time the incident and Sherrod's performance as Executive Director was discussed. Exhibits 5-7.

24. A dispute exists as to whether Sherrod resigned and turned in his keys at that time, or if he was directed to turn over his keys and (effectively) suspended at that time. For purposes of the Defendant's Motion for Summary Judgment, it is accepted that he was directed to turn over his keys and suspended.

25. Between that date and the date the Sherrod was formally notified of his termination, Sherrod performed no work for, or on behalf of, BTWC. Exhibit 5; Exhibit 12.

26. There were a number of discussions over the next several weeks concerning Sherrod's continued employment with BTWC, or the possibility of a severance package. Exhibits 5-7.

27. Sherrod eventually rejected the severance package offered to him. Exhibit 5.

28. Sherrod was then notified, formally, of his termination. Exhibits 5 and 12.

29. A majority of the BTWC Board of Directors, at all times relevant to this action, was African-American. Exhibits 5-12.

30. Prior to these events, Sherrod felt that there were at least 3 members of the BTWC Board who did not care for him. Exhibit 5.

31. All of these individuals were also African-American. Exhibits 5-7, 12.

32. All of these individuals were members of the BTWC Board of Directors at the time of Sherrod's termination. Exhibits 5-7, 12.

33. There is no evidence that these individuals disliked Sherrod because of his race. Exhibit 5.

34. There is no evidence that Coleman ever referred to Sherrod, himself, as a "nigger." Exhibits 5, 15 and 16.

35. Coleman did not vote for Sherrod's termination because of his race. Exhibit 6.

36. There is no evidence that any BTWC Board Member voted to terminate Sherrod because of his race.

37. Sherrod was eventually replaced as Executive Director by William Jeffres, who was a member of the BTWC Board at the time of Sherrod's termination. Exhibits 5-7.

38. Sherrod believes that Jeffres supported his termination because he (Jeffres) wanted Sherrod's position. Exhibit 5

39. Jeffres is African-American. Exhibit 7.

40. There were three (3) articles (including one editorial column) published by the Erie Times-News regarding this matter. Exhibit 14.

41. There is no evidence that these articles were published at the insistence or direction of BTWC.

42. As of August 6, 2002, there were no written policies or procedures in place with regard to safety and accountability procedures for day-trips sponsored by the BTWC.

43. Likewise, there was no policy that provided for employees (not utilizing vacation, sick, or personal days) to be compensated for time not worked.  Exhibit 17.

WHEREFORE, the Defendant, Booker T. Washington Center, demands judgment in its favor and against the Plaintiff, James Sherrod, as to all claims, together with an award of costs, counsel fees, and such other relief as this Honorable Court shall deem necessary and just.

Respectfully submitted,

QUINN, BUSECK, LEEMHUIS, TOOHEY
& KROTO, INC.


By  /s/Arthur D. Martinucci
    Arthur D. Martinucci, Esquire
    Pa. I.D. No. 63699
    2222 West Grandview Boulevard
    Erie, PA  16506-4509
    (814) 833-2222
    Attorney for the Defendant,
    Booker T. Washington Center