1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3

4    JAMES C. SHERROD,                    :
          Plaintiff                       :
                                          :
5        vs.                              : Civil Action No. C.A. 04-208 ERIE
                                          :
6    BOOKER T. WASHINGTON                 :
     CENTER,                              : Magistrate Judge Susan Paradise
7                 Defendant               : Baxter

8

9          Deposition of JAMES C. SHERROD, taken before and by

10   Heather E. Nass, Notary Public in and for the Commonwealth

11   of Pennsylvania, on Wednesday, January 25th, 2006,

12   commencing at 1:30 p.m., at the law offices of Quinn Buseck

13   Leemhuis Toohey & Kroto, Inc., 2222 West Grandview

14   Boulevard, Erie, Pennsylvania 16506.

15

16   For the Plaintiff:

17          Edith Benson, Esquire
            4683 Budd Drive
18          Erie, Pennsylvania 16506

19
     For the Defendant:
20
            Arthur D. Martinucci, Esquire
21          Quinn Buseck Leemhuis Toohey & Kroto, Inc.
            2222 West Grandview Boulevard
22          Erie, Pennsylvania 16506

23

24

25          Reported by Heather E. Nass
          Ferguson & Holdnack Court Reporting, Inc.

1
2                              I N D E X
3    JAMES SHERROD
4          Direct Examination by Mr. Martinucci              3
5          Cross-Examination by Ms. Benson                  55
6          Redirect Examination by Mr. Martinucci           90
7          Recross-Examination by Mr. Benson               103
8
9
10   Exhibits:
11         Sherrod Exhibit No. 1                            43
12         Sherrod Exhibit No. 2                            48
13         Sherrod Exhibit No. 3                            51
14         Sherrod Exhibit No. 4                            53
15
16
17
18
19
20
21
22
23
24
25

1      J A M E S   S H E R R O D, first having been duly

2           sworn, testified as follows:

3

4                 DIRECT EXAMINATION

5    BY MR. MARTINUCCI:

6

7        Q.     Now, before we get started with the questioning,

8    we're here today to address, primarily, liability issues.

9    Again, out of consideration for scheduling this deposition

10   and not knowing, at least on my end, how good or bad your

11   back was going to be, we wanted to keep this deposition

12   fairly short, so we're focusing on liability issues today.

13   I expect that after this deposition and before the court

14   deadlines expire we will be filing a motion for summary

15   judgment.  If the case survives and we go to trial, I'm

16   reserving the right to call you back for an additional,

17   again, not long, but an additional deposition to discuss

18   damage issues.  So I'm not going to be asking you about

19   money or things like that, okay?

20       A.     Okay.

21       Q.     Now.  You've heard your attorney give instructions

22   at the beginning of the depositions and ask some general

23   questions and I'm going to do, basically, the same thing,

24   okay?

25       A.     Okay.

1    Q.    If you don't understand a question that I ask,

2    please, let me know. If you don't hear it, if I talk too

3    fast, which does happen sometimes. If I talk too soft,

4    which never happens. But if there's something about the

5    question that you don't understand or that you didn't hear,

6    let me know and I will do my best to repeat the question or

7    to rephrase it in a fashion so that you can answer it, okay.

8         If you answer a question it will be my

9    understanding that you heard the question, that you

10    understood the question, and that you gave the answer that

11    you intended to give; is that fair?

12    A.    Yes.

13    Q.    The answer to these next questions probably would

14    have been different if we had done this back in September or

15    October. And, again, I don't want you to feel taken back or

16    insulted by these questions, they're fairly standard. Your

17    attorney asked them of Mr. Coleman and, I believe,

18    Mr. Jeffress as well. Are you, today, aware of any reason

19    why you cannot answer truthfully and completely questions

20    that are put to you?

21    A.    No.

22    Q.    Are you on any prescription medication?

23    A.    No.

24    Q.    Are you on any nonprescription medication?

25    A.    No.

1        Q.    Are you under the influence of any drug or

2    alcohol?

3        A.    No.

4        Q.    For the record, can you please state your name.

5        A.    James Curtis Sherrod.

6        Q.    And where do you reside?

7        A.    917 East 33rd Street, Erie, Pennsylvania 16504.

8        Q.    How long have you resided there?

9        A.    About 10 years.

10       Q.    Are you married?

11       A.    Yes.

12       Q.    How many times?

13       A.    Once.

14       Q.    Good for you, me too.  How many children, any?

15       A.    I have two biological children and two

16    stepchildren.

17       Q.    And they reside with you at 917 East 33rd.

18       A.    My youngest does, he's nine years old.

19       Q.    Mr. Sherrod, what was the last day you actually

20    performed any duties for the Booker T. Washington Center?

21       A.    That would have been August 7th, 2002.

22       Q.    And have you been paid by the Booker T. Washington

23    Center for your time up through that date?

24       A.    Yes.

25       Q.    It's your position, in this lawsuit, that at no

5

1    time did you ever indicate a willingness or desire to resign

2    from your position as executive director.

3         A.    Yes.

4         Q.    Were you told to not return to work after August

5    7th of 2002?

6         A.    I was told to hand over my keys to the committee

7    chairperson of the management committee.

8         Q.    Who was that?

9         A.    And then I would have to leave.

10        Q.    I'm sorry.

11        A.    Bill Jeffress.

12        Q.    Now, you contend that you've been discriminated

13   against from the basis of your race, correct?

14        A.    Yes.

15        Q.    Specifically, you believe that you were terminated

16   because you were an African American.

17        A.    Yes.

18        Q.    Anything else?

19        A.    Not at this point that I can interject, no.

20        Q.    Aside from your allegation about Mr. Coleman's use

21   of the word "nigger", what evidence do you base your claim

22   of discrimination on?

23        A.    Well, Mr. Coleman ordered me to fire several

24   individuals that were employed at the agency that were

25   involved in the incident that took place.  Along with that,

1  the person that was in charge of approving the field trip

2  that took place.  There was no disciplinary action taken on

3  that -- on his behalf.

4       Q.     Okay.  Is that it?

5       A.     Yes.

6       Q.     Aside from those two things, do you have any

7  evidence to support your claim?

8       A.     There's been affidavits submitted.  You have

9  copies of those from the information that we've submitted to

10  you and to the EEOC which outlined the other issues that are

11  contained within our submission.

12       Q.     And what are those other issues, to the extent

13  that you're aware of them?

14       A.     I can't recall them right at this time.  If you

15  would allow me to pull out those documents at a later date,

16  I could give you copies of them.

17       Q.     I've got the documents; you don't have to give me

18  extra copies.  I was just looking for your recollection of

19  the other issues.  I mean, is there something besides race

20  discrimination?

21       A.     Not that I'm aware of at this point, no.  I mean,

22  the main thing that we've submitted our claim to the court

23  was because of the racial issues.

24       Q.     It's your contention that the board of the Booker

25  T. Washington Center voted to terminate you because of your

1    race.

2        A.    Yes.

3        Q.    Specifically, which board members voted to

4    terminate you on the basis of your race?

5        A.    I wasn't present at the meeting that took place

6    that authorized or suggested the termination.

7        Q.    Aside from what you've indicated above with regard

8    to Mr. Coleman's supposed statement and the fact that

9    Mr. Bessetti was not disciplined, what evidence do you base

10    that contention on?

11        A.    Contention of what?

12        Q.    That these board members voted to terminate you

13    because you were African American.

14        A.    I received a letter in the mail outlining the

15    termination somewhere around September 26th, 27th of 2002,

16    saying I was terminated.

17        Q.    And did it say you were terminated because you

18    were African American?

19        A.    It didn't state that in the letter, no.

20        Q.    Has anybody else ever stated that to you?

21        A.    No.

22        Q.    You don't have any written documents or anything

23    like that that would suggest that that was the situation.

24        A.    I don't have any written documents in my

25    possession that would suggest that I was terminated because

1    of my race.  But in looking back on the situation at hand

2    and how it occurred in relation to all that were involved,

3    that would be one of the issues.

4         Q.    Okay.  If you would, describe for me your

5    relationship with the board of the Booker T. Washington

6    Center prior to August 6th of 2002.

7         A.    We had a good relationship, nothing that was

8    anything of a major difference.

9         Q.    If there were no major differences, were there

10   minor ones?

11        A.    Well, when you're dealing with 17 individuals or

12   more on a board of directors, you're always going to have

13   different people stating different things to you and

14   recommending that you do something that, you know, the whole

15   board should have spoke about.  But relationships are

16   relationships, no two relationships are the same.

17        Q.    Was there anybody in particular on the board that

18   you felt you had more of a contentious relationship than

19   not?

20        A.    If I had to sit here and pick one person or two

21   people, I couldn't pinpoint exactly at this time who those

22   two individuals would be.  But there were some negative

23   relationships with maybe two or three board members.

24        Q.    Do you recall what those negative relationships

25   involved, what were they over?

1    A.    Well, most of them --

2    MS. BENSON:    Excuse me, what time period are we

3    talking about?  He was there from -- as the

4    executive director, I believe he started in

5    November of '98.  So what period of time are we

6    talking about here?

7    MR. MARTINUCCI:    We're talking about any time

8    before August of 2002.

9    MS. BENSON:    So you want him to go and deal with

10    from November of '98 to August of 2002.  That's

11    rather broad, isn't it?

12    MR. MARTINUCCI:    Sure it is.  Go ahead and answer

13    the question.

14    MS. BENSON:    Well, let me just --

15    MR. MARTINUCCI:    Are you objecting to the

16    question?

17    MS. BENSON:    I am.

18    MR. MARTINUCCI:    On what basis?

19    MS. BENSON:    Well, I think it's rather board.

20    MR. MARTINUCCI:    It's allowed to be a board

21    question, it's my deposition.

22    MS. BENSON:    I understand that it's your

23    deposition.

24    MR. MARTINUCCI:    Oaky, then he can answer the

25    question.

1          MS. BENSON:    Let me just state my objection for

2          the record.  I think it's rather broad.  Our

3          complaint deals with the incident that occurred on

4          August the 6th, 2002, and what happened with

5          regard to that incident with respect to how the

6          board treated Mr. Sherrod.  We are not here to

7          deal with the nature of his relationship with

8          individual board members.

9          MR. MARTINUCCI:    Your objection is noted.  Can you

10         answer the question.

11    A.        The Booker T. Washington Center, you know, was

12    founded some 80 years ago.  Several board members have come

13    and gone through the agency.

14    Q.        I would hope several.

15    A.        And over that time period, I'm sure there has been

16    many executive directors who have had less than perfect

17    relationships with their board of directors.  As you know,

18    when I was hired in 1998 the Booker T. Washington Center was

19    going through a time period where, I guess you would say,

20    they were questioning what was going on within the agency.

21    And the previous director, prior to myself, was terminated

22    and she did serve some jail time, along with her other

23    staff.

24         And during that time period, the board sort of

25    took over the operation of the agency and looked into hiring

1    the next executive director.  And there was a lot of

2    disagreements on what direction both sides, and I say both

3    sides of the board, wanted to take the agency during that

4    time period.  When I was hired, there was some trifling

5    interbattles going on with board members that I had to go

6    into.  And --

7         Q.     Let me stop you there just very briefly.

8    Infighting as between board members?

9         A.     Between board members.

10        Q.     Not between you and board members.

11        A.     Correct.

12        Q.     You can continue, thank you.

13        A.     Having come into a situation like that,

14   expectations were that I would do what the board president,

15   the vicechair or any of the officers asked me to do.  In

16   doing so, following the orders of the vice president, that

17   created opposition on the other line.

18            See, you look back at the board of directors at

19   that time.  There was, I believe, 13 or 15 members prior to

20   one resigning.  And once that one board member resigned,

21   there was equal lines for battle to occur, basically, which

22   divided the board.  There were the African American members

23   and the Caucasian members that battled.  And that was a

24   trying time for me, because I was put in the middle of that

25   battle that was going back and forth in between the two

1    sides on the board.  And sticking with the majority of

2    members that were officers that were Caucasian, it caused

3    problems for me, I guess.

4          Q.      Okay.

5          A.      So, I can't recall what members it was, but I know

6    that there was some conflict there and I was drawn to the

7    president at the time, I think it was William Sessler, to do

8    as he told me to do.  Because he was the board chairman and

9    he was authorized to, you know, basically tell me what to

10   do.  So that was, as you said, any battles, or that was the

11   first incident that occurred with me having to choose a

12   side, basically.

13         Q.      Now, let me stop you there and bring you up a

14   little bit further.  Let's go back to August of 2002, okay?

15         A.      Okay.

16         Q.      At that point in time, August of 2002, in terms of

17   ethnic or racial composition, what was the split on the

18   board; was it majority African American or majority

19   Caucasian?

20         A.      I think the majority on the board at that time was

21   African American, if I'm not mistaken.

22         Q.      Do you recall how many -- I'm sorry for not

23   letting you finish there.  Do you recall how many Caucasian

24   members there might have been on the board?

25         A.      I don't know specifically, but I'm sure they have

1    some records back at the agency that would outline the

2    number of members that were each --

3        Q.    And I think that actually we've exchanged that

4    during the course of the litigation.

5        A.    Because I know for funding sources we have to turn

6    that information in.

7        Q.    Do you feel that from these early battles from

8    1998, '99, 2000, 2001, coming up to 2002; do you think that

9    there were any board members that were in place that were on

10   the board in August of 2002 that may have harbored some

11   resentment against you?

12       A.    From?

13       Q.    From anything --

14       A.    From when I was hired?

15       Q.    From anything, from the time you were hired up

16   until August of 2002, were there people on the board that

17   you would consider to be detractors?

18       A.    Yes.

19       Q.    Do you recall who those people were?

20       A.    Well, let me see.  One of those persons would have

21   been Charles Faulkerson.

22       Q.    And when you give me peoples' names, to the extent

23   that you can recall, would you give me their race too?

24       A.    He's African American.  The only other person

25   would have been Mr. Coleman.

1      Q.    And he's also African American.

2      A.    Yes, he's African American.

3      Q.    I know we all know that, but I want to make sure

4  it's on the record.

5      A.    The last individual, I guess, if I had to pick

6  those that I felt were questionable relationships with was

7  Paul Gambill, he's also African American.

8      Q.    Those three individuals, can you trace any

9  animosity that they may have had for you back to any one

10  thing?

11      A.    Yes.  It all goes back to board members having the

12  authority to tell you what to do and what not to do.

13  Charles Faulkerson was the type of person that wanted things

14  done his way, as he told you to do them.  You know, within

15  the agency, outside the agency, anything to do with the

16  agency.  He wanted to, I'll say, oversee what was going on

17  and implement his ideas through me, you know.  And when I

18  objected to some of the things that he was asking me to do

19  our relationship struggled, you know.

20          I looked at Charles Faulkerson as a person that

21  was going to create the policies, give me direction, make

22  suggestions to the full committee, and that committee come

23  back to me and tell me, okay, this is what we want you to

24  do.  Not to come in and tell me how to run the agency on a

25  day-to-day basis.  Not to come in my office Monday through

1    Friday and sit for four to five hours telling me what his

2    plans are, all right.

3              With Sean Coleman and Paul Gambill, I guess, it

4    was just resentment that they weren't the executive

5    director. And they felt they could possibly do a better

6    job, I don't know what the modus operandi was, but the

7    relationship struggled. Sean Coleman, basically, thought

8    that he was a better person than I was, you know, for

9    whatever reasons, you know. Paul Gambill, he just didn't

10   care for some of the moves that I made as far as staffing.

11   He questioned a lot of any staffing movements.

12        Q.    So they were used to, maybe from this transition

13   from -- for a couple of these guys, because I don't know --

14   Sean Coleman was on the board when you were hired, right?

15        A.    No, he wasn't.

16        Q.    Do you think that maybe there was a culture that

17   developed of the board micromanaging the operation of the

18   Center?

19        A.    I would say that, you know, the micromanagement of

20   the agency started the day that I was hired, you know, which

21   I didn't expect.

22        Q.    Okay.

23        A.    And when the board members sort of said, okay, if

24   you resign I'm going to resign. So a large majority of the

25   Caucasian members and the African American members that were

1   on the board from '98 to, I believe, 2000 to 2001 actually

2   stepped down because of the inside battles that were

3   occurring.

4         Q.    Okay.

5         A.    Looking back on that situation, I don't know.  I

6   mean, there could be things that are carried over to this

7   time period, you know.  Because, usually, when a board

8   member comes on another board member recommends that

9   individual.

10        Q.    Uh-huh.

11        A.    And that board member, I would imagine, would

12   update him on where the agency has come.  But I know that in

13   our orientation that we completed, we also gave them a

14   historical background on the agency and where we have been,

15   under my direction, and where we are at the current time.

16   Including all of the battles that have occurred and all of

17   the problems that have occurred and the issues that we have

18   addressed and issues that we needed to address down the

19   line.

20        Q.    Okay.

21        A.    So it's quite possible.

22        Q.    You said that you looked to the board president to

23   set policy.

24        A.    The board as a whole, the board as a whole.  But

25   the person that was in my office all of the time was the

1   board president.

2        Q.    What types of policies were you looking for the

3   board to set?

4        A.    You know, as the board of directors, you know,

5   they are supposed to outline and have the director fit into

6   the plan for the agency.  And the director that developed

7   that plan, based on what their recommendations are to him or

8   her, you know.  Just direction mainly.

9        Q.    They're responsible for, hopefully, a vision for

10  the agency.

11       A.    I wouldn't say wholly responsible for the vision

12  for the agency, but as far as the corporate incorporation

13  values of the agency goes, they're responsible for making

14  sure that those are addressed.

15       Q.    They're not responsible for policies on parking

16  and sick days and personnel matters.

17       A.    Well, any policy that is created has to be, I

18  would imagine, be approved by the board of directors before

19  it's enacted.  And the board of directors would make a

20  recommendation; we need to look at having a policy for, say

21  for instance, an evacuation plan, you know.

22       Q.    Would that be something that you would expect the

23  board to come to you with or that you would recommend to the

24  board?

25       A.    I think, in some instances, we would work

1    hand-in-hand, but, you know, the agency has been around for

2    80 years.  And a lot of those policies, practices, and

3    procedures have already been in place, you know.

4         Q.    Okay.

5         A.    Normally, the board would come say; we need to

6    take a look at changing this or instituting something

7    that -- like Charles Faulkerson and a couple of board

8    members came to me and said, well, we want you to put

9    together an evacuation plan because of all of these mail

10   bombs that were happening.

11        Q.    Okay.

12        A.    So I took that instruction, that direction, and

13   put together an evacuation plan.  Submitted it to them for

14   review, revised it, submitted it back to them for them to

15   approve it.  That's how it normally occurred.

16        Q.    Okay.  Now, in terms of your employment

17   relationship with the board, you understood when you signed

18   your employment contract that you served at the pleasure of

19   the board?

20        A.    I was hired by the board of directors in November

21   1998.

22        Q.    The specific date is not significant today.

23        A.    And they gave me an engagement letter that

24   outlined what they had me under agreement for.

25        Q.    And before we finish up here, I may ask you to

1    look at that and authenticate it, just as a matter of

2    record.  I don't have any specific questions for you about

3    the document itself.  Prior to -- I want to skip up to the

4    time of August 6th, 2002 and forward at this point, okay?

5            A.    Okay.

6            Q.    I may have some more historical questions for you

7    later, but right now I would like you to shift your focus to

8    the more recent time period.

9            A.    Okay.

10           Q.    And specifically, at this time I want you to focus

11   on the meeting that you had with Sean Coleman where you

12   allege that he said, "fire all of those niggers."

13           A.    Okay.

14           Q.    And I feel -- I don't want to say I feel silly

15   doing this, but I do want to make this clear for the record.

16   It's awkward for me to use that word in this room, okay.

17           A.    I understand.

18           Q.    And I apologize to all of you for --

19           A.    It's okay.

20           Q.    It's part of the lawsuit; I don't have much of a

21   choice, okay?

22           A.    Right, and I understand that you're using it to

23   gain information for this.

24           Q.    Exactly.  Now, when he said that to you, those

25   were specifically the words that he said, "fire all of those

1    niggers."

2        A.    To that effect, yes.

3        Q.    What did you do at that point in time?

4        A.    Well, the first time that Mr. Coleman used those

5    words was over the telephone to me.  He contacted me at my

6    home and basically said, "what the fuck are those niggers

7    doing."  I'm like, what are you talking about.  "Those

8    fucking niggers took a kid on the field trip and she was

9    lost."  And I told him to the effect, I don't know what is

10    going on.  So that was the first time that he used the word.

11        Q.    Uh-huh.

12        A.    The word was also used at a meeting with him and

13    I, prior to interviewing the individuals that were involved

14    supervising the field trip that the children had went on,

15    before that interview process occurred.

16        Q.    Right.

17        A.    And, also, after the interview process was

18    conducted.

19        Q.    So you're saying that there were three times,

20    three conversations that he used the term.

21        A.    That I can recall at this point, yes.

22        Q.    Now, at that point, at any of those points, what

23    did you do?

24        A.    I looked at him in disbelief when I was in person

25    with him.  On the phone I was like, what, you know.  I was

1   sort of taken back because this is the board acting

2   chairman, per se, using this type of language to me.  We

3   didn't talk like that, you know.  I didn't talk like that,

4   you know, period.  If I'm having a conversation with, you

5   know, business, I don't talk like that.  And in my regular

6   life, I don't talk like that, you know.  And I was taken

7   back because of the way that he threw the word out.

8          Q.     Did you tell him that you were taken back?

9          A.     No, I didn't tell him.

10         Q.     Did you ask him what he meant?

11         A.     No, I didn't ask him what he meant.  He told me

12   specifically, you know, after he said -- and when I said,

13   what are you talking about.  And he said, your staff that

14   took the field trip or whatever.

15         Q.     Okay.

16         A.     And I assumed he was talking about the same before

17   the interviews.

18         Q.     Okay.  Did you report it to anyone?

19         A.     Who am I going to report it to?

20         Q.     You had all the remaining members on the board of

21   directors, correct?

22         A.     First of all, I was on vacation at the time I

23   received this call.  And like I said, I was taken back

24   because of that.  My main goal at that point was to try to

25   get an understanding of what was going on.  Either that

1    night, or the prior day when I went in to meet with my

2    staff, you know. No, I didn't contact the board president,

3    the on-record board president, because no one could get

4    ahold of him anyway.

5         Q.    What about any other members of the board?

6         A.    Paul Gambill and Mr. Coleman were in communique

7    with each other. It wouldn't have mattered what I said to

8    Mr. Gambill at that time either. And I don't keep my board

9    members phone numbers and addresses handy at 11:00 at night.

10   I wasn't going to call anyone at 11:00 at night like

11   Mr. Coleman called me and said, "fire all of those fucking

12   niggers."

13        Q.    Did you call anyone on August 7th to tell them

14   that?

15        A.    No, because on August 7th when I went in, the goal

16   was to interview the individuals involved in the field trip

17   process.

18        Q.    When was the first time that you told anybody that

19   Mr. Coleman had used that language with you?

20        A.    I guess it would have been at the board meeting

21   that we had on August 12th. That's the first time that I

22   saw the board members together, and the first time that I

23   was back from vacation and had the chance to speak with the

24   board members.

25        Q.    And you told the board members as a group at that

1    time.

2    A.    In the conversation of the recall of the story, I

3    used the exact, you know, words that he used in describing

4    it to them what had occurred.  Because they wanted to know

5    from the beginning to the end what had occurred.

6    Q.    Okay.  Now, ultimately, you terminated the three

7    African American individuals who were involved in this field

8    trip, right?

9    A.    Mr. Coleman told me, again, to do so, to "fire all

10    of those niggers."  And, you know, he told me to put

11    together a letter and let them know.  So, I called him on

12    the phone and I read the letter to him and he said, okay, go

13    ahead.

14    Q.    Okay.  Now, did that go -- did those terminations

15    go to the board for a vote before the letter was sent out?

16    A.    No.

17    Q.    You were just going on Mr. Coleman's directions.

18    A.    He was acting as the person in charge, acting in

19    the capacity of the president, so.

20    Q.    Did you feel that you were terminating these

21    individuals because of their race?

22    A.    Did I feel?

23    Q.    Yes.

24    A.    In the way he spoke to them, yes.

25    Q.    What about you?  I mean, you're the person that

1    signed the letter, right?

2        A.    Yes, I'm the person that signed the letter.

3        Q.    Okay.

4        A.    I wasn't terminating them because of their race.

5        Q.    Why were you terminating them?

6        A.    I terminated those employees because Mr. Coleman

7    directed me to do so.

8        Q.    Did you feel that they should be terminated?

9        A.    Well, at the time, I wanted to continue conducting

10   an investigation to get to the bottom of how things had got

11   to the point where they were. I, myself, didn't have enough

12   information. And I had told Mr. Coleman, this is all we

13   have. I don't know if the girl left the movie theater with

14   her cousins from the mall, if she, as they say, walked from

15   the Millcreek Mall 6 all the way down to 20 whatever street,

16   22nd and German or something. Or if -- there was something

17   going around saying that some lady at the Dairy Queen had

18   seen her.

19            I wanted to conduct a more thorough investigation

20   prior to making any decision, you know. But Mr. Coleman,

21   you know, he just didn't want that to happen, I guess. He

22   said he had already conducted an investigation, and you have

23   his notes from his interviews of the investigation that he

24   said he conducted. And through that, his thing to me was to

25   fire them.

1    Q.    And you didn't disagree with him strongly enough

2    to bring the matter to the board for a vote.

3    A.    No, I didn't.

4    Q.    Okay.  In all of this, what disciplinary action

5    did you recommend against Brian Bessetti?

6    A.    As I said, you know, I didn't even get an

7    opportunity to recommend any disciplinary action against

8    Brian because I, myself, was told to get out.  And it's kind

9    of hard to recommend disciplinary action when I'm sitting at

10    home and don't have keys to the agency.

11    Q.    When were the other three individuals terminated?

12    A.    If my dates are correct, I believe, it was August

13    7th or 8th, in the afternoon.

14    Q.    You could have done something against Mr. Bessetti

15    at that time, correct?

16    A.    No.

17    Q.    No, why not?

18    A.    For one, like I said, I wanted to conduct a more

19    thorough investigation.  And when I told the individuals,

20    when I gave them the letter, this was bigger than me.  It

21    wasn't coming from me as far as their termination.  And if

22    it was up to me, they would still be there.  And with Brian

23    Bessetti, I wasn't sure what had occurred with him, if he

24    was notified.  I didn't get an opportunity to talk with him,

25    so I couldn't have fired him based on firing three other

26

1    people.

2        Q.    Okay.  You were never told not to discipline him

3    or not to fire him, correct?

4        A.    As I said, I didn't get the opportunity to do

5    anything because when I got back from vacation I had a

6    meeting there and I was told to get out, basically.

7        Q.    My question though is, nobody ever told you don't

8    do anything with regard to Brian Bessetti.

9        A.    No.

10       Q.    Okay.  What evidence do you have that Mr. Bessetti

11   was not terminated or was not disciplined because of his

12   race?

13       A.    Well, he's still at the agency, for one.

14       Q.    Anything else?

15       A.    Some of the documents that were submitted outline

16   that there was some discussion about discipline, but nothing

17   really occurred.  And that was after the fact, I guess, this

18   whole process started.  I don't have anything in my

19   possession, but there are documents that I have read that

20   outline that.

21       Q.    To your recollection, I mean, we've all got the

22   same documents here.  To your recollection, none of those

23   documents indicate that there was any consideration of

24   Mr. Bessetti's race, is there?

25       A.    Not that I know of.

1    Q.    Now, you said that Mr. Bessetti was in charge of

2  the agency on August 6th.

3    A.    Yes, I left the office on August 3rd or 2nd or

4  whatever, to go on my vacation.  And, normally, when I

5  leave, Brian is in charge of everything that happens with

6  the agency.  And he's supposed to handle it as he's done in

7  the past, since he was employed by me.

8    Q.    And what has that been?  What happens if there's

9  an emergency, what happens if there's a situation; is he

10  supposed to handle it or is he supposed to call you?

11    A.    He's supposed to handle it.

12    Q.    Was there ever a point in time when you left

13  somebody besides Mr. Bessetti in charge of the agency?

14    A.    Not that I'm aware of.

15    Q.    And your standing orders to him were just to

16  handle things.

17    A.    Basically, we meet, we have a staff meeting.  I

18  outline what my time period of vacation is going to be.  You

19  know, let staff know that Brian is going to be in charge and

20  if they have any issues let him know.  If there's something

21  that he can't deal with directly get ahold of one of the

22  board members.  At the time I was going to Canada, so it

23  would have been kind of difficult for him to get ahold of

24  me.

25    Q.    Brian wasn't responsible for establishing any

1    day-to-day policies or procedures for the Center?

2         A.    Policies, practices, procedures are all, as I said

3    before, you know, this agency has an 80-year history.  Those

4    things are already in place, you know.  There was nothing he

5    had to establish.

6         Q.    And he didn't have the authority to hire or fire

7    employees, did he?

8         A.    No.

9         Q.    He wasn't authorized to discipline employees.

10        A.    Depends on what type of discipline you're talking

11   about.

12        Q.    Well, suspension.

13        A.    If there was a suspension, being he wasn't -- in

14   that he was in charge, he would have to take that to the

15   president or the vice president, or just like I would have

16   to do.  I mean, you just don't suspend someone or fire

17   someone without one of the officers knowing.

18        Q.    Okay.  Now, I'm just going to go back to some

19   comments that you made when I was asking you questions about

20   your conversation with Mr. Coleman.  You say that in your

21   business life, you don't talk like that; in your personal

22   life you don't talk like that.  Have you ever used the word

23   "nigger"?

24        A.    In reference to rap music and educating youth on

25   why they shouldn't say that word, possibly, and what the

1    word means. I can't say that it's a thousand percent out of

2    my vocabulary, because when you educate young people on the

3    different things of life, you know, you want to give them

4    background on, you know, those issues and so you have to use

5    that word.

6         Q.    Have you ever used it in a noninstructional or

7    nonhistorical sense?

8         A.    No, I would say, no.

9         Q.    Some kind of personal questions here, but they get

10   to a point later on. Name for me some of your favorite

11   music artists.

12        A.    I guess I don't really have like favorites anymore

13   because I don't listen to music too much. I used to like

14   Prince when I was younger, probably until I graduated.

15   Right now, I like listen to Ashanti or J-Lo or something

16   like that. I like Third Eye Blind.

17        Q.    You're not a rap or hip-hop fan.

18        A.    Not really, because it sends a negative message.

19        Q.    What about comics, do you like Jamie Foxx?

20        A.    I like Jamie Foxx as an actor.

21        Q.    Chris Tucker?

22        A.    I don't really listen to Chris Tucker. I haven't

23   really seen any of his stuff.

24        Q.    Chris Rock?

25        A.    I haven't seen any of his stuff either.

1    Q.    Eddie Murphy?

2    A.    Eddie Murphy when I was younger.  I've watched his

3    last couple of movies with the doctor stuff.

4    Q.    Those were kind of painful, weren't they?

5    A.    Yes.

6    Q.    What about television shows?  Are you familiar

7    with the new show out there based on a comic strip called

8    Boondocks?

9    A.    No.

10    Q.    Favorite authors or poets?

11    A.    Don't really have a favorite, I used to like

12    Danielle Steel.

13    Q.    Whatever your personal tastes and preferences are,

14    would you agree with me that as offensive as the word

15    "nigger' is, it is still a fixture in popular culture?

16    A.    I mean, the rappers, they have that gangster music

17    and the kids -- the hip-hop stuff.  It's to sell clothes,

18    sell sneakers, sell hats, jewelery, the whole bit, to sell

19    albums, it's all a persona.

20    Q.    And people like Dave Chappelle, do you know who

21    Dave Chappelle is?

22    A.    No, who is he?

23    Q.    He's a comedian.  Now, you said you don't listen

24    to Jamie Foxx, but even Eddie Murphy back in the day as it

25    were.  Back when you and I were just out of high school and

1   in college.  He used the word "nigger" in some of his

2   routines, didn't he?

3        A.    I watched Eddie Murphy as an actor in like,

4   Trading Places and stuff like that.  I really didn't get in

5   to watching the stand-up comics a lot.

6        Q.    Okay.  You are familiar though -- I mean, if

7   you're educating kids too.

8        A.    Yes, I'm familiar with the type of dialogue that

9   they put out there to their audiences.

10        Q.    Would you say -- and I don't mean to imply this as

11   for you, okay.  But would you say that as a general matter

12   with the kids that you're dealing with, and even some of the

13   adults that you're dealing with, that there's a perception

14   that the use of the word "nigger" is different if it's

15   between two African Americans as opposed to an African

16   American and somebody of a different racial background?

17        A.    I don't know.  I mean, there's a thin line there

18   and you can't tread on that line.

19        Q.    But people today could use the word for

20   describing --

21        A.    People today can, I don't.

22        Q.    I understand you don't; I understand you don't.

23   I'm asking, and again, I'm not suggesting that any of this

24   reflects you, James Sherrod.

25        A.    Okay.

1        MS. BENSON:    I think he's answered the question.

2        You've gone through this line of questioning and

3        he's pretty much indicated that he's taught on the

4        use of that word and its negative impact and why

5        it shouldn't be used.  And I think he's also

6        answered the question insofar as what he thinks

7        about popular culture.

8    Q.    What context have you seen the word being used in?

9    A.    Rap music, videos.

10    Q.    Casual conversation.

11    A.    Among youth, possibly, you know, mostly that.

12    Q.    By youth, how old was Sean Coleman; do you know?

13    A.    How old is Sean?

14    Q.    Yes.

15    A.    I don't know.  He went to school after me, so he's

16    probably like 36, 32, I don't know, somewhere around there.

17    He was a few years after me at Prep.

18    Q.    Did you ever spend any time with him socially?

19    A.    No.

20    Q.    Do you know what any of his tastes are, in terms

21    of music, comics, literature, or anything like that?

22    A.    No, I didn't know Sean on a personal level.

23    Q.    Okay.  Talking about policies and what existed at

24    the agency and what did not.  Was there a policy in place, a

25    written policy in place for field trips?

1    A.    Well, if you're looking for a written document

2    you'd have to go search the archives. But most of the staff

3    that was under my direction and, you know, as I said, I'm

4    not the first executive director of the agency. I came at a

5    time where there was a lot of stuff going on and, you know,

6    I took my direction from the board. And I sort of tried to,

7    you come in and keep going with what was there.

8    Q.    Okay.

9    A.    And as I've said earlier, if the board didn't ask

10    me to change anything, I didn't change anything. If they

11    came to me and said we want you to create this, then I would

12    put it together and submit it to them. There's an 80-year

13    history, this isn't the first time that policies and

14    practices and procedures have been in place for field trips

15    or anything of that nature.

16          I did, however, meet with my staff on a regular

17    basis to discuss and inform them how I wanted them to

18    conduct the activities. And part of that procedure included

19    for any child to come into the program, there had to be a

20    registration form. I didn't put a policy in place to say,

21    this is what the registration form is going to look like,

22    this is how it's going to be filled out, and this is when

23    we're going to have it back in place. Those things were

24    already in place.

25    Q.    Okay.

1      A.      But staff knew that any child coming into the

2    program had to have an enrollment form signed by the

3    parents, which included like four or five documents and

4    things of that nature.  Staff knew that whenever they were

5    going on a field trip they had to have a sign-in sheet for

6    each activity.  And they had to make sure that the kids

7    going on were the kids coming back, you know.  And that was

8    how things operated, basically.

9            We've taken over -- since I was employed in

10   November of 1998, up until August 2002, there's probably

11   been over two, 300 field trips taken in town and out of

12   town, as far as D.C. and Virginia.  So staff was well aware

13   of what the policy and practices and procedures were as far

14   as what was dictated them to do to ensure the safety of the

15   children.

16     Q.      But you weren't there personally to do the head

17   count when they go on the bus or when they got on the bus.

18     A.      I was on vacation.

19     Q.      No, I'm talking any time.

20     A.      I did spot checks here and there.

21     Q.      But it wasn't in an every field trip thing whether

22   it was in town or --

23     A.      No, it wasn't an every day thing, no.

24     Q.      And in your opinion, were those policies and your

25   instructions followed by the people who were at the field

1    trip and handling the field trip on August 6th of 2002?

2         A.    From the interviews that were conducted by Sean

3    Coleman and myself, the people interviewed openly admitted

4    that they didn't follow that practice.

5         Q.    Okay.

6         A.    Except Derrick Johnson, he did say that he did a

7    head count for his kids and he made sure they were all there

8    when he left.

9         Q.    Now, newspaper articles.  One of the things that

10   has come up in this case is a question of several newspaper

11   articles that appeared in the Erie Times; you're familiar

12   with those?

13        A.    Uh-huh.

14        Q.    You know Kevin Flowers.

15        A.    Yes, I know Kevin Flowers.

16        Q.    Did you contact him to talk about your situation

17   at Booker T. Washington Center in August or September of

18   2002?

19        A.    Kevin Flowers, for some reason, contacted me daily

20   from August -- I'd say August 9th, August 8th.  Not daily,

21   maybe three or four times a week.  But Kevin Flowers

22   contacted me on several occasions asking me what's going on

23   with the agency and me.  And on several occasions, I told

24   him I didn't know, you'd have to talk to someone at the

25   agency.  And after he, I guess, did an article in the paper

1    and got his information, that information came out in the

2    newspaper as of what was going on, you know. I've seen

3    Kevin, I've known Kevin since he was at McDowell High

4    School. He's been involved at the Erie Times for a number

5    of years, so I do know him.

6        Q.    So you're saying that you never gave Kevin Flowers

7    an interview.

8        A.    I did give Kevin Flowers an interview, yes.

9        Q.    Okay.

10        A.    I didn't know that was your question.

11        Q.    Well, actually, it hadn't been. I was leading up

12    to it, but you kind of jumped ahead a little bit.

13        A.    I sat down with Mr. Flowers on August -- or

14    September 12th maybe.

15        Q.    Okay.

16        A.    And he asked me some questions related to the

17    previous story that I believe he had written.

18        Q.    Now, the previous story, I don't have a copy of

19    the actual newspaper article. Why don't you take a look at

20    that, this is the story of September 5th. Take a minute and

21    read through that. You didn't provide any information for

22    this article, September 5th of 2002.

23        A.    No.

24        Q.    And as the circled section -- I hadn't circled it

25    necessarily for your deposition, those were for my own

1    notes. But what's the indication in this article as to what

2    information Booker T. Washington Center contributed?

3         A.    It says, we can offer no comment at this time on

4    our personnel policies and practices, confidential rights --

5    from this here, looking at this, it's stating that it's

6    under review and investigation. So I would say they didn't

7    give too much information.

8         Q.    Do you feel that the board or the Booker T.

9    Washington Center is responsible for the publication of that

10   article?

11              MS. BENSON:    Well, I think the article speaks for

12              itself. And we'll have to find out from the

13              article who in fact contacted Erie Times and gave

14              them that information, it speaks for itself. What

15              we know is Mr. Sherrod didn't, he didn't give them

16              any information, he was not contacted.

17              MR. MARTINUCCI:    If you're going to pose an

18              objection, why don't you indicate so.

19              MS. BENSON:    I object to the question.

20              MR. MARTINUCCI:    And what's the basis of the

21              objection?

22              MS. BENSON:    As I understand your questioning --

23              I'm certainly willing to accept a correction from

24              you. But as I understand, you're wondering

25              whether or not Mr. Sherrod was responsible for

1    that article.

2    MR. MARTINUCCI:    Well, I asked him that question

3    and he pretty clearly answered that and then I

4    asked him another question.  Let me rephrase that

5    question, maybe that will clear things up.

6    Q.    Do you have any information that would suggest

7    that anyone on the board or anyone at the Booker T.

8    Washington Center was responsible for the publication of

9    that article?

10    MS. BENSON:    And I object to that.  Mr. Sherrod

11    can't testify as to who -- other than reading that

12    article.  Obviously, somebody had to tell the news

13    media that he was not there.  And so the

14    presumption is that it came from the board itself.

15    MR. MARTINUCCI:    With all due respect, he could

16    have simply said I don't know and that would have

17    been an accurate answer to the question.  You

18    don't have to testify for him.

19    MS. BENSON:    I'm not testifying for him.

20    MR. MARTINUCCI:    That's exactly what you did

21    because that was not an objection.

22    MS. BENSON:    I think the -- my objection is the

23    article speaks for itself.

24    MR. MARTINUCCI:    I'm not asking about anything in

25    the article.  I'm asking if he knows who's

1             responsible for the publication of it.

2        Q.     Do you know?

3        A.     I don't know who's responsible for the

4 publication.

5        Q.     Okay. That's fine, that's all I needed you to

6 say.

7             MS. BENSON:    The Erie Times did, they printed it.

8        A.     It says Erie Times on it.

9        Q.     But you don't know who got in touch with Kevin

10 Flowers.

11        A.     No.

12        Q.     You, yourself, don't have any information to

13 suggest that it was a member of the board or anybody else at

14 the Booker T. Washington Center that contacted Kevin and

15 said, hey, this is a story you ought to follow.

16        A.     Do I have any information that says that they

17 contacted him and said that?

18        Q.     Yes.

19        A.     Well, it's a press release. So I would think that

20 someone from the board contacted him, there's a general

21 statement there. That statement just wasn't, you know, off

22 the top of someone's head. I mean, it's clearly one of

23 those model statements that's utilized in situations.

24        Q.     Do you think that somebody just puts that out

25 there in a vacuum?

1    A.    No, I'm thinking that the board of directors had a

2  meeting, and here's the statement that we're going to

3  release when we get a phone call.

4    Q.    Okay.  Thank you.  Now, the next article,

5  September 13th of 2002; can you take some time to look at

6  that.  Are you familiar with that article?

7    A.    Yes.

8    Q.    The statements attributed to you in that article;

9  are they correct?

10    MS. BENSON:    Which statements are you referring

11    to.  There are several statements.

12    MR. MARTINUCCI:    I'm referring to all of them; are

13    they correct?

14    MS. BENSON:    I think that maybe we should go one

15    by one and that would be better for him in terms

16    of answering your question.

17    Q.    Have you had a chance to read the article?

18    A.    Yes.

19    Q.    Have you reviewed the statements that are

20  attributed to you in there as quotes?

21    A.    Yes, I reviewed them.

22    Q.    Are those statements correct?

23    A.    I wouldn't say a 100 percent.

24    Q.    Which ones are not?

25    A.    First statement, "I didn't do anything wrong or

1    anything related to mishandling the agency, said Sherrod.

2    Nobody on the board is claiming that I did anything wrong,

3    so they have --

4           Q.    Why don't you go a little slower.

5           A.    Sorry.

6           Q.    And just while you're doing that, why don't you

7    make reference to the paragraph number?

8           A.    Paragraph 3, second sentence, "Nobody on the board

9    is claiming that I did anything wrong, they've just said

10   they want to go in a different direction." I think that

11   whoever wrote that was paraphrasing what my statement was.

12          Q.    What was your statement?

13          A.    There's some more information that was related to

14   that statement there that he has in quotes. And I can't be

15   a 100 percent positive on what the detail was, but I would

16   have gone into more explanation if I was going to say

17   something like that. There's something missing, I don't

18   know what it is.

19          Q.    Okay.

20          A.    Second page, the fifth section on that page. It

21   says, "Sherrod said he is scheduled to meet Monday with the

22   board's executive committee and expects to discuss how to

23   resolve all of this amicably, including a severance

24   package." I don't know where that amicably came from.

25          Q.    But that wasn't the word you used.

1     A.     I don't think that that's a word that I would

2   normally use.

3     Q.     Okay.

4     A.     I guess the rest looks okay.

5            MR. MARTINUCCI:    We'll mark that as Defendant's 1.

6            I think we already all have copies, but you'll get

7            another copy in the transcript.

8            (Sherrod Exhibit No. 1 marked for identification.)

9     Q.     Again, in that article --

10    A.     And I'm just looking at the quotes that are in

11  there.  I didn't look at the detail because I can't attest

12  to any of the detail that's in there.

13    Q.     I'm not looking for you to attest to anything

14  other than what you've said, okay.

15           MS. BENSON:    Let me just make sure.  Are you

16           saying that you're only dealing with those

17           statements attributed to you in quotation marks?

18           MR. SHERROD:    Yes.

19    Q.     Is there anything attributed to you that's not in

20  quotation that you believe is inaccurate?  Take your time,

21  we've got plenty, we're going through this at a pretty good

22  clip right now.

23    A.     There's a lot of -- when a person writes

24  something, they put their flavor into it.

25    Q.     Absolutely.

1       A.     And the writer here, Kevin Flowers, has put his

2    flavor in here.  And I don't want his flavor to be

3    attributed to me.

4       Q.     Okay.

5       A.     And here on the second line, now he's talking and

6    claiming the Center's board of directors hasn't explained

7    why he's out.  That's sort of a little dramatic.

8            MR. MARTINUCCI:    While you're reading that.  Off

9            the record.

10           (Off-record discussion held.)

11      Q.     Mr. Sherrod, have you had a chance to go through

12    the article?

13      A.     Yes, I did.

14      Q.     Okay.

15      A.     I'll bring a couple of things to your attention.

16    In relation to how this was put together or how the

17    information was gained, okay.  It says the girl walked more

18    than 5 miles from Tinseltown, I don't know nothing about

19    that.

20      Q.     Right.

21      A.     Also on Page 2, it says that I changed my mind

22    about speaking out after a statement was released because it

23    left a lot of questions unanswered.  I never was in the

24    mindset of not speaking out, I was reserving that.  It

25    wasn't like, well, they're doing this, so now I'm going to

1    do this; it wasn't like that.

2        Q.    Okay.

3        A.    It says on here that the board refused to publicly

4    discuss why I was asked to resign.  And over here it says,

5    "Coleman, asked Thursday about the meeting and said, the

6    board is working out something that is very beneficial."  So

7    they never spoke out, but yet they spoke out.

8        Q.    Okay.

9        A.    See what I'm saying?

10        Q.    I understand.

11        A.    And it says on here on No. 4, "Sherrod had

12    originally agreed to resign rather than being fired because

13    a firing could make it tougher to find a job.  Sherrod has

14    also said he is still waiting for a letter from the board

15    outlining why they want to make a change."  Yes, I did say

16    to him I want to know why they want to make a change and why

17    I haven't received any information related to me not being

18    at the agency.

19        Q.    Okay.  You did indicate to him though that you had

20    resigned and they know you changed your mind.

21        A.    No, I didn't indicate to him that I had resigned.

22    I said that they asked me to resign.

23        Q.    It says, "Sherrod said he originally agreed to

24    resign rather than be fired, because a firing could make it

25    tougher to find another job."  Did you make any statement

1  similar to that to Kevin Flowers?

2       A.    I may have told Kevin that I looked at the

3  possibility of resigning instead of being fired.  Because

4  when you get fired people don't want to hire you.

5       Q.    Did you ever make any statement, to either the

6  board as a whole or anyone on the board of directors of the

7  Booker T. Washington Center, in August of 2002, that you

8  were resigning?

9       A.    There were various meetings and informal meetings,

10  related to me resigning, with board members, many board

11  members and individual board members.  And as you know, I

12  must not have resigned, I got a termination letter firing

13  me.

14       Q.    That was over a month later, right?

15       A.    I received the letter September 26th, 27th.  Prior

16  to receiving that letter, I had been in discussion with

17  members of the board of directors on various levels about

18  retaining some involvement.  They wanted me to be involved

19  in assisting them until the end of the year, but they didn't

20  want me as executive director, you know.

21            And at one point, they also said that they were

22  going to look at the executive directorship.  But in the end

23  they sent that letter out, September 27th, after our

24  meeting, which they were supposed to go back to the board

25  and discuss what my attorney and I had wanted.

1          Q.      Okay.  Just to kind of bring the question back

2    into focus here.  During any of these meetings, any of these

3    conversations with any board members, where it was a group,

4    whether as the board, whether as group of one or more, or

5    whether as individuals, did you ever tell any member of the

6    board of directors, "If they want my resignation they can

7    have it"?

8          A.      It wasn't to that effect.  Like I said, we had

9    various discussions.  I had discussions with Sean Coleman,

10   him  coming to my house, telling me I need to resign and get

11   this over with.  I had telephone conversations with the full

12   board in conference.  I had conversations with Mr. Jeffress,

13   Mr. Rege O'Neil, with Mr. Paul Gambill.  At no time did I

14   submit my resignation.  I also sent a letter out to them

15   clarifying that to them, I think the letter was dated August

16   16th, 2002, after the August 12th meeting, so that it was

17   clear to them that I did not resign.

18         Q.      Why would you feel the need to submit that letter?

19         A.      Because I was -- I received a telephone call from

20   an organization that we dealt with on a regular basis.  And

21   they said to me, what's going on, because I hear Anita is

22   the executive director now.

23         Q.      And who was that?

24         A.      If I remember correctly, I think it was someone

25   from HANDS, Housing and Neighborhood Development Services.

1      Q.     Do you remember who it was from HANDS, was it

2  Chuck?

3      A.     I'm not positive who it was, but it was someone

4  from HANDS, because I had a good relationship with them;

5  they were a part of our development process for housing.

6      Q.     At any rate, there was --

7      A.     Conversation about resignation.

8      Q.     Yes.

9      A.     There was conversation about being fired too.

10  There were conversations about me coming back and being

11  employed as executive director; although, I hadn't left.

12      Q.     Okay.  Let me show you what I'll ask be marked as

13  Defendant's 2 in this.  Can you go down that list and tell

14  me if you believe that's an accurate representation of the

15  membership of the board of directors for the Booker T.

16  Washington Center and its racial composition for the period

17  indicated, which I believe, January through December of

18  2002?

19             (Sherrod Exhibit No. 2 marked for identification.)

20      A.     Can you restate your question again.

21      Q.     Sure.  After you've had a chance to review that

22  document, can you tell me, is it your understanding, your

23  recollection, that that document is an accurate reflection

24  of the composition of the board of directors of the Booker

25  T. Washington Center for the period from January 1 --

1  A.    2002?

2  Q.    Yes.  January 1, 2002 through December 31, 2002.

3        MS. BENSON:    And let me just object.  Because

4        Mr. Sherrod does not have access to the records of

5        the Booker T. Washington Center here.  He would

6        purely be responding based on memory.  Booker T.

7        Washington is in a better position to provide us

8        with a listing of who was on the board, at that

9        time, and whether that is a complete and full and

10       accurate list of board members.

11       MR. MARTINUCCI:    It's noted.

12  A.    For January 2002 to December 2002, this listing is

13  for, I can say that, from January 2002 until August 6th,

14  2002, that the members listed on here were on the roll as

15  board members, whether active or inactive.

16  Q.    Okay.  Very good.  Do you recall who was active

17  and who was inactive?

18  A.    Active based on board policies or based on

19  attendance at meetings?

20  Q.    Who was inactive in terms of attendance at

21  meetings, why don't we go with that, hopefully it will be a

22  smaller number.

23  A.    James Hamilton, Cliffton Anderson, Joe Fries,

24  Anthony Ross.  John Williams looks like an addition to this

25  list.  I don't recall any John Williams.

1      Q.     Okay.

2      A.     Charolett Gavin.

3      Q.     Those were inactive.

4      A.     As from what I would call inactive.

5      Q.     Just looking down the entire list. I just want to

6 confirm, James Hamilton; you knew him?

7      A.     Yes.

8      Q.     African American.

9      A.     Yes.

10     Q.     Sean Coleman, you knew him.

11     A.     Yes.

12     Q.     African American.

13     A.     I knew those individuals as being on the board of

14 directors from January, 2002 to August, 2002, not John

15 Williams on there.

16     Q.     Well, I just -- and I guess you're shortcutting my

17 questions for me, which is great. But --

18     A.     I apologize.

19     Q.     No, it actually will save time. I just want to be

20 clear, when you're saying that, in terms of John Williams, I

21 understand you don't know him from Adam.

22     A.     Well, I know who he is, but I don't know him as

23 being a board member between January of 2002 and August of

24 2002.

25     Q.     Okay. I'm not saying this in terms of like

1    socially interacting with or best friends with, but you

2    personally know all of these people.

3              MS. BENSON:    Do you mean in his capacity as the

4              director of the Booker T. Washington Center?

5              MR. MARTINUCCI:    I'm saying that, if he was in a

6              room he would know who this individual was.

7         A.    Cliffton Anderson, I couldn't pick him out from a

8    lineup.

9         Q.    That's what I was looking for.  Because I want to

10   be clear, Mr. Sherrod, over on the race column, to the

11   extent that you're able to tell me whether or not that's

12   accurate, you tell me that it's accurate.  And I understand

13   that there might be a couple of people on there that you

14   can't.

15        A.    Yes, this is accurate.  I know that Clifton

16   Anderson is a male and he's black.  I met him one time.

17        Q.    Okay.  Like you said, you couldn't pick him out of

18   a crowded room.

19        A.    I know that John Williams is male and he's black

20   because I know who he is.

21        Q.    But you don't recall him as being on the board of

22   directors.

23        A.    No.

24        Q.    That's fine.  And I'm going to ask you to take a

25   look at, and if you can identify, what I'm going to show

1    you, and ask be marked as Defendant's Exhibit 3.

2                  (Sherrod Exhibit No. 3 marked for identification.)

3                  MS. BENSON:     Do you intend to mark this as an

4           exhibit?

5                  MR. MARTINUCCI:     That's right.  This is

6           Defendant's 2.

7           A.     I think I have copy of this in my bag, can I get

8    it and make sure it's the same?

9           Q.     If you want to compare that's fine, absolutely.

10          A.     And your question.

11          Q.     My question is, if you would, review and, if you

12   can, identify the document for me; tell me what it is.

13          A.     This document is a job description that was put

14   together on 8/11/1998.  It references executive director and

15   the immediate supervisor being the board of directors.

16          Q.     Is that the job description that you were given?

17          A.     I believe, I can't be 100 percent positive.

18          Q.     You have copy of it?

19          A.     This is the copy that I got out of the information

20   that was submitted to the EEOC.

21                 MS. BENSON:     Submitted by whom?

22                 MR. SHERROD:     Submitted by --

23                 MR. MARTINUCCI:     Booker T. Washington or by your

24          attorney?

25                 MR. SHERROD:     I'm not sure who it was submitted

1    by, I'm not sure.

2    MS. BENSON:    The document came out of a file

3    that --

4    MR. SHERROD:    It came out of the package.

5    Q.    And this, I'll ask be marked as Defendant's

6    Exhibit 4, will you take a look at that.  Do you recognize

7    the document?

8    (Sherrod Exhibit No. 4 marked for identification.)

9    A.    Yes.

10   Q.    And can you tell us what that is.

11   A.    This is a letter that I received from William

12   Sesler after I met with him to discuss becoming the

13   executive director of the Booker T. Washington Center.

14   Q.    You received a letter from Bill Sesler or from

15   Johnny Johnson?

16   A.    From Bill Sessler.

17   Q.    Was it hand delivered to you?

18   A.    I believe he gave it to me at his office.

19   Q.    Okay.  Very good.  The letter is signed by Johnny

20   Johnson, though, correct?

21   A.    Yes, it is.  I believe Mr. Sesler was the one that

22   was in charge of things.

23   Q.    Okay.  Now, we're almost done here, just a couple

24   of housekeeping questions.  What documents did you review

25   before coming to today's deposition?

53

1          A.      I reviewed my file that I received from the EEOC

2    which we submitted a copy to you, I believe.

3          Q.      Exactly.

4          A.      Just to refresh my memory on some dates, and stuff

5    of that nature, to know exactly what was back and forth in

6    the file.

7          Q.      Okay.  Anything else?

8          A.      And you know I reviewed this stuff because I have

9    copies of it.

10          Q.      Absolutely.

11          A.      Which is the job description and engagement

12    letter.

13          Q.      With regard to the deposition, the documents that

14    you reviewed, did you review any transcripts of anybody

15    else's testimony?

16          A.      No, I haven't seen any transcripts.

17          Q.      Other than your attorney and your wife, did you

18    talk to anybody about your preparation for testifying here

19    today?

20          A.      I just reviewed documents.  My wife and my son are

21    in the house, so they asked me what I'm doing.

22          Q.      Like I said, I don't need to know about your

23    conversations with your family.  I'm not going to drag them

24    in for a deposition.

25          A.      My supervisor at worked asked me did I need a

1    whole day off, because I had asked her for a day off to do

2    my deposition. I told her that I was going to do a

3    deposition and she said I only had to take a half day

4    because I had flextime.

5        Q.    But you didn't talk to her about the substance of

6    what you were going to be talking about today?

7        A.    No, she didn't want to know what it was all about.

8            MR. MARTINUCCI:    For today, Mr. Sherrod, granted,

9            I'll certainly follow up on anything that your

10           attorney asks. But, for today and for right now,

11           those are all of the questions that I have for

12           you. And, again, that's subject to calling you

13           back if we need to talk about damages and other

14           aspects of the case.

15           MR. SHERROD:    Okay.

16           MS. BENSON:    What I would like to do, Art, if it's

17           okay with you is just take a few minutes to go

18           over my notes.

19

20                    CROSS-EXAMINATION

21   BY MS. BENSON:

22

23       Q.    Let me go back, some of my questions deal with

24   just putting this in context. You previously testified that

25   you were on vacation when this incident occurred. Tell us

1  the time period that you were on vacation.

2      A.    My last day at work was August 2nd, I believe,

3  prior to this incident. I'm saying that because I had a

4  meeting with Mr. Coleman in my office and we discussed

5  different stuff that was going on at the agency and when I

6  would be coming back. And I also asked him if I could get

7  my check early, I remember that.

8      Q.    So you believe that you went on vacation around

9  August 2nd of '02.

10      A.    Yes.

11      Q.    And prior to going on vacation you had a meeting

12  with Mr. Coleman.

13      A.    Yes.

14      Q.    Now, among the things that you discussed with

15  Mr. Coleman were, you said, your check and things happening

16  in the agency.

17      A.    Yes.

18      Q.    Did you discuss anything else with Mr. Coleman?

19      A.    I told him if he needed anything that Brian was in

20  charge and he could go to Brian and talk to Brian about it.

21  I told him that I had had a meeting with my staff and they

22  knew that I would be on vacation next week. Just the

23  general things that we normally cover. He asked me some

24  questions related to programs and other things.

25      Q.    Did Mr. Coleman know the period of time you would

1   be away from the office?

2        A.     Yes.

3        Q.     And what period of time did he know you would be

4   away?

5        A.     August 5th through August 9th, I believe, because

6   it was a week.

7        Q.     And why was Brian Bessetti in charge of the

8   agency?

9        A.     Brian was in charge of the agency every time I

10  left, because that's what the board had directed me to put

11  him in charge when I left the agency.  Because he was the

12  finance director, he had all -- you can't put someone else

13  in charge because of that.

14       Q.     So he was placed in charge at the board's

15  direction.

16       A.     Yes.

17       Q.     Was it for any period of time?

18       A.     Whenever I was out.  Even like -- if there was

19  like a phone call that, say from a funder that they needed

20  to talk to someone when I wasn't at the agency and it

21  couldn't be patch through to me somehow, Brian would take

22  it.  So I would say on a regular basis.

23       Q.     Was he in charge also for extended period of

24  absences?

25       A.     Yes, whenever I went out of town to trainings or

1    conferences, Brian was always in charge.

2         Q.     Now, I don't know if you identified Brian's race

3    or ethnic identity, but can you state that for the record.

4         A.     Brian is a white male, he's like 38, 40 years old.

5         Q.     Now, the alleged incident involving the little

6    girl occurred on what date?

7         A.     August 6th, I believe, 2002.

8         Q.     And at what point did you learn of this alleged

9    incident?

10        A.     Let's see, I got back to the house at about, I

11   want to say 8:00 or 9:00.

12        Q.     A.m., p.m.?

13        A.     P.m., the date of the alleged incident.  And

14   there was just a general message on my machine that

15   something had occurred at work, but it was all taken care of

16   and I wasn't to worry about it and they would see me after

17   my vacation.

18        Q.     And do you know who left this message?

19        A.     Randy Davis.

20        Q.     And it was just a general message.

21        A.     Yes.

22        Q.     It didn't tell you what had occurred.

23        A.     Not in specifics, no.

24        Q.     So you said you got back to your house, were you

25   still then -- you had previously testified that you were

1    departing for Canada.  When were you scheduled to depart for

2    Canada?

3          A.    Well, my wife had decided that we weren't going to

4    leave the day we were supposed to leave, because she wanted

5    to do some shopping to get some stuff to wear up there

6    before we left, so that kicked us back another day.  So we

7    were supposed to leave on that Monday, but we didn't leave

8    on that Monday.

9          Q.    So when you received this telephone message in the

10   evening you were still here in Erie, Pennsylvania.

11         A.    Yes.

12         Q.    Can you remember when you had a conversation

13   with -- let me rephrase the question.  Did you have a

14   conversation with any other staff person -- with any staff

15   person after 8:00 that evening?

16         A.    After 8:00 that evening, the only person I spoke

17   to was Sean Coleman.

18         Q.    Okay.  And what time did you first speak with

19   Mr. Coleman?

20         A.    I believe my first conversation with Mr. Coleman

21   occurred around 10:30, 10:45 p.m.

22         Q.    And you had a second conversation with him.

23         A.    Yes, he called me back like a half an hour later

24   at my home.

25         Q.    Now, you've previously testified that Mr. Coleman

1    used the "N" word on three separate occasions with you.

2         A.    Right.

3         Q.    Going back to the first one, when was that?

4         A.    That was on the telephone.

5         Q.    On what day?

6         A.    August 6th, the date of the alleged incident.

7         Q.    And was that in the first conversation or the

8    second conversation?

9         A.    It was in the first conversation.  I can't recall

10   if he did use it in the second conversation, but I do have

11   some notes from our conversation that I could check and see,

12   if I can find them.

13        Q.    Well, you said that he used the "N" word again on

14   a second occasion, when was that?

15        A.    That was August 7th, the day that we conducted the

16   interviews at the agency.

17        Q.    Was that the next day after your phone call with

18   him?

19        A.    Yes, the next day.

20        Q.    Now, let me ask you this question.  Based on your

21   testimony, it appears that Mr. Coleman was far more active

22   in agency business than the board president; tell us why?

23             MR. MARTINUCCI:    I'm going to object, because it

24             calls for speculation.

25             MS. BENSON:    Okay.

1          MR. MARTINUCCI:    You can go ahead and answer the

2          question, that's just on the record.

3     A.    Mr. Hamilton who was the board president.

4     Q.    What's Mr. Hamilton's first name?

5     A.    James Hamilton, an African American male was the

6     board president, but wasn't active, I wouldn't say active as

7     president.

8     Q.    When did Mr. Hamilton become board president?

9     A.    I believe he became board president January, 2002.

10    He was appointed December, 2001.

11    Q.    What do you mean appointed?

12    A.    That's where they have the votes and everything

13    and pick officers for the year and bring on new board

14    members at the annual meeting.

15    Q.    So he officially assumed his position as board

16    president January of 2002.

17    A.    Yes.

18    Q.    And when did Mr. Coleman become board vice

19    president?

20    A.    I believe it was at the same time period, because

21    I know we had a new slate of officers.  I'd have to look at

22    the board minutes or director or something to see to compare

23    it to 2001 and 2002, to be positive.

24    Q.    Now, you've previously described Mr. Charles

25    Faulkerson as being in your office on a daily basis.  And I

1    believe you testified that he had previously served as board

2    president.

3          A.    Yes.

4          Q.    When did Mr. Faulkerson serve as board president?

5          A.    I believe his term of board presidency was 1999 --

6    no, 2000 was the first year and 2001 would have been his

7    second year, I believe.  But, again, if I could get, if they

8    had it available, the board listings for those years.

9          Q.    What's the length of term for a board officer?

10         A.    One year.

11         Q.    And then they can stand for reelection.

12         A.    Yes.

13         Q.    Now, describe for us Mr. Coleman's role in

14   carrying out his responsibilities as board vice president.

15         A.    Well, according to the -- I guess, it's the

16   bylaws, whenever the board president is inactive or not

17   available, or for some reason not in attendance or has

18   been -- the vice president assumes the role of the

19   president.  Mr. Coleman had assumed the role of the

20   president prior to August, 2002, so it wasn't just August,

21   2002.

22         Q.    Had he assumed it almost from the beginning of

23   Mr. Hamilton's tenure as board president in January of 2002?

24         A.    I can't say for positive that he assumed that role

25   prior to April.  Because I know that during the latter part

1    of April, May, and June that we had meetings in which he

2    acted in that capacity.

3         Q.    He, meaning Mr. Coleman.

4         A.    Mr. Coleman, right.

5         Q.    Now, did Mr. Coleman show up at your office on a

6    daily basis?

7         A.    Yes, Mr. Coleman showed up almost on a daily basis

8    too.  I mean, yes, he did.

9         Q.    And why would he show up there daily?

10        A.    To see what's going on.  Come in and do some of

11   his work.  Come in and sit in my office and tell me things

12   and ask me questions about programs and related information

13   about the agency.

14        Q.    Did he also want you to perform in a certain way?

15        A.    Sean wanted things the way he wanted things and he

16   wanted me to do as he suggested or told me to do, basically.

17   Like for instance, there were several occasions where he

18   called me at the office to come and pick him up and

19   transport him places.  He's the board president, what am I

20   to say.

21        Q.    And did you?

22        A.    Yes.  I had taken him to his work three or four

23   times.  I had taken him a number of places.

24        Q.    Now, prior to coming to the Booker T. Washington

25   Center in November of '98, were you employed?

1     A.    Yes, I was employed at Bayfront Nato Martin Luther

2    King Center.

3     Q.    And what was your position there?

4     A.    Director of operations.

5     Q.    And just very briefly, tell us what the Bayfront

6    Nato Martin Luther King Center does or is?

7     A.    It's a social service, nonprofit agency that

8    provides services to low income individuals in the Erie

9    community.

10     Q.    And just for the record, describe for us what the

11    Booker T. Washington Center is?

12     A.    The Booker T. Washington Center is a social

13    service agency that provides social services to the low

14    income individuals, similar to the Martin Luther King Center

15    and the John F. Kennedy Center.

16     Q.    Are the programs that -- when you were at the

17    Booker T. Washington Center, were the programs that were

18    there, or that you instituted, similar to those at the

19    Martin Luther King Center?

20     A.    There were similar programs.  Youth recreation,

21    housing, food pantry.  But the Martin Luther King Center had

22    a dance program at the time and we didn't have a dance

23    program.  We both had football teams.

24     Q.    Now, how long have you been in the social service

25    field?

1    A.    I started working in the social service field in

2  1990, so that would be 15 years, a little more than 15

3  years.

4    Q.    When you went to the Booker T. Washington Center

5  you said you were given a letter of engagement. What were

6  your expectations about how long your tenure might last?

7    A.    As long as I received positive ratings I would be

8  employed as executive director.

9    Q.    And calling your attention specifically to August

10  of 2002. Did you have a positive rating from the Center

11  with regard to your performance?

12    A.    Yes, and I also received a raise.

13    Q.    And when did you receive that raise?

14    A.    Shortly after the evaluation took place. I want

15  to say I got evaluated in February or March.

16    Q.    Of 2002?

17    A.    2002.

18    Q.    Now, when you went on vacation, specifically, I'm

19  calling you to August of 2002, had any board members told

20  you that you were going to be fired for failure to perform?

21  I'm taking you to August of 2002.

22    A.    Prior to August of 2002?

23    Q.    No. When you went on vacation in August -- let me

24  reword it. August 2nd, 2002, you were on vacation. In that

25  meeting with Mr. Coleman, did Mr. Coleman tell you that you

1    were going to be fired because of a failure to perform?

2         A.    No.

3         Q.    Mr. Coleman expected you to return back to your

4    job after your vacation.

5         A.    Yes.

6         Q.    Now, after you spoke with Mr. Coleman on the night

7    of August the 6th, 2002, what if anything, had you decided

8    to do with regard to the alleged incident of August the 6th?

9         A.    Well, after we had our conversation, I told him I

10   was going to go in the morning and meet with those staff

11   involved to find out what exactly happened and start an

12   investigation into the matter.

13        Q.    Had you planned to do anything else other than

14   meet with the staff?

15        A.    I hadn't planned to do anything aside from meeting

16   with them and trying to compel some information that would

17   provide me with answers.

18        Q.    Was there anyone else that you expected to talk

19   to, other than staff?

20        A.    Yes, I wanted to mainly retrace what had occurred

21   that day, on August 6th, from the time they left the agency

22   to the time they got to the movie theater and back to the

23   agency.  And also talk to -- there was some thought that a

24   few people had seen the girl walking down Peach Street and

25   she had stopped at several places.  I had a hard time,

1    myself, believing that a kid, age 7, would walk from

2    Millcreek Mall 6 down Peach Street, all the way down to the

3    inner city, safely. I didn't believe it, so I wanted to

4    retrace those steps and speak with the people at the movie

5    theater and along that route.

6         Q.    You said earlier that you wanted to make sure you

7    had done a thorough investigation. Was it your intent to

8    speak with the little girl and her mother?

9         A.    Yes, it was my intent. Mr. Coleman said I didn't

10    need to because he had already spoke with them.

11         Q.    And when did he tell you he had spoken with them?

12         A.    When he called me back, he said -- the first time

13    he called me he said he didn't need to contact the -- he

14    asked me if I had the phone number of the people. And I'm

15    like, I don't have any phone numbers, they're at the agency,

16    I'm at home. And he said, well, I'll get the number, don't

17    do anything, I'll get the number and I'll take care of it.

18    And he called me back and he said he got in contact with

19    Paul Gambill, Charolett, not Charolett, Claudette McAdory.

20    And he was on his way over to talk to, I guess her name was

21    Valerie Hughes.

22         Q.    At 11:00 at night?

23         A.    Yes.

24         Q.    Now, to your knowledge, is Mr. Coleman related to

25    Valerie Hughes?

1       A.      It's my understanding that he is related to the
2   Hughes.
3       Q.      Did he disclose that information to you on August
4   the 6th, 2002?
5       A.      No.
6       Q.      Now, you've testified that Mr. Coleman used the
7   "N" word at the initial conversation with you on August the
8   6th, 2002, when you showed up on August the 7th to begin
9   your investigation.  Tell us the circumstances in which he
10  used the "N" word at the Booker T. Washington Center on the
11  morning of August the 7th, 2002.
12      A.      It was in the same context that, you know, all
13  them F'ing niggers should be fired.  And then, I guess,
14  after we conducted the interviews it was even more -- he
15  used it more strongly, to say that they all should be fired,
16  and we went back and forth.
17      Q.      Now, let me ask you:  Identify for us for the
18  three individuals who were adults who were supervising the
19  field trip.
20      A.      Derrick Johnson, male, African American.  Rene
21  Smith, female, African American and Lester Howard, male,
22  African American.
23      Q.      There were no other adults supervising the field
24  trip other than those three?
25      A.      There were no other adults that were employed by

1    the Booker T. Washington Center that were supervising those

2    three from the information submitted by Mr. Coleman in his

3    report.

4        Q.    What report are you referring to?

5        A.    He submitted a piece of paper to Mr. Martinucci

6    that had his notes on it, the interviews.

7        Q.    Are you talking about the notes that he had

8    available at his deposition?

9        A.    No, it was a piece of paper, I have a copy of it

10   too.  Yes, I guess that might be it.  And it said that he

11   had talked to Dasha Pacely (phonetic).

12       Q.    And who was she?

13       A.    She was the, I guess, the youth recreation summer

14   person.

15       Q.    But she was not paid staff.

16       A.    Not by the Booker T. Washington Center, no.

17       Q.    So when Mr. Coleman -- and you said there was a

18   third occasion in which Mr. Coleman used the word.

19       A.    After our interview process with the staff.

20       Q.    When he gave you the instruction to fire those

21   niggers, who did you take that to mean?

22       A.    Rene, Derrick, and Lester, the people that we had

23   interviewed shortly prior to that statement.

24       Q.    Now, you've previously testified that Mr. Coleman

25   was aware that the controller was in charge of the agency in

1    your absence.  Did he direct you to bring Brian in for an

2    interview?

3         A.    No.

4         Q.    Now, these interviews occurred on August the 7th,

5    2002.  On what day did you give those three individuals

6    their termination letter?

7         A.    I believe I gave them the termination letters the

8    same day, in the afternoon.

9         Q.    I think you previously testified that you had to

10   review that letter --

11        A.    August 8th, we had the interviews and Sean told me

12   he wanted all of them fired.  He told me to put together a

13   letter.  I called him on the phone.  And after he approved

14   it, I met with them in the conference room and gave them the

15   letters.

16        Q.    Would you have fired those -- excuse me, let me

17   rephrase it.  Left to your own will, would you have fired

18   those individuals on that day?

19        A.    No, I don't think I would have fired them on that

20   day, because I wanted more information before doing that

21   because those people involved in that field trip had a long

22   history of working within youth services.  And I wanted to

23   find out why they didn't do as they were supposed to do

24   working within this here field trip.

25        Q.    So your testimony is you feel you did not have

1    enough information in order to fire them.  Within agency

2    policy, did you have the authority -- or let me rephrase it.

3    Within agency policy, was there the opportunity to provide a

4    warning to staff, a suspension of staff, a written reprimand

5    to staff?  In other words, were there degrees of punishment

6    available to staff?

7         A.    Within the personnel policies manual there's

8    different degrees that you can discipline staff at.  From a

9    conversation, to suspension, to termination.

10         Q.    To a written warning?

11         A.    To a written warning.  There's different levels,

12    there's like five levels.

13         Q.    Of those three individuals, was there any

14    individuals who had not been assigned the responsibility of

15    supervising field trips?

16         A.    Lester Howard was called in to assist with the

17    field trip.  He wasn't assigned that day to the field trip.

18         Q.    Was it his primary duty?

19         A.    No.

20              MR. MARTINUCCI:    Are you done with that?

21              MS. BENSON:    Yes, I am.  I just wanted to touch on

22              that.

23              MR. MARTINUCCI:    I was wondering if you were

24              picking up Lester's representation now that Jeff

25              isn't.

1          MS. BENSON:    No, I'm not.

2          Q.      So you met with the staff, interviewed them, gave

3    them a letter.  And did you then resume your vacation?

4          A.      After I handed them the letters and talked to

5    Rene, I probably left the agency probably 45 minutes to an

6    hour after that, the best I can recall, yes.

7          Q.      And when did you return back to the Booker T.

8    Washington Center?

9          A.      The morning of August 12th.

10         Q.      Now, when you arrived on -- you've previously

11   testified that there was a meeting of the board on August

12   the 12th.

13         A.      Yes.

14         Q.      Had you arranged for that board meeting to take

15   place?

16         A.      No, I received a phone call from Mr. Coleman

17   saying that the board was going to have a meeting on Monday

18   and I needed to be there.

19         Q.      When you say Monday, would that be August 12th?

20         A.      August 12th.

21         Q.      And when did you receive that phone call from

22   Mr. Coleman?

23         A.      I believe I received that call on Saturday.  I

24   don't know if it was in the morning or the evening, but, I

25   believe, it was on Saturday which would have been August

1    10th.

2         Q.      Did Mr. Coleman tell you the purposes for that

3    meeting?

4         A.      Yes, he said that the board had met on Friday and

5    they wanted me to come in and go back over what occurred

6    with them and explain the situation.

7         Q.      Were you aware that the board had met -- prior to

8    this conversation with Mr. Coleman, were you aware that the

9    board had met on Friday?

10        A.      No.

11        Q.      Are you -- when Mr. Coleman told you that the

12   board had met on Friday, did he tell you who called that

13   board meeting?

14        A.      No, he didn't tell me who called the board

15   meeting.

16        Q.      So when you went in, there was a board meeting on

17   August the 12th.  So would it be -- you've previously

18   testified that your last day was August the 7th.  Isn't it

19   correct that you reported to work on August the 12th?

20        A.      It's correct because my vacation was over so I

21   would have went to work anyway, even if he hadn't told me to

22   go to work, to be there.  So I it would have been August

23   12th.

24        Q.      Do you recall who was present at the meeting on

25   August the 12th?

1        A.    Sean Coleman, Bill Jeffress, Cathy Lyons.

2        Q.    Ms. Lyons, is she white or black?

3        A.    She's African American, female.  I believe Charles

4    Faulkerson was there.

5              MR. MARTINUCCI:    If it would help, why don't you

6              look at that.

7        A.    I believe Charles Faulkerson was there; he's male,

8    African American.  Claudette McAdory, African American,

9    female.  I can't remember.

10        Q.    Was Mr. Joe Fries there?

11        A.    I believe Mr. Joe Fries was there, he's male,

12    white.

13        Q.    Any other people that you can recall that were

14    there?

15        A.    I think Tom Antolik might have been there also,

16    he's male and white.  That's all of the people that I can

17    remember.

18        Q.    Do you know, if at that meeting, the meeting was

19    recorded?

20        A.    I tried recording it, they wouldn't let me.

21        Q.    You said you tried having the meeting recorded.

22        A.    I tried recording it myself, but they wouldn't let

23    me.  I don't know if they record it or not because I took my

24    tape off of the tape table.

25        Q.    So you had a tape and they would not allow you to

1    record the meeting.

2          A.    Uh-huh, no.

3          Q.    Do you recall -- let me ask you this question

4    here:  Are board member meetings normally recorded?

5          A.    For the most part, yes.

6          Q.    Under your leadership they were recorded?

7          A.    Yes.

8          Q.    Would an incident such as what allegedly occurred

9    on August the 6th happens, is the Center required, or the

10   staff required to prepare what are called incident reports?

11         A.    Yes.

12         Q.    Was one prepared in this situation?

13         A.    Yes.

14         Q.    Who was it prepared by?

15         A.    Anita Smith.

16         Q.    And what was her title in August of 2002?

17         A.    I believe her title was case manager.

18         Q.    And what were her responsibilities?

19         A.    Anita did a lot of things at the agency, from

20   recordkeeping, to filling in the food pantry, to filling in

21   on the lunch program.  But her main responsibility, I guess,

22   would be record statistical information and that type of

23   stuff.  And she was assistant to the housing manager.

24         Q.    And why did Ms. Smith prepare the incident report?

25         A.    Probably because she was the person at the agency

1    at the time when the situation happened.

2        Q.      Now --

3        A.      And I think the incident report is dated.

4        Q.      Well, can you recall if that incident report was

5    part of the EEOC file?

6        A.      Yes, I think it was.

7        Q.      Does that incident report indicate who was in

8    charge on the day of the incident?

9                MR. MARTINUCCI:    Objection.  If the incident

10               report is part of the record, it's going to speak

11               for itself.

12               MS. BENSON:    All right.  Objection noted, but, if

13               you know, answer it.

14       A.      Yes.

15       Q.      And who did it indicate was in charge of the

16   agency on that day?

17       A.      Brian Bessetti.

18       Q.      You previously testified that on August the 12th,

19   in the meeting with the board, you reported on Mr. Coleman's

20   use of the "N" word; is that correct?

21       A.      Yes.

22       Q.      And did you inform the board of all three

23   incidents of Mr. Coleman's use of that word?

24       A.      Through my explanation of -- they wanted an

25   explanation from the start of --

1     Q.     When you say "explanation", are you saying they

2     wanted a history?

3     A.     Yes, they wanted a history of what had occurred

4     from the incident back.  And I gave them the total history

5     and it included from the time that Sean had -- Mr. Coleman

6     had telephoned me up until that current day, what my

7     knowledge was of what was going on and what had occurred.

8     Q.     Is it your testimony that those three individuals

9     were terminated at Mr. Coleman's direction?

10    A.     Yes.

11    Q.     And that in giving that direction he used the "N"

12    word to refer to these three individuals.

13    A.     Yes.

14    Q.     Now, you were previously asked whether or not you

15    strongly disagreed, and I hope I'm quoting correctly here.

16    MR. MARTINUCCI:    I doubt it.

17    Q.     If you strongly disagreed with Mr. Coleman, why

18    you didn't take the recommendation of the firings of those

19    three individuals to board.

20    MR. MARTINUCCI:    That's a good paraphrase.

21    MS. BENSON:    Okay.

22    A.     Why I didn't take the recommendation of the firing

23    to the board?

24    MR. MARTINUCCI:    Right.

25    Q.     If you strongly disagreed with Mr. Coleman.

1         A.     I didn't think I had a choice.  Mr. Coleman told

2    me to fire them, he was acting as the president of the

3    board, I did what he told me to do.  I answer to the board

4    and he's a person that was there telling me what to do.

5         Q.     In your capacity as the executive director, was it

6    your experience that the board expected you to carry out the

7    directions of the board president?

8         A.     It's my belief that they wanted me to carry out

9    the direction of the board president.  If he told me to do

10   something and I didn't do it then I would be the person on

11   the hot seat.

12        Q.     To your knowledge, is Mr. Bessetti still at the

13   Booker T. Washington Center?

14        A.     To the best of my knowledge, yes.

15        Q.     And what do you base that on?

16        MR. MARTINUCCI:    We'll stipulate that he is.

17        MS. BENSON:    All right.  Thank you.

18        Q.     Now, you previously testified that Mr. Bisetti

19   would have had to go to the board for authorization to

20   discipline an employee; is that correct?

21        A.     I believe it's correct, yes.

22        Q.     You've previously testified that you did spot

23   checks on field trips to make sure that agency policies and

24   procedures were being carried out; is that correct?

25        A.     That's correct.  I would go down and check the

1    sign-in sheets in one area.  And then if they were going out

2    of the building, I would go outside and just observe to make

3    sure they were checking the kids off when they got on the

4    vehicle or making some type of notation.

5        Q.    Now, with regard to the two newspaper articles

6    that you were questioned on earlier, were you contacted by

7    the reporter, Kevin Flowers for this September 5th, '02

8    article?

9        A.    No.

10        Q.    Did you contact Mr. Flowers regarding that

11    article?

12        A.    No.

13        Q.    You've previously testified that Mr. Flowers

14    called you several times after it became known that you were

15    no longer at the Center.

16        A.    Yes.

17        Q.    How did Mr. Flowers know how to reach you?

18        A.    I don't know, my telephone number is a private

19    number.  So he would have had to obtain it from somewhere.

20    I didn't give him the telephone number.

21        Q.    Did you authorize that your number be given out?

22        A.    Employee information can't be given out to anyone

23    and I wouldn't authorize that.

24        Q.    So you did not authorize that anyone at the Booker

25    T. Washington Center could give your number to Kevin

1 Flowers.

2   A. No.

3   Q. Now, you said that Mr. Flowers began calling you.

4 Can you tell us, roughly, when he began calling you. Was it

5 after the first article of September the 5th?

6   A. September 5th.

7   Q. Do you need to see articles?

8   A. No. Most of the telephone calls I received from

9 Mr. Flowers were after the article. I did receive, I think,

10 two phone calls prior to that article. But most of the

11 phone calls were after the article of September 5th.

12   Q. When he called you the two times prior to the

13 article of September the 5th, did you speak with Mr. Flowers

14 and discuss the matter in detail?

15   A. No, I told him I didn't have nothing to say.

16   Q. And that was in both of those phone calls.

17   A. Uh-huh.

18   Q. Now, September the 12th, can you tell us how that

19 article may have come about?

20   A. I met with Mr. Flowers at the Erie Times-News and

21 he interviewed me -- well, I gave him an interview, if you

22 want to call it that. I went down there to -- my whole

23 reason for going down there was that, you know, all of this

24 here conversation and --

25   Q. What do you mean all this here conversation?

1      A.      People talking about the incident and talking

2  about me and what had occurred. And I wanted to try to

3  clarify things, so that's when I went to the Erie Times, I

4  think it was like September 9th, maybe it was on a Thursday

5  or Friday. I think it was after Bill and I had met.

6      Q.      When you say Bill, are you referribg to Mr. --

7      A.      Mr. Jeffress.

8      Q.      So you went there to try to clear your reputation.

9      A.      Yes, because in the article in the paper it left a

10  lot of things in question, because they linked it to -- can

11  I see this.

12              MR. MARTINUCCI:    Sure that's the one from the

13              13th.

14      A.      They linked it to all of this stuff that occurred

15  with Dorothy Lockett.

16      Q.      The previous director.

17      A.      The previous director that had been fired and had

18  some jail time and stuff. And I didn't want people to think

19  that, you know, I wasn't there because I had done something

20  inappropriate or, you know --

21      Q.      Illegal.

22      A.      Illegal. I just felt obligated to go and do that

23  because it was the right thing to do.

24      Q.      So it is your testimony that you didn't provide --

25  with regard to the September 5, '02 article, you provided no

1    information to the reporter, Kevin Flowers.

2         A.    No, I didn't.

3         Q.    Now, going back to the board meeting of August the

4    12th, were you asked to resign or were you told that you

5    must either resign or you would be terminated?

6         A.    At that meeting they wanted me to resign or be

7    fired.

8         Q.    And your response was?

9         A.    Well at that meeting it was kind of hot because

10   Mr. Coleman was interrogating me, I felt interrogating me,

11   so we passed some words back and forth.  After he said they

12   wanted me to resign or be fired.  And I said to him,

13   whatever, and I walked out of the meeting and went into my

14   office.

15        Q.    Why did you -- were you asked to leave the

16   meeting?

17        A.    At that time, I wasn't asked to leave, but prior

18   to that I had been out of the meeting for about half an hour

19   or 45 minutes and they had a discussion going on and I was

20   called back.  And then when I was called back Mr. Coleman

21   and I exchanged some words that led me to get up and leave

22   out of the meeting.

23        Q.    So this meeting lasted -- started at what time?

24        A.    I believe it was a noon meeting.

25        Q.    And to your knowledge, how long did it last?

1      A.    It was a couple of hours.

2      Q.    Were you in there the entire time?

3      A.    No.

4      Q.    So it's your -- as I understand it, you were in

5   the meeting twice.

6      A.    Yes.

7      Q.    So you go into this meeting, was there an agenda

8   for this meeting?

9      A.    I didn't receive an agenda at the meeting, no.

10     Q.    At what point during this meeting did you hear for

11  the first time that you must either resign or be fired?

12     A.    At what point did they say that to me?

13     Q.    You said you were in the meeting twice. Did they

14  say it at the meeting the first time or the second time?

15     A.    The second time.

16     Q.    So the second time they told you that.

17     A.    I believe it was the second time.

18     Q.    All right. So when you left the meeting the first

19  time, why did you leave?

20     A.    I left because Brian came in and they talked to

21  him.

22     Q.    Did they ask you to leave while -- let me correct

23  that. Were you asked to leave when Brian came in?

24     A.    After Brian came in, he was there for a couple of

25  minutes and then I left out and he was still in there.

1      Q.      Were you asked to leave?

2      A.      Yes.

3      Q.      Were you present when Brian was invited into the

4   meeting?

5      A.      Yes.

6      Q.      Why was he invited into the meeting?

7      A.      They wanted him to come into the meeting, I guess,

8   to -- I'm just guessing that they wanted him to explain what

9   had occurred.

10     Q.      To tell them what had occurred.

11     A.      To tell them what had occurred on August 6th, 2002

12  with the field trip.

13     Q.      But you were not permitted to stay in the meeting

14  to hear that?

15     A.      No, they didn't ask him -- I don't think they

16  asked him any questions while I was in there.

17     Q.      Now, were you then called back into the meeting?

18     A.      Yes, I went back into the meeting and, I believe,

19  I asked them --

20     Q.      By the way, excuse me.  Who was conducting the

21  meeting on this day?

22     A.      Sean Coleman was conducting the meeting on the

23  day.

24     Q.      Okay.

25     A.      I went back into the meeting and asked them a

1    couple of questions and Sean and I got into a verbal

2    exchange and that's when I left.  Shortly after that, I left

3    out of the meeting.

4         Q.    At that time, did you resign?

5         A.    No, I hadn't submitted any resignation or

6    anything.

7         Q.    Now, you said it was on that day that you gave

8    them your keys.

9         A.    I gave my keys to Bill Jeffress.

10        Q.    Why did you give him the keys?

11        A.    They asked me for the keys, so I gave them to him.

12        Q.    So that was at the August the 12th, '02.  You've

13   testified that you sent a letter to the board on August the

14   16th, '02.  Do you know if that letter is part of the EEOC

15   file?

16        A.    I believe it is.

17        Q.    The letter will speak for itself, but just tell

18   us, in summary, what did you say to them?

19        A.    I told them that I hadn't resigned and I didn't

20   appreciate that they had appointed someone as interim

21   director.  And that's not how things are handled in my

22   absence.  And I addressed it to Mr. Hamilton with copies to

23   all of the board members.

24        Q.    Now, from September the -- from August the 12th,

25   '02 until you received a letter that was dated, I think,

1    September the 24th, '02, but you said you received it around

2    the 27th of September, did the board ever have any formal

3    contact with you?

4         A.    Formal contact with me sitting in front of them?

5         Q.    Yes.

6         A.    The total board?

7         Q.    Yes.

8         A.    No.

9         Q.    Now, from August the 12th to September the 27th,

10    '02, did you have any conversation with any board members?

11        A.    Yes.

12        Q.    And name those board members.

13        A.    Sean Coleman, Rege O'Neil, Bill Jeffress, Paul

14    Gambill.

15        Q.    How about Mr. Hamilton?

16        A.    Yes, Mr. Hamilton, I met with him.

17        Q.    Anyone else?

18        A.    I think I saw Joe Fries somewhere and we spoke

19    during that time period, in between that time period.

20        Q.    What about Ms. Lyons?

21        A.    Ms. Lyons contacted me on August 13th by phone.

22        Q.    At any time did you tell any of those individuals

23    that you had resigned from the Booker T. Washington Center?

24        A.    No.

25        Q.    What was Mr. Hamilton's response when he got your

1    letter?

2          A.    Well, I didn't talk to him directly after he

3    received it and called me, because we weren't there.  He

4    left a message on my phone wanting to know what was going on

5    and we need to get together to discuss this.  It was like on

6    a Saturday, or something, he called me.  So I think I met

7    with him and Bill Jeffress after that.  We had a meeting

8    after that up at the Zoo parking lot.

9          Q.    The Erie Zoo parking lot?

10         A.    The Erie Zoo parking lot and we discussed what was

11   going on at the agency.  And Mr. Hamilton asked me questions

12   related to that stuff.  And he said to me, we're going to

13   get to the bottom of this here, we'll take care of things,

14   you know.  He sort of tried to relieve -- give me some

15   relief about the situation.  And I left there awaiting a

16   call back from him that I never got.

17         Q.    Was it your -- from that conversation, what was

18   your understanding that Mr. Hamilton would be doing?

19         A.    He was going to get me back into the agency.

20         Q.    As the executive director.

21         A.    Yes.

22         Q.    And did Mr. Hamilton, as a result of that

23   conversation, understand that you had not resigned?

24         A.    Yes, I made it quite clear to him, yes.

25         Q.    You've previously testified that Mr. Coleman came

1    to your home after the August 12th, '02 meeting.  Why did

2    Mr. Coleman come to your home?

3        A.    On which occasion?

4        Q.    Well, you said he came in after the board meeting

5    of August the 12th of '02.

6        A.    He came to my house a couple of times trying to

7    offer me resignation packages, I guess you could say.

8        Q.    Was he asking you to resign?

9        A.    Yes.

10       Q.    So he asked you to resign?

11       A.    He said, well, what can we do to get you to

12   resign, we don't want to just put you out there and not give

13   you anything.  And that they don't normally do that, but he

14   would try to make sure that I was taken care of.

15       Q.    So it is your testimony that Mr. Coleman

16   understood that you had not resigned your position on August

17   the 12th.

18            MR. MARTINUCCI:    Objection, he doesn't know what

19            Mr. Coleman understood or didn't understand.

20            MS. BENSON:    Answer it anyway.

21       A.    From our conversation, yes.

22       Q.    As of this day, do you still view yourself as the

23   director of the Booker T. Washington Center?

24       A.    Yes, in some long about way.  I was never given,

25   like -- I don't know, yes, I do.

1    Q.    You previously testified that there was a meeting

2    between yourself, Mr. Coleman, Mr. Jeffress, and myself.  Do

3    you recall when that meeting occurred?

4    A.    I believe that meeting took place September 16th

5    at the Booker T. Washington Center at 1:30.

6    Q.    And who had asked for that meeting?

7    A.    Mr. Coleman.

8    Q.    And why did Mr. Coleman want that meeting?

9    A.    He wanted to present to me an agreement to sign

10   and resign and obtain a severance package.

11   Q.    And did you sign it?

12   A.    No.

13   Q.    And in that meeting did you make a request of

14   Mr. Coleman and Mr. Jeffress?

15   A.    Yes.

16   Q.    What was the request?

17   A.    Through my attorney, I requested an additional

18   meeting.

19   Q.    With whom?

20   A.    The board of directors, so that we could discuss

21   my coming back to the agency.

22   Q.    And what was Mr. Jeffress' response to that

23   request?

24   A.    They were going to try to work it out.

25   Q.    Did Mr. Jeffress, during that meeting, indicate to

1    you that he thought the board had acted improperly on August

2    the 12th?

3          A.      Yes.

4          Q.      Did Mr. Jeffress, during that meeting, indicate to

5    you that he thought you should return to the agency?

6          A.      I think from the onset Mr. Jeffress' attitude had

7    been that I should return to the agency and he was trying to

8    assist me in doing so.

9          Q.      Until he was appointed director?

10          MR. MARTINUCCI:    I'm sorry, are you testifying or

11          was that a question?

12          MS. BENSON:    I'll withdraw that statement.

13          MR. MARTINUCCI:    A little professionalism

14          occasionally would be nice.

15          Q.      Was the meeting of the board ever granted?

16          A.      No, it wasn't.

17          MS. BENSON:    I have no further questions at this

18          time.

19

20                    REDIRECT EXAMINATION

21    BY MR. MARTINUCCI:

22

23          Q.      With regard to the taped message that you got from

24    Randy Davis; did you save that?

25          A.      No.

90

1    Q.    Did you make notes of it?

2    A.    No.

3    Q.    You've indicated that you do have notes from your

4    conversations with Mr. Coleman.

5    A.    Yes.

6    Q.    Do you have those with you here today?

7    A.    No, I don't. I haven't been able to locate the

8    legal pad that my notes from August 6th, my initial

9    conversation with him up until --

10    Q.    Whenever you lost the legal pad.

11    A.    Yes. I have to go in my garage and look.

12         MR. MARTINUCCI:    I'll make a request now, that if

13         you do ever come across, that your counsel provide

14         me with a copy of those notes.

15    A.    Okay.

16    Q.    You were asked what your expectations of continued

17    employment were with Booker T. Washington Center. And you

18    basically said as long as you did a good job you were going

19    to continue with employment, right?

20    A.    Yes.

21    Q.    Now, your counsel asked you that question in the

22    context of the offer letter that you had received, or your

23    letter of engagement.

24    A.    This one's mine.

25    Q.    That's yours?

1      A.      That's your copy.

2      Q.      That is my copy.  But the first paragraph with an

3   underlined heading, can you tell me what that says.

4      A.      The first paragraph?

5      Q.      With an underlined heading.

6      A.      It says, "Employment at Will.  You will serve at

7   the will and discretion of the board and the board retains

8   the right to terminate your employment with or without

9   cause.  However, you may expect that continued positive

10  performance will forge you a long-term employment

11  opportunity under ordinary circumstances."

12     Q.      There's nothing in there that says that you are

13  always going to have a job with the Booker T. Washington

14  Center, even if you do a good job.

15     A.      Afford you long-term employment.

16     Q.      Opportunities, right?

17     A.      Uh-huh.

18     Q.      Opportunity is not a guarantee, is it?

19     A.      Opportunity means that if you do as asked you will

20  have advantage of that opportunity.

21     Q.      It very clearly states that you're an at-will

22  employee, correct?

23     A.      It states within there, that employment at will.

24     Q.      Okay.  You said Brian Bessetti was not called in

25  for an interview on August 7th by Sean Coleman.  Did you

92

1    ever interview Brian Bessetti on your own?

2         A.    I didn't have an opportunity to interview Brian

3    Bisetti. It was the first thing on my list to do when I got

4    back from vacation.

5         Q.    Did you ask to interview Brian on the 12th?

6         A.    No. I was being interviewed myself, how can I ask

7    to interview someone else.

8         Q.    Okay. Your attorney asked you a very direct

9    question, if Mr. Coleman had used the "N" word to describe

10   the three individuals that were subsequently terminated.

11   Now, you had previously testified that it was your belief

12   that he had done so; you don't know what was he referring

13   to, do you?

14        A.    At the date that we interviewed them he used it.

15        Q.    I'm not saying -- I'm not arguing that point with

16   you at this juncture, okay?

17        A.    I'm trying to get clarification --

18        Q.    I'm asking you --

19        A.    -- on that aspect.

20        Q.    I'm asking you, did he say, and by the word

21   "nigger", I mean X, Y and Z?

22        A.    No, it was implied.

23        Q.    That was your understanding of the situation.

24        A.    That it was implied that it meant Derrick, Rene

25   and Lester.

93

1         Q.     Do you believe or have any evidence that your

2 phone number was given out by the Booker T. Washington

3 Center?

4         A.     I don't have any evidence, but it's my belief that

5 somebody gave it out.

6         Q.     And nobody else in the City of Erie has your phone

7 number.

8         A.     Only the people that I gave it to or my wife gave

9 it to.

10         Q.     Okay. You wanted to clear your name with regard

11 to the September 5th article. That's why you had the

12 conversation with Kevin Flowers.

13         A.     Yes.

14         Q.     Who tied your name to the past executive director,

15 was that Kevin or was that somebody from Booker T.

16 Washington Center?

17         MS. BENSON:    Well, I think the article speaks for

18         itself.

19         A.     It was within the article that was September 5th.

20         Q.     Is it your position that anybody at Booker T.

21 Washington Center tied anything that you had done or not

22 done to the past administration at the Booker T. Washington

23 Center?

24         A.     Again, I felt it was implied within there,

25 because --

1    Q.    Implied within the article or implied by the

2    Booker T. Washington Center?  There's a difference.

3              MS. BENSON:    Let him answer the question.  The

4              article speaks for itself.  You want to read the

5              article again?

6    A.    It was, I think, on two sides.  Because anytime

7    that you don't clarify what is going on with someone in a

8    CEO or head possession, it leaves question within, not on

9    funders, but within the community, that the reason they're

10   not clarifying is because this person did something

11   drastically wrong.  Okay.  And in that aspect, I think it's

12   implied by both the agency and within the article.

13   Q.    But didn't you just testify a little bit ago that

14   personnel records are confidential?

15   A.    Yes, personnel records are supposed to be kept

16   confidential.  Only access to those personnel records is

17   supposed to be from within, and with that person coming to

18   the agency and requesting in document form to see their

19   records.  But those records can be accessed within the

20   agency.

21   Q.    Okay.  Who told you that you had to resign or be

22   fired, specifically?

23   A.    Sean Coleman.

24   Q.    And when you exchanged words with Sean Coleman

25   what words did you exchange?

1   A. I don't recall the full content, but it was in

2 relation to what he was saying to me that I didn't agree

3 with.

4   Q. Okay.

5   A. I don't know the content.

6   Q. Did you yell at him?

7   A. He yelled at me and I yelled at him.

8   Q. Okay.

9   A. Or we got very vocal with one another.

10   Q. And what did Mr. Jeffress say the board had done

11 improperly when you and your attorney met with him and

12 Mr. Coleman?

13   A. Well, he just didn't think that the situation was

14 handled appropriately. I mean, that's been his -- that was

15 his thing from the beginning when we started having our

16 conversations over the telephone and our meetings.

17   Q. You think that Bill Jeffress ultimately supported

18 your termination because he wanted your job?

19   A. I can't say that I'm 100 percent positive in that

20 aspect, but he is the executive director.

21   Q. Your view on this is basically if X then Y, right?

22   MS. BENSON: Well, I'm not --

23   A. I think that's a little more simplistic than how I

24 would view it.

25   Q. Well, you were fired, it must have been because of

1    your race.

2              MS. BENSON:    Well, wait a minute, excuse me.

3              That's --

4        A.    That's not the question you were asking me though.

5        Q.    I'm going a little bit broader here, I apologize

6    for that, I should have given you some warning.

7              MS. BENSON:    Well, now -- but --

8              MR. MARTINUCCI:    Now let him testify, unless

9              you're going to object to the question.

10              MS. BENSON:    I'm going to object to the question

11              because --

12              MR. MARTINUCCI:    Then tell me what the objection

13              is.

14              MS. BENSON:    Wait a minute.  Because your question

15              said, if X then Y, and he began to respond a

16              certain way and you broadened it.  So I want you

17              to be specific, so wait until he answers the

18              question.

19        Q.    Let's start and work backwards.  With regard to

20    Bill Jeffress, okay, he is the executive director,

21    therefore, he must have wanted your job.

22        A.    I didn't say I was 100 percent positive in that.

23        Q.    Brian Bessetti was not fired, therefore, it must

24    have been because he was white.

25        A.    Just because of how the situation was handled in

1    relation to myself and the others through Mr. Coleman.

2        Q.    You were fired, therefore, it must be because you

3    were African American.

4        A.    Just because of how the situation was handled

5    between Sean Coleman, myself, and the others that were

6    fired.

7        Q.    There's nothing else that you have that will

8    demonstrate that to be the case?

9        A.    I wouldn't say that.

10       Q.    What else do you have?

11       A.    Brian Bessetti is a Caucasian male.

12       Q.    Right.

13       A.    He was left in charge of the agency by myself.  I

14   was on vacation, I get dragged into a board meeting and

15   subsequently fired.  In conversation with Mr. Bessetti,

16   nothing happened to him, he's still the finance director at

17   the Booker T. Washington Center at least for another month

18   or so.  So that's what leads me to believe and understand

19   that I was fired and talked about, as by Mr. Coleman,

20   stating, you know, I fired all of those niggers.

21       Q.    Now, wait a minute.  You're saying Mr. Coleman

22   said that?

23       A.    Yes.

24       Q.    When and to whom?

25       A.    In the affidavit that's in the EEOC file.  There's

1    an affidavit that states from two employees that were

2    present at the meeting on August 13th that he stated that.

3         Q.    So you're saying that you're included in that.

4         A.    Yes.  From their affidavits he said that he fired

5    all of those niggers.

6         Q.    Okay.

7         A.    And he admitted that he used the word.

8         Q.    And by niggers, do you mean African Americans?

9         A.    We were the only ones that were terminated.

10         Q.    And you think he did it because you were African

11    American.

12         A.    The basis of our suit is that I was racially

13    discriminated against.

14         Q.    I understand that.  I'm asking what the underlying

15    facts are that support that claim.

16              MS. BENSON:    I think he's answered the question.

17         A.    I just told you.  Because --

18              MS. BENSON:    Wait a minute, James, I'm making an

19              objection.  You repeatedly answered the question,

20              and his answer is that he was fired because of his

21              race and so were three other individuals.

22         A.    Right.

23         Q.    My question is, what's the basis for that

24    contention?

25              MS. BENSON:    And he's answered that.

1    A.    Because we were all fired.

2    Q.    Okay.  There was a Notice of Deposition going back

3  to July of 2005.  And most recent one was sent out last week

4  that directed you to bring certain documents to the

5  deposition.  Did you bring any documents with you in

6  response to the Notice of Deposition?

7    A.    The only documents that I have in my possession

8  are the same ones you have.

9    Q.    There's nothing else that you're aware of.

10    A.    Only my notes that I can't find.

11    Q.    With regard to any witnesses, aside from the

12  people whose affidavits appear in the EEOC materials, and

13  the people who are being deposed in this case so far, are

14  you aware of anyone who has information that would be

15  relevant to the case?

16    A.    Who do you have on your witness list?

17    Q.    I'm sorry.  We've deposed Bill Jeffress; we've

18  deposed Sean Coleman; we've deposed you.

19    A.    Right.

20    Q.    Who else is out there that you're aware or that

21  your counsel is aware of?

22    A.    That are going to get deposed?

23    Q.    No, that are going to be witnesses in the case or

24  have information, or they could be witnesses in the case.

25    A.    No one that I'm aware of at this time.

1      MS. BENSON:    Let me -- because I don't want to

2      mislead the other side.  I think we, early on,

3      gave a statement of potential witnesses, but just

4      let me repeat.  There's Anita Smith, who prepared

5      the incident report.  And according to that

6      report, she was the first personnel who had word

7      that the little girl may have been missing.

8      MR. MARTINUCCI:    You don't have to go through each

9      of the individuals, just in terms of what they're

10      going to testify to.  If I have a question, I'll

11      ask.

12      MS. BENSON:    There's Anita Smith.  I would expect

13      that we would have Mr. Davis.  I would expect that

14      -- the secretary.

15   A.   The people that are on our list.

16      MR. MARTINUCCI:    Okay.

17      MS. BENSON:    Right.  I would expect that there

18      might be a possibility of having Brian, and that

19      there may be some others.  But we would make sure

20      that, consistent with the rules, that you are

21      aware of any changes.

22      MR. MARTINUCCI:    Okay.  And one final question for

23      you here.

24   Q.   The board meeting on the 12th of August was at

25   noon.

1          A.       I think it was either at noon or 1:00, it was in

2    the middle of the day.

3          Q.       Why didn't you come in before that and interview

4    Brian Bessetti?

5                   MS. BENSON:       Did you have any meetings outside of

6                   the office?

7                   MR. MARTINUCCI:      I'm sorry, are you going to

8                   answer it for him?

9                   MS. BENSON:    No.  No, I'm not.

10         A.       I didn't come in and interview Brian that day

11   because I was trying to figure out what was going on.

12         Q.       And part of figuring out what was going on was not

13   talking to Brian Bessetti, the person that was first on your

14   list to interview when you got back to the office.

15         A.       See, this is the thing.  I believe the situation

16   that Sean Coleman asked and directed me to handle was

17   handled, okay.  And because he called me and told me that

18   they wanted to meet with me on August 12th, which was Monday

19   when I got back, that's what my main focus was.  Not to, you

20   know, I had one meeting that day also prior to the board

21   meeting, outside of the building.

22         Q.       What meeting wasthat?

23         A.       I had a meeting with Al Messina, who was my

24   mentor.

25         Q.       And actually, I'm sorry, I do have one more

1    question for you.  You talked about the number of meetings

2    that you had and conversations that you had with individual

3    board members from August 12th until September 24th.  During

4    any of those conversations, did you tell any of those board

5    members that you thought that your termination or that your

6    situation was racially motivated?

7         A.    I may have discussed it with one or two people.

8         Q.    Who?

9         A.    That I felt I was wronged.

10        Q.    I'm not asking if you felt you were wronged.  I'm

11   asking if you told these people that you were being targeted

12   because you were African American?

13        A.    Probably not specifically.

14        Q.    Okay.

15             MR. MARTINUCCI:    I have nothing else.

16             MS. BENSON:    I do.  Let me -- just a few

17             questions.

18

19                    RECROSS-EXAMINATION

20   BY MS. BENSON:

21

22        Q.    You testified that Brian Bessetti is still at the

23   Booker T. Washington Center.  And I believe your comment was

24   at least for another month, why did you say that?

25        A.    Because, I believe, he's going to be seeking other

1    employment.

2         Q.    And do you have a reason for believing that?

3         A.    Yes.

4         Q.    Let me ask you whether or not that's as a result

5    of a conversation with Mr. Bessetti.

6         A.    No, it's not from a direct conversation with

7    Mr. Bessetti. It's not from a direct conversation with

8    Mr. Bessetti.

9         Q.    You made reference to a staff meeting on August

10   the 13th, '02, that was a day after the board meeting of

11   August the 12th. And I believe your testimony was that it

12   was during that meeting that Mr. Coleman acknowledged

13   directing you to fire those niggers.

14              MR. MARTINUCCI:   I'm going to object to the

15              question. His testimony was that there are

16              affidavits in the file that reflect that he wasn't

17              there, he doesn't know.

18        Q.    When you met with individual board members, did

19   you tell them of Mr. Coleman using the word "nigger" or

20   directing you to fire those niggers?

21        A.    I think I used both who, I don't know who with,

22   but through conversations with the various board members. I

23   can't identify, you know, like, I said this to Cathy or I

24   said this to Bill or I said this to Tom or I said this to

25   Paul or anything like that.



1          MS. BENSON:    I have no further questions.

2          MR. MARTINUCCI:    I assume you're going to read.

3          MS. BENSON:    Yes.

4

5          (Deposition concluded at 5:00 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

1

2

3    I, Heather E. Nass, a Court Reporter and

4    Notary Public in and for the Commonwealth of

5    Pennsylvania, do hereby certify that the foregoing

6    is a true and accurate transcript of my

7    stenographic notes in the above-captioned matter.

8

9

10

11

12    Notary Public

| NOTARIAL SEAL |
| HEATHER E. NASS, NOTARY PUBLIC |
| WATERFORD TWP. ERIE COUNTY, PA |
| MY COMMISSION EXPIRES SEPT. 18, 2008 |

13

14

15    Dated: February 10, 2006

16

17

18

19

20

21

22

23

24

25