IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

James C. Sherrod          :
    Plaintiff             :
    vs.                   :   Civil Action No. 04-208 Erie
Booker T. Washington      :
Center                    :
    Defendant             :


      The deposition of SEAN P. COLEMAN, taken before and by Heather E. Nass, Notary Public in and for the Commonwealth of Pennsylvania, on Tuesday, June 28th, 2005, commencing at 9:30 a.m., in Rm. 211 , at the Erie County Court House, 140 West 6th Street, Erie, Pennsylvania 16501.


For the Plaintiff:
Edith Benson, Esquire
Benson Law Office
4683 Budd Drive
Erie, Pennsylvania 16506


For the Defendant:
Arthur D. Martinucci, Esquire
Quinn Buseck Leemhuis Toohey & Kroto
2222 West Grandview Boulevard
Erie, Pennsylvania 16506


            Reported by Heather E. Nass
      Ferguson & Holdnack Reporting, Inc.

1     A.   That would have been, I believe, our chairperson.

2     Q.   So you're saying Mr. Hamilton was there on August

3   the 12th.

4     A.   I'm saying I think he was there, I don't recall

5   specifically if he was --

6     Q.   Is there a possibility that he wasn't -- at this

7   moment I want you to testify from memory, we can if we need

8   to later on.  Is there a possibility he wasn't there?

9     A.   Yes, as there's a possible that 13 other people who

10  weren't there because I don't know exactly, again, of the

11  list who was there except for those three I've excluded.

12     Q.   Who did most of the discussion on August the 12th?

13     A.   Probably me because of my involvement with the

14  situation.

15     Q.   You say your "involvement", tell me what you mean

16  by that.

17     A.   Well, I received the initial phone calls on that

18  night, the 6th from James, or Mr. Sherrod on that night.

19  Went to the Center the next day to talk to employees and

20  converse.  And then James had contacted me several times the

21  day -- the 6th was a Tuesday, the day after he got back from

22  wherever he said he had gone that Friday, that would be the

23  9th.

24     Q.   You said you received initial phone calls on August

25  the 6th.  Who did you receive phone calls from?

1      A.    That would have been from Paul Gambill and
2    Claudette McAdory.
3      Q.    And what time of day did you receive those calls?
4      A.    I don't know what time they came in, but I didn't
5    receive them until I got off of work and that would have
6    been 10:30, 10:40 at night.
7      Q.    Those calls were on your machine.
8      A.    No, my mom had informed me that they had called.
9      Q.    So they had left the message with her.
10     A.    Correct.
11     Q.    And she gave you the message around 10:30 on August
12   the 6th.
13     A.    Between 10:30 and 10:40.
14     Q.    Around 10:30 p.m. on August the 6th.
15     A.    Around 10:30 or 10:40 when I got home.  I'm not
16   sure exactly when I got home, somewhere around there.
17     Q.    And who did you speak to first?
18     A.    I'm not sure who I spoke to first, but I believe I
19   spoke to both of those individuals.
20     Q.    And what did you learn from Ms. McAdory?
21     A.    Their was story was pretty similar, that a little
22   girl was missing from a field trip that we took to the mall.
23   Not we, but that the Center had taken to the mall.
24     Q.    And where did Ms. McAdory get her information from?
25     A.    I don't know.

1    Q.   Where did Mr. Gambill get his information from?

2    A.   I don't know.

3    Q.   After hearing from Ms. McAdory did you -- you said

4    you're not sure the order in which you spoke to either one.

5    A.   Correct.

6    Q.   What did you do after speaking to them?

7    A.   I contacted Mr. Sherrod.

8    Q.   Did you speak with both of them before you

9    contacted him?

10   A.   Yes.

11   Q.   And what time was it on August the 6th when you

12   spoke to Mr. Sherrod?

13   A.   I don't know.  I have it written in my notes if I

14   can refer to that.

15   Q.   Can you guess at this point.

16   A.   It had to be between when I arrived home at 10:30

17   and 11:30 that evening.

18   Q.   And you can look at your notes and tell me what

19   time.

20   A.   I think it's in here.  It would have had to have

21   been between 10:30 and 11:15.

22   Q.   Now, when you spoke with Mr. Sherrod what did you

23   inform him?

24   A.   Pretty much asked him had he heard about -- I told

25   him, first of all, that I got two phone calls.  And I told

1    him had he heard about the situation of the girl missing

2    from the field trip.

3        Q.   Okay.  And his response was?

4        A.   I believe he had told me something to the fact that

5    he had spoke to one of his staff and that the girl was found

6    with her cousins later, something along those lines.

7        Q.   I'm sorry.

8        A.   I said, I believe he had told me something to the

9    effect that he had spoken to one his staff and the girl was

10   found with her cousins or relatives or something along those

11   lines.

12       Q.   Then what did you do?

13       A.   I think I had said, okay.  I think I talked to a

14   few more people, who exactly I talked to --

15       Q.   I'm sorry.

16       A.   I said, I kind of ended the conversation.  I recall

17   speaking to a couple of people, I'm not sure exactly who I

18   had spoken to.  And then I called Mr. Sherrod back telling

19   him that I've heard a different story.  And that's when he

20   began to phone other staff members, and then I had contacted

21   other people as well.

22       Q.   What time was your second call to Mr. Sherrod?

23       A.   I have no idea of the times, 10:30, 11:15.

24       Q.   Now going to August the 7th.

25       A.   Yes.

1    Q.    What did you do with regard to the incident of
2    August the 6th?
3    A.    Mr. Sherrod had got to -- went to the Center and
4    talked to the three employees involved, or four actually,
5    there was a youth aid also.
6    Q.    Who were the four employees?  And I would want you
7    to recall from memory as opposed to referring to that.
8    A.    Sure.  It would have been Derek Johnson, Renee
9    Smith, Lester Howard, and, I believe the young youth aid was
10   Dasha Pacely.
11   Q.    You spoke to all four of those individuals.
12   A.    I believe so.
13   Q.    You and Mr. Sherrod together.
14   A.    Correct.
15   Q.    Did you speak to those individuals as a group or
16   individually?
17   A.    Individually.
18   Q.    And what was the purpose of speaking with those
19   individuals?
20   A.    To figure out what happened the previous day.
21   Q.    Who did you speak to first?
22   A.    I think Derek Johnson, I'm not sure.
23   Q.    Who do you think you spoke to next?
24   A.    I believe Lester Howard, again, I'm not sure.  And
25   obviously Renee Smith.  And I don't know -- we may have

1    spoke to Dasha about it, now that I think about it.

2        Q.    Of the four individuals you mentioned, the last one

3    you said was a young lady whose name?

4        A.    Dasha Pacely, I think.

5        Q.    And was she a full-time member of the staff?

6        A.    No, she was just a summer aid.  I think she was a

7    summer youth aid.

8        Q.    She was hired on a program that a Booker T.

9    Washington Center operated.

10        A.    I believe so.

11        Q.    Now of the four individuals mentioned, three were

12    fired; weren't they?

13        A.    Yes, they were.

14        Q.    Now, Ms. Pacely was not; can you tell me why?

15        A.    I have no idea.

16        Q.    Now, during this meeting, these individual

17    meetings, did you take notes --

18        A.    Yes.

19        Q.    -- of your conversation with them?

20        A.    Yes, and that's what you have there.

21        Q.    So, those notes were in the spiral notebook that

22    you now have.

23        A.    Correct.

24        Q.    Did anyone else take notes?

25        A.    Mr. Sherrod had recorded the meetings.

1      Q.    All right.  So there were recordings of the

2  meetings.  Now, is that recording still in the possession of

3  the Booker T. Washington Center?

4      A.    I don't know.

5      Q.    In addition to talking to those four individuals,

6  did you speak to anyone else?

7      A.    You mean that day pertaining to this or just in

8  general?

9      Q.    In general.

10     A.    I mean -- he Board members and that was the night

11  before, and that's pretty much it.  And the day of August

12  the 7th.

13     Q.    So you spoke to Board members also on August the

14  7th?

15     A.    I think I may have, I'm not sure.  I just know, in

16  general, I spoke to the Board members the night before.

17     Q.    Well, when you say the night before --

18     A.    That would be the 6th.

19     Q.    August the 6th.  What Board members did you speak

20  to?

21     A.    Claudette McAdory and Paul Gambill.

22     Q.    Were they the only Board members you spoke to on

23  August the 6th?

24     A.    Yes, I think I may have put a phone call in to Mr.

25  Hamilton.  The only reason I say that is because I know I

1   have the number written down here, but I'm not sure if I

2   spoke with him.  I don't think I spoke with him.

3       Q.   And then on August the 7th you don't recall

4   speaking to any other Board members?

5       A.   No, I don't.

6       Q.   Now, let's take each one of those individuals one

7   by one.  Lester Howard, how long had he worked for the

8   Booker T. Washington Center?

9       A.   I don't know.

10      Q.   Derek Johnson.

11      A.   Correct.

12      Q.   How long had he worked for the Booker T. Washington

13   Center?

14      A.   I think and I maybe mistaken, but I think Derek was

15   there less than a year.

16      Q.   And Renee Coates Smith, how long had she worked for

17   the Booker T. Washington Center?

18      A.   Again, I think Renee was there for about two years,

19   maybe a little more, maybe a little less, I'm not sure.

20      Q.   All three of those individuals are African

21   Americans; am I correct?

22      A.   Yes.

23      Q.   Now, this happened on August the 6th, Mr. Sherrod

24   was on vacation; wasn't he?

25      A.   I'm not sure if he was on vacation then or if he

1    was taking his vacation later on, but I'm not particularly

2    sure, I can't remember.  Actually, no, he was on vacation,

3    sorry.

4        Q.    In fact, you had met with Mr. Sherrod prior to him

5    going on vacation; hadn't you?

6        A.    I don't understand, what do you mean?

7        Q.    You had met with Mr. Sherrod before he went on

8    vacation?

9        A.    I don't recall.

10        Q.    Would it help you if I were to tell you that Mr.

11    Sherrod was on vacation from August the 5th through August

12    the 9th, 2002?

13        A.    Okay.

14        Q.    Does that refresh your memory at all?

15        A.    Well, see Mr. Sherrod and I had met on numerous

16    occasions.  So to say I met with him before August 6th would

17    be accurate, when, I don't know.

18        Q.    Well, let's go back and see if we can pin it down.

19    His vacation was scheduled from August the 5th to August the

20    9th.  Isn't it true that you met with him before August the

21    5th, the day before, to discuss agency business and affairs?

22        A.    I don't recall.

23        Q.    You don't recall having a meeting with Mr. Sherrod.

24        A.    I recall having a meeting with Mr. Sherrod, but I'm

25    not sure if it was on August 5th, so I don't recall if it

1    was August 5th.

2        Q.  All right.  So you do recall having a meeting with

3    him about him going on vacation.

4        A.  Again, I don't know what the topic matter of that

5    meeting was.

6        Q.  You have no idea, you can't recall what the topic

7    was.

8        A.  We probably talked about some things with the

9    Center, but I'm not sure if we talked about him going on

10   vacation.  He didn't have to discuss that with me.

11       Q.  He didn't remind you that he was scheduled for

12   vacation from August the 5th through the 9th?

13       A.  As I mentioned, I don't recall.

14       Q.  Do you recall the two of you discussing who would

15   be in charge during his absence from August the 5th to

16   August the 9th, 2002?

17       A.  No, I don't.  Because, again, I don't recall

18   discussing -- he and I just talking about his vacation.  He

19   didn't have to talk to me or run certain things by me, so,

20   no.

21       Q.  Now, when Mr. Sherrod was away from the Booker T.

22   Washington Center for extended absences, who was in charge?

23       A.  I don't know.  That would be a decision that was

24   left up to his discretion.

25       Q.  Isn't it true that the Board gave him directions as

1    to who would be in charge during extended absences?

2        A.    Again, I don't recall.

3        Q.    So it's a possibility that the Board had given him

4    such directions?

5        A.    It's a possibility that it didn't happen as well.

6        Q.    Answer my question.  Is it a possibility that the

7    Board had given Mr. Sherrod directions as to who to appoint

8    when he was on extended absences?

9        A.    Of course, it's a possibility.  But as I mentioned,

10   those days could have been left up to his discretion.

11       Q.    Now, you came on in 1999, right?

12       A.    Correct.

13       Q.    Now, once you came on Mr. Sherrod took vacation

14   during 1999 to 2002; didn't he?

15       A.    Right.

16       Q.    And isn't it correct that Brian Bessetti, the

17   controller, was in charge of the agency during extended

18   absences by Mr. Sherrod?

19       A.    Again, as I mentioned, I'm not sure because those

20   things could have been left to Mr. Sherrod's discretion.

21       Q.    Now, Mr. Coleman.

22       A.    Yes.

23       Q.    You would drop by the Booker T. Washington Center

24   on a regular basis, wouldn't you?

25       A.    Yes, it's right in the neighborhood.

1      Q.    You would drop by almost on a daily basis?

2      A.    No, that's inaccurate.

3      Q.    You would drop by there on -- several times during

4 the week; isn't that correct?

5      A.    Depending on activities going on, yes.

6      Q.    You would drop by when, in between Board of

7 Directors meetings; isn't that correct?

8      A.    Yes.

9      Q.    You would drop by in between executive committee

10 meetings; isn't that correct?

11     A.    Yes.

12     Q.    You would drop by in between management committee

13 meetings; isn't that correct?

14     A.    Yes.

15     Q.    Of all the Board members identified on Plaintiff's

16 Exhibit Number 1 you were the most frequent visitor to the

17 Booker T. Washington Center; wasn't that correct?

18     A.    Correct.

19     Q.    You were the most informed Board member; isn't that

20 correct?

21     A.    I don't know.

22     Q.    You would see Mr. Sherrod every time you went

23 there, wouldn't you?

24     A.    Yes.

25     Q.    And you would discuss agency business; isn't that

1    correct?

2        A.    Not every time.

3        Q.    You didn't discuss agency business?

4        A.    I didn't say that, I said, not every time.  He

5    could have just as well informed any other member of the

6    Board more information than he disclosed to me.

7        Q.    But my question to you is, you've just testified

8    that you were the most frequent visitor of the Board of

9    Directors.

10        A.    That doesn't mean I'm the most informed.

11        Q.    All right.  Now, let's go back and see if you can

12    recall meeting with Mr. Sherrod the day before he went on

13    vacation.

14        A.    Okay.

15        Q.    In August of 2002 -- now, you're shaking your head,

16    just give me an answer.

17        A.    No, I don't recall.

18        Q.    Do you recall you and Mr. Sherrod talking about

19    Brian would once again assume his responsibilities of

20    running the agency in Mr. Sherrod's absence?

21        A.    First, I can't say, once again, because as I

22    mentioned I thought that was up to James' discretion.  And

23    secondly, no, I don't recall having any discussions

24    concerning who would run the agency in James' absence.  I

25    don't recall the meeting.

1      Q.    Let's go back.  From 1999 until August of 2002, was

2    the controller ever in charge of the agency in Mr. Sherrod's

3    absence?

4      A.    I don't know.

5      Q.    Could he have been?

6      A.    Could have been.

7      Q.    You have here what has been previously mentioned as

8    executive committee meeting report, one-page, dated August

9    9th, 2002, submitted by Sean P. Coleman.

10     A.    Right.

11     Q.    When did you prepare this statement?

12     A.    That would have had to have been between the 6th

13   and the 9th.  I think what I did was after I wrote them I

14   think I cut and pasted on the one page, the two reports,

15   that's why they're on one page.

16     Q.    So there are two reports, one says executive

17   committee meeting report August the 9th of 2002, and the

18   other executive meeting report August the 13th?

19     A.    Right.

20     Q.    Were they prepared on the same day?

21     A.    No, couldn't have been.

22     Q.    But you said you prepared them and then you pasted

23   them together?

24     A.    No, what I said was I did it between the 6th and

25   the 9th, and then I said for the second one -- I didn't say

1    anything about the second one.  What I did was prepared the

2    report and just cut and pasted them on the same sheet of

3    paper.

4        Q.   Why did you prepare these two reports?

5        A.   Because we had executive committee meetings.

6        Q.   And were these reports -- at what meeting were

7    these two reports presented?

8        A.   I don't recall.

9        Q.   On what -- in preparing these two reports on what

10    did you base the reports on?

11        A.   The meetings that we had.

12        Q.   Did you present this document here, which I'll have

13    labeled as Plaintiff's Exhibit Number 3.  Did you present

14    this document here at a single meeting?

15            (Plaintiff Exhibit Number 3 marked for

16            identification.)

17        A.   Yes, I believe so, that's why I put it on one sheet

18    of paper.

19        Q.   And in looking at these two dates can you recall

20    when that meeting might have occurred?

21        A.   Probably the week of August 19th.  I presume that

22    would be when our regular general Board meeting was.

23        Q.   Now, in preparing the August 9th, 2002 statement

24    what did you rely upon in order to write that?

25        A.   The meeting that we had on August 9th, 2002.

1    Q.   So there was a meeting on August the 9th?

2    A.   Yes.

3    Q.   And what was that meeting of?

4    A.   Discuss the August 6th report -- or August 6th

5   incident as noted, and then information from Mr. Hamilton.

6   I mean this paragraph pretty much just sums it up, the

7   discussions included.

8    Q.   Now, in this summary here dated August the 9th, the

9   third sentence reads, discussion included the transportation

10  of children on an overcrowded vehicle, potential

11  disciplinary action against the executive director, and the

12  preparation of a press release, if necessary.  Now, you had

13  spoken with Mr. Sherrod on August the 6th, right?

14   A.   That night, correct.

15   Q.   And he had come into the office back from vacation

16  on the 7th, right.

17   A.   Correct.

18   Q.   There is a meeting held on August the 9th while he

19  was still on vacation?

20   A.   Uh-huh.

21   Q.   Correct.

22   A.   Right.

23   Q.   And that meeting was held by an executive

24  committee?

25   A.   My dates may be off, August 9th was a Saturday,

1    correct?

2        Q.   No, I think it may have been a Friday.

3        A.   Sorry.  So, I'm sorry, your question.

4        Q.   So my question to you.  At this meeting of the

5    executive committee on August the 9th one item you discussed

6    was quote, "the potential disciplinary action against the

7    executive director".

8        A.   Correct.

9        Q.   Had you given Mr. Sherrod notice on August the 6th

10   or August the 7th that you were going to be raising an issue

11   regarding whether he should be disciplined?

12       A.   I didn't raise the issue, that was a Board

13   committee meeting discussion.  I didn't raise the issue so I

14   didn't give him any notice because even prior to going into

15   that meeting there was no definite direction of where we

16   were going to go, that's why it says potential.

17       Q.   So August the 6th you talked with him in the

18   evening.

19       A.   Right.

20       Q.   August the 7th there's no question about Mr.

21   Sherrod and disciplinary action?

22       A.   Not from me, no.

23       Q.   Now, you said there's a meeting on August the 9th?

24       A.   Right.

25       Q.   An executive committee meeting.

1      A.    Right.

2      Q.    Who raised the issue of disciplining Mr. Sherrod?

3      A.    I don't remember.

4      Q.    Did you raise it?

5      A.    I don't think so, again, I don't recall.

6      Q.    Is it a possible that you raised it?

7      A.    I don't think I brought it up at all, but it's a

8  possibility, yes.

9      Q.    So there's a possibility.  Did you defend Mr.

10  Sherrod during this meeting of August the 9th?

11      A.    There was nothing to defend.

12      Q.    He was the only -- you were the only Board member

13  from the moment of this incident on August the 6th to the

14  August 9th meeting that he had spoken to; isn't that

15  correct?

16      A.    I don't know if he had spoken to anyone else, I

17  couldn't tell you that.

18      Q.    So you say there was nothing to defend --

19      A.    Correct.

20      Q.    -- when it comes to Mr. Sherrod

21      A.    Right.

22      Q.    Why do you say that?

23      A.    Because you're making it appear as if he like rode

24  out on a white horse and saved the world.  There were

25  actions that took place, he met with the employees and then

1    we met to see what course of direction the Board should take

2    on August 9th.  So there really was nothing to defend or

3    nothing to support, we had discussions on it on the 9th.

4        Q.    But the executive committee met while Mr. Sherrod

5    was on vacation.

6        A.    Right.

7        Q.    And discussed matters, right?

8        A.    Right.

9        Q.    Now, you knew that Mr. Sherrod was going to resume

10   his vacation plans, right, on August the 7th?

11       A.    I assumed so.

12       Q.    Did you in the meeting on August the 9th suggest to

13   the Board that in fairness to Mr. Sherrod there should be no

14   discussion about disciplinary action until he had come back

15   to town?

16       A.    No, I didn't, but why would I have had to, everyone

17   knew the situation.  See you're trying to -- obviously you

18   guys are trying to put everything right here.  I mean, other

19   Board members were there as well.

20       Q.    I'm sorry, you said other Board members were there

21   as well.

22       A.    At the executive committee meeting.  I didn't have

23   an executive committee meeting by myself.

24       Q.    I understand that you didn't have a

25   committee-of-one meeting.  My question to you is, did you

1    suggest to the committee that they not engage in any

2    discussion of potential disciplinary action of Mr. Sherrod

3    since he was not present?

4        A.    I answered that question.

5        Q.    And your answer is?

6        A.    I answered, no, no one did.

7        Q.    Now, there was another meeting according to this

8    Exhibit, Plaintiff's Exhibit 3.  It says executive meeting

9    report August the 13th?

10        A.    Uh-huh.

11        Q.    And I just want to read a statement or two from

12    there.  "We discussed a possible severance package for Mr.

13    Sherrod which included one-month's pay, continuation of

14    health benefits for 90 days, and an agreement not to contest

15    his unemployment".

16        A.    Correct.

17        Q.    "This package was based upon a discussion I had had

18    with Mr. Sherrod that night before.  We talked briefly about

19    defining the role of the executive director".  Now, let me

20    go back.  Prior to -- I'm assuming you're reporting on a

21    meeting of the executive committee that took place on August

22    the 13th of 2002; am I correct?

23        A.    Yes.

24        Q.    Prior to this meeting had notice gone out to the

25    executive committee that there would be such a meeting?

1   associated with the field trip of August the 6th, 2002 were

2   fired.  Did they file grievances?

3       A.   Yes.

4       Q.   What committee of the Board heard those grievances?

5       A.   I believe members of the management committee.

6       Q.   And who served on the management committee at that

7   time?

8       A.   Again, I don't know exactly.

9       Q.   Did you participate in those meetings?

10      A.   No.

11      Q.   Who did the Board members receive information from?

12      A.   What do you mean?

13      Q.   Who did they -- in hearing the appeals of these

14  three fired employees who did the Board receive information

15  from, those committees -- I'm sorry, the management

16  committee?

17      A.   I'm sorry, I don't understand your question.  Who

18  did the management committee receive information from.  What

19  information?

20      Q.   With regard to the appeal that these three

21  employees filed.

22      A.   The employees would have sent a written appeal and

23  then they would have met with the management committee or

24  that particular grievance committee.

25      Q.   So were you aware that the management committee

1    thought that Mr. Lester Howard should have been given his

2    position back?

3         A.    I proposed that.

4         Q.    You proposed that.

5         A.    I didn't think that Lester Howard should have been

6    fired.

7         Q.    Were you at that committee meeting involving Mr.

8    Howard?

9         A.    No.

10        Q.    So when did you make that proposal to the

11   committee?

12        A.    I suggested that, I said that to Mr. Sherrod and I

13   said that to the rest of the Board.

14        Q.    And when did you suggest that Mr. Sherrod?

15        A.    The day of the interviews.

16        Q.    August the 7th of 2002?

17        A.    That is correct.

18        Q.    You said it to Mr. Sherrod right then and there?

19        A.    After we got done -- see we were discussing what

20   should happen, and every scenario that we came across I

21   expressed that to Mr. Sherrod.

22        Q.    So let me go back to August 27th of 2002.

23        A.    Yes.

24        Q.    After each of the four individuals were interviewed

25   about what happened, you and Mr. Sherrod had a discussion?

1      A.    Yes.

2      Q.    And your recommendation --

3      A.    I didn't give any recommendations.

4      Q.    You didn't give my recommendation with regard to

5  any of those four individuals?

6      A.    I want to put you in the conversation.  We had a

7  conversation, he and I.  And we were pretty much talking

8  about the situation and how it should be addressed.  And in

9  that discussion he asked my opinion, I asked his, we threw

10  some things off of each other.  But I didn't recommend

11  anything happen to anyone.  I may have told him what I would

12  have done if I was in that situation, but that was not a

13  recommendation, and I did not instruct him to do anything.

14      Q.    What did you tell him you would have done if you

15  were in his situation?

16      A.    I believe I said I would have -- according to the

17  situation, according to the data, I think that two of the

18  three should be terminated and that's just my opinion.  I've

19  given my opinion many times and he took it or he didn't.  So

20  I didn't see the situation was any different.

21      Q.    Now, after the interview and the discussions you

22  and Mr. Sherrod had.

23      A.    Correct.

24      Q.    Did you an Mr. Sherrod speak later on that day?

25      A.    Not that day.

1    Q.   Not on August the 7th.

2    A.   No, because I believe he said he was going out of

3    town that day.

4    Q.   Did you direct Mr. Sherrod to prepare letters

5    notifying all three that they were fired?

6    A.   Absolutely not.

7    Q.   Did Mr. Sherrod read a draft of that letter to you

8    and get your approval?

9    A.   Yes, he did.  He didn't get my approval, he did

10   read a draft.  That situation -- the next day I received

11   subsequent telephone calls from Mr. Sherrod.  The first

12   phone call that I received from Mr. Sherrod he had said and

13   this is a quote.  He said, "I spoke to my wife last night

14   and I think I'm going to let all three of them go."  My

15   response to that was, James, if you think that's the right

16   thing to do then I'll see to it that the Board supports your

17   decision.

18   A few hours later I received a phone call from Mr.

19   Sherrod and he had asked me to come and write the

20   termination letter.  And I said to him then, I said, James,

21   we pay you $40,000 a year to run that organization, you do

22   the hiring and you do the firing, this is your decision, I

23   am not involved in that process; he said, okay.

24   He called me the third time and this is from your point.

25   He said, Sean, I just want to read this termination letter

1   to you.  Halfway through the letter I cut him off and I

2   said, James, why are you reading this to me.  This is your

3   decision, you got to make the call on this, so why are you

4   bothering me with this, and we terminated the conversation

5   then.

6        So there was conversation afterwards, but there was

7   nothing that I suggested by writing the letter, nor did he

8   seek my approval of the letter.

9        Q.   So you're saying that while Mr. Sherrod was on

10  vacation on August 8th he called you up.

11       A.   Absolutely, that next morning.  And, again, he was

12  on vacation from the Center, but whether he was in town or

13  not -- I believe he was in town.

14       Q.   Are you aware that he left town shortly after the

15  interviews?

16       A.   Again, I think so, because I had asked, you know --

17       Q.   Now, you say you talked to him on the 8th and there

18  was an executive committee meeting on August the 9th.

19       A.   Right.

20       Q.   Had Mr. Sherrod been given notice of the August the

21  9th meeting?

22       A.   Again, like I said, many times we had sent things

23  out via e-mail and I do believe his signature was on that

24  list -- his e-mail was on that list.  So if we sent out

25  e-mails, which I believe we did, he should have received a

1    copy.

2        Q.    But you realize he was scheduled to be on vacation

3    on August the 9th?

4        A.    As far as the executive committee he's not required

5    to be present.

6        Q.    Not even when there's a discussion of potential

7    disciplinary action against him.

8        A.    Again, just because that became part of the

9    discussion that doesn't mean that that was the primary focus

10   of the meeting.  The meeting was to discuss what happened on

11   August 6th.  Now, had members of the committee had brought

12   that up then went in to the report -- so we could have been

13   in there having a potential meeting about A and then someone

14   brought up B and so we reported on A and B as what happened

15   in the minutes during the course of the meeting.

16       Q.    Mr. Coleman, if somebody on the Board of Directors

17   were to say at the August 9th meeting that it was you

18   pushing for the termination for Mr. Sherrod would they be

19   telling the truth?

20       A.    I don't know what they would be doing.  Whether

21   they were telling the truth or not that's up to their

22   discretion.  As I mentioned, I don't recall what happened at

23   that particular meeting.  I mean who brought it up, but

24   there was a discussion.

25       Q.    Is it possible that you brought it up that Mr.

1    Sherrod should be terminated?

2        A.   Of course it's possible.  But, again, we took

3    discussion of potential disciplinary action.  Nothing in

4    there states anything about termination.  According to this

5    report it didn't say anything about termination.  Potential

6    disciplinary action which means that he may or may not have

7    been disciplined for the events.

8        Q.   That's right.

9        A.   And, again, that does not mean that I brought it

10   up.  That could have been brought up by other members of the

11   Board.

12       Q.   But it's possible that you brought it up.

13       A.   Yes, it's possible.

14       Q.   And of course, we understand that potential

15   disciplinary action could include anywhere from a warning to

16   termination, right?

17       A.   Right, just as it could include nothing at all.

18       Q.   Now, Mr. Coleman.

19       A.   Yes.

20       Q.   Isn't it true that after the interviews with the

21   staff on August the 7th, 2002 you directed Mr. Sherrod to

22   fire all the employees involved with the field trip?

23       A.   Absolutely not.  As I mentioned earlier I didn't

24   think Lester Howard should have been fired.

25       Q.   Isn't it true that you directed him to fire all

1    those niggers?

2        A.   Absolutely not.

3        Q.   Now, you learned that the controller was in charge

4    of the Center during Mr. Sherrod's absence, didn't you?

5        A.   Again, depending on how that's defined -- all the

6    controller said was that he was told that if anything

7    happened he was supposed to call Mr. Sherrod and he said he

8    did.

9        Q.   When did you speak with the controller?

10       A.   I spoke to him probably sometime during -- between

11   or after the event on probably like between August 12th and

12   the end of the month, the end of August or sometime in

13   there.

14       Q.   So you didn't go to him from August the 6th until

15   the end of August of 2002?

16       A.   I didn't say the end of August, it could have been

17   August 13th when I spoke to him.  I just said, sometime

18   between the 12th and the end of the month because I'm not

19   sure when.

20       Q.   Do you have any notes in your notebook that would

21   show when you spoke with the controller?

22       A.   I don't think so, but possibly.  No, I don't, no.

23       Q.   When do you think you might have spoken with him?

24       A.   Again, I don't recall.

25       Q.   Mr. Coleman.

1      A.    Yes.

2      Q.    The Booker T. Washington Center claims that Mr.

3    Sherrod submitted a verbal resignation to the Board in

4    August of 2002; is that your -- do you recall any such thing

5    happening?

6      A.    Yes.

7      Q.    And when do you recall it happening?

8      A.    At the August 12th meeting.

9      Q.    This is the meeting where there was probably no

10   notice given?

11     A.    Pardon.

12     Q.    August 12th meeting.

13     A.    No, there had to be notice given, 11 people showed

14   up.

15     Q.    But you can't tell us where we can find proof that

16   such notice was given?

17     A.    I think proof would be in the fact that 11 people

18   showed up.  You can't show up for a meeting that you don't

19   know exists, that was August the 12th.

20     Q.    We need to know if there was notice given and if so

21   what was the method of it.

22     A.    If there was notice given it would have been either

23   through e-mail, telephone call, or it could have been mailed

24   out, I'm not particularly sure.

25     Q.    And would that e-mail have come from you?

1      A.    We could have talked about the weather or anything
2    else.
3      Q.    Well, I'm not dealing with the weather here, I want
4    to deal with any other conversations that day surrounding
5    the incident of August the 6th and what to do with the
6    employees on August the 7th; did you have any other
7    conversations with Mr. Sherrod?
8      A.    I would look at that as just one conversation,
9    because we talked about the same event.  So to say did we
10   have any other conversations, yes, but it was all focused
11   around the same event.
12     Q.    You left there, the Booker T. Washington Center, at
13   what time?
14     A.    I don't know, sometime in the afternoon, sometime
15   in the late morning.
16     Q.    Late morning.  And the next contact you had with
17   Mr. Sherrod?
18     A.    That next day he called me.
19     Q.    You had no other contact on August the 7th.
20     A.    No, I don't think so, because he said he was going
21   out of town.  If I'm not mistaken, he was supposed to be
22   leaving from the Center to go pick up his family to go out
23   of town, so I didn't have any other contact with him.
24     Q.    Now, the Defense has claimed that Mr. Sherrod was
25   suspended.  Can you tell me when Mr. Sherrod was suspended?

1     A.    I don't know.

2     Q.    Was he suspended?

3     A.    There was like a period in there -- and we may have

4  just been playing with semantics, but there was a period of

5  time where we did use the term suspension.

6     Q.    That you what?

7     A.    That we used the term suspension.

8     Q.    When you say we who are you referring to?

9     A.    The Board.

10    Q.    Well, let's go back.  We're dealing with August the

11  6th, and we have a letter of resignation -- a firing, I'm

12  sorry, dated September the 24th, '02.

13    A.    Right.

14    Q.    When did the Board suspend Mr. Sherrod?

15    A.    Right, I guess, it would have been -- again, he

16  gave his verbal resignation on the 12th.  So once his letter

17  came in stating that he wasn't going to resign, I must

18  presume that it would have to have been between the 16th of

19  August and the 24th of September.

20    Q.    Well, let's go back and not have you presume.

21    A.    I have to because I don't know exactly.

22    Q.    Well, this -- I'll assume that Mr. Martinucci as he

23  was drafting the Answer and New Matter to Plaintiff's

24  Complaint consulted with you; would that be accurate?

25    A.    I don't know, did you consult with me.  I don't

1     A.   Correct.

2     Q.   After Mr. Sherrod was let go there was an article

3  in the newspaper involving the August 6th incident about Mr.

4  Sherrod being let go.  Who among the Board had contact with

5  the media?

6     A.   I know they contacted me a couple of times.

7     Q.   Who contacted you?

8     A.   The media.

9     Q.   Who, which --

10    A.   Kevin Flowers.

11    Q.   Of the Erie Times.

12    A.   Correct.

13    Q.   Any other reporters?

14    A.   No.

15    Q.   How many times did Kevin Flowers contact you?

16    A.   I don't know, I want to say twice.

17    Q.   When did he do so?

18    A.   Sometime after August 6th -- after August 12th, I

19  mean.

20    Q.   What led Kevin Flowers to contact you after August

21  12th of 2002?

22    A.   I have no idea.

23    Q.   Kevin Flowers contacted you.

24    A.   Yes.

25    Q.   And you said contacted you more than once.

1    A.   I think twice.

2    Q.   When was the second time?

3    A.   I don't know when the second time was, but I think

4    he contacted me twice.

5    Q.   I'm sorry.

6    A.   I'm not sure when the second time was, but I think

7    he contacted me twice.

8    Q.   Do you know why Kevin Flowers contacted you the

9    first time?

10   A.   To discuss this incident, James resigning and they

11   terminated him.

12   Q.   So he called you to discuss the Plaintiff's

13   situation?

14   A.   Yes, trying to get an article.

15   Q.   Now, did he say where he had received his

16   information from?

17   A.   I do not recall.

18   Q.   The Defendant in the Answer in New Matter quotes a

19   portion of a prepared statement regarding the Plaintiff's

20   situation.  Did you make that statement to the media?

21   A.   Can I see it?

22        MR. MARTINUCCI:  Can I show him the statement?

23        MS. BENSON:  Yes.

24   A.   Am I allowed to answer from the statement.  Where

25   are we at.

1        MR. MARTINUCCI:  19.

2        MS. BENSON:  19.

3   A.   Yes.

4   Q.   So you made that statement to the media.

5   A.   Uh-huh.

6   Q.   In making that statement to the media was it in

7  writing or orally?

8   A.   That was oral, I believe.

9   Q.   Did you consult with anyone before making that

10  statement?

11   A.   Yes.

12   Q.   Who did you consult with?

13   A.   We were at, I believe -- I want to say, again, I'm

14  getting all of these mixed up as you can see.  But it was at

15  an executive committee meeting or maybe it was a general

16  Board meeting, and they informed me if I was contacted or if

17  I was to be contacted that that was the statement I was to

18  give.

19   Q.   And who told you to do that?

20   A.   I believe Mr. Faulkerson had come up with the

21  wording and the rest of us agreed that's what we would say.

22   Q.   And Mr. Faulkerson is a member of the Board of

23  Directors?

24   A.   I don't think he's there now, but he was at the

25  time.

1    don't recall.

2       Q.   Mr. Coleman, are you making yourself available to

3    testify at this matter in trial?

4       A.   Aren't I obligated, don't I have to?  I would

5    appreciate not to if you could avoid that because I will be

6    starting a new job soon.

7       Q.   Mr. Coleman, do you recall the August 12th, '02

8    meeting with the staff of the Booker T. Washington Center on

9    August the 13th of '02?

10      A.   I do recall meeting with the staff, but I'm not

11   sure if it was the 13th or the 14th.  But I do recall

12   meeting with the staff.

13      Q.   Now, the purposes of that meeting was to tell the

14   staff where things stood with regard to Mr. Sherrod; is that

15   correct?

16      A.   Yes.

17      Q.   Now, in that meeting weren't you asked to confirm

18   that in directing Mr. Sherrod to fire Mr. Howard, Mr.

19   Johnson and Ms. Smith --

20      A.   Smith.

21      Q.   -- Smith, that you used the word nigger?

22      A.   I don't recall because, number one, I can't confirm

23   that because I didn't make that direction or instruction.  I

24   didn't direct anyone to fire anyone.

25      Q.   So if I brought in every single staff member

1    present at that meeting on August the 13th --

2        A.   And there was a Board member also.

3        Q.   That's right.  And that Board member was who?

4        A.   Paul Gambill.

5        Q.   If I brought in every single member at that meeting

6    and they said that you used the word nigger in telling Mr.

7    Sherrod to fire those individuals they would all be lying.

8        A.   Yes, because I did not instruct Mr. Sherrod to fire

9    anyone.

10       Q.   Did you use the word nigger in reference to Mr.

11   Johnson, Mr. Howard, and Ms. Smith?

12       A.   No.

13       Q.   Now the Defendant, in response to a request for

14   admissions, says that you did.  I'll read it to you.

15       A.   Please do.

16       Q.   Just give me a moment.

17       MR. MARTINUCCI:  Why don't you let me show it to

18       him?

19       MS. BENSON:  I would prefer to read it to him.

20       A.   Just let me see it.

21       MS. BENSON:  I want to read it to him.  I'll be

22       accurate.

23       MR. MARTINUCCI:  Well, fine, you can read it to him

24       and he can look at it too.

25       MS. BENSON:  No, I want to read it, I don't know

1        what's on your document.
2        MR. MARTINUCCI:  You know what, here take a look at
3        what's on my page.  See if it's the same thing
4        that's on yours.
5        MS. BENSON:  I have mine, thank you.  This is what
6        it says.
7        MR. MARTINUCCI:  You're referencing Number 24.
8        MS. BENSON:  No, I'm referencing Number 25 and this
9        is the question.
10   Q.   Let me read it to you, Mr. Coleman.
11   A.   Sure.
12   Q.   I'm going to read you the question and then I'll
13   read you the answer.  And you don't have to read that, you
14   can just listen to me.
15   A.   I'd like to read it.
16        MR. MARTINUCCI:  Or if you want to read it you can
17        read it.
18   A.   I'll read it.
19        MS. BENSON:  No, this is my deposition.  Put that
20        book away, I'll read it to you.
21   A.   Who are you yelling at, calm down.
22        MS. BENSON:  No, that's being disrespectful.
23   A.   No, what's disrespectful is that you asked me to
24   tell you something that the Defendant said.
25        MS. BENSON:  I'll read it to you.

1      Q.   Now, Mr. Coleman, I'm not at this point asking you

2   to look at a document that you apparently were --

3      A.   So how can you read something to me --

4           MR. MARTINUCCI:  Here, go ahead.  Let her read it

5           to you.

6      Q.   This is the question, that on or about August the

7   13th, 2002 in a meeting with the Center staff, Mr. Sean

8   Coleman, the Center's vice president admitted calling

9   African American employees niggers.  Defense answer, they

10  admitted in part and denied it in part.  It is admitted that

11  a Coleman, also african American, acknowledged using the

12  word nigger or niggers or some derivative of that word.  Now

13  I'm going to go back.

14          MR. MARTINUCCI:  Derivation.

15          MS. BENSON:  Derivation.

16     Q.   I want to go back at this point, back to the

17  meeting and your memory of August the 13th.

18     A.   Correct.

19     Q.   Did you in that meeting acknowledge referring to

20  Mr. Howard, Mr. Johnson, and Ms. Smith as niggers?

21     A.   No.

22          MR. MARTINUCCI:  And for the record, I'm going

23          to read in the rest of the response to the Request

24          for Admissions.  Upon information and belief,

25          however, it is denied that Coleman's use of this

1    word was necessarily restricted to African American

2    employees.  As Plaintiff is aware, Coleman is no

3    longer a member of the Defendant's Board of

4    Directors and has moved from the area,

5    parenthetical on my point which was my

6    understanding at the time that these were prepared.

7    Continuing on the response.  The Defendant has been

8    unable to contact Coleman to ascertain the specific

9    scope and context of this reference as referred to

10   in the Request for Admissions.  This response for

11   Request for Admissions will be supplemented at such

12   time as the parties are able to depose Mr. Coleman,

13   which is what we're here for today.

14 BY MS. BENSON:

15      Q.   Mr. Coleman.

16      A.   Yes.

17      Q.   As an African American you are and have heard the

18 word nigger, right?

19      A.   Absolutely.

20      Q.   And as an African American you are aware that word

21 is only directed to people of African decent; aren't you?

22      A.   That is not correct.

23      Q.   Mr. Coleman, the three individuals that were fired

24 from the Booker T. Washington Center on August the 7th were

25 all African Americans; isn't that correct?

1      A.    Yes.

2      Q.    And then on August the 12th, the other individual

3    fired was an African American, Mr. Sherrod.

4      A.    Correct.

5      Q.    And during the time period of August 5th to August

6    the 9th of 2002 the controller was in charge of the Booker

7    T. Washington Center; isn't that correct?

8      A.    I believe so.

9      Q.    And the controller is a white individual; isn't

10    that correct?

11     A.    Correct.

12     Q.    Now, the Board in dealing with the incident of

13    August the 6th, 2002 has never taken any action against the

14    controller, has it?

15     A.    At the time I was there, no.

16     Q.    Did you ever recommend that the Board do so?

17     A.    Yes.

18     Q.    You recommended that the Board take action?

19     A.    Yes, I did.

20     Q.    And when did you recommend that?

21     A.    That would have been at -- that would have been at

22    a meeting between -- again, August -- sometime in one of

23    those meetings in August, exactly when, I have no idea.

24     Q.    Which meeting in August?

25     A.    I just told you, exactly when I have no idea.  I

1   don't recall.

2       Q.   Was the meeting recorded?

3       A.   I don't know if it was a regular Board meeting or

4   an executive committee.

5       Q.   Did you take notes of that meeting?

6       A.   I rarely took notes at any meeting.

7       Q.   Well, you have quite a few there.

8       A.   These aren't notes from meetings, these are notes

9   from conversations regarding this incident.

10      Q.   At that meeting do you recall taking any notes?

11      A.   I don't recall.

12      Q.   Do you have any documentation that will show that

13  you made such a recommendation?

14      A.   No, I don't.

15      Q.   Who on the Board of Directors do you think would

16  recall such a recommendation?

17      A.   Whomever was there.  Again, I don't recall exactly

18  who was there.  Jeffress was there, I believe, Fries was

19  there, McAdory was there, several other members, I don't

20  recall who.

21      Q.   And what reason did you give them for taking action

22  against the controller?

23      A.   Well, again it wasn't until the 12th that I found

24  out that the controller was supposed to be in charge.  All

25  right.  But, again, as I mentioned the controller stated

1    that all he was told to do was contact Mr. Sherrod, which he
2    said he had done.  My reason was, again, because he was the
3    -- prior to me finding out that bit of information, after
4    finding out that he was in charge, that then he should have
5    some type of disciplinary action as well.
6        Q.    So on August the 12th you felt that the
7    controller--  action should have been taken against the
8    controller.
9        A.    After I found out he was in charge, yes.
10       Q.    And you found this out on August the 12th you said.
11       A.    Yes.
12       Q.    And it was in a meeting that you did so, that you
13   found this out.
14       A.    Yes, from Mr. Sherrod.
15       Q.    The entire Board, or the people that you meet with,
16   heard your recommendation regarding the controller.
17       A.    Yes, I believe it would have been at the executive
18   committee meeting on the -- I don't want to misstate.  I
19   think it would have been at the executive committee meeting
20   on the 13th, but it could have possibly been the next Board
21   meeting the following week.
22       Q.    Was it where there was this large number of people?
23       A.    No, there was only about -- that's why I'm trying
24   to identify.  It was only six people, if that.
25       Q.    Can you recall who they were?

1    Washington Center made a decision to advertise for the

2    availability of Mr. Sherrod's position.

3        A.    Uh-huh.

4        Q.    At what point did Mr. Bill Jeffress express an

5    interest in Mr. Sherrod's position?

6        A.    He didn't express an interest in Mr. Sherrod's

7    position, he expressed an interest in the vacant executive

8    director's position.  And, I believe, that was -- I'm not

9    sure, it was sometime in the winter.  I'm not sure if it was

10   December, I think it was December.  I think I'm not

11   particularly sure.

12       Q.    Was it before you started advertising for the

13   position?

14       A.    Again, I don't recall.

15       Q.    Now, how did Mr. Jeffress's, who's the current

16   director go about expressing his interest in the executive

17   directorship?

18       A.    I believe he had sent a -- again, I'm not sure if

19   it was an e-mail or a written letter.  But he had sent a

20   notice of correspondence.

21       Q.    Do you know who he sent that to?

22       A.    To the members of the Board.

23       Q.    Do you have a copy of that?

24       A.    No, I don't.

25       Q.    Now, who served as the -- did anyone serve as an

1    interim director pending the selection of Mr. Jeffress?

2        A.   I don't recall how that process went.

3        Q.   Were you on the search committee?

4        A.   In fact, what we had done is when we began to

5    receive application, I believe, Mr. Jeffress did start off

6    as the interim director.

7        Q.   Were you on the search committee?

8        A.   Yes.

9        Q.   Who conducted the search?  Was this a normal Board

10   committee or --

11       A.   I think what we did -- I think it was pretty much

12   the executive committee, I believe, I think.  I can't be

13   sure, but I think it was the executive committee.

14       Q.   How can we find out who constituted the search

15   committee?

16       A.   Talk to the members of the Board or to that Board.

17       Q.   So through your letter --

18       A.   Whose letter.

19       Q.   I'm referring back to the notice that you sent to

20   Ms. Smith, Anita Smith, dated August the 21st of 2002, that

21   appointed her to manage the program on a day-to-day basis.

22   How long did Ms. Smith serve in this temporary capacity?

23       A.   I don't remember.

24       Q.   After Ms. Smith, who took over after her?

25       A.   It was Mr. Jeffress.

1    Q.   So it was an immediate take over after that.

2    A.   I'm not sure how you define immediate.  I can't say

3  if it was immediate or not, because I'm not sure how long

4  Ms. Smith has had served in that capacity.

5    Q.   You have no idea when Mr. Jeffress first expressed

6  an interest in the position.

7    A.   No, like I said --

8    Q.   Did anybody else on board express an interest in

9  the position?

10   A.   No, not to my knowledge.

11   Q.   So he was the only one.  Mr. Coleman, I'll show you

12  what will probably become, I think, should be Exhibit Number

13  6.  I'll give you a few seconds to review that.

14        (Plaintiff Exhibit Number 6 marked for

15        identification.)

16   A.   Okay.

17   Q.   And there's a notation, as you can see on here that

18  says letter from Mr. Jeffress to the Board.

19   A.   Correct.

20   Q.   In reviewing both this handwritten note and this

21  typed written note, any idea when this was given to the

22  Board?

23   A.   No, again I thought it was sometime in the winter,

24  but I don't have any recollection.

25   Q.   Is this what you were referring to?

1    A.   Yes.

2    Q.   So it doesn't look like it was an e-mail, it looks

3    like --

4    A.   I said it could have been possibly an e-mail or a

5    written notice, I did say that.

6    Q.   Now, the first statement in the second sentence in

7    this, it says -- let me read the first statement and second.

8    In order to better serve the Booker T. Washington community

9    I am proposing to executive committee that I be allowed to

10   step down as chair of the management committee and the BESSETTI

11   Board.  This will enable me to assist in the facilitation of

12   a smooth transaction (sic) with its current director, Mr.

13   James Sherrod.

14         MR. MARTINUCCI:  Transition.

15   Q.   I'm sorry, transition with its current director,

16   Mr. James Sherrod.  Does that statement help you in so far

17   as trying to figure out when Mr. Jeffress expressed an

18   interest in executive director?

19   A.   No, it probably was sooner than I thought it was.

20   Q.   I'm sorry

21   A.   It just helped me refresh that it was sooner than I

22   thought it was.

23   Q.   Was it before September the 24th, '02?

24   A.   I have no idea.

25   Q.   Mr. Coleman, I only have one copy of this, but

1    you're probably familiar with this.  It's the incident

2    report prepared by Anita Smith, dated August the 6th, '02.

3    Does that look familiar to you at all?

4        A.   Yes.

5        Q.   Can you tell me whether the Board of Directors or

6    any committees of the Board ever had a copy of Ms. Smith's

7    report?

8        A.   I believe the entire Board got a copy of this.

9        Q.   Any idea when they might have received a copy of

10   it?

11       A.   I think -- I'm not sure if Anita presented it or I

12   -- the August 12th meeting, I believe.

13       Q.   So you think she might have presented it then also?

14       A.   I think she gave a copy of it at that meeting.

15       Q.   You made a recommendation to the Board that they

16   take disciplinary action against the controller?

17       A.   It wasn't a recommendation, it was a suggestion.

18       Q.   Suggestion.

19       A.   Yes.

20       Q.   What was your suggestion?

21       A.   I think it was very general, I said that something

22   should be done to Brian as well if he was in charge.  And I

23   think that was the basis of it.

24       Q.   Did you make a recommendation with regard to Mr.

25   Sherrod?

1        A.   At what point?

2        Q.   At any time beginning from the very first meeting,

3   I think it was a committee meeting or Board meeting.  Did

4   you make any recommendation for Mr. Sherrod and what

5   disciplinary action should be taken?

6        A.   Again, with Mr. Sherrod there was a discussion.  I

7   don't think I made a recommendation.  I don't recall as

8   much, but we had discussed and then voted on the action to

9   be taken against Mr. Sherrod.

10       Q.   And was that at the August 12th, '02 meeting?

11       A.   Yes.

12       Q.   What was your suggestion with regard to Mr.

13  Sherrod?

14       A.   Again, it was a collective decision to ask for Mr.

15  Sherrod's resignation.

16       Q.   But did you make your own personal recommendation

17  to the Board as to what --

18       A.   Again, I supported the decision.  I gave my input

19  and my input was that we should ask for his resignation as

20  well.

21       Q.   That was your opinion.

22       A.   Yes.

23       Q.   Mr. Coleman, are you aware of any other Board

24  members being actively involved in the investigation

25  surrounding the incident of August the 6th, '02?

1     A.   Yes.

2        Q.   And can you identify those Board members?

3     A.   I don't know all of them, but Mr. Hamilton, Mr.

4   Jeffress, Mr. Gambill, I believe Mr. Fries.  There were

5   probably more, but they are the four that come to mind.

6        Q.   What did Mr. Hamilton, who was the Board chair at

7   that time, do?

8     A.   Again, he pretty much directed what type of

9   information we should get.  What type of data we needed to

10  collect.

11       Q.   Was that in preparation for the executive committee

12  meeting that you have testified to before?

13    A.   It was in preparation of that as well -- I mean, he

14  was kind of like steering the ship after that point.

15       Q.   After which point?

16    A.   The 12th, after that meeting -- or after the

17  meeting on the 9th, I'm sorry.

18       Q.   So after the meeting on August the 9th -- Mr.

19  Hamilton was steering the matter?

20    A.   Well, he was the chairperson, he was functioning as

21  his capacity as chairperson.

22       Q.   How would you characterize your role after Mr.

23  Hamilton began acting as Board chair?

24    A.   My capacity was still the same, I was functioning

25  as the capacity of vice chair.

1    Q.    As the two of you, who was the most active?

2    A.    Probably, up to a point, myself because his work

3    conflicted with the times we had met for meetings.  And so

4    up until this point, myself.  Then I can't say who was the

5    most active because we were doing different things, we had

6    different capacities.

7    Q.    So the meeting of August the, I think, the 9th was

8    Mr. Hamilton there?

9    A.    Was he there.  I want to say, yes, because he had

10   instructed me to get data the day before.  I can't recall if

11   he was present or not, I believe he was.

12   Q.    The meeting of August the 12th, was Mr. Hamilton

13   there?

14   A.    Yes, I believe he was.

15   Q.    The meeting of August the 13th, was Mr. Hamilton

16   there?

17   A.    I'm not sure.

18   Q.    Do you know whether Mr. Hamilton ever met with Mr.

19   Martinucci regarding the incident of August the 6th, '02 and

20   then the letting go of Mr. Sherrod?

21   A.    I don't know.

22   Q.    Now, Mr. Jeffress, you say was involved.  What did

23   Mr. Jeffress do?

24   A.    I mean, again, it was just a matter of taking the

25   data, reviewing the information, and seeing what the action

1    would be.

2        Q.    Taking data from where, Mr. Jeffress?

3        A.    No, I'm saying collectively.  I don't recall

4    specifically what he did.  It was just that we had this

5    information, we went through and then we developed an action

6    plan or course of action.

7        Q.    When you say we who are you referring to?

8        A.    The members of the executive committee.

9        Q.    To your knowledge did Mr. Jeffress do anything on

10   his own?

11       A.    I don't know.

12       Q.    For instance, like have conversations with Mr.

13   Sherrod.

14       A.    I'm sure he did, I know he did have conversations

15   with Mr. Sherrod.  But other than that I don't know, you

16   have to ask Mr. Jeffress.

17       Q.    Do you know if he reported to the Board on those

18   conversations?

19       A.    Yes.

20       Q.    When did he report to the Board on those

21   conversations?

22       A.    At whatever subsequent meetings we attended.

23   Because Mr. Jeffress was also a member of the executive

24   management committee.  So where and when I don't know, but

25   I've got to presume at those particular meetings.

1     Q.   Mr. Paul Gambill, what did Mr. Gambill do?  You've

2     testified earlier that he was at the meeting of the staff on

3     August the 13th?

4     A.   Yes, right.

5     Q.   What else did Mr. Gambill do?

6     A.   I don't know, I can't recall.

7     Q.   And Mr. Fries.

8     A.   Mr. Fries, he was on the management committee --

9     was he on the management committee.  I believe he was on the

10    management committee.  I do recall him being at subsequent

11    meetings after the 6th or after the 12th, I'm sorry.  But I

12    could be confusing a Board meeting with the executive

13    committee, I mean the management committee meeting.

14    Q.   So Mr. Fries, you recall him as being primarily

15    being involved in committee activities?

16    A.   I'm not sure.  I know that he was also a part of

17    the decisions revolving around the investigation of what

18    happened.  He would been at a regular Board meeting or at a

19    committee meeting.

20    Q.   In Ms. Smith's report of August the 6th, '02 she

21    makes mention of the fact that she called Brian to inform

22    him of the incident since he was covering for James while

23    James was on vacation.

24    A.   Yes.

25    Q.   Is that when you say that was the only time you

1  were aware of that?

2       A.   Can I see that.

3       Q.   Sure, it's on the second page.  And it's this

4  sentence right here.

5       A.   Okay.  Now, what was your question?

6       Q.   Are you saying that it was only as a result of her

7  report to the Board that you learned that Brian was in

8  charge?

9       A.   I'm not saying it was only as a result -- I'm just

10 saying I didn't learn of that until the 12th of August.  So

11 it could have come from James at that meeting or it could

12 have been after reading that incident report.

13          MS. BENSON:  Excuse me for a moment.  Do you have

14          any questions?

15       MR. MARTINUCCI:  I have a couple for you.

16

17                    CROSS-EXAMINATION

18 BY MR. MARTINUCCI:

19

20       Q.   Sean, these first couple of questions are going to

21 seem a little ridiculous, but this is a written transcript

22 and not a video one.  So I want to make sure this is clear

23 on the record.

24       A.   Okay.

25       Q.   What is your race?

1    A.   African American.

2    Q.   What is your color?

3    A.   Black.

4    Q.   Now, there have been a couple of times during the

5  course of this deposition where it has been suggested or

6  other people have reported to have alleged that you used the

7  word nigger; do you remember those?

8    A.   Correct.

9    Q.   Now, you've denied that and I understand that

10  that's where things stand.  But let me pose a hypothetical

11  to you.  If you were to have used that word would it have

12  been your understanding or belief that the use of that word

13  would have been offensive to Mr. Sherrod?

14    A.   No.

15    Q.   Why not?

16    A.   Because Mr. Sherrod and I in conversations at the

17  Center and outside of the Center have used the term in

18  conversing with each other.  It is an accepted part of the

19  vernacular between he and I.

20    Q.   You say it's an accepted part of the vernacular?

21    A.   Right.

22    Q.   Is the term always used in a negative way?

23    A.   No.

24         MS. BENSON:  Objection, that's speculative and

25         awfully broad.  And who are you referring to,

```
 1              always used that way.
 2      A.     Pardon me.
 3              MR. MARTINUCCI:  Let me phrase it this way.
 4              MS. BENSON:  The question is overly broad.
 5              MR. MARTINUCCI:  Fine, your objection is noted for
 6              the record.
 7      Q.     Sean, to your understanding is the term nigger
 8      always used in a negative connotation?
 9      A.     No, it's not.
10      Q.     What is your understanding as to how it's used?
11      A.     To my understanding it's the intent behind the
12      word.
13      Q.     Okay.
14      A.     So in conversations with whether it's Mr. Sherrod
15      or someone else if the term or derivative of the term is
16      used it depends on the intent.  It could be just in
17      reference of just calling someone dude or cat.  It hasn't
18      always been used to refer to only African Americans in my
19      conversations with people.  But it's kind of like -- then if
20      it's used as with any other term with the intent to harm,
21      which hasn't been the case with my conversations with Mr.
22      Sherrod or anyone else, then it's not offensive.  I think
23      that answers your question.
24      Q.     You say that you've heard Mr. Sherrod use that
25      word?
```

1    A.    Yes.

2    Q.    You've heard him use that word at the Booker T.

3  Washington Center?

4    A.    Right, in conversations with me.

5    Q.    Did you recall to whom he was referring to in any

6  of those conversations?

7    A.    No, it could just have been very general.  About

8  things that like when we were in high school or even from

9  high school or referring to people in the community or just

10  in talking in general.

11    Q.    Okay.  Mr. Sherrod ultimately was the individual

12  who came to the Board with recommendations to terminate the

13  three individuals who were let go, correct?

14    A.    Correct.

15    Q.    Did he ever make any recommendations -- well, let

16  me phrase it this way.  What recommendation did Mr. Sherrod

17  make with regard to Mr. Bessetti?

18    A.    None.

19    Q.    Did Mr. Bessetti report to Mr. Sherrod during that

20  period of time, was that the way the chain of command

21  worked?

22    A.    You mean during the period of the incident or just

23  in general.

24    Q.    During the period of the indent or at any time in

25  general?

1      A.   Right, from my understanding that's how it was

2   suppose to have worked.

3      Q.   Did Mr. Sherrod recommend any disciplinary action

4   against -- I forgot her first name, but Ms. Pacely the

5   temporary worker?

6      A.   No.

7      Q.   Do you recall what race she was?

8      A.   Ms. Pacely was African American.

9      Q.   You were involved with discussions and meetings and

10  ultimately votes that resulted in Mr. Sherrod's separation

11  from the Booker T. Washington Center, correct?

12     A.   Yes.

13     Q.   Did you take or participate in or recommend any

14  action in that regard based on Mr. Sherrod's race?

15     A.   Absolutely not.

16     Q.   Did you take, recommend, or participate in any

17  action with regard to taking or not taking disciplinary

18  action against Brian Bessetti because of his race?

19     A.   Absolutely not.

20     Q.   Do you know of any other Board member who used race

21  as a consideration in any of these events?

22     A.   No.

23     Q.   Bill Jeffress is the current executive director of

24  the Booker T. Washington Center.

25     A.   Yes.

1    Q.    What's his race?

2    A.    African American.

3    Q.    What's his color?

4    A.    Black.

5         MR. MARTINUCCI:  Thank you, I have nothing further.

6         MS. BENSON:  Let me just go back.

7

8                    REDIRECT EXAMINATION

9    BY MS. BENSON:

10

11   Q.    You've just testified that Mr. Sherrod came to the

12   Board with recommendations of firing those three

13   individuals.  Which Board meeting did he come to with those

14   recommendations?

15   A.    Can you rephrase that?

16   Q.    You just testified that Mr. Sherrod came to the

17   Board with recommendations to fire Howard, Smith, and

18   Johnson.  At which Board meeting did he make that

19   recommendation?

20   A.    I must have misstated what James had done, or what

21   Mr. Sherrod had done.

22        MR. MARTINUCCI:  I probably misstated.

23   A.    He contacted me and told me that was what he was

24   going to do, which he didn't have to, but he did because we

25   were corresponding during this episode or this situation.

1    therefore should not be fired?

2        A.   I know he wasn't there, but I didn't believe that

3    he should not have been fired.  He actually wasn't fired at

4    that meeting.

5        Q.   He was asked to resign at that meeting.

6        A.   Correct.

7        Q.   And would you say that asking him to resign was in

8    effect firing him?

9        A.   No, because we asked him for his resignation.

10       Q.   Wasn't his keys taken from him that day?

11       A.   I do not recall because he gave his verbal

12   resignation.  So if his keys had been taken from him that

13   would have been as the result of his resignation.

14       Q.   So, if Mr. Jeffress were to say that he, Mr.

15   Jeffress, left the Board meeting and went to Mr. Sherrod and

16   said, give me your keys Mr. Jeffress would not be telling

17   the truth.

18       A.   I did not say that, I said I don't recall.  But I

19   said it would be taken as the result of his resignation.

20            MS. BENSON:  Okay.

21

22                         RECROSS-EXAMINATION

23   BY MR. MARTINUCCI:

24

25       Q.   Sean, just so I'm clear on the chain of events

1    leading up to the termination of the three employees.
2    You're saying here that that was Mr. Sherrod's decision and
3    that he didn't have to check with you or any other Board
4    member before he disciplined or fired any employees.
5        A.    Correct.
6        Q.    Would that include Mr. Bessetti?
7        A.    Correct.
8        Q.    To your knowledge did Mr. Sherrod ever take any
9    action against Mr. Bessetti?
10       A.    No, he didn't to my knowledge.
11             MR. MARTINUCCI:  Thank you, nothing further.  As
12             Ms. Benson said at the beginning of the deposition
13             you do have the right to review this transcript
14             before it becomes an official part of the record.
15             If you want to, the court reporter will need an
16             address for you, or I'll need an address for you so
17             we can send you a copy of it.  You'll have 30 days
18             to review it once she sends the transcript out.
19             There's a sheet attached to the back called an
20             Errata Sheet where you will have an opportunity to
21             say okay, well, it says this on Page 24, line 15,
22             and it should say that.  And you sign it at the end
23             to certify that what you're putting down on the
24             Errata Sheet is true and correct.  It's completely
25             up to you whether or not you do that.

1          MS. BENSON:  And only -- not to change a response.

2    A.   Do I have to correct it?

3          MR. MARTINUCCI:  No, you don't?

4    A.   Okay.

5          MS. BENSON:  Let me just go to make sure for the

6          record.  Plaintiff Exhibit Number 1 is the Booker

7          T. Washington Board of Director list from January

8          of 2002 to December 2002.  Plaintiff Exhibit Number

9          2 is the termination letter dated September 24th,

10         '02.  Plaintiff Exhibit Number 3 is the notes of --

11         a summary of the executive committee meeting on

12         September the 13th, 2002.  Plaintiff Exhibit Number

13         4 is the narrative, three-page narrative here from

14         the Booker T. Washington Center.  And Plaintiff

15         Exhibit Number 5, August 16th, 2002, a letter from

16         Mr. Sherrod to Mr. Hamilton indicating that he had

17         not and was not going to resign his position.

18         Plaintiff Exhibit Number 6 is a note from that, it

19         has been identified from Mr. Bill Jeffress, it is

20         not dated.  So those are that and if you would give

21         me back that and then I can give it to her rather

22         than give it from my notes.

23

24         (Deposition concluded at 4:05 p.m.)

25

1    COMMONWEALTH OF PENNSYLVANIA          :

2    COUNTY OF ERIE                        :

3

4        I, Heather E. Nass, Notary Public in and for the

5    Commonwealth of Pennsylvania, do hereby certify that I

6    recorded, stenographically, the deposition of SEAN P.

7    COLEMAN, held on June 28th, 2005.  Further, that I am not an

8    employee or an attorney of any of the parties, or a

9    relative, or employee of any counsel, and that I am in no

10   way interested directly or indirectly in this action.  IN

11   WITNESS THEREOF, I have set my hand and affixed my seal of

12   office this 18th day of July, 2005.

13

14

15   _____
     Notary Public

16                    NOTARIAL SEAL
                 HEATHER E. NASS, NOTARY PUBLIC
17               WATERFORD TWP. ERIE COUNTY, PA
             MY COMMISSION EXPIRES SEPT. 18, 2008

18

19

20

21

22

23

24

25