```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   JAMES C. SHERROD,              :
 3          Plaintiff             :
                                  :
 4          v.                    :   Civil Action NO. 04-208 Erie
                                  :
 5   BOOKER T. WASHINGTON CENTER, :
            Defendant             :
 6

 7

 8

 9          Deposition of WILLIAM JEFFRESS, taken before

10      and by Sondra A. Black, Notary Public in and for the

11      Commonwealth of Pennsylvania, on Wednesday, July 27,

12      2005, commencing at 9:36 a.m., at the offices of

13      Susmarski Law Office, 4030 West Lake Road, Erie,

14      Pennsylvania 16505.

15

16

17   For the Plaintiff:

18      Edith Benson, Esquire
        4683 Budd Drive
19      Erie, PA 16506

20   For the Defendant:

21      Arthur D. Martinucci, Esquire
        Quinn Buseck Leemhuis Toohey & Kroto, Inc.
22      2222 West Grandview Boulevard
        Erie, PA 16506
23

24
                  Reported by Sondra A. Black
25              Ferguson & Holdnack Reporting, Inc.
```

1    Q.   So when you received notice of this meeting, which
2    you've stated you believe was by phone, what were you told
3    would be the purpose of this meeting?
4    A.   The Booker T. Washington Center right now has a
5    situation that happened, and we need to have a board meeting
6    to discuss the situation.
7    Q.   What situation was being referred to?
8    A.   The situation that was being referred to a young
9    lady who was left at a movie theater, and from a public
10   standpoint it looked as if the Booker T. Washington Center
11   was negligent, and we needed to know how we were going to be
12   acting.
13   Q.   Now, prior to August of 2002 -- let me withdraw the
14   question.  Were you aware that Mr. Sherrod was on vacation in
15   August of 2002?
16   A.   I can't say I was aware he was on vacation, but I
17   did know that we both were going to do something that
18   weekend.
19   Q.   What weekend are you referring to?
20   A.   The week -- there was -- basically, I believe, that
21   some of this took place like either a Monday or a Tuesday,
22   and I know that Mr. Sherrod and I met, probably on a
23   Wednesday or a Thursday, to talk about our plans to -- for
24   the management committee.  And then we said, well, we'll get
25   together back when we -- you know, when we come back because

1    I told him I was going to Connecticut at that time.  When I

2    got back from Connecticut, I got a phone call we were going

3    to have a meeting, and I showed up at the meeting.

4        Q.   So you were out of town when this incident involving

5    the little girl occurred?

6        A.   I believe I was out of town.  If I was in town, I

7    wasn't aware of it because I probably wasn't watching the

8    news.  But I believe I was out of town, yes.

9        Q.   Would it be helpful for you to know that this

10   incident involving the little girl occurred on August the

11   6th, 2002?

12       A.   And that day was a Thursday?  A Monday?  A Tuesday?

13       Q.   It was a weekday.

14       A.   Right.

15       Q.   So you said you had a prior conversation with

16   Mr. Sherrod and that both of you were planning something.

17       A.   Correct.

18       Q.   And prior to leaving you had gotten together to

19   discuss the management committee business.

20       A.   Correct.  And our -- what we were going to be doing

21   in the future.

22       Q.   Now, did you know how long Mr. Sherrod would be away

23   from the agency?

24       A.   No, I did not.

25       Q.   Was it board policy that when Mr. Sherrod was away

1    from the agency for an extended period of time that the
2    controller, Brian Bessetti --
3             MR. MARTINUCCI:  Bessetti.
4        Q.   Bessetti, I'm sorry.  Would be in charge?
5        A.   I don't think -- I don't know any policy that was
6    anything like that.
7        Q.   You don't recall any such policy?
8        A.   No.
9        Q.   Is there a possibility that was a policy and you
10   simply were not aware of it?
11       A.   That's a possibility.
12       Q.   Would you describe for us the role of Mr. James
13   Hamilton, the president of the board of directors.
14       A.   That would be outlined in the bylaws of what the
15   president's role would be, wouldn't it?
16       Q.   Well, let me ask you this question here.  You came
17   on the board in January of '02?
18       A.   Yes.
19       Q.   Was Mr. Hamilton present for every board of
20   directors' meeting?
21       A.   No.
22       Q.   From January of '02 until August -- the end of
23   August of '02, would it be correct to say that Mr. Sean
24   Coleman pretty much ran the board of directors' meetings?
25       A.   Yes.

1    Q.    From January of '02 to, let's say, the end of August

2    of '02, would it be correct to say that Mr. Sean Coleman

3    showed up at the Booker T. Washington Center on almost a

4    daily basis?

5    A.    I wouldn't know that.

6    Q.    Beginning in August of '02, when is the first time

7    that you learned of this incident involving the little girl?

8    A.    When I was notified of the board meeting.

9    Q.    Now, when you appeared for this board of directors'

10   meeting, was there an agenda for the meeting?

11   A.    I don't recall.

12   Q.    At this meeting did the board of directors receive

13   any reports, including the incident involving the little girl

14   on August the 6th of '02?

15   A.    I don't believe we received any written reports.

16   Q.    Did you receive any oral reports?

17   A.    During the meeting we did ask for an update of what

18   was going on, yes.

19   Q.    Who did you receive that report from?

20   A.    Mr. Sherrod.

21   Q.    Now, was Mr. Hamilton in charge of this particular

22   meeting?

23   A.    I'm not even sure if Mr. Hamilton was there.  I

24   don't think he was there.

25   Q.    As best as you can recall, was Mr. Coleman there?

54

1    A.    Yes, Mr. Coleman was there.

2    Q.    Was Mr. Coleman there running the meeting?

3    A.    It's hard to say.  I don't -- I don't recall whether

4    or not he called the meeting to order or who called.  There

5    was several people talking at the time.

6    Q.    Who was managing the meeting?

7    A.    I honestly don't recall.

8    Q.    There was no one trying to maintain order in this

9    meeting?

10    A.    Like I said, we had 12, or whatever, people on

11    the -- in the room.  Basically it was just a meeting of

12    professional people getting together and having a

13    conversation, in my book, and I don't know if anyone in

14    particular took a lead.  But I do know that there were

15    discussions during the meeting and reference to the event.

16    Q.    And, to your knowledge, there was no written report

17    given to the board of directors at this meeting?

18    A.    To my knowledge, no.

19    Q.    Is there anyplace that you can look to confirm

20    whether any documentation, any report, in writing, was given

21    to the board of directors at this meeting?

22    A.    I don't recall of any document being given, and

23    therefore, I couldn't have an idea of --

24    Q.    Who did the board of directors receive its

25    information from?

1      A.   Mr. Sherrod.

2      Q.   Now, would you describe Mr. Sean Coleman's role in

3   this meeting.

4      A.   His role in the meeting was the role of a board

5   member, just having a discussion.

6      Q.   What information, if any, did he provide to the

7   board of directors?

8      A.   He provided, I guess, the information that --

9   what -- what his actions were during this time, and what his

10  knowledge of the situation was.

11     Q.   So what did he say was his actions?

12     A.   He basically said that -- I can't recall exactly

13  what he said.  All I know is that he just gave an account of

14  his knowledge of what took place.  What he knew about what

15  took place with the girl.  What he knew about whether or not

16  she got home.  Whether or not she -- you know, who was at the

17  place.  Who he talked to possibly.  It was just a recount of

18  what had happened, I believe.

19     Q.   Now, other than the board of directors, were there

20  anyone else present at this meeting?

21     A.   I believe Mr. Bessetti was called in eventually.  I

22  believe.  And possibly Ms. Smith was called in.  I'm not

23  sure, though.  I've had a number of meetings.

24     Q.   At what time did this meeting take place?

25     A.   I'm not sure, but I'm going to say it's possible

1    that it could be noon.

2        Q.   And at what time would you say Mr. Bessetti was

3    called in?

4        A.   Probably 40 minutes after.

5        Q.   And Ms. Smith?

6        A.   I don't recall what time she was called in or

7    anything else, but --

8        Q.   Were they called in together or separately?

9        A.   I don't recall.

10       Q.   Now, did the board receive any reports from staff

11   about the incident of August the 6th?

12       A.   I'm not sure.

13       Q.   Did the board talk with any staff about the incident

14   of August the 6th?

15       A.   We talked to Mr. Bessetti during that meeting, I

16   believe, or asked him a question or two.

17       Q.   How long did the meeting go on?

18       A.   I don't recall.  No more than two hours I'd say.  No

19   less than an hour.

20       Q.   So you estimated from about noon to 2:00?

21       A.   No more than that time.

22       Q.   Now, you said Mr. Sherrod was in this meeting.  Was

23   he in this meeting the entire time?

24       A.   No.

25       Q.   Were you in the meeting the entire time?

1    A.   No.

2    Q.   At some point did Mr. Sherrod go to his office?

3    A.   Yes.

4    Q.   Did you follow him into his office?

5    A.   Yes.

6    Q.   At that time did Mr. Sherrod tell you that he was

7    not resigning as executive director of the Booker T.

8    Washington Center?

9    A.   No.

10   Q.   He never told you he wasn't resigning?

11   A.   Our conversation was, James, what's going on.  This

12   is crazy.

13   Q.   That's what you're saying?

14   A.    That's what I said to him.  He basically said,

15   they've been after me for a long time.  I said, what do you

16   mean.  He said, they've -- they've -- you know, they've been

17   after me for a very long time, and I'm just tired of it.  I'm

18   sick and tired of it.  I don't want to deal with it anymore.

19   I said, do you know what you just did.  He said, I'm just

20   sick and tired of it.  I don't even want to talk about it.

21   I'm tired.

22   Q.   Now, at that time did you ask Mr. Sherrod for his

23   keys to the Booker T. Washington Center office building?

24   A.   I'm not sure.  I don't know if it was that day.  I

25   think we received keys at a later time.

1    Q.   You didn't receive them personally?

2    A.   I'm not sure how the keys took place.

3    Q.   So you're not sure whether you received the keys

4    from Mr. Sherrod personally?

5         MR. MARTINUCCI:  On that date?

6         MS. BENSON:  On that date.

7    A.   That part, like I said, is not clear.  If I did

8    receive any keys, they -- you know -- again, I don't really

9    recall that.

10   Q.   Is it possible that you asked Mr. Sherrod for his

11   keys on that date when you followed him into the office?

12   A.   It's possible that Mr. Sherrod said, here's the

13   keys, but I don't think I asked him for the keys.

14   Q.   Is it possible that you asked him for the keys?

15   A.   I don't think I asked Mr. Sherrod for the keys.

16   That was not my intent of walking into the office.

17   Q.   I want to get back to who was running the meeting

18   that day.  Who was running the meeting on that day?

19   A.   I'm not sure.

20   Q.   Can you recall?  I realize you may not be sure, but

21   can you, to the best of your ability, recall who was running

22   the meeting that day?

23        MR. MARTINUCCI:  Bill, you can answer, but just for

24            the record, that's been asked and answered about

25            five times now.

1    A.    Correct.

2    Q.    When you were removed from the board of directors,

3    was that in writing?

4    A.    I don't know.

5    Q.    Is there any minutes that reflect your removal?

6    A.    I'm not sure.

7    Q.    When did you express an interest in helping the

8    Booker T. Washington Center in a capacity other than as a

9    member of the board of directors?

10    A.    My -- I was in the capacity of a board member when I

11    expressed an interest in helping Booker T. Washington Center

12    through this situation.

13    Q.    When was that?

14    A.    That was when I had a conversation with Mr. Sherrod.

15    Q.    When did this conversation occur?

16    A.    This conversation took place after the incident,

17    after Mr. Sherrod had said he resigns, and basically my

18    conversation with Mr. Sherrod was, this is terrible.  We need

19    to basically be able to move forward.  I'm not saying --

20    can't be passing judgment on who's right or who's wrong, but

21    we need to get through this for the organization.  Can we

22    work something out in terms of, if the board doesn't want you

23    executive director, then we need to look at your future as

24    well as the organization's future, and I'm willing to work

25    between you and the board to see how we can make this thing

1   work out.

2          If you need to move on and the organization moves

3   on, then I'm willing to work that -- that may take a year,

4   that may take six months, or that may take until the time you

5   find other employment.  But if you can come back as taking --

6   with your responsibilities and help this organization through

7   a transition period, I'll work with the board and bring that

8   back to the board.  Just as long as we can all move forward

9   and get through this.

10      Q.   When did you have this conversation with

11   Mr. Sherrod?

12      A.   I don't know the exact date, but I believe it's

13   about maybe a week or -- week or so after the incident.

14      Q.   When you say -- the incident or this board meeting

15   that you previously described?

16      A.   The incident --

17      Q.   The incident was August 6, 2002.

18      A.   And the board meeting was probably on a Monday, I

19   believe.  Again, I don't have anything in front of me.  I

20   don't know what August 6th was back in 2002.  But if you look

21   at it after the incident, after the board meeting, the

22   question came down to did Mr. Sherrod resign.  Says, yes.

23   Well, he hasn't turned in his resignation.  Well, I'll go

24   talk to him to see what's going on.  That's when I had the

25   conversation with him.  I said, listen, bottom line comes

1    down to, I don't know what the history is, but the

2    organization needs to move forward, you need to move forward,

3    I know you got to think about your employment.  How can we do

4    this.  Can we do this transition.  And you never know, by the

5    time we get through this, maybe some of the stuff will have

6    died down.

7         And at that time we were having a conversation, Mr.

8    Sherrod said to me, well, I want people to know my side of

9    the story because people are giving the wrong side of the

10    story here, and I want people to know what I'm saying.  And I

11    believe it was Mr. Flowers at that time wanted to interview

12    him for a newspaper to get his side of the story.  I said,

13    James, if I were you, I wouldn't do it.  I said, I think we

14    can move forward with this.  He said, well, I'll think about.

15    I'll see what to do.

16         The next day, basically the newspaper article came

17    out -- because I had called some of the board members and

18    said, listen, I think we'll be able to work through this.

19    The next day the newspaper article came out, and they said, I

20    thought you said we were going to be able to work through

21    this.  I thought you said James was on board with trying to

22    work through this.  I said, I thought so, too.  When I left

23    him, he -- he gave me the indication he wasn't going to do

24    the article, and then he responded in the article.

25         At that time, when I did get to see the article, I

1    contacted James and said, what's going on.  He said, I just

2    wanted my side to be out.  I said, okay, but now everything

3    we talked about, my hands are tied with the board.  I can't

4    do much with them because that's it.  And that's how that

5    took place.  So that was my initial, answering your question,

6    on how I got involved with trying to work through the

7    transition.

8             MR. MARTINUCCI:  Just for everybody's benefit,

9             August 6th was a Tuesday, 2002; August 12th was a

10            Monday in 2002.

11    Q.   Going back to the question of when did you show this

12    interest in this transitional role.  Can you narrow that down

13    as to when you expressed an interest in playing this

14    transitional role?

15    A.   I thought I just did.  That's when I expressed an

16    interest.

17    Q.   So it was after the August 12th board meeting?

18    A.   Correct.  It was after my meeting -- I only -- I

19    didn't even express an interest to the board.  I expressed an

20    interest to resolve the problem with Mr. Sherrod.

21    Q.   I want you to take a few moments and read what will

22    become Exhibit No. 2.

23            (Jeffress Deposition Exhibit No. 2 marked for

24             identification.)

25    A.   (Witness reviewed document.)

1  ample time to make an assessment of any of his skills or

2  abilities.

3    Q.   How long would it take you to have to do that?

4    A.   I told you -- basically, ask my wife.  It takes me

5  five years to get to know somebody.

6    Q.   Five years?

7    A.   I told my wife the first day I met her, five years.

8  Then I married her.

9    Q.   So you formed not even preliminary opinions until

10 you've known somebody for five years?

11   A.   Like I said before when you asked me about my

12 preliminary opinion, I said that we were part of the same

13 fraternity, he must be a good man.

14   Q.   And until August 12, 2002, you had no reason to

15 question Mr. Sherrod's performance, did you?

16   A.   Correct.

17   MS. BENSON:  I have no further questions.

18

19                     CROSS-EXAMINATION

20 BY MR. MARTINUCCI:

21

22   Q.   Bill, I have just a couple of quick questions for

23 you.  First of all, this is going down on a written

24 transcript, not a video transcript, so these questions are

25 going to sound silly, but ultimately they'll be important.

1   What is your race?

2       A.   African American.

3       Q.   What is your color?

4       A.   Black.

5       Q.   To your knowledge, is Mr. Sherrod also an African

6   American?

7       A.   Yes.

8       Q.   Is he also black?

9       A.   Yes.

10      Q.   What about Mr. Coleman?

11      A.   Yes.

12      Q.   To both?

13      A.   He's black and African American, correct.

14      Q.   Now, did you ever recommend support or take any

15  action against Mr. Sherrod because of his color?

16      A.   No.

17      Q.   What about because of his race?

18      A.   No.

19      Q.   Did you ever recommend, support, or take any action,

20  or not take any action, against Brian Bessetti or Anita Smith

21  because of their race?

22      A.   No.

23      Q.   With regard to that same series of questions, did

24  you ever do anything with regard to Mr. Sherrod because of

25  his color?

1     A.   No.

2     Q.   What about with regard to doing or not doing

3 anything concerning Mr. Bessetti or Ms. Smith because of

4 their color?

5     A.   No.

6     Q.   To your knowledge, has anybody taken any action

7 against Mr. Sherrod because of his race or color?

8     A.   No.

9     Q.   To your knowledge, has anybody not taken any action

10 between Mr. Bessetti or Ms. Smith because of their color?

11     A.   No.

12     Q.   What about because of Mr. Sherrod's race?

13     A.   No.

14     Q.   What about because of Mr. Bessetti's race?

15     A.   No.

16     Q.   What about because of Ms. Smith's race?

17     A.   No.

18     Q.   The three employees that were fired, that was Lester

19 Howard, Renee Coates-Smith, and Derek --

20     A.   Coleman?

21     MS. BENSON:  Johnson.

22     MR. MARTINUCCI:  Johnson.  Thank you.  I thought

23          that was it, but I wasn't sure.

24     Q.   Those were all African Americans?

25     A.   Yes.

1     Q.   Who fired them?

2     A.   To my knowledge, Mr. Sherrod.

3     Q.   Now, was it part of his responsibility, as the

4     executive director, to make those decisions?

5     A.   Yes.

6     Q.   With regard to Mr. Bessetti as the controller, whose

7     decision would it have been to take action against him?

8     A.   Mr. Sherrod's.

9     Q.   Are you aware of any allegation that anybody on the

10    board of directors told Mr. Sherrod not to take action

11    against Mr. Bessetti?

12    A.   I'm not aware of any allegations.

13    Q.   There was some question as far as whether or not the

14    use of the word nigger in a conversation between two black,

15    African-American males would raise a red flag to you.  It was

16    your testimony that it would not.

17         MS. BENSON:  Objection.  It's irrelevant.

18         MR. MARTINUCCI:  That's fine.

19    Q.   You can go ahead and answer the question.

20    A.   In the context, like I said, in terms of the

21    terminology or anything else, coming from an African-American

22    male, it could have been just a terminology that he was using

23    to describe something.  I was -- I did not take it as being

24    discriminatory in terms of when it was brought to my

25    attention.  And it was not actually being communicated as

1   discriminatory.  It was being communicated as this was what

2   was said.

3       Q.   Did Mr. Sherrod ever complain to you that he felt he

4   was being discriminated against on the basis of his race or

5   his color?

6       A.   Not to my --

7            MS. BENSON:  What time period are you referring to?

8            MR. MARTINUCCI:  Any time period.

9       Q.   Let me put it this way:  Any time period before the

10  filing of the EEOC charge, did Mr. Sherrod ever complain to

11  you about being discriminated against on the basis of his

12  race or color?

13      A.   No.

14           MR. MARTINUCCI:  I have no further questions.

15           MS. BENSON:  Just a few follow-up questions.

16

17                    REDIRECT EXAMINATION

18  BY MS. BENSON:

19

20      Q.   You previously testified that you came on the board

21  in January 2002.  From January 2002 to August, before August

22  12, 2002, had the board of directors dealt with any personnel

23  matter?

24      A.   Not to my knowledge.

25      Q.   Now, are you aware that the board of directors had

1  indicated to Mr. Sherrod that he needed to inform them or

2  have their support in order to fire someone?

3      A.  No.

4      Q.  You're not aware of that?

5      A.  No.  Actually, that's -- actually, that's the first

6  time that's come to my attention.

7      Q.  Now, you've just testified with regard to the use of

8  the terminology of nigger.  And that sounds so much similar

9  to what Mr. Coleman testified -- how he testified.  Did you

10  and he discuss how you would handle that?

11      A.  No.  I just think that he's, once again, an

12  African-American male, a black male.  Basically you can

13  probably pick up three more outside and they'll probably give

14  you the same definition.

15      Q.  I doubt that.

16      A.  I -- I --

17      Q.  Let me go on.  You do realize that from most African

18  Americans, probably all African Americans, the word nigger is

19  considered offensive, don't you?

20          MR. MARTINUCCI:  I'm going to object to the form of

21          the question.  I mean, you're offering an opinion

22          without any empirical support for it.

23          MS. BENSON:  Let me go back.

24      Q.  You just testified you're an African-American male.

25      A.  Yes.

1    Q.   And I guess you've heard the word nigger used in an

2    employment context, haven't you?

3    A.   I've never been in the employment environment where

4    I've really heard the word used.

5    Q.   If Mr. Coleman instructed Mr. Sherrod, in an

6    employment context, to fire those niggers, wouldn't you

7    conclude that he was referring to African Americans and

8    African Americans only?

9    A.   No.

10   Q.   Have you ever heard a white individual, in an

11   employment context, being described as a nigger?

12   A.   Yes.

13   Q.   When?

14   A.   On several occasions.

15   Q.   In an employment context?

16   A.   Yes.

17   Q.   Where at?

18   A.   Gateway Community College, Community Health Net,

19   basically.  You know, in terms of -- you said describe --

20   using it in that context, an employment environment, have I

21   ever heard.  Now, was it in an employee-related issue or

22   anything else, no.  It was outside of the scope of the job.

23   It was an employment context, but the cafeteria.

24   Q.   I'm talking about in an employment situation, have

25   you ever heard a white person being referred to as a nigger

1    in employment?

2        A.    No.   I've never heard a black person being referred

3    to as -- I told you earlier I didn't hear it, but outside of

4    an employee context, yes.   That's why I want to make sure I'm

5    clear on what you're asking me.   I have heard it -- the

6    description being said, whether you're white, black,

7    Hispanic, or whatever else, I have heard them use the

8    terminology.   Now, in an employment context, I haven't heard

9    it, whether you're white, black, or Hispanic.

10       Q.    So in an employment context you've not heard it at

11   all?

12       A.    No.

13       Q.    If, as Mr. Sherrod says, he was instructed by

14   Mr. Coleman to fire those niggers, would you agree that that

15   was in an employment context?

16       A.    I wouldn't think that that was an employment context

17   because that's not his responsibility to instruct him to do

18   so.   Since -- since I'm aware of that -- what his position

19   is, and I'm aware of what Mr. Sherrod's position is, you can

20   say fire anybody.   But I'm just saying that, you know, that's

21   not in an employment context because that's not his

22   responsibility to tell him to fire them.

23       Q.    The average individual, wouldn't you say, having

24   heard that would say that he had been instructed to fire

25   those three individuals?

1          MR. MARTINUCCI:  Objection.  Calls for speculation.

2          That one I'm going to direct you not to answer.

3          You're not even asking for his opinion now.  You're

4          asking for the average individual's opinion.

5          MS. BENSON:  Let me go back.

6     Q.   If you were standing there when he had been given

7     the instruction by Mr. Coleman to fire those niggers, in an

8     employment context --

9     A.   So that means we're in the boardroom.

10    Q.   No.  This means after -- excuse me, let me go back.

11    Are you aware -- you testified earlier that Mr. Coleman

12    participated with Mr. Sherrod in interviewing of Lester

13    Howard, Derek Johnson, and Renee Coates-Smith, right?

14    A.   I don't know if I testified that way because, like I

15    said, I wasn't present there.  So I don't know whether he did

16    or didn't.

17    Q.   Did you learn at any point that Mr. Coleman

18    participated in those interviews?

19    A.   I did -- again, I've heard that from -- now I know

20    Mr. Coleman I heard it from, when I interviewed Renee

21    Coates-Smith or something else, it was basically he was

22    there, yes.

23    Q.   In fact, you, as chairperson of the management

24    committee, conducted all three appeal hearings, right?

25    A.   Yes.

1     Q.   So you were aware from their appeal that Mr. Coleman

2     was part of the interviewing process, weren't you?

3     A.   I was aware he was present, yes.

4     Q.   You were aware that he asked questions?

5     A.   Again, I didn't get into that much detail.  I wasn't

6     looking at that.

7     Q.   Were you aware that he took notes?

8     A.   No, I was not.

9     Q.   So you handled these three appeals, and you did not

10    find out what his role was in those hearings -- in the

11    interview meetings?

12    A.   In my opinion, Mr. Coleman didn't have an opinion --

13    or a role in the termination of those employees.  I was not

14    present.  I was answering the appeal that they were

15    terminated, not who they were terminated by.

16    Q.   Did Mr. Coleman tell you he was present for those

17    interviews?

18    A.   I don't know if he came out and said I was present

19    for those interviews, no.

20    Q.   So going back to the appeal of Lester Howard, Renee

21    Coates-Smith, and Derek Johnson, Mr. Coleman never revealed

22    to you, as the chair of the management committee, that he was

23    present for those interviews?

24    A.   Again, I don't recall him saying to me, I was

25    present during those interviews.

1    Q.   In your committee review of those appeals, describe

2    for us Mr. Coleman's role.

3    A.   I'm not sure what his role was.  His role was a

4    member of the management committee.

5    Q.   What did he do in the meetings?

6         MR. MARTINUCCI:  During the meetings or during the

7         hearings?

8         MS. BENSON:  During the appeal.

9    A.   I don't recall, but I -- I believe that in certain

10   instances he did not start out on the meetings, but then he

11   did come in on the meetings because they weren't -- they

12   wanted to basically talk to him.

13   Q.   Because?

14   A.   The people who were being heard wanted to express

15   their opinions in front of him.  So he was called in.

16   Q.   Was he called in by you or by them?

17   A.   He was called in by me, but it was requested of

18   them.

19   Q.   Now, as part of that, did he describe for you his

20   role in the interviewing of all three of these individuals?

21   A.   No.  I -- he did not describe what his role was in

22   interviewing those individuals.  The only thing that I know

23   is that the question was asked, did you tell James to fire

24   these individuals.

25   Q.   Who asked that question?

203

1       A.    I did.

2       Q.    And what was his response?

3       A.    I never told James that.

4       Q.    So his response to you was that he never told James

5    that?

6       A.    Correct.

7       Q.    When did the management committee meetings take

8    place?

9       A.    Between August 12th and September 20th.

10       Q.    Let me show you what I think now would be Exhibit

11    No. 10.

12            (Jeffress Deposition Exhibit No. 10 marked for

13             identification.)

14       A.    Okay.

15       Q.    Can you tell us what Exhibit No. 10 is.

16       A.    Exhibit No. 10 is Booker T. Washington Board

17    management committee minutes.

18       Q.    What date is on Exhibit 10?

19       A.    September 3, 2002.

20       Q.    Who prepared these notes?

21       A.    It looks -- these look like notes that I would have

22    prepared.

23       Q.    Did you prepare it?

24       A.    These look like notes that I would have prepared,

25    yes.

C E R T I F I C A T I O N

I, Sondra A. Black, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes in the above-captioned matter.

Dated: _August 12, 2005_

Sondra A. Black, Notary Public
Waterford Twp., Erie County
My Commission Expires Aug. 22, 2005
Member, Pennsylvania Association of Notaries