## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JAMES C. SHERROD,** | |
| **Plaintiff** | **Civil Action No.  C.A. 04 – 208 ERIE** |
| **vs.** | |
| | **Magistrate Judge Susan Paradise Baxter** |
| **BOOKER T. WASHINGTON CENTER,** | |
| **Defendant** | **JURY TRIAL DEMANDED** |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

AND NOW, comes the Defendant, Booker T. Washington Center ("BTWC"), by and through its attorneys, Quinn Buseck Leemhuis Toohey & Kroto, Inc., and files the within Brief in support of its Motion for Summary Judgment pursuant to Fed.R.Civ.P. Rule 56, of which the following is a statement:

## I.    FACTS

The Plaintiff, James Sherrod ("Sherrod") is African-American.  He was hired as the Executive Director of BTWC effective November 9, 1998 and as an at-will employee who served "at the will and discretion of the Board of Directors," which reserved the right "to terminate [his] employment with or without cause."  Exhibit 1, Exhibit 5, p.92. He actively served in that role until August 12, 2002.  During this time, he received three (3) evaluations, which actually showed a drop in his performance.  The first evaluation, in January of 2000, could be fairly characterized as "average."  Exhibit 2(a)  The next review, in March of 2001 was largely reflective of areas in which it was deemed that Sherrod needed improvement (Exhibit 2(b)), while the last, in November 2001, showed some improvement, but did not reach the levels noted in January 2000.  Exhibit 2(c).

As Executive Director, Sherrod's duties included "[O]verall conduct and management of the affairs and operations of BTWC" and formulating "plans, policies and procedures," as well as the supervision of "all hiring, training, evaluation, promotion and termination of agency staff."  Exhibit 3.

On August 6, 2002, it was reported at the end of the business day that a child had been left behind on a BTWC sponsored activity, and had walked from the Millcreek Mall to the home of a relative, a distance of several miles.  Exhibit 4.  Sherrod was on vacation that day and had left the controller, Brian Bessetti ("Bessetti") in charge of the facility.  Exhibit 5, p.28.

Bessetti is Caucasian.  Exhibit 5, p.58.  Bessetti did not have the authority to hire or fire employees and was not responsible for establishing policy or other non-financial procedures for BTWC (Exhibit 5, pp.28-29), including "hiring, training, evaluation, promotion and termination of agency staff."  He was not responsible for investigating the August 6, 2002 incident.  Exhibit 3.  In short, although Bessetti might have been nominally in charge of BTWC on August 6, 2002, he was not responsible for the events leading up to, or following upon the heels of, this particular incident.  Those were matters outside of his pay-grade, as well as the scope of his authority.

Although Sherrod was on vacation on August 6, 2002, he was in town and was made aware of the situation.  Exhibit 4.  In fact, it appears Sherrod was made aware of the situation before Bessetti.  Exhibit 4.  Despite this, Sherrod did not become engaged in the situation until later that night when he had his initial discussions with Sean Coleman, vice-president of the BTWC Board of Directors ("Coleman").  At Coleman's direction, Sherrod came to work the next day to interview involved employees.  Exhibits

5, pp.59-60 and Exhibit 6..  Although he participated in interviews of those employees directly involved in the situation (all of whom were African-American), Sherrod did not interview Bessetti, with or without Coleman, on August 7, 2002 or at any other time. Exhibit 5, pp.26-27, 92-93, 101-102.

Although disputed by Coleman, Sherrod contends that in subsequent discussions, Coleman told him to "fire all those niggers" after those interviews were conducted.  He also claims that on at least one other occasion, Coleman referred to the involved employees as "niggers."  For purposes of the Defendant's Motion for Summary Judgment, it is accepted that Coleman made this, or some similar, statement. Coleman, himself, is African-American.  Exhibit 6, p.164.

Sherrod did not, at that time, question or challenge Coleman's purported statement.  Exhibit 5.  Instead, he terminated the three African-American employees involved, at least two (2) of whom he believed violated BTWC practices during the field trip in question.  Exhibit 5.  Sherrod never took, or even recommended, any disciplinary action against Bessetti.  Exhibits 5, pp.26-27; Exhibit 6, pp.167; Exhibit 7, pp.195-197; Exhibits 8-11.  It was certainly within his power to do so.  There is no evidence contained in the record that would suggest, let alone establish, that Bessetti received preferential treatment because he was Caucasian.

A meeting of the BTWC Board of Directors was held on August 12, 2002, at which time the incident and Sherrod's performance as Executive Director was discussed.  Exhibits 5 and 6.  There is disagreement as to whether Sherrod resigned and turned in his keys at that time, or if he was directed to turn over his keys and (effectively) suspended at that time.  For purposes of the Defendant's Motion for

Summary Judgment, it is accepted that he was directed to turn over his keys and suspended.

Between that date and the date the Sherrod was formally notified of his termination, Sherrod performed no work for, or on behalf of, BTWC.  Exhibit 6. Although there were a number of discussions over the next several weeks concerning Sherrod's continued employment with BTWC, or the possibility of a severance package, he eventually rejected the severance package offered to him, at which time he was notified, formally, of his termination.  Exhibits 5, 6 and 13.

At all times relevant to this action, the majority of the BTWC Board of Directors was comprised of African-American.  Exhibit 5, p.13; Exhibits 6 - 12.  Even before these events, Sherrod felt that there were at least 3 members of the BTWC Board who did not care for him, all of whom were also African-American, and all of whom were members of the BTWC Board of Directors at the time of Sherrod's termination.  Exhibit 5, pp.14-17. Sherrod was eventually replaced as Executive Director by William Jeffres, who was a member of the BTWC Board at the time of Sherrod's termination.  Exhibits 5 and 7. Additionally, Sherrod – or at least his counsel – believes that Jeffres supported his termination because he (Jeffres) wanted Sherrod's position.  Jeffres is also African-American.  Exhibit 7, p.193.  There is no evidence that any of these individuals disliked Sherrod because of his race.  Exhibit 5, pp.6-9.  There is no evidence that any BTWC Board Member voted to terminate Sherrod because of his race.  Exhibits 5-11.  Sherrod never advised any Board member that he felt that the actions taken against him were racially motivated.  Exhibit 5, p.103.

Following Sherrod's suspension (assuming, *arguendo*, that he did not, in fact, resign), there were a series of newspaper articles published by the Erie Times-News. Sherrod seeks to base a claim of defamation and of "emotional distress" upon them. The articles (Exhibit 14) speak for themselves, and contain no statement from BTWC other than the fact that it will not discuss personnel matters in public.

## II.    ISSUE

**A.    Has Sherrod stated a claim upon which relief might properly be granted pursuant to Title VII of the Civil Rights Act of 1964 (as amended), the Pennsylvania Human Relations Act or 42 U.S.C. §1981?**

Suggested answer in the negative.

**B.    Has Sherrod stated a claim upon which relief might properly be granted pursuant to Pennsylvania's Wage Payment and Collection Law?**

Suggested answer in the negative.

**C.    Has Sherrod stated a claim upon which relief might properly be granted pursuant to any claim of defamation or emotional distress?**

Suggested answer in the negative.

## III.    DISCUSSION

### Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A

factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex*, 477 U.S. at 322. Evidence introduced to defeat or support a motion for summary judgment, however, must be capable of being admissible at trial. Callahan v. AEV, Inc., 182 F.3d 237, 252 n. 11 (3d Cir.1999)(citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n. 9 (3d Cir.1993)). A plaintiff cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather must present competent evidence from which a jury could reasonably find in her favor. *See* Anderson*, 479 U.S. at 248; Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir.1999); Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989);

Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa.1995). The Court must view the

evidence presented on the motion in the light most favorable to the opposing party.

Anderson, 477 U.S. at 255.

A.    **Sherrod both has failed to meet his *prima facie* burden or to satisfy the standards of a "pretext" case with regard to his claims under Title VII of the Civil Rights Act of 1964 (as amended), the Pennsylvania Human Relations Act or 42 U.S.C. §1981.**

An employment discrimination case under Title VII may be advanced on either a

pretext theory of causation under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, or a "mixed-motives" theory as

outlined in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d

268 (1989). *See* Watson v. SEPTA, 207 F.3d 207, 214 (3d Cir.2000). In "pretext" cases

the plaintiff must prove that consideration of the impermissible factor was "a

determinative factor" in the adverse employment action. *Id.* In "mixed-motive" cases, by

contrast, a plaintiff need only show that the unlawful motive was a "substantial

motivating factor" in the adverse employment action. *Id.* The same standards apply to

claims under the PHRA (*see* Jones, 198 F.3d at 410; Harris v. Smithkline Beecham, 27

F.Supp.2d 569, 576 (E.D.Pa.1998)), as well as to his claims under 42 U.S.C. §1981.

Tucker v. Merck & Co., Inc. 2005 WL 1176565, *1 (3rd Cir.2005). In the matter now

before the Court, Sherrod cannot satisfy either of these burdens.

In the typical race discrimination case, the facts now before the Court (at least

those conceded, *arguendo*, for the purposes of the instant Summary Judgment Motion)

might be daunting – an African-American Executive Director suspended and eventually

terminated shortly after the vice-president of the Board of Directors purportedly directs that same individual to "fire all those niggers" – from the Defendant's perspective, but this is far from the typical case.

In this instance, most of the cast of characters before the Court are of the exact same protected class as the Plaintiff. Significantly, even the Board vice-president accused of uttering the racial epitaphs (Coleman) is African-American, as is Sherrod's replacement, Jeffres. The Board of Directors for BTWC had only three (3) non-African-Americans in its membership at the time of the matters complained of by Sherrod, and there is not a single shred of evidence that any Board member voted to terminate Sherrod based on his race. Exhibit 5, pp.6-9,

In order to sustain his claim of racial discrimination here, Sherrod must either bring forward direct evidence that he was terminated because of his race, or evidence to demonstrate that the stated reason for his termination – the Board's overall dissatisfaction with his performance, culminating in his handling of the investigation of and general response to the August 6, 2002 situation – was a pretext for a racially motivated termination. A reading of the record in this matter, even in a light most favorable to Sherrod, clearly demonstrates that he cannot meet these burdens.

There is no direct evidence of discrimination, such as would support Sherrod's claims under a "mixed-motive" theory. That is, he has failed to produce any evidence that BTWC "placed substantial negative reliance on an illegitimate criterion in reaching their decision." Price Waterhouse, 490 U.S. at 277; Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 n. 4 (3d Cir.1995). Such evidence would have to be "so

revealing of discriminatory animus that it is not necessary to rely upon any presumption from the prima facie case [as is necessary in a pretext action]." Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir.1994)). Direct evidence of discrimination involves "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting a discriminatory attitude." *See* Starceski, 54 F.3d at 1096 (citing Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring)). Stray remarks in the workplace, statements by nondecision-makers, or even statements by decision-makers unrelated to the decisional process itself, do not constitute direct evidence of discrimination. *See* id.

The decision to terminate Sherrod was made by the Board of BTWC, not by any individual (Exhibits 5-11), and any words attributed to Coleman in reference to other employees do not constitute direct evidence of an intention by Coleman or BTWC to discriminate against Sherrod on the basis of his race.  In fact, in the context of the matter now before the Court, it is respectfully submitted that these purported utterances by Coleman are no evidence of any discriminatory intent whatsoever.

The "N" Word

Sherrod, himself, admits as much in the course of his deposition.  He points to Coleman's purported use of the word "nigger" (although there is no evidence that Coleman ever used the word in reference to Sherrod, himself) as the strongest indicator of discriminatory intent.  While the (purported) use of that particular word may be distasteful, it is not *per se* illegal, and in the context of this case does not support a

finding – or even an inference – of discrimination vis-à-vis the suspension and termination of Sherrod.

It is a matter of common knowledge (and one of which BTWC would ask the Court to take Judicial Notice) that the word "nigger" is frequently made use of in popular African-American culture.  It appears in literature, in "rap" or "hip hop" music, in live-action movies and television shows, in comedy routines, and in animated shows.  It is not, in each of these instances, always used with the same intent or purpose, and its meaning must be gauged by context on a case-by-case basis.  Coleman – who is honest enough to admit that he has, in fact, used the word in various settings – stated at his deposition that his usage of the word varies, but that he never uses it as a way to reflect any discriminatory animus against African-Americans.  To the contrary, his usage of the word is typically reflective of the more modern contexts in which the word now finds use, and not strictly of race. Exhibit 6, pp.165-168.

Much attention has been given to the word, and its common usage amongst African-Americans in recent years.  Randall Kennedy, an African-American attorney and member of the faculty at the Harvard School of Law discusses the subject at length in his book nigger – The Strange Career of a Troubling Word, (Vintage Books, 2003).  In the first chapter, "The Protean N-Word," Randall writes:

> [A]s we have seen, *nigger* can mean many different things, depending upon, among other variables, intonation, the location of the interaction, and the relationship between the speaker and those to whom he is speaking.  Generally a reference to people of color, particularly blacks, *nigger* can refer to people of any hue…[T]he linguist Arthur K. Spears has also discerned an appreciable revision of *nigger's* racial usage…[M]ore vividly than most words, then, *nigger*

> illustrates Justice Oliver Wendell Holmes's observation that
> 'a word is not a crystal, transparent and unchanged.' A word
> is instead 'the skin of living thought [that] may vary greatly in
> color and content according to the circumstances and time in
> which it is used.

Id. at pp. 43-44 (emphasis in original). No matter what result Sherrod might hope for in terms of this case, the fact of the matter is that the word "nigger" is no longer restricted to use solely in reference to African-Americans. Id.

The Courts, too, have recognized this distinction in the context of what would normally be seen as discriminatory actions or utterances by members of the Plaintiff's same protected class. As noted by the District Court for the Eastern District of Pennsylvania:

> The decision to terminate plaintiff was made by someone
> who had promoted him to the position and by someone who
> is a member of the same protected class who then selected
> someone else in that class to replace plaintiff. While this
> does not per se foreclose a claim of discrimination, it
> certainly does not help to sustain plaintiff's claim. *See*
> Pivirotto, 191 F.3d at 354; Rhodes v. Guiberson Oil Tools,
> 75 F.3d 989, 1002 (5th Cir.1996) (that decision-maker is of
> same race as plaintiff "considerably undermine[s] the
> probability that race was a factor"); Dungee v. Northeast
> Foods, Inc., 940 F.Supp. 682 n. 3 (D.N.J.1996) (that
> decision-maker is member of plaintiff's protected class
> "weakens any possible inference of discrimination")

Burch v. WDAS AM/FM, AM.FM INC, 2002 WL 1471703 (E.D.Pa.). *See also*

Rajbahadoorsingh v. Chase Manhattan Bank, NA, 68 F.Supp.2d 496 (D.V.I. 2001)

(where Plaintiff and decision-maker were of same race, it is hard to fathom how

decision-maker's statements could be construed to show that Plaintiff's termination was

racially motivated); Dungee v. Northeast Foods, Inc. 940 F.Supp. 682,

*688 (D.N.J.,1996); Rooks v. Girl Scouts of Chicago, No. CIV.A. 95-3516, 1996 WL

459941, at *3 (7th Cir. Aug. 9, 1996) ("[T]here can be no compelling inference of age discrimination because [the decision maker] herself is also in the protected category."); Marlow v. Office of Court Admin. of State of N.Y., 820 F.Supp. 753 (S.D.N.Y.1993), aff'd, 22 F.3d 1091 (2d Cir.), cert. denied, 513 U.S. 897, 115 S.Ct. 252, 130 L.Ed.2d 173 (1994) (pointing out that because some of the decision makers were members of the same protected age group as plaintiff, plaintiff's ability to raise an inference of discrimination was hampered); Toliver v. Community Action Comm'n to Help the Economy, Inc., 613 F.Supp. 1070 (S.D.N.Y.1985), aff'd, 800 F.2d 1128 (2d Cir.), cert. denied, 479 U.S. 863, 107 S.Ct. 217, 93 L.Ed.2d 146 (1986) (holding that given the composition of the 11-person decision making board (6 were black and 3 were black men), inference raised by black male plaintiff that his termination was due to race and sex discrimination was implausible); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 1002 (5th Cir.1996) (en banc) ("[In] a Title VII case alleging discrimination because of race, proof that all of the decision makers were members of the same race as the complaining employee would considerably undermine the probability that race was a factor in the employment decision.").

Other <em>prima facie</em> Elements

Not only does the analysis set forth above dispose of the question of "direct evidence," it also demonstrates that Sherrod is not entitled to any favorable inference such as would support a *prima facie* claim under a Price Waterhouse analysis. While Sherrod is clearly a member of a protected class (as, indeed, are we all), and that he suffered an adverse employment action, he cannot meet the second and fourth elements of his *prima facie* burden. Specifically, he cannot demonstrate that he was

qualified for the position of Executive Director, and he cannot demonstrate that other,

similarly situated, employees outside of his particular race were treated more favorably

than he.

Sherrod's evaluations (Exhibits 2(a)-(c)) speak for themselves.  He was, at best,

a marginal Executive Director, at least in the eyes of the Board of Directors.  There were

serious issues identified in March 2001, and while some appeared to have been

addressed by November 2001, there was obviously more work to be done.  Sherrod, in

his own deposition, gave some indication of his leadership style and the basis of his

failures as an executive director.  He looked to the Board to run BTWC instead of taking

the initiative himself to set tactical (operational) and strategic objectives for BTWC and

to bring to the Board a real vision for the future.  Exhibit 5, pp.16-19.  The Board found

that he did not take adequate steps to disseminate and implement safety and

accountability procedures prior to August 6, 2002.  While Plaintiff's counsel prepared

two (2) affidavits for former BTWC employees for purposes of the EEOC investigation of

this matter (Exhibits 15 and 16) indicating that these particular employees were aware

of certain practices, the fact remains that no written policies concerning these processes

existed in August 2002, and there is no record of who was or was not purportedly

trained in these policies.  Exhibit 5, pp.33-34; Exhibit 17.  Once he was engaged in the

process by Coleman on August 7, 2002, Sherrod had an opportunity to complete the

investigation on his terms.  Instead, he returned to his vacation.  Exhibit 5, p.72.  When

a member of the Board expressed dissatisfaction with his performance, he got into a

shouting match with him.  Exhibit 5, pp.95-96.  This is not satisfactory performance; a

plaintiff who has failed to perform her job adequately is unqualified for her position and

cannot make out a *prima facie* case of discrimination. *See* <u>Spangle v. Valley Forge</u>
<u>Sewer Authority</u>, 839 F.2d 171, 173-74 (3d Cir.1988); <u>Wilson v. U.S. Air Express</u>, 2001
WL 856948 (E.D.Pa. 2001).

Sherrod acknowledges that there were at least three (3) Board members who
disliked him, all of whom were current or former officers of the Board, and at least one
of whom (Coleman) Sherrod believed was interested in his job.  Small wonder, then,
that these Board members – all of whom were also African-American (Exhibit 16) –
were dissatisfied with Sherrod performance in general and his response to the August
6, 2002 matter.  As will be discussed at length, *infra*, it is the opinion of these decision-
makers that matters in determining Sherrod's fitness for the job.  They believed, as
noted above, that he was <u>not</u> qualified for the job, or at least no more qualified than his
ultimate replacement.  Exhibit 17.

Sherrod points to the treatment of Bessetti (who is, again, Caucasian, but who
was <u>not</u> Sherrod's replacement) in support of the argument that a similarly situated
white employee was treated more favorably than he was, in that Bessetti was "in
charge" of BTWC on the day of August 6, 2002.  This analysis is ludicrous, and fails to
recognize a number of important factors.

First, Bessetti was the Controller, not the Executive Director, for BTWC, and
while he might have been the person opening mail and taking phone calls on the day in
question, he was not empowered to do anything about the situation that arose on
August 6, 2002.  He had no ability to affect non-financial policies or procedures for
BTWC prior to August 6, 2002.  He was not present on the field trip of August 6, 2002

and was not even aware of the situation until the end of the business day, having learned of it <u>after</u> Sherrod.  There is no evidence he (Bessetti) had the authority to investigate the matter or to discipline or terminate employees found to be in the wrong.

Secondly, Sherrod had both the authority <u>and</u> the ability to recommend disciplinary action against Bessetti at any time before August 12, 2002, but failed to do so.  Exhibit 5, p.26.  Sherrod testified at his deposition that he wanted to talk to Bessetti before taking any action, but as important as this was to him, he decided to complete his vacation, and them talk to his mentor, before trying to do so.  Exhibit 5, pp.72, 102-103.

In light of this, it cannot be said that Bessetti is an appropriate "comparator" for Sherrod.  He had a different position, different responsibilities, and did not create or perpetuate the environment that resulted in the matter of August 6, 2002.  He was not evaluated by the Board, but rather by Sherrod.  His failings, if any, were not those of Sherrod, and his performance cannot be held to the same measure as the individual whose job it was to lead BTWC.  *See* <u>Radue v. Kimberly Clark Corp.</u>, 219 F.3d 612, 618 (7th Cir.2000) ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a *prima facie* case of discrimination"); <u>Hollins v. Atlantic Co.</u>, 188 F.3d 652, 659 (6th Cir.1999) (plaintiff must produce evidence that other relevant employees were similarly situated in all respects to show disparate treatment); <u>Lanear v. Safeway Grocery</u>, 843 F.2d 298, 301 (8th Cir.1988) (same); <u>Maull v. Division of State Police</u>, 141 F.Supp.2d 463, 483 (D.Del.2001) (when employment decisions concerning different employees are made by different supervisors, such decisions are seldom sufficiently comparable to raise an

inference of discrimination because different supervisors may exercise their discretion differently)(*citing* Radue, supra.).

It must also be reiterated that Sherrod was replaced by another African American, Jeffres, who sat on the BTWC Board at the time of Sherrod's suspension and ultimate termination.  Exhibit 7.  This further dilutes Sherrod's claims of discrimination. Burch, supra at *7 (Where Plaintiff was replaced by a person in his protected class and has not presented competent evidence to support an inference that he was terminated because of his race he failed to satisfy the fourth element of a prima facie case).  Jeffres is the appropriate comparator, but since he and Sherrod are of the same protected class, Sherrod cannot meet the fourth element of his *prima facie* burden.  Sherrod is entitled to no inference in this regard, nor is he entitled to any favorable inference because of Coleman's purported use of the word "nigger."[1]

<u>The "Pretext" Analysis</u>

It is clear from discovery in this matter that neither Sherrod nor his counsel believe that the August 6, 2002 incident was adequately investigated, and it is presumed that it upon this that they will assert the claim of pretext.  Any such assertion, however, would be futile.

In order to demonstrate pretext, Sherrod must first show that he has met his *prima facie* burden.  <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 410 (3d

---

[1] To the extent that, for purposes of this argument, BTWC concedes that Coleman used the word "nigger," such usage should be viewed as a "stray remark."  There is no evidence that Coleman ever used the word in reference to Sherrod.  While Sherrod contends otherwise (Exhibit 5, pp.98-99), the affidavits to which he refers contain no such statements.  Exhibits 15 and 16.

Cir.1999).  For the reasons discussed above, he cannot.  Assuming for the moment, however, that this burden was met, it is respectfully submitted that Sherrod still cannot satisfy the requirements of a pretext analysis and therefore cannot survive Summary Judgment.

Had Sherrod established a *prima facie* case for discrimination, the burden *of production* would shift to BTWC to show a "legitimate, non-discriminatory reason" for the action taken.  This is easily done.  The reason is reflected in Sherrod's termination letter, as well as in the depositions of Sherrod, Jeffres and Coleman.  Sherrod was an at-will employee (Exhibit 1; Exhibit 5, pp.92) and the Board was dissatisfied with his performance.  (Exhibit 13).  The Board's evaluation of Sherrod's performance – and of the August 6, 2002 incident – could have been dead wrong (though it is respectfully submitted it was not), but it is not the province of the Court to review the wisdom of the employer's decision.

Since BTWC has met its burden of production, Sherrod must "discredit [BTWC's] articulated reasons and show they are pretextual from which one may infer the real reason was discriminatory or otherwise present evidence from which one reasonably could find that unlawful discrimination was more likely than not a determinative or 'but for' cause of the adverse employment action. Simpson v. Kaye Jewelers, Div. of Serling, Inc., 142 F.3d 639, 643-44 (3d Cir.1998); Miller v. CIGNA Corp., 47 F.3d 586, 595-96 (3d Cir.1995) (*en banc*).

To discredit the legitimate reason proffered by the employer, Sherrod must present evidence demonstrating such weaknesses, implausibilities, inconsistencies,

contradictions or incoherence in that reason that one reasonably could conclude it is incoherent and unworthy of belief. Simpson, 142 F.3d at 644; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir.1993). Sherrod cannot do this simply by showing that the adverse employment decision was mistaken, wrong, imprudent, unfair or even incompetent. *See* Fuentes, 32 F.3d at 765 ("to discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent or competent' "); Hicks v. Arthur, 878 F.Supp. 737, 739 (E.D.Pa.) (that a decision is ill-informed or ill-considered does not make it pretextual), *aff'd,* 72 F.3d 122 (3d Cir.1995); Doyle v. Sentry Ins., 877 F.Supp. 1002, 1009 n. 5 (E.D.Va.1995) (relevant issue is perception of decision maker); Orisakwe v. Marriott Retirement Communities, Inc., 871 F.Supp. 296, 299 (S.D.Tex.1994) (employer who wrongly believes there is legitimate reason to terminate employee does not discriminate when he acts on that belief).

Then, too, Sherrod himself provides a number of other, non-discriminatory, reasons why members of the Board might have supported his termination. Some were long-standing disagreements over management styles (Faulkerson) (Exhibit 5, pp.14-16), others supposedly wanted his job (Gambill, Coleman, Jeffres). Exhibit 5, pp.16, 90 and 97. This comports with Jeffres testimony that Sherrod, on August 12, 2002, said that "they [Board members] been after me for a very long time, and I'm just tired of it." Exhibit 7, p.58. These were scenarios raised by Sherrod, not BTWC, and in viewing the

record – his own testimony – in a light most favorable to him, should be considered as additional non-discriminatory reasons for his termination.

Assuming (again, for the sake of argument only) that Sherrod could provide some reason to disbelieve all of the reasons outlined above (including his own), the ultimate burden of showing that an illegal, discriminatory, animus was involved in the decision-making process remains squarely with him.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).  As noted above, no such evidence has been produced by Sherrod.  It strains all credulity to believe that the mostly African-American Board of BTWC – and organization created to advance the interests of African-Americans – would terminate its African-American executive director *because of his race*, and then turn around and replace him with *another* African-American executive director.  Sherrod is entitled to no inference that such motives existed in any analysis of his case, be in "mixed motive" or "pretext."

>        **B.    Sherrod both has failed to state a claim under Pennsylvania's Wage Payment and Collection Law.**

Sherrod's last day of active employment with BTWC was August 12, 2002.  After that date, he never performed any service for BTWC, through and including his "formal" termination date of September 24, 2002.  He is not entitled to compensation for time he did not work.

Sherrod was an at-will employee, and there is nothing in his letter of engagement (Exhibit 1) or in the Personnel Policies in place as of August 12, 2002, that would have provided him with the right to be compensated during the period from August 12 through September 24, 2002.  At best, it was a period of suspension, and at worst he had

resigned.  In either case, there is no basis upon which he might properly be paid as an active employee.  <u>Weldon v. Kraft</u>, 896 F.2d 793, 800-801 (3rd Cir. 1990).

**C.    Sherrod both has failed to state a claim damage to reputation or for emotional distress**

<u>Reputational Harm</u>

Sherrod's claim for harm to his reputation ("Personal and Professional Reputation and Character") must be viewed as a defamation action; there is simply no other cause of action that fits the bill in that regard.  That being the case, the claim is barred in its entirety by the applicable statute of limitations.

Specifically, defamation actions carry a one (1) year statute of limitations.  42 Pa.C.S.A. § 5523; <u>Pro Golf Manufacturing v. Tribune Review Newspaper Company</u>, 570 Pa. 242, 809 A.2d 243 (2002).  The actions complained of here all occurred on or before October 1, 2002.  The instant action was filed on or about July 21, 2004, more than one year later.

Even without the limitations period, however, there is no evidence of any actionable wrong by BTWC.  Sherrod provided the newspaper with far more detail than BTWC, which essentially held to a "no comment" line.  To sustain a claim for defamation, a plaintiff must show the defamatory character of the communication; publication by the defendant; application to the plaintiff; the understanding of the recipient of its defamatory meaning; the understanding of the recipient that it was intended to apply to the plaintiff; special harm to the plaintiff from its publication; and, abuse of any conditionally privileged occasion. *See* Pa.C.S.A. § 8343(a).  No such evidence exists here.

To recover damages, a plaintiff must also prove that the statement results from some fault on the part of the defendant. *See* U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 923 (3d Cir.), cert. denied, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). A communication is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or deter third persons from associating or dealing with him." Beverly Enterprises, Inc. v. Trump, 182 F.3d 183, 187 (3d Cir.1999) (quotations omitted). An allegedly defamatory statement must also be viewed in context to assess the effect it is fairly calculated to produce and the impression it would ordinarily create with those among whom it is intended to circulate. *See* Weinstein v. Bullick, 827 F.Supp. 1193, 1197 (E.D.Pa.1993). A communication is not defamatory because it may embarrass or annoy the person to whom it refers. *See* Maier v. Moretti, 448 Pa.Super. 276, 671 A.2d 701, 704 (Pa.Super.1995). Again, there is no evidence in the instant record that would support any claim by Sherrod in this regard. Exhibit 5, pp.36-48, 80-81; Exhibit 14.

<u>Emotional Distress</u>

Sherrod makes a very general claim for Emotional Distress. There is no indication if it is for intentional or negligent infliction of emotional distress. In either case, his complaint fails to set forth sufficient factual allegations to sustain such claims. The record in this matter, likewise, does not support his position.

The viability of this claim is to be determined by the Court, as a matter of law. "[I]t is for the court to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery." Reimer

v. Tien, 356 Pa.Super. 192, 198-200, 514 A.2d 566, 569 (1986).  Although the Supreme

Court of Pennsylvania has never expressly recognized a cause of action for intentional

infliction of emotional distress and has not formally adopted §46 of the Restatement

(Second) of Torts (1965), the court has cited this section as setting forth the minimum

elements necessary to sustain a cause of action for the intentional infliction of emotional

distress.  Taylor v. Albert Einstein Medical Center, 562 Pa. 176, 754 A.2d 650, 652

(2000). This section provides (in relevant part):"(1) One who by extreme and outrageous

conduct intentionally or recklessly causes severe emotional distress to another is

subject to liability for such emotional distress, and if bodily harm to the other results

from it, for such bodily harm.  No such allegation is found in Sherrod's Complaint, and

no such evidence may be found in the record now before the Court:

> Liability has been found only where the conduct has been *so
> outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency, and to be regarded
> as atrocious, and utterly intolerable in a civilized society.*
> Generally, the case is one in which the recitation of the facts
> to an average member of the community would arouse his
> resentment against the actor, and lead him to exclaim,
> "Outrageous."  Small, 452 Pa.Super. at 420, 682 A.2d at 355
> ( *quoting* Jones v. Nissenbaum, Rudolph and Seidner, 244
> Pa.Super. 377, 383, 368 A.2d 770, 773 (1976)) (emphasis in
> original).

Strickland v. University of Scranton  700 A.2d 979, 987 (Pa.Super.,1997)

Likewise, neither the Complaint nor the record is capable of sustaining a cause of

action for the *negligent* infliction of emotional distress:

> In order to recover under either of the Browns'
> theories of liability as submitted to the jury-
> professional negligence and negligent infliction of
> emotional distress-they must prove the elements of a
> cause of action for negligence, i.e., "that the

> defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." <u>Martin v. Evans</u>, 551 Pa. 496, 502, 711 A.2d 458, 461 (1998). *See also*, <u>Brazens v. World Truck Transfer, Inc.</u>, 755 A.2d 36, 45, 2000 WL 778226, at *9 (Pa.Super.2000) ("absent a finding of negligence, the negligent infliction of emotional distress claim cannot survive").

Brown v. Philadelphia College of Osteopathic Medicine 760 A.2d 863, *868 (Pa.Super.,2000). These elements have not been pleaded by Sherrod, nor are they found in the record. Additionally, any claim of *negligent* infliction of emotional distress would be barred by Pennsylvania's Worker's Compensation Act, 77 P.S. §481.

## IV.    <u>CONCLUSION</u>

WHEREFORE, the Defendant, Booker T. Washington Center, demands judgment in its favor and against the Plaintiff, James Sherrod, as to all claims, together with an award of costs, counsel fees, and such other relief as this Honorable Court shall deem necessary and just.

Respectfully submitted,

QUINN, BUSECK, LEEMHUIS, TOOHEY & KROTO, INC.

By   /s/Arthur D. Martinucci
        Arthur D. Martinucci, Esquire
        Pa. I.D. No. 63699
        2222 West Grandview Boulevard
        Erie, PA 16506-4509
        (814) 833-2222
        Attorney for the Defendant,
        Booker T. Washington Center