IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**James C. Sherrod**
**Plaintiff**

          **CIVIL ACTION NO. 04-208 ERIE**
          **JUDGE SEAN J. McLAUGHLIN/**
          **MAGISTRATE JUDGE SUSAN BAXTER**

      vs.

**Booker T. Washington Center**
**Defendant**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Presently pending before the Court is Defendant's Motion for Summary Judgment which seeks to dismiss Plaintiff's Employment Discrimination Action and related claims, pursuant to Rule 56 (c) of the Federal Rules of Civil Procedure. For reasons set forth herein, the Court should deny the Defendant's Motion for Summary Judgment.

Plaintiff initiated this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. section 2000e, et. seq.; section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C.A. section 1981; Pennsylvania's Human Relations Act, 43 P.S. section 951, et. seq.; Pennsylvania's Wage Payment and Collection Law, 43 P.S. section 260.1, et. seq.; and related tort actions.

**II. COUNTER STATEMENT OF FACTS**

Accompanying this Memorandum is a Statement of Disputed Material Facts and Supporting Documentation. A summary of those facts are stated below.

Plaintiff James C. Sherrod (hereinafter referred to as Plaintiff or Sherrod), an African American, served as the Executive Director of Defendant Booker T. Washington Center (hereinafter referred to as BTWC/ Center/Agency), from November 1998 to September 2002. The Center fired Plaintiff by letter dated September 24, 2002. Complaint, Nos. 7 & 9; Plaintiff's Affidavit; Defendant's Exhibit No.13.

Mr. Sherrod had assumed the Executive Director position at a time of crisis for the Defendant; its previous Executive Director had resigned just months earlier, in July of 1998, as a result of a federal criminal investigation which led to her conviction and those of three other employees. Plaintiff's Deposition; Defendant's Exhibit No. 14.

Mr. Sherrod's terms of employment were set forth in writing, but were superseded by the adoption of revised by-laws and a new organizational structure. Essentially Plaintiff was limited as to what

he could and could not do.  Plaintiff's Affidavit; Plaintiff's Exhibits Nos. 18 & 19.

Mr. Sherrod's firing centered around a field trip that occurred on August 6, 2002, while he was on vacation, and while the Center's Controller, Mr. Brian Bessetti, a Caucasian employee, was in charge of the agency at the Defendant's direction. Complaint, Nos. 10-11, 13; Plaintiff's Affidavit; Defendant's Exhibit No.4.

Mr. Sherrod had advised the Board of Directors of his vacation plans, scheduled from August 5-August 9, 2002, and had reminded the Board 's Vice- President, Mr. Sean Coleman, of his plans a day or two before his departure. Plaintiff's Affidavit; Defendant's Exhibit No. 4.

On August 6, 2002, with the approval of the Acting Executive Director, Mr. Bessetti, children in defendant's Summer Day Camp Program, were taken to the movies. Three (3) adults, all African Americans, supervised the return trip. Allegedly a young girl was left behind. Defendant's Exhibit No.4.

The trip in questioned was not on a list of field trips previously approved by Mr. Sherrod and required the specific approval of Mr. Bessetti. Plaintiff's Exhibit No. 5.

Mr. Sherrod learned of the incident at approximately 10:30 or10:45 P.M. on August 6 from Mr. Coleman. Plaintiff's Affidavit & Plaintiff's Deposition.

Mr. Coleman began his conversation with Mr. Sherrod with the statement: "What are those fucking niggers doing?". Plaintiff's Affidavit & Plaintiff's Deposition.

Having just learned of the incident, Mr. Sherrod advised Mr. Coleman that he would interrupt his vacation and report to work to investigate the matter. Mr. Coleman advised Mr. Sherrod that he would be participating in the interviewing of staff. Plaintiff's Affidavit & Plaintiff's Deposition.

On August 7, 2002, prior to and after the interviews, Mr. Coleman referred to the three (3) adults supervisors as "niggers" and directed Mr. Sherrod to "fire those niggers". Plaintiff's Deposition. Mr. Sherrod had expressed the desire to continue his investigation. Plaintiff's Deposition.

As a result, believing he had to follow a directive from the Board, Mr. Sherrod drafted a termination letter; reviewed it with Mr. Coleman for approval and gave it to the individuals in questioned.  Plaintiff's Affidavit & Plaintiff's Deposition.

Also, on August 7, 2002, Mr. Sherrod took additional steps to ensure the safety and protection of program participants. Plaintiff's Affidavit.

Mr. Sherrod was relieved of his duties within days of the terminated employees, on August 12, 2002, and in a letter dated September 24, 2002, was fired. Prior to his termination, Mr. Sherrod was not under any disciplinary action. Plaintiff's Affidavit.

Prior to his termination, Plaintiff had received a positive evaluation and a pay raise Plaintiff's Affidavit & Deposition.

Mr. Sherrod learned of the August 12 Board meeting from Mr. Coleman on August 11 who simply told him the Board wished to receive a report on the incident. Instead, Mr. Coleman used the meeting to inform Mr. Sherrod that he had an option of resigning or being fired. Plaintiff's Deposition.

Mr. Sherrod refused both options. His keys were taken from him. Plaintiff's Affidavit & Deposition.

On the evening of August 12, 2002, Mr. Coleman came to Mr. Sherrod's home and again asked him to resign. Mr. Sherrod refused. Plaintiff's Affidavit & Deposition.

### III. LEGAL ARGUMENT

**Summary Judgment Standard**

The Federal Rules of Civil Procedure, Rule 56(c), mandates the granting of a motion for summary judgment " if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

An issue is genuine if there is a sufficient evidentiary basis for which a jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In evaluating a motion for summary judgment, the Court must draw all inferences in favor of the non-moving party and where the non-moving party's evidence conflicts with the movant's, the Court must accept the non-movant's version as true. United States v. Diebold, 369 U.S. 654 (1962) and Pastore v. Bell Tel. Co. of Penna., 24 F. 3d 508, 512 (3rd Cir. 1994).

The party moving for summary judgment bears the initial burden of demonstrating the basis for the motion and identifying evidence of record that establishes the lack of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986). The non-moving party must then present evidence of record showing that there is a genuine material issue of fact. Matsushita Elec. Indus. Co, Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court is then presented with deciding "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52; Tabas v. Tabas, 47 F. 3d 1280, 1287 (3rd Cir. 1995).

Applying the above rules to the instant case, resolving conflicting evidence in favor of Plaintiff and giving Plaintiff the benefit of all reasonable inferences, it is clear that "the evidence presents a sufficient disagreement" requiring "submission to the jury".

### PLAINTIFF HAS ESTABLISHED A CLAIM FOR RELIEF UNDER APPLICABLE FEDERAL AND STATE STATUTES

Mr. Sherrod, an African American, has established a prima facie case of employment discrimination based on race under Title VII of the Civil Rights Act of 1964, as amended, the

Pennsylvania Human Relations Act, as amended and his Civil Rights Claim under 42 U.S.C. section 1981.

A review of the facts in this case clearly illustrates that defendant used an impermissible factor, race, in firing plaintiff and having done so, now seeks to justify its behavior by accusing plaintiff of a failure to satisfactory perform his job.

The Pennsylvania Unemployment Compensation Board rejected this claim in a decision awarding plaintiff benefits on September 19, 2002. Plaintiff's Exhibit No. 2.

On August 12, 2002, his first day back from vacation, plaintiff was removed from his job. His removal was directly tied to an incident in which plaintiff had no involvement. Complaint, Nos. 9-13.

Plaintiff was removed from his job within days of having fired three (3) African American employees at the insistence of Mr. Sean Coleman, the Board's Vice-President, who referred to then with the racial epithet "nigger", in at least three (3) separate instances, including when he directed the plaintiff to fire them. Plaintiff's Deposition.

Plaintiff reported these remarks to the Board on August 12, 2002. Plaintiff's Deposition. The next day, August 13, at a staff meeting, Mr. Coleman himself confirmed calling the three (3) African American employees "niggers". Defendant's Exhibits Nos. 15-16.  And on September 2, 2002, at a grievance hearing of one of the fired employees, it was again reported to Board Members. Plaintiff's Exhibit No. 8.

Mr. Coleman controlled and directed the Board's August 12 meeting and it was he who insisted that plaintiff resign or be fired, even though Mr. Coleman and the Board was well aware that Mr. Bessetti had been in charge of the agency in Mr. Sherrod's absence. Plaintiff's Deposition.

Plaintiff refused both options. Plaintiff's Exhibits Nos. 6, 12-16; Plaintiff's Affidavit; Plaintiff's Deposition.

On the evening of August 12, 2002, Mr. Coleman came to plaintiff's home to get him to resign, which plaintiff declined to do. Plaintiff's Affidavit.

On September 16, 2002, at defendant's request and without knowing the purpose of the meeting, plaintiff met with Mr. Coleman and Mr. Jeffress and was presented with two (2) documents prepared by legal counsel, one entitled "Board of Director's Final Decision [Resignation of James Sherrod, Executive] and the other "Agreement and General Release". Plaintiff's Exhibits Nos.10-11. Plaintiff was told he had to accept the terms set forth in the documents. The offer was rejected.

At the time of his vacation, plaintiff was in good standing with the defendant and, in fact, earlier in the year, had received a raise as a result of a positive evaluation. There is nothing in the record to contradict this, including defendant's Exhibits Nos. 2a-2c, entitled "Performance Assessment".

Consistent with a long standing directive from the Board, plaintiff appointed the defendant's Controller, Mr. Brian Bessetti, a Caucasian employee, to serve as acting Executive Director in his

absence. In this capacity, Mr. Bessetti approved a field trip to a local movie theater for participants in the defendant's Summer Day Camp Program. A participant was reported to have been left at the theater. This occurred on the first day of plaintiff's vacation, August 6, 2002.

A list of trips approved by plaintiff prior to the commencement of the summer program is included in supporting documentation. Plaintiff's Exhibit No. 5.

Anita Smith, a Caucasian employee, was appointed interim Executive Director on August 13, 2002. Plaintiff's Exhibit No. 7.

Initially supportive of plaintiff, Mr. William Jeffress at some point expressed an interest in working for the Center and currently serves as its Executive Director. Plaintiff's Exhibits Nos. 9 and 21.

Plaintiff was hired by defendant in November, 1998. The defendant stated in its letter of engagement that "... the Search Committee and the Board of Directors [were] of the opinion that you can provide effective leadership for the Center and make a significant contribution to its mission and goals." Plaintiff's Exhibit No. 3.

Additional terms of employment were set out in an addendum. Plaintiff's Exhibit No. 4.

When plaintiff assumed the Executive Director position, the defendant was in a state of crisis as a result of the criminal misconduct of his predecessor. Among other things, plaintiff was required to rebuild the trust and confidence of funding sources and carry out the specific directives of the Board of Directors. Plaintiff's & Deposition.

Plaintiff was directed to revised defendant's By-Laws in accordance with specific instructions from the Board. Plaintiff's Affidavit. These changes provided the Board with even greater control over the day to day operations of the agency. Plaintiff's Exhibits Nos.18 & 19.

Mr. Coleman denies ever using the word "nigger" and ever directing plaintiff to fire anyone. Plaintiff's Exhibit No. 20, Mr. Coleman's Deposition.

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee with respect to the terms, conditions, or privileges of employment because of his race. This protection extends to the termination of employment. 42 U.S.C.A. section 2000e-2.

This case essentially involves disparate treatment, that is, the treatment of an employee differently than others who are similarly situated because of the employee's protected status. In the instant case, the mistreatment of James Sherrod because of his protected status, race.

The Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 s. Ct. 1817, 36 L. Ed. 2d 668 (1973) created a prima facie test for disparate treatment cases under Title VII. McDonnell deals with the order and allocation of proof in evaluating employment discrimination cases.

The Court held that the complainant must carry the initial burden under Title VII in establishing a prima facie of racial discrimination and that the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employer's action. Assuming the defendant does

so, the burden remains with the plaintiff to prove by a preponderance of the evidence that the proffered reason was pretextual.

In McDonnell, a failure-to- hire case, the Supreme Court outlined the elements of a prima facie case. The Supreme Court held in hiring cases that the elements of a prima facie case were: 1. The plaintiff had to be a member of a protected class; 2. That he applied for and was qualified for the position for which he applied; 3. That he was not hired despite his qualifications; and 4. That the employer continued to seek applicants from person's with complainant's qualifications.

Immediately following in a footnote the Court stated: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations." Id. at 802 n.13. Such is the case here, where plaintiff was in his position for almost four (4) years before being fired. Never the less, McDonnell and its progeny provide a framework for the analysis of this case.

The Supreme Court in Texas Department of Community Affairs v. Burdine, 450 U.S. 248;101 S. Ct. 1089; 67 L. Ed. 2d 207 (1981), reviewed its holding in McDonnell and in great detail spoke of its practical application.

After plaintiff, by a preponderance of the evidence, has established a prima facie case of discrimination, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for its decision. Assuming the defendant meets this burden, plaintiff must then establish by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason for its decision, but a pretext for discrimination. (Quoting McDonnell at 804).

Burdine discussed the nature of each party's burden pointing out that the " ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the defendant remains at all times with the plaintiff.... The McDonnell Douglas division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question."

Burdine further stated: "The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a proponderance (sic) of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstance which give rise to an inference of unlawful discrimination. n6 The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. As the Court explained in Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978), the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are most likely than not based on the consideration of impermissible factors.' Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case. n7"

The facts in this case establishes plaintiff's prima facie case, that is, Mr. Sherrod, an African American, is a member of a protected class; Mr. Sherrod held a position with the defendant for which he was qualified; the defendant took adverse action against him, even though he was on

vacation at the time of the incident and another, a white employee, was in charge of the agency.

By a preponderance of the evidence, plaintiff has established a prima facie case. The evidence clearly permits an inference of discrimination.

Defendant has justified its decision by claiming it fired plaintiff due to his failure to perform his job, throughout his tenure and the day or night of the incident. Additionally, the defendant appears to be arguing that it couldn't discriminate against defendant because, like the plaintiff, the majority of its Board Members at the time of the firing were African Americans.

The Supreme Court has rejected the argument that members of the same protected group can't discriminate against each other. Justice Scalia , in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998 (1998), a case involving sex discrimination, stated "... in the related context of racial discrimination in the **workplace** we have **rejected** any **conclusive presumption** that an employer will not discriminate against members of his own race. 'Because of the many facets of human motivation, it would be unwise to **presume as a matter of law** that human beings of one definable group will not discriminate against other members of their group.' ( Emphasis added. Citations omitted.). Id. at 1001.

While in dispute, the plaintiff, by affidavit and in his deposition, has testified to Mr. Coleman referring to African Americans as "niggers" and directing that they be fired; to Mr. Coleman and the Board being aware that Mr. Sherrod was on vacation and Mr. Bessitti was in charge on August 6, 2000; to only the Board having the authority to fire.

This apparent argument by the defendant is similar to its analysis with regard to the use of the "N" word. The defendant fails to recognize the importance of this word having been used in an employment context. The applicable federal and state statutes governing this case involves employment or as with section 1981, contracts. Even the defendant's quote from Professor Kennedy's book, nigger- The Strange Career of a Troublesome Word (Vintage Books, 2003), makes clear that the use of the word, how it is spoken, the location in which it is spoken, to whom it is spoken, the context in which it is spoken, adds to its meaning.

As Professor Kennedy wrote:

> As we have seen, *nigger* can mean many different things,
> depending upon, among other variables, **intonation**,
> the **location** of the interaction, and the **relationship**
> between the speaker and those to whom he is speaking. Id. at 54.

Plaintiff testified to Mr. Coleman using "nigger" at least three times - on the night of August 6 when Mr. Coleman first called him, and twice on August 7, the day of interviewing staff. Plaintiff testified that in his capacity as a subordinate he felt he had no other choice but to follow the directions and demands of Mr. Coleman, the Acting Board President. Plaintiff's & Deposition.

While Mr. Coleman now disputes his use of the word "nigger", on August 13, 2002, in a meeting with staff, he acknowledged referring to the three (3) fired employees as "niggers". Defendant's Exhibits Nos. 15 & 16. Interestingly, while very much aware that Mr. Bessetti was in charge of the

agency on August 6, Mr. Coleman did not direct that he be fired. As Acting Board President, he told Mr. Sherrod who to fire and directed the drafting of a termination letter for his approval. Plaintiff's Deposition.

This case is not about what is or is not happening in "popular culture", assuming the parties could agree on what is meant by that, but employment discrimination. Whether Mr. Coleman used the racial epithet, whether he intended it to only apply to the African American employees, whether by inference it applied to Mr. Sherrod, are all questions for a jury.

As noted earlier, once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to justify its decision by producing a legitimate, nondiscriminatory reason for its action. Defendant claims poor performance, during plaintiff's tenure and on the night in questioned.

Plaintiff worked for defendant for almost four (4) years. According to plaintiff's engagement letter, written by defendant, defendant was required to conduct semi- annual reviews of Plaintiff's performance which it never did. Plaintiff's Exhibit No. 3. Defendant 's Exhibits Nos. 2a, 2b and 2c, entitled "Performance Assessment", are incomplete personnel instruments, with two (2) not being signed by either party. Two of the three (3), the first and the third, shows plaintiff's performance as "acceptable", including the one performed before the incident. The instruments defines "acceptable" to mean "Does a satisfactory job; meets expectations or standards for performance." The second identified areas of improvement, which was met by the third assessment. Plaintiff testified to receiving raises throughout his tenure. Plaintiff's Affidavit & Deposition.

With regard to the evening of August 6, 2002, the evidence establish that plaintiff heard from Mr. Coleman at approximately 10:30 or 10:45. The agency had closed for the day and everyone had gone home. Information to investigate the matter was at the agency. The earliest plaintiff could act was in the morning and, while hampered by Mr. Coleman, he did the best he could. Plaintiff's Deposition.

If the defendant meets or carries its burden of production, Burdine notes "... the presumption raised by plaintiff's prima facie case is rebutted and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus services to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the **factual issue** with clarity so that the plaintiff will have a full and fair opportunity to demonstrate **pretext**." (Emphasis added).

There are some facts on which the parties agree including:

1. Mr. Sherrod is a member of a protected class;
2. Mr. Sherrod was an employee of the defendant;
3. Mr. Sherrod was on vacation when the August 6, 2002 incident occurred;
4. The Board held a meeting on August 12, 2002; and
5. The Board sent Mr. Sherrod a letter dated September 24, 2002 terminating his employment.

The parties differ, however, on material issues of facts, which warrants a denial of defendant's summary judgment motion. We differ on such critical facts, such as:

1. Whether Mr. Sherrod was fired because of his race;
2. Whether Mr. Sherrod was fired because of an unsatisfactory job performance;
3. Whether there is evidence in this case permitting an inference of discrimination; and
4. Whether defendant's claim of an unsatisfactory job performance is a pretext for the sort of discrimination prohibited by applicable statutes.

The above analysis applies to claims under the Pennsylvania Human Relations Act and Section 1981 of the Civil Rights Act of 1866, 42 U.S. C. A. Section 1981.

A review of the defendant's Answer, the cross-examination on deposition of Mr. Coleman and Mr. Jeffress, defendant's interpretation of certain documentation, and the defendant's apparent inability to appreciate the totality of the circumstances in which the use of a racial epithet in an employment setting led to the adverse employment action against Mr. Sherrod, establishes the existence of material facts in dispute.

Based on the forgoing, plaintiff has established a prima facie and the existence of material facts in dispute to warrant a denial of defendant's motion for summary judgment.

### PLAINTIFF HAS ESTABLISHED A CLAIM UNDER THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW

Pennsylvania's Wage Payment and Collection Law require every employer to pay a separated employee all wages due and payable to him no later than his next regular payday. From August 12- September 24, 2002, as a result of defendant's own actions, was left in limbo as to his employment status and would have reported to work, but for defendant's actions.

Plaintiff pointed out that he had done nothing wrong and repeatedly expressed his desire to return to work. Plaintiff's Exhibit Nos. 6, 12-16; Plaintiff's Affidavit & Deposition. Defendant precluded plaintiff from working.

### PLAINTIFF WITHDRAWS HIS DEFAMATION OF CHARACTER CLAIM

Since it appears that Pennsylvania 's one year statute of limitation applies to plaintiff's defamation of character claim, plaintiff withdraws this claim.

### IV. CONCLUSION

As stated above, in considering a motion for summary judgment, all evidence must be construed in a light most favorable to the non-moving party and where, as in the instant case, the non-moving party has presented evidence establishing the existence of material facts in dispute, the motion must be denied.

Wherefore, Plaintiff request that Defendant's Motion for Summary Judgment be denied.

Respectfully Submitted,

_____

Edith Benson, Esq.
PA. Atty. No.: 33510
4683 Budd Drive
Erie, PA 16506
814-838-3760