1    A.   Sometime between the 12th and the 21st of August.

2    Q.   Are there minutes of that meeting?

3    A.   I don't know.

4    Q.   Are there notes of that meeting?

5    A.   I don't know.

6    Q.   Who was in attendance at that meeting?

7    A.   I don't recall that either.

8    Q.   Is there any documentation that could refresh your

9    memory and who might have it?

10   A.   I don't know.

11   Q.   So, you don't know who might have documentation

12   that could reflect if meetings occurred around the

13   appointment of Ms. Smith and when.

14   A.   I would have to presume whatever members of the

15   management committee -- members of the committee at that

16   time.  And, again, other members of the Board would know

17   that as well.

18   Q.   Now, in reviewing these documents last evening with

19   Mr. Martinucci was there anything in particular pointed out

20   to you with regard to their significance?

21   A.   No, not that I can recall.

22        MR.MARTINUCCI:   Just so the record's clear, since

23             these aren't being entered as Exhibits right now, I

24             just want to identify these for the record; if I

25             could.

1           MS. BENSON:  I might bring them in later on.

2           MR. MARTINUCCI:  That's fine, but I want to

3           identify them for the record now.  The documents in

4           question that Mr. Coleman has indicated he reviewed

5           with me last night or saw at my office last night

6           include a three-page, stapled document titled BTWC

7           Incident Report, Tuesday August 6th, 2002,

8           submitted by Sean P. Coleman, Vice President,

9           Booker T. Washington, BTWC Board of Directors.

10          There's a one-page document with two entries on it,

11          both of them entitled Executive Meeting Reports.

12          One from August 9th, 2002, 12:00 p.m., one from

13          August 13th, 2002, 12:00 p.m., both submitted by

14          Sean P. Coleman.  There's a letter dated August

15          21st, 2002 to Anita Smith from Sean Coleman, Re:

16          Appointment to day-to-day operations of Booker T.

17          Washington Center.  And there's September 24th,

18          2002 letter to James Sherrod, Re:  Termination of

19          employment, signed by Sean P. Coleman, Vice

20          president.

21          MS. BENSON:  And let me just say that the last

22          document is already entered.

23          MR. MARTINUCCI:  That's already entered as Exhibit

24          2.

25      Q.  Now, Mr. Coleman.

1      A.   Yes.

2      Q.   You say that there was this meeting on August the

3  12th, 2002.  Was there an agenda for the meeting on August

4  the 12th, 2002?

5      A.   I think so.  I'm not sure.  I think it was just an

6  emergency meeting.

7      Q.   Who prepared the agenda?

8      A.   Again, I said I think there was an agenda, I'm not

9  sure.

10     Q.   Do you know what were the items discussed at the

11  August 12th meeting?

12     A.   We were going to discuss --- I believe that was the

13  event that happened August 6th.  That's my answer.

14     Q.   So you were going to discuss the August 6th matter.

15     A.   Right.

16     Q.   Now, prior to the meeting on August the 12th, 2002

17  had there been any other meetings of the Board or Board

18  committees around the August 6th incident?

19     A.   I think I typed a report of this.  Yes, apparently

20  there was.  There was a ---

21     Q.   What are you using to refresh your memory?

22     A.   Executive meeting report that I submitted for

23  August 9th.

24     Q.   All right.  So before you read that let me have you

25  tell me what you recall of that meeting.

1     A.    Actually, I don't know, I would have to read it.  I
2  know we talked about the August 6th incident.

3     Q.    Who was present at that meeting?

4     A.    I do not recall.

5     Q.    Who called that meeting?

6     A.    I believe that was called by -- I'm not sure if it
7  was myself or Mr. Hamilton.

8     Q.    Would that meeting have been called by written
9  notice?

10    A.    E-mail.  I think it would have been an e-mail.

11    Q.    Sent from whose computer?

12    A.    If I'm not mistaken, I believe that -- I'm not sure
13  how it went down, but I believe that I sent the notice for
14  the meeting.

15    Q.    Does every member of the Board of Director have a
16  computer and Internet access?

17    A.    I don't know that they have a computer, but I
18  presume they all have Internet access because they supply
19  e-mail addresses.

20    Q.    So every one of these individuals listed in
21  Plaintiff's Exhibit Number 1 had a computer.

22    A.    I don't know if they had a computer.

23    Q.    Every one of them had access to the Internet?

24    A.    I believe so.

25    Q.    Did you have their e-mail addresses?

1      A.    Yes.

2         Q.    Where did you obtain those e-mail addresses from?

3         A.    From the compilation of the Board and their data

4    information.

5         Q.    Well, on this sheet here, Exhibit Number 1, that is

6    a list of the Booker T. Washington Center Board of

7    Directors, there are no e-mail addresses?

8         A.    We've had multiple forms, we are always updating

9    them.

10        Q.    Who would have documentation that would provide us

11    with the e-mail addresses of these Board members in 2002?

12        A.    I guess that information would be at the Center.

13        Q.    Now that you've read the document, is your memory

14    refreshed?

15        A.    Yes.

16        Q.    Did you provide a written report to the Board of

17    Directors in the August 12th meeting?

18        A.    Written report of the --

19        Q.    August 6th indent.  Did you provide a written

20    report to the Board of Directors?  I'm going to August 12th

21    now.

22        A.    Right, I'm not sure if I submitted what I wrote up

23    from the information I gathered on August 12th or not.

24        Q.    So you're going to a meeting on August the 12th,

25    who's conducting that meeting?

1     A.     That would have been, I believe, our chairperson.
2     Q.     So you're saying Mr. Hamilton was there on August
3  the 12th.
4     A.     I'm saying I think he was there, I don't recall
5  specifically if he was --
6     Q.     Is there a possibility that he wasn't -- at this
7  moment I want you to testify from memory, we can if we need
8  to later on.  Is there a possibility he wasn't there?
9     A.     Yes, as there's a possible that 13 other people who
10 weren't there because I don't know exactly, again, of the
11 list who was there except for those three I've excluded.
12    Q.     Who did most of the discussion on August the 12th?
13    A.     Probably me because of my involvement with the
14 situation.
15    Q.     You say your "involvement", tell me what you mean
16 by that.
17    A.     Well, I received the initial phone calls on that
18 night, the 6th from James, or Mr. Sherrod on that night.
19 Went to the Center the next day to talk to employees and
20 converse.  And then James had contacted me several times the
21 day -- the 6th was a Tuesday, the day after he got back from
22 wherever he said he had gone that Friday, that would be the
23 9th.
24    Q.     You said you received initial phone calls on August
25 the 6th.  Who did you receive phone calls from?

1       A.    That would have been from Paul Gambill and

2    Claudette McAdory.

3       Q.    And what time of day did you receive those calls?

4       A.    I don't know what time they came in, but I didn't

5    receive them until I got off of work and that would have

6    been 10:30, 10:40 at night.

7       Q.    Those calls were on your machine.

8       A.    No, my mom had informed me that they had called.

9       Q.    So they had left the message with her.

10      A.    Correct.

11      Q.    And she gave you the message around 10:30 on August

12   the 6th.

13      A.    Between 10:30 and 10:40.

14      Q.    Around 10:30 p.m. on August the 6th.

15      A.    Around 10:30 or 10:40 when I got home.  I'm not

16   sure exactly when I got home, somewhere around there.

17      Q.    And who did you speak to first?

18      A.    I'm not sure who I spoke to first, but I believe I

19   spoke to both of those individuals.

20      Q.    And what did you learn from Ms. McAdory?

21      A.    Their was story was pretty similar, that a little

22   girl was missing from a field trip that we took to the mall.

23   Not we, but that the Center had taken to the mall.

24      Q.    And where did Ms. McAdory get her information from?

25      A.    I don't know.

1    Q.    Where did Mr. Gambill get his information from?

2    A.    I don't know.

3    Q.    After hearing from Ms. McAdory did you -- you said

4    you're not sure the order in which you spoke to either one.

5    A.    Correct.

6    Q.    What did you do after speaking to them?

7    A.    I contacted Mr. Sherrod.

8    Q.    Did you speak with both of them before you

9    contacted him?

10    A.    Yes.

11    Q.    And what time was it on August the 6th when you

12    spoke to Mr. Sherrod?

13    A.    I don't know.  I have it written in my notes if I

14    can refer to that.

15    Q.    Can you guess at this point.

16    A.    It had to be between when I arrived home at 10:30

17    and 11:30 that evening.

18    Q.    And you can look at your notes and tell me what

19    time.

20    A.    I think it's in here.  It would have had to have

21    been between 10:30 and 11:15.

22    Q.    Now, when you spoke with Mr. Sherrod what did you

23    inform him?

24    A.    Pretty much asked him had he heard about -- I told

25    him, first of all, that I got two phone calls.  And I told

1    him had he heard about the situation of the girl missing

2    from the field trip.

3        Q.   Okay.  And his response was?

4        A.   I believe he had told me something to the fact that

5    he had spoke to one of his staff and that the girl was found

6    with her cousins later, something along those lines.

7        Q.   I'm sorry.

8        A.   I said, I believe he had told me something to the

9    effect that he had spoken to one his staff and the girl was

10   found with her cousins or relatives or something along those

11   lines.

12       Q.   Then what did you do?

13       A.   I think I had said, okay.  I think I talked to a

14   few more people, who exactly I talked to --

15       Q.   I'm sorry.

16       A.   I said, I kind of ended the conversation.  I recall

17   speaking to a couple of people, I'm not sure exactly who I

18   had spoken to.  And then I called Mr. Sherrod back telling

19   him that I've heard a different story.  And that's when he

20   began to phone other staff members, and then I had contacted

21   other people as well.

22       Q.   What time was your second call to Mr. Sherrod?

23       A.   I have no idea of the times, 10:30, 11:15.

24       Q.   Now going to August the 7th.

25       A.   Yes.

1       Q.   What did you do with regard to the incident of
2   August the 6th?
3       A.   Mr. Sherrod had got to -- went to the Center and
4   talked to the three employees involved, or four actually,
5   there was a youth aid also.
6       Q.   Who were the four employees?  And I would want you
7   to recall from memory as opposed to referring to that.
8       A.   Sure.  It would have been Derek Johnson, Renee
9   Smith, Lester Howard, and, I believe the young youth aid was
10  Dasha Pacely.
11      Q.   You spoke to all four of those individuals.
12      A.   I believe so.
13      Q.   You and Mr. Sherrod together.
14      A.   Correct.
15      Q.   Did you speak to those individuals as a group or
16  individually?
17      A.   Individually.
18      Q.   And what was the purpose of speaking with those
19  individuals?
20      A.   To figure out what happened the previous day.
21      Q.   Who did you speak to first?
22      A.   I think Derek Johnson, I'm not sure.
23      Q.   Who do you think you spoke to next?
24      A.   I believe Lester Howard, again, I'm not sure.  And
25  obviously Renee Smith.  And I don't know -- we may have

1    spoke to Dasha about it, now that I think about it.

2        Q.   Of the four individuals you mentioned, the last one

3    you said was a young lady whose name?

4        A.   Dasha Pacely, I think.

5        Q.   And was she a full-time member of the staff?

6        A.   No, she was just a summer aid.  I think she was a

7    summer youth aid.

8        Q.   She was hired on a program that a Booker T.

9    Washington Center operated.

10       A.   I believe so.

11       Q.   Now of the four individuals mentioned, three were

12   fired; weren't they?

13       A.   Yes, they were.

14       Q.   Now, Ms. Pacely was not; can you tell me why?

15       A.   I have no idea.

16       Q.   Now, during this meeting, these individual

17   meetings, did you take notes --

18       A.   Yes.

19       Q.   -- of your conversation with them?

20       A.   Yes, and that's what you have there.

21       Q.   So, those notes were in the spiral notebook that

22   you now have.

23       A.   Correct.

24       Q.   Did anyone else take notes?

25       A.   Mr. Sherrod had recorded the meetings.

1      Q.   All right.  So there were recordings of the
2    meetings.  Now, is that recording still in the possession of
3    the Booker T. Washington Center?
4      A.   I don't know.
5      Q.   In addition to talking to those four individuals,
6    did you speak to anyone else?
7      A.   You mean that day pertaining to this or just in
8    general?
9      Q.   In general.
10     A.   I mean -- he Board members and that was the night
11   before, and that's pretty much it.  And the day of August
12   the 7th.
13     Q.   So you spoke to Board members also on August the
14   7th?
15     A.   I think I may have, I'm not sure.  I just know, in
16   general, I spoke to the Board members the night before.
17     Q.   Well, when you say the night before --
18     A.   That would be the 6th.
19     Q.   August the 6th.  What Board members did you speak
20   to?
21     A.   Claudette McAdory and Paul Gambill.
22     Q.   Were they the only Board members you spoke to on
23   August the 6th?
24     A.   Yes, I think I may have put a phone call in to Mr.
25   Hamilton.  The only reason I say that is because I know I

1    have the number written down here, but I'm not sure if I

2    spoke with him.  I don't think I spoke with him.

3        Q.   And then on August the 7th you don't recall

4    speaking to any other Board members?

5        A.   No, I don't.

6        Q.   Now, let's take each one of those individuals one

7    by one.  Lester Howard, how long had he worked for the

8    Booker T. Washington Center?

9        A.   I don't know.

10       Q.   Derek Johnson.

11       A.   Correct.

12       Q.   How long had he worked for the Booker T. Washington

13   Center?

14       A.   I think and I maybe mistaken, but I think Derek was

15   there less than a year.

16       Q.   And Renee Coates Smith, how long had she worked for

17   the Booker T. Washington Center?

18       A.   Again, I think Renee was there for about two years,

19   maybe a little more, maybe a little less, I'm not sure.

20       Q.   All three of those individuals are African

21   Americans; am I correct?

22       A.   Yes.

23       Q.   Now, this happened on August the 6th, Mr. Sherrod

24   was on vacation; wasn't he?

25       A.   I'm not sure if he was on vacation then or if he

1    was taking his vacation later on, but I'm not particularly
2    sure, I can't remember.  Actually, no, he was on vacation,
3    sorry.
4        Q.   In fact, you had met with Mr. Sherrod prior to him
5    going on vacation; hadn't you?
6        A.   I don't understand, what do you mean?
7        Q.   You had met with Mr. Sherrod before he went on
8    vacation?
9        A.   I don't recall.
10       Q.   Would it help you if I were to tell you that Mr.
11   Sherrod was on vacation from August the 5th through August
12   the 9th, 2002?
13       A.   Okay.
14       Q.   Does that refresh your memory at all?
15       A.   Well, see Mr. Sherrod and I had met on numerous
16   occasions.  So to say I met with him before August 6th would
17   be accurate, when, I don't know.
18       Q.   Well, let's go back and see if we can pin it down.
19   His vacation was scheduled from August the 5th to August the
20   9th.  Isn't it true that you met with him before August the
21   5th, the day before, to discuss agency business and affairs?
22       A.   I don't recall.
23       Q.   You don't recall having a meeting with Mr. Sherrod.
24       A.   I recall having a meeting with Mr. Sherrod, but I'm
25   not sure if it was on August 5th, so I don't recall if it

1    was August 5th.

2        Q.    All right.  So you do recall having a meeting with

3    him about him going on vacation.

4        A.    Again, I don't know what the topic matter of that

5    meeting was.

6        Q.    You have no idea, you can't recall what the topic

7    was.

8        A.    We probably talked about some things with the

9    Center, but I'm not sure if we talked about him going on

10   vacation.  He didn't have to discuss that with me.

11       Q.    He didn't remind you that he was scheduled for

12   vacation from August the 5th through the 9th?

13       A.    As I mentioned, I don't recall.

14       Q.    Do you recall the two of you discussing who would

15   be in charge during his absence from August the 5th to

16   August the 9th, 2002?

17       A.    No, I don't.  Because, again, I don't recall

18   discussing -- he and I just talking about his vacation.  He

19   didn't have to talk to me or run certain things by me, so,

20   no.

21       Q.    Now, when Mr. Sherrod was away from the Booker T.

22   Washington Center for extended absences, who was in charge?

23       A.    I don't know.  That would be a decision that was

24   left up to his discretion.

25       Q.    Isn't it true that the Board gave him directions as

1    to who would be in charge during extended absences?

2        A.    Again, I don't recall.

3        Q.    So it's a possibility that the Board had given him

4    such directions?

5        A.    It's a possibility that it didn't happen as well.

6        Q.    Answer my question.  Is it a possibility that the

7    Board had given Mr. Sherrod directions as to who to appoint

8    when he was on extended absences?

9        A.    Of course, it's a possibility.  But as I mentioned,

10    those days could have been left up to his discretion.

11        Q.    Now, you came on in 1999, right?

12        A.    Correct.

13        Q.    Now, once you came on Mr. Sherrod took vacation

14    during 1999 to 2002; didn't he?

15        A.    Right.

16        Q.    And isn't it correct that Brian Bessetti, the

17    controller, was in charge of the agency during extended

18    absences by Mr. Sherrod?

19        A.    Again, as I mentioned, I'm not sure because those

20    things could have been left to Mr. Sherrod's discretion.

21        Q.    Now, Mr. Coleman.

22        A.    Yes.

23        Q.    You would drop by the Booker T. Washington Center

24    on a regular basis, wouldn't you?

25        A.    Yes, it's right in the neighborhood.

    1       Q.   You would drop by almost on a daily basis?

    2       A.   No, that's inaccurate.

    3       Q.   You would drop by there on -- several times during

    4    the week; isn't that correct?

    5       A.   Depending on activities going on, yes.

    6       Q.   You would drop by when, in between Board of

    7    Directors meetings; isn't that correct?

    8       A.   Yes.

    9       Q.   You would drop by in between executive committee

   10    meetings; isn't that correct?

   11       A.   Yes.

   12       Q.   You would drop by in between management committee

   13    meetings; isn't that correct?

   14       A.   Yes.

   15       Q.   Of all the Board members identified on Plaintiff's

   16    Exhibit Number 1 you were the most frequent visitor to the

   17    Booker T. Washington Center; wasn't that correct?

   18       A.   Correct.

   19       Q.   You were the most informed Board member; isn't that

   20    correct?

   21       A.   I don't know.

   22       Q.   You would see Mr. Sherrod every time you went

   23    there, wouldn't you?

   24       A.   Yes.

   25       Q.   And you would discuss agency business; isn't that

1    correct?

2         A.    Not every time.

3         Q.    You didn't discuss agency business?

4         A.    I didn't say that, I said, not every time.  He

5    could have just as well informed any other member of the

6    Board more information than he disclosed to me.

7         Q.    But my question to you is, you've just testified

8    that you were the most frequent visitor of the Board of

9    Directors.

10        A.    That doesn't mean I'm the most informed.

11        Q.    All right.  Now, let's go back and see if you can

12   recall meeting with Mr. Sherrod the day before he went on

13   vacation.

14        A.    Okay.

15        Q.    In August of 2002 -- now, you're shaking your head,

16   just give me an answer.

17        A.    No, I don't recall.

18        Q.    Do you recall you and Mr. Sherrod talking about

19   Brian would once again assume his responsibilities of

20   running the agency in Mr. Sherrod's absence?

21        A.    First, I can't say, once again, because as I

22   mentioned I thought that was up to James' discretion.  And

23   secondly, no, I don't recall having any discussions

24   concerning who would run the agency in James' absence.  I

25   don't recall the meeting.

1       Q.   Let's go back.  From 1999 until August of 2002, was
2   the controller ever in charge of the agency in Mr. Sherrod's
3   absence?
4       A.   I don't know.
5       Q.   Could he have been?
6       A.   Could have been.
7       Q.   You have here what has been previously mentioned as
8   executive committee meeting report, one-page, dated August
9   9th, 2002, submitted by Sean P. Coleman.
10      A.   Right.
11      Q.   When did you prepare this statement?
12      A.   That would have had to have been between the 6th
13  and the 9th.  I think what I did was after I wrote them I
14  think I cut and pasted on the one page, the two reports,
15  that's why they're on one page.
16      Q.   So there are two reports, one says executive
17  committee meeting report August the 9th of 2002, and the
18  other executive meeting report August the 13th?
19      A.   Right.
20      Q.   Were they prepared on the same day?
21      A.   No, couldn't have been.
22      Q.   But you said you prepared them and then you pasted
23  them together?
24      A.   No, what I said was I did it between the 6th and
25  the 9th, and then I said for the second one -- I didn't say

1     anything about the second one.  What I did was prepared the
2     report and just cut and pasted them on the same sheet of
3     paper.
4          Q.   Why did you prepare these two reports?
5          A.   Because we had executive committee meetings.
6          Q.   And were these reports -- at what meeting were
7     these two reports presented?
8          A.   I don't recall.
9          Q.   On what -- in preparing these two reports on what
10    did you base the reports on?
11         A.   The meetings that we had.
12         Q.   Did you present this document here, which I'll have
13    labeled as Plaintiff's Exhibit Number 3.  Did you present
14    this document here at a single meeting?
15              (Plaintiff Exhibit Number 3 marked for
16              identification.)
17         A.   Yes, I believe so, that's why I put it on one sheet
18    of paper.
19         Q.   And in looking at these two dates can you recall
20    when that meeting might have occurred?
21         A.   Probably the week of August 19th.  I presume that
22    would be when our regular general Board meeting was.
23         Q.   Now, in preparing the August 9th, 2002 statement
24    what did you rely upon in order to write that?
25         A.   The meeting that we had on August 9th, 2002.

```
1        Q.    So there was a meeting on August the 9th?

2        A.    Yes.

3        Q.    And what was that meeting of?

4        A.    Discuss the August 6th report -- or August 6th

5    incident as noted, and then information from Mr. Hamilton.

6    I mean this paragraph pretty much just sums it up, the

7    discussions included.

8        Q.    Now, in this summary here dated August the 9th, the

9    third sentence reads, discussion included the transportation

10   of children on an overcrowded vehicle, potential

11   disciplinary action against the executive director, and the

12   preparation of a press release, if necessary.  Now, you had

13   spoken with Mr. Sherrod on August the 6th, right?

14       A.    That night, correct.

15       Q.    And he had come into the office back from vacation

16   on the 7th, right.

17       A.    Correct.

18       Q.    There is a meeting held on August the 9th while he

19   was still on vacation?

20       A.    Uh-huh.

21       Q.    Correct.

22       A.    Right.

23       Q.    And that meeting was held by an executive

24   committee?

25       A.    My dates may be off, August 9th was a Saturday,
```

1    correct?

2        Q.    No, I think it may have been a Friday.

3        A.    Sorry.  So, I'm sorry, your question.

4        Q.    So my question to you.  At this meeting of the

5    executive committee on August the 9th one item you discussed

6    was quote, "the potential disciplinary action against the

7    executive director".

8        A.    Correct.

9        Q.    Had you given Mr. Sherrod notice on August the 6th

10   or August the 7th that you were going to be raising an issue

11   regarding whether he should be disciplined?

12       A.    I didn't raise the issue, that was a Board

13   committee meeting discussion.  I didn't raise the issue so I

14   didn't give him any notice because even prior to going into

15   that meeting there was no definite direction of where we

16   were going to go, that's why it says potential.

17       Q.    So August the 6th you talked with him in the

18   evening.

19       A.    Right.

20       Q.    August the 7th there's no question about Mr.

21   Sherrod and disciplinary action?

22       A.    Not from me, no.

23       Q.    Now, you said there's a meeting on August the 9th?

24       A.    Right.

25       Q.    An executive committee meeting.

1      A.    Right.

2      Q.    Who raised the issue of disciplining Mr. Sherrod?

3      A.    I don't remember.

4      Q.    Did you raise it?

5      A.    I don't think so, again, I don't recall.

6      Q.    Is it a possible that you raised it?

7      A.    I don't think I brought it up at all, but it's a

8  possibility, yes.

9      Q.    So there's a possibility.  Did you defend Mr.

10  Sherrod during this meeting of August the 9th?

11      A.    There was nothing to defend.

12      Q.    He was the only -- you were the only Board member

13  from the moment of this incident on August the 6th to the

14  August 9th meeting that he had spoken to; isn't that

15  correct?

16      A.    I don't know if he had spoken to anyone else, I

17  couldn't tell you that.

18      Q.    So you say there was nothing to defend --

19      A.    Correct.

20      Q.    -- when it comes to Mr. Sherrod

21      A.    Right.

22      Q.    Why do you say that?

23      A.    Because you're making it appear as if he like rode

24  out on a white horse and saved the world.  There were

25  actions that took place, he met with the employees and then

1    we met to see what course of direction the Board should take

2    on August 9th.  So there really was nothing to defend or

3    nothing to support, we had discussions on it on the 9th.

4        Q.   But the executive committee met while Mr. Sherrod

5    was on vacation.

6        A.   Right.

7        Q.   And discussed matters, right?

8        A.   Right.

9        Q.   Now, you knew that Mr. Sherrod was going to resume

10   his vacation plans, right, on August the 7th?

11       A.   I assumed so.

12       Q.   Did you in the meeting on August the 9th suggest to

13   the Board that in fairness to Mr. Sherrod there should be no

14   discussion about disciplinary action until he had come back

15   to town?

16       A.   No, I didn't, but why would I have had to, everyone

17   knew the situation.  See you're trying to -- obviously you

18   guys are trying to put everything right here.  I mean, other

19   Board members were there as well.

20       Q.   I'm sorry, you said other Board members were there

21   as well.

22       A.   At the executive committee meeting.  I didn't have

23   an executive committee meeting by myself.

24       Q.   I understand that you didn't have a

25   committee-of-one meeting.  My question to you is, did you

1    suggest to the committee that they not engage in any

2    discussion of potential disciplinary action of Mr. Sherrod

3    since he was not present?

4        A.    I answered that question.

5        Q.    And your answer is?

6        A.    I answered, no, no one did.

7        Q.    Now, there was another meeting according to this

8    Exhibit, Plaintiff's Exhibit 3.  It says executive meeting

9    report August the 13th?

10       A.    Uh-huh.

11       Q.    And I just want to read a statement or two from

12   there.  "We discussed a possible severance package for Mr.

13   Sherrod which included one-month's pay, continuation of

14   health benefits for 90 days, and an agreement not to contest

15   his unemployment".

16       A.    Correct.

17       Q.    "This package was based upon a discussion I had had

18   with Mr. Sherrod that night before.  We talked briefly about

19   defining the role of the executive director".  Now, let me

20   go back.  Prior to -- I'm assuming you're reporting on a

21   meeting of the executive committee that took place on August

22   the 13th of 2002; am I correct?

23       A.    Yes.

24       Q.    Prior to this meeting had notice gone out to the

25   executive committee that there would be such a meeting?

1       A.    I believe we set this meeting up at the previous
2   meeting from August 12th.
3       Q.    August --
4       A.    12th.
5       Q.    So let me get this straight.  There was a meeting
6   on August the 9th of the executive committee.
7       A.    Right.
8       Q.    A meeting on August the 12th of the executive?
9       A.    No, there was a meeting on August 12th, but it
10  wasn't just an executive meeting, we've already defined that
11  earlier.
12      Q.    Well, you weren't sure?
13      A.    Well, yes, but I said after reading through the
14  notes I don't think it was the committee meeting because of
15  the number of the people in attendance.
16      Q.    So you think the August 12th was a Board meeting?
17      A.    Yes.
18      Q.    And then there was an executive committee meeting
19  on the 13th?
20      A.    Correct.
21      Q.    Now, again, going back to my question of, prior to
22  the meeting on August the 13th had notice gone out to
23  executive committee members that there would be this
24  meeting?
25      A.    Again, it was either announced at the 12th meeting

1    or an e-mail sent out. You see the executive committee --
2    we weren't required and, again, my memory is obviously a
3    little off, but I don't believe committees were required to
4    send notices. So we could have verbally contacted each
5    other and set up our meeting, arranged on an as-needed
6    basis. So therefore, notice -- I would have to say, yes,
7    because notice would have been given the day before.
8        Q.   Did you check the bylaws to make sure you were
9    acting in accordance with the bylaws' requirements --
10       A.   No.
11       Q.   -- of the meetings notice?
12       A.   I'm pretty sure that's the way it was.
13       Q.   Let me go back to August 9th meeting. Had notice
14   gone out to the executive committee members of the August
15   9th meeting?
16       A.   Obviously, because we had the meeting on the 9th,
17   people were there.
18       Q.   So, you had a meeting on August the 9th. Who was
19   present at the August 9th, 2002 meeting?
20       A.   I don't remember.
21       Q.   Who were the members on the executive committee at
22   that time?
23       A.   It would have been the officer and the chairpeople
24   on the committee, the other committees.
25       Q.   Now, three people were -- the three people

1     associated with the field trip of August the 6th, 2002 were
2     fired.  Did they file grievances?
3          A.   Yes.
4          Q.   What committee of the Board heard those grievances?
5          A.   I believe members of the management committee.
6          Q.   And who served on the management committee at that
7     time?
8          A.   Again, I don't know exactly.
9          Q.   Did you participate in those meetings?
10         A.   No.
11         Q.   Who did the Board members receive information from?
12         A.   What do you mean?
13         Q.   Who did they -- in hearing the appeals of these
14    three fired employees who did the Board receive information
15    from, those committees -- I'm sorry, the management
16    committee?
17         A.   I'm sorry, I don't understand your question.  Who
18    did the management committee receive information from.  What
19    information?
20         Q.   With regard to the appeal that these three
21    employees filed.
22         A.   The employees would have sent a written appeal and
23    then they would have met with the management committee or
24    that particular grievance committee.
25         Q.   So were you aware that the management committee

1    thought that Mr. Lester Howard should have been given his

2    position back?

3        A.    I proposed that.

4        Q.    You proposed that.

5        A.    I didn't think that Lester Howard should have been

6    fired.

7        Q.    Were you at that committee meeting involving Mr.

8    Howard?

9        A.    No.

10       Q.    So when did you make that proposal to the

11   committee?

12       A.    I suggested that, I said that to Mr. Sherrod and I

13   said that to the rest of the Board.

14       Q.    And when did you suggest that Mr. Sherrod?

15       A.    The day of the interviews.

16       Q.    August the 7th of 2002?

17       A.    That is correct.

18       Q.    You said it to Mr. Sherrod right then and there?

19       A.    After we got done -- see we were discussing what

20   should happen, and every scenario that we came across I

21   expressed that to Mr. Sherrod.

22       Q.    So let me go back to August 27th of 2002.

23       A.    Yes.

24       Q.    After each of the four individuals were interviewed

25   about what happened, you and Mr. Sherrod had a discussion?

1      A.    Yes.

2      Q.    And your recommendation --

3      A.    I didn't give any recommendations.

4      Q.    You didn't give my recommendation with regard to
5   any of those four individuals?

6      A.    I want to put you in the conversation.  We had a
7   conversation, he and I.  And we were pretty much talking
8   about the situation and how it should be addressed.  And in
9   that discussion he asked my opinion, I asked his, we threw
10  some things off of each other.  But I didn't recommend
11  anything happen to anyone.  I may have told him what I would
12  have done if I was in that situation, but that was not a
13  recommendation, and I did not instruct him to do anything.

14     Q.    What did you tell him you would have done if you
15  were in his situation?

16     A.    I believe I said I would have -- according to the
17  situation, according to the data, I think that two of the
18  three should be terminated and that's just my opinion.  I've
19  given my opinion many times and he took it or he didn't.  So
20  I didn't see the situation was any different.

21     Q.    Now, after the interview and the discussions you
22  and Mr. Sherrod had.

23     A.    Correct.

24     Q.    Did you an Mr. Sherrod speak later on that day?

25     A.    Not that day.

1      Q.   Not on August the 7th.

2      A.   No, because I believe he said he was going out of

3    town that day.

4      Q.   Did you direct Mr. Sherrod to prepare letters

5    notifying all three that they were fired?

6      A.   Absolutely not.

7      Q.   Did Mr. Sherrod read a draft of that letter to you

8    and get your approval?

9      A.   Yes, he did.  He didn't get my approval, he did

10   read a draft.  That situation -- the next day I received

11   subsequent telephone calls from Mr. Sherrod.  The first

12   phone call that I received from Mr. Sherrod he had said and

13   this is a quote.  He said, "I spoke to my wife last night

14   and I think I'm going to let all three of them go."  My

15   response to that was, James, if you think that's the right

16   thing to do then I'll see to it that the Board supports your

17   decision.

18       A few hours later I received a phone call from Mr.

19   Sherrod and he had asked me to come and write the

20   termination letter.  And I said to him then, I said, James,

21   we pay you $40,000 a year to run that organization, you do

22   the hiring and you do the firing, this is your decision, I

23   am not involved in that process; he said, okay.

24       He called me the third time and this is from your point.

25   He said, Sean, I just want to read this termination letter

1    to you.  Halfway through the letter I cut him off and I

2    said, James, why are you reading this to me.  This is your

3    decision, you got to make the call on this, so why are you

4    bothering me with this, and we terminated the conversation

5    then.

6         So there was conversation afterwards, but there was

7    nothing that I suggested by writing the letter, nor did he

8    seek my approval of the letter.

9         Q.   So you're saying that while Mr. Sherrod was on

10   vacation on August 8th he called you up.

11        A.   Absolutely, that next morning.  And, again, he was

12   on vacation from the Center, but whether he was in town or

13   not -- I believe he was in town.

14        Q.   Are you aware that he left town shortly after the

15   interviews?

16        A.   Again, I think so, because I had asked, you know --

17        Q.   Now, you say you talked to him on the 8th and there

18   was an executive committee meeting on August the 9th.

19        A.   Right.

20        Q.   Had Mr. Sherrod been given notice of the August the

21   9th meeting?

22        A.   Again, like I said, many times we had sent things

23   out via e-mail and I do believe his signature was on that

24   list -- his e-mail was on that list.  So if we sent out

25   e-mails, which I believe we did, he should have received a

1    copy.

2        Q.    But you realize he was scheduled to be on vacation
3    on August the 9th?

4        A.    As far as the executive committee he's not required
5    to be present.

6        Q.    Not even when there's a discussion of potential
7    disciplinary action against him.

8        A.    Again, just because that became part of the
9    discussion that doesn't mean that that was the primary focus
10   of the meeting.  The meeting was to discuss what happened on
11   August 6th.  Now, had members of the committee had brought
12   that up then went in to the report -- so we could have been
13   in there having a potential meeting about A and then someone
14   brought up B and so we reported on A and B as what happened
15   in the minutes during the course of the meeting.

16       Q.    Mr. Coleman, if somebody on the Board of Directors
17   were to say at the August 9th meeting that it was you
18   pushing for the termination for Mr. Sherrod would they be
19   telling the truth?

20       A.    I don't know what they would be doing.  Whether
21   they were telling the truth or not that's up to their
22   discretion.  As I mentioned, I don't recall what happened at
23   that particular meeting.  I mean who brought it up, but
24   there was a discussion.

25       Q.    Is it possible that you brought it up that Mr.

1    Sherrod should be terminated?

2         A.    Of course it's possible.  But, again, we took

3    discussion of potential disciplinary action.  Nothing in

4    there states anything about termination.  According to this

5    report it didn't say anything about termination.  Potential

6    disciplinary action which means that he may or may not have

7    been disciplined for the events.

8         Q.    That's right.

9         A.    And, again, that does not mean that I brought it

10   up.  That could have been brought up by other members of the

11   Board.

12        Q.    But it's possible that you brought it up.

13        A.    Yes, it's possible.

14        Q.    And of course, we understand that potential

15   disciplinary action could include anywhere from a warning to

16   termination, right?

17        A.    Right, just as it could include nothing at all.

18        Q.    Now, Mr. Coleman.

19        A.    Yes.

20        Q.    Isn't it true that after the interviews with the

21   staff on August the 7th, 2002 you directed Mr. Sherrod to

22   fire all the employees involved with the field trip?

23        A.    Absolutely not.  As I mentioned earlier I didn't

24   think Lester Howard should have been fired.

25        Q.    Isn't it true that you directed him to fire all

1    those niggers?

2        A.    Absolutely not.

3        Q.    Now, you learned that the controller was in charge

4    of the Center during Mr. Sherrod's absence, didn't you?

5        A.    Again, depending on how that's defined -- all the

6    controller said was that he was told that if anything

7    happened he was supposed to call Mr. Sherrod and he said he

8    did.

9        Q.    When did you speak with the controller?

10       A.    I spoke to him probably sometime during -- between

11   or after the event on probably like between August 12th and

12   the end of the month, the end of August or sometime in

13   there.

14       Q.    So you didn't go to him from August the 6th until

15   the end of August of 2002?

16       A.    I didn't say the end of August, it could have been

17   August 13th when I spoke to him.  I just said, sometime

18   between the 12th and the end of the month because I'm not

19   sure when.

20       Q.    Do you have any notes in your notebook that would

21   show when you spoke with the controller?

22       A.    I don't think so, but possibly.  No, I don't, no.

23       Q.    When do you think you might have spoken with him?

24       A.    Again, I don't recall.

25       Q.    Mr. Coleman.

1    A.    Yes.

2    Q.    The Booker T. Washington Center claims that Mr.

3    Sherrod submitted a verbal resignation to the Board in

4    August of 2002; is that your -- do you recall any such thing

5    happening?

6    A.    Yes.

7    Q.    And when do you recall it happening?

8    A.    At the August 12th meeting.

9    Q.    This is the meeting where there was probably no

10   notice given?

11   A.    Pardon.

12   Q.    August 12th meeting.

13   A.    No, there had to be notice given, 11 people showed

14   up.

15   Q.    But you can't tell us where we can find proof that

16   such notice was given?

17   A.    I think proof would be in the fact that 11 people

18   showed up.  You can't show up for a meeting that you don't

19   know exists, that was August the 12th.

20   Q.    We need to know if there was notice given and if so

21   what was the method of it.

22   A.    If there was notice given it would have been either

23   through e-mail, telephone call, or it could have been mailed

24   out, I'm not particularly sure.

25   Q.    And would that e-mail have come from you?

1       A.    Possibly.

2       Q.    But did it?

3       A.    I don't recall.  Again, I don't recall the method

4    of which notice was given.  But notice had to be given,

5    again, by the fact of the people being in attendance.

6       Q.    Were the minutes -- were any minutes taken for this

7    August 12th 2002 meeting?

8       A.    Yes.

9       Q.    Who has those minutes?

10      A.    They would be with the Center.

11      Q.    Okay.  Now, at the meeting on August the 12th isn't

12   it true that Mr. Sherrod informed the group that he would

13   not resign because he had done nothing wrong.

14      A.    No, that's not accurate.

15      Q.    Now, you say you went to -- I'm going back to the

16   report, executive committee report of August the 13th.  And

17   you say, this package was based upon a discussion I had with

18   Mr. Sherrod that night before, meaning August the 12th.

19      A.    Correct.

20      Q.    Where did you hold that discussion at?

21      A.    Came by, picked James up, and we went for a little

22   ride at Burton Park, 38th and Burton.

23      Q.    That was on August the 12th when you went to the

24   park.

25      A.    Yes.

1    Q.   And you had a discussion with Mr. Sherrod.

2    A.   Yes.

3    Q.   Now, isn't it true during that meeting Mr. Sherrod

4    once again reiterated that he had done nothing wrong and

5    would not resign from the Booker T. Washington Center?

6    A.   It's not a reiteration, because, again, I don't

7    recall him saying anything about not resigning at the

8    earlier meeting.

9    Q.   At this meeting that you say took place on the

10   evening of August the 12th.

11   A.   Correct.

12   Q.   Mr. Sherrod told you he wasn't resigning because he

13   had done nothing wrong; isn't that true?

14   A.   I don't recall.  I do recall that we had discussion

15   on several things, meaning bringing Mr. Sherrod back to the

16   Center in another capacity other than the executive

17   director.  And he said something to the effect that he would

18   not come back unless it was as the executive director, that

19   doesn't mean he's not resigning though.

20   Q.   Now, isn't it true that after Mr. Sherrod left the

21   Booker T. Washington Center on the day of August the 12th

22   that you continued to pursue him to obtain his resignation.

23   A.   No, that's not true.

24   Q.   Isn't it true that you went to his home the evening

25   of August the 12th, right?

1      A.    Correct.

2      Q.    Seeking his resignation.

3      A.    No, that's false.  That's not true.

4      Q.    Isn't it true that you saw him on several other

5   occasions seeking his resignation.

6      A.    No.

7      Q.    Now, did Mr. Sherrod, in your meetings with him at

8   his home and at Burton Park, ever submit a resignation to

9   you?

10     A.    We didn't meet at his home, I went by and I asked

11  him if he wanted to go for a ride which he agreed and we met

12  at Burton Park.  And, no, he did not submit his resignation

13  outside of his verbal resignation he gave earlier that day.

14     Q.    Why did you ask Mr. Sherrod what would it take for

15  him to go away quietly?

16     A.    I didn't ask that question.

17     Q.    Isn't it true that you then began to propose

18  packages, severance packages to him.

19     A.    Yes.

20     Q.    As a means of him going away quietly.

21     A.    No.

22     Q.    Isn't it true that you offered Mr. Sherrod a

23  severance package if he would submit his resignation.

24     A.    First of all, I didn't offer him anything, the

25  Board had talked about this by way of severance packages.

1    Secondly, he had already given his resignation verbally at
2    the Board meeting.
3        Q.    Now, if I bring in here some Board members who say
4    otherwise then somebody is not telling the truth, right?
5        A.    You got that right.
6        Q.    All right.
7        A.    There's only one truth.
8        Q.    All right.  On the meeting of August the 13th --
9    I'm referring back to Plaintiff Exhibit 3, which deals with
10   executive meeting report.  It is said, we discussed a
11   possible severance package for Mr. Sherrod.  Who proposed a
12   severance package?
13       A.    I don't recall.  I think it was a matter of -- I
14   mean one thing about the Board, I would say, is that we were
15   trying to be a bunch of iron fists, iron clad individuals.
16   We made a decision and we wanted to offer James something,
17   or Mr. Sherrod something.  So, again, when we say we
18   discussed, we mean the members of the executive committee.
19       Q.    Who proposed -- who went into this meeting
20   proposing a severance package for Mr. Sherrod?
21       A.    I don't know, I don't recall.
22       Q.    Did you make a proposal?
23       A.    It's possible.
24       Q.    And if it's possible what was your proposal?
25       A.    Again, I'm not sure.  But if I made a proposal, if

1    anyone made a proposal, we didn't have to, but we did.

2        Q.    Well, it says here -- the next line says -- I'm

3    reading the first and then the second line.  We discussed a

4    possible severance package for Mr. Sherrod, which included

5    one-month's pay, continuation of health benefits for 90

6    days, and an agreement not to contest his unemployment.

7    This package was based upon a decision I had with Mr.

8    Sherrod that night before.

9        A.    Right.

10       Q.    So that would imply that you were the one who made

11   -- that made the proposal?

12       A.    Not necessarily.  Because James and I had discussed

13   the night before -- Mr. Sherrod and I had discussed the

14   night before a few of those items.  However, prior to that

15   people could have said -- other members could have said,

16   let's give him a severance package.

17       Q.    Now, from what you testified to you became involved

18   in this situation on the evening of August the 6th.

19       A.    Right.

20       Q.    You also participated in interviewing of staff on

21   August the 7th?

22       A.    Correct.

23       Q.    According to your testimony you claim to have

24   spoken to Mr. Sherrod on August the 8th regarding

25   termination letters.

1        A.    That wasn't a claim, that happened.

2        Q.    Now, at what point did you consult with the Board

3    president in relation to the August 6th, 2002 incident?

4        A.    Probably would have been August 8th.

5        Q.    And where did you consult with him?

6        A.    We probably did -- I know he has -- the information

7    that he requested from me that I put in the August 9th

8    minutes that was via e-mail.  But we may have spoke over the

9    telephone, he's a hard fellow to catch up with.  We may have

10   talked on the telephone, I believe we did.

11       Q.    You're saying you spoke with the Board president on

12   August the 8th.

13       A.    Correct, I believe it's the 8th.

14       Q.    By phone.

15       A.    I believe by phone, but I know we did do

16   correspondence by e-mail.

17       Q.    Do you have a copy of that e-mail?

18       A.    No, I don't.

19       Q.    From what computer did you transmit?

20       A.    I don't recall.

21       Q.    What was his response to what was occurring at the

22   Booker T. Washington Center?

23       A.    I don't recall exactly.  But I think he just wanted

24   to get a lot of data in place.

25       Q.    I'm sorry.

1       A.    I said, I don't recall exactly what his response
2   was, but I know he did want to get a lot of data in place.
3       Q.    And what was some of the data he wanted in place?
4       A.    New program policy procedures, dates and times,
5   policy for meeting with the staff and incident reports.
6       Q.    Did he want to find out all the facts surrounding
7   the August 6th incident?
8       A.    I'm sure he did.
9       Q.    Did Mr. Hamilton want to find out all of the facts
10  involving Mr. Sherrod?
11      A.    Yes, I'm pretty sure.
12      Q.    Did he have any questions?
13      A.    I don't recall, maybe, maybe not.  I'm pretty sure
14  he would have had questions, but I don't recall.
15      Q.    Now, it seems that you were the one that called for
16  the meeting on August the 9th; is that correct?
17      A.    I don't think so.
18      Q.    Who do you think called that meeting?
19      A.    I believe Mr. Hamilton had wanted to get together.
20      Q.    I'm sorry.
21      A.    I believe that was Mr. Hamilton.
22      Q.    And the meeting of August the 12th, 2002, who
23  called that meeting?
24      A.    I think I called that one.
25      Q.    And the meeting of August the 13th.

1       A.    Again, I'm not sure.  I don't know.

2       Q.    Now, after August 13th, were there any other

3    meetings involving the August 6th, 2002 incident and all

4    subsequent events involving personnel, including Mr.

5    Sherrod?

6       A.    I don't recall.  I think we may have had a staff

7    meeting that week, other than that I don't recall.

8       Q.    Mr. Coleman, I want to go back.  You are testifying

9    that Mr. Sherrod submitted his resignation on August the

10   12th, 2002?

11      A.    Verbally, yes.

12      Q.    Why would Mr. Sherrod do that?

13      A.    Because the Board had asked him for it.

14      Q.    So during the meeting of August the 12th, 2002 the

15   Board asked for his resignation.

16      A.    Correct.

17      Q.    Did the Board during the meeting of August the

18   12th, 2002 give Mr. Sherrod a sense that if he did not

19   resign he would be fired?

20      A.    I don't know how to answer that question.

21      Q.    You know how to answer that question, Mr. Coleman.

22      A.    Actually I don't, but I'm about to attempt to if

23   you would allow me to.  Am I allowed to answer the question?

24      Q.    Please answer the question.

25      A.    Thank you.

1      Q.    And the question calls for a yes or no answer.  Did
2    the Board, during the meeting of August the 12th give Mr.
3    Sherrod a sense that if he did not resign he would be fired?
4      A.    I don't know.
5      Q.    Does the minutes of the meeting of August the 12th
6    reflect -- August the 12th, 2002 reflect the Board asking
7    Mr. Sherrod to resign?
8      A.    I don't know.
9      Q.    Now, what if any report was given to the Board that
10   would lead the Board to request Mr. Sherrod's resignation on
11   August the 12th?
12     A.    Well, prior -- during that meeting we had discussed
13   the entire event, so we had met for quite a period of time,
14   I believe, that morning or that afternoon, I'm not sure what
15   it was.  So whatever information was in the discussion from
16   that meeting.
17     Q.    And who provided the information to the Board?
18     A.    Only thing I provided to the Board was the time
19   line of events of what happened.  And then other Board
20   members -- again, we had a discussion.
21     Q.    The only thing you provided to the Board was a time
22   line of events.
23     A.    The time line, the narrative, the incident report
24   that you have.  What happened, who I had spoke to, James had
25   spoke to, things like that, or who Mr. Sherrod had spoke to.

1    Q.    Now, you say the narrative.  Are you referring to
2    --
3    A.    That incident report dated -- that I think I
4    misdated.
5    Q.    I have a three-page document that was given to me
6    for -- as a result of a Request for Production of Documents.
7    And it's captioned BTWC Incident Report, Tuesday, August the
8    6th, 2002, submitted by Sean P. Coleman.
9    A.    Correct.
10   Q.    Vice president, BTWC.
11   A.    Right.
12   Q.    Now, this report here, did you present that to the
13   Board on August the 12th?
14   A.    Yes, I believe so.
15   Q.    Are you sure or not?
16   A.    I'm not sure, but I know that the Board got a copy
17   of that.
18   Q.    When did the Board receive a copy of this document?
19   A.    I believe it would have been on the 12th.
20   Q.    And I'm just going to label this as Plaintiff
21   Exhibit 4.  And you believe that the Board received this --
22           (Plaintiff Exhibit Number 4 marked for
23           identification.)
24   A.    Yes.
25   Q.    -- document.

1    A.   Those were my notes from what had transpired.  So
2  in conversing with the Board about those events I would have
3  referred to that document.
4    Q.   What led to the creation of Exhibit Number 4?  This
5  is a three-page report, what led to it?
6    A.   Well, pretty much there was no narrative of what
7  happened and mine was a third party narrative.
8    Q.   Who suggested that you prepare the narrative?
9    A.   I'm not sure if anyone suggested it to me.  I think
10  I just put down an outline of events.
11    Q.   And you think you put down the outline of the
12  events?
13    A.   Or what I thought happened.
14    Q.   When do you think you put this together?
15    A.   Pardon me.
16    Q.   When do you think that you would have put that
17  together?
18    A.   I would have done that after the interviews,
19  obviously.  So it was either that Friday or that Saturday,
20  the 8th or 9th.
21    Q.   And they were based -- this three-page document
22  here, Plaintiff Exhibit Number 4 was based on what?
23    A.   It was based on what I've gathered and the
24  interviews.
25    Q.   What have you gathered from where?

1    A.    From the conversations I had on the night -- or the
2    telephone calls I received and the conversations I had the
3    night of the 6th when I got home from work.

4    Q.    Were they based on any notes that you had?

5    A.    Yes, these notes here, some of those notes are in
6    here.

7    Q.    All right.

8    A.    Not all of them, but some of them, yes.

9    Q.    Are those notes that -- the spiral notebook that
10   you're pointing to is -- do I now have all of those notes?

11   A.    Pertinent to the situation, yes.  It says right
12   here the front paragraph, the following account is what I
13   believe to be true and accurate based on the interviews
14   conducted concerning the incident that occurred concerning
15   Briana Hughes and explains the situation.

16   Q.    Now, let me just take you here.  We're at a Board
17   meeting on August the 12th.

18   A.    Correct.

19   Q.    There is a discussion about Mr. Sherrod and his
20   behavior.

21   A.    Uh-huh.

22   Q.    A decision is made to request his resignation and
23   Mr. Sherrod is hit with all of this after he comes back from
24   vacation; is that correct?

25   A.    He was told that at the Board meeting on August

1    12th.

2        Q.    He was hit with it as he comes into that meeting?

3        A.    He was informed August 12th.

4        Q.    August the 12th.

5        A.    Correct.

6        Q.    Very little time or no time to respond, in terms of

7    fairness?

8        A.    He could have responded then.

9        Q.    Excuse me?

10       A.    He could have responded then.

11       Q.    Now, you claim that Mr. Sherrod not only resigned,

12   but then later on attempted to rescind his resignation; is

13   that correct?

14       A.    What I stated was that he resigned verbally from

15   the Board.  And then through the letter, that you discussed

16   earlier this morning, he said that he wasn't going to

17   resign.  You said he had sent us some correspondence stating

18   the situation.

19       Q.    I'll show you a document dated August the 16th,

20   which I have labeled Plaintiff Exhibit Number 5, which is a

21   letter dated August 16th, 2002 to Mr. James Hamilton, the

22   president of the Booker T. Washington Board from Mr.

23   Sherrod.  Read that.

24            (Plaintiff Exhibit Number 5 marked for

25            identification.)

1        A.    Okay.

2        Q.    Doesn't that tell you that Mr. Sherrod did not

3    resign.

4        A.    Let me see.  This states what he did after the

5    16th, but the day of the 12th he submitted his verbal

6    resignation.

7        Q.    That's based on your recollection.

8        A.    And this is based off of his.

9        Q.    Other than the letter that I just showed you,

10    Plaintiff Exhibit Number 5, are there any other methods that

11    you said Mr. Sherrod used to rescind his resignation?

12        A.    Other than that letter, I don't recall.

13        Q.    Would it be reflected in any Board minutes?

14        A.    I don't know, I would have to look at the minutes.

15        Q.    If he attempted to rescind any claimed resignation

16    would it be in the Board minutes?

17        A.    I don't know, I would have to look at the minutes.

18        Q.    Would you say that it's a subject so important that

19    it should have been in the Board minutes?

20        A.    If it happened, but that day it didn't happen, not

21    to my knowledge.

22        Q.    Now, earlier I showed you, and you are aware of

23    Plaintiff Exhibit Number 2, which is the September 24th,

24    2002 letter of termination?

25        A.    Correct.

 1        Q.    Who provided Attorney Martinucci with the
 2    information contained in that letter?
 3        A.    I did and that was based off discussions that I had
 4    with members of the Board.
 5        Q.    And when did you have those discussion?
 6        A.    Sometime between the 12th and the 24th of this
 7    letter.
 8        Q.    Were these discussions during a meeting of the
 9    Board or a Board committee?
10        A.    Yes.
11        Q.    What meeting?
12        A.    I'm not sure if it was a general Board meeting or
13    executive committee meeting.
14        Q.    Would the discussions be reflected in minutes of
15    that Board meeting or committee meeting?
16        A.    They should be, I don't know.
17        Q.    The Booker T. Washington Center in its Answer to
18    Plaintiff's Complaint makes reference to the Plaintiff's
19    alleged failure in the quote, "eyes of the Board, to
20    adequately or properly address the situation after it
21    occurred".  At what Board meeting did the Board discuss this
22    matter?
23        A.    It could have been, I believe, the August 12th
24    meeting.
25        Q.    Would that discussion be reflected in the Board

1    minutes?

2         A.    Again, I don't know, it should be.

3         Q.    In Paragraph Number 14 of the Defendant's Answers

4    to Plaintiff Complaint, it is alleged that Plaintiff was

5    notified of the August 6th incident before being contacted

6    by you.  Who are you claiming notified Mr. Sherrod of this

7    incident before you called him around 11 or 11:30?

8         A.    I didn't claim anything, what are you talking

9    about?

10               MR. MARTINUCCI:  I'm going to object to the form of

11               the question.  Because, as you've pointed out Mr.

12               Coleman is not here as a representative of the

13               Booker T. Washington Center.  So he can't speak to

14               what's in the answer.

15               MS. BENSON:  I can phrase it differently.

16               MR. MARTINUCCI:  Give it a shot.

17         Q.    Mr. Coleman, you spoke with Mr. Sherrod, you've

18    testified, on August the 14th.

19               MR. MARTINUCCI:  August the 14th.

20         Q.    August the 6th, around 10:30 to 11 that night.

21         A.    Right.

22         Q.    And based on your testimony here today you were the

23    primary person, it appears the only person on the Board,

24    active in this matter.  So, did you provide information to

25    the Booker T. Washington Center which would lead them to

1    conclude that Mr. Sherrod had notice of the incident before
2    you called him?
3         A.   I'm sorry, can you rephrase or restate the
4    question?
5         Q.   Did you provide --
6         A.   Information.
7         Q.   -- information to the Booker T. Washington Center
8    or it's attorney, Mr. Martinucci, that led the Defendant to
9    conclude that Mr. Sherrod knew of the August 6th incident
10   before you contacted him?
11        A.   I didn't, but other employees said that they
12   contacted Mr. Sherrod.
13        Q.   Other employees said they did.
14        A.   Yes, I believe they did.
15        Q.   Who would have been those employees?
16        A.   I believe that would have been Brian Bessetti.
17        Q.   So Brian --
18        A.   And I think Mr. Sherrod told me that he spoke with
19   Randy Davis, I think.
20        Q.   Now, what leads you to believe that Brian Bessetti
21   spoke with Mr. Sherrod on August the 6th?
22        A.   I'm not sure, because after we had spoke -- well,
23   after we had spoke at the event he said he was told to
24   contact James in the event that something happened, and he
25   did.  So I got to presume -- I'm assuming, I don't know if

1    he did or not, that he did contact Mr. Sherrod.

2        Q.   Did you ever check with Mr. Sherrod to see if Brian

3    Bessetti had contacted him?

4        A.   No, I didn't.

5        Q.   Now, you said there was someone else, Randy Davis.

6        A.   Right.

7        Q.   Did you speak with Mr. Davis about whether he had

8    contacted Mr. Sherrod?

9        A.   No, I believe, Mr. Sherrod had told me that he had

10   spoke with Mr. Davis.

11       Q.   And when are you saying that Mr. Sherrod told you

12   this?

13       A.   During the initial telephone call.

14       Q.   Of August the 6th.

15       A.   Right, that I had with him.

16       Q.   And what did Mr. Sherrod -- what are you saying

17   that Mr. Sherrod said he learnt from Mr. Davis?

18       A.   That girl was found with her cousins or relatives

19   or along those lines.

20       Q.   So, the only thing you're saying that Mr. Davis

21   supposedly told Mr. Sherrod was that the girl was found.

22       A.   No, that's the only thing that I'm saying that I

23   was informed of.  What other parts of the conversation I

24   don't have any knowledge of.

25       Q.   Now, Paragraph Number 15, again, of the Defendant's

1    Answer refers to a conversation you had with Mr. Sherrod on

2    August the 7th, '02.

3        A.    Okay.

4        Q.    It says a decision between Sherrod and Coleman

5    followed, during which Coleman instructed Sherrod that he

6    had to determine a level of acceptable conduct on the part

7    of employees.  Now, I notice that you're reading the answer,

8    but you didn't draft this Attorney Martinucci did it.  So my

9    question to you is --

10       A.    So why are you asking me a question?

11       Q.    What time of day are you claiming that this

12    conversation occurred on August the 7th?

13       A.    In the morning.

14       Q.    What time in the morning on August the 7th?

15       A.    After we spoke with the other employees.

16       Q.    So, while you were still at the Booker T.

17    Washington Center?

18       A.    I believe so.

19       Q.    So you were at the Booker T. Washington Center on

20    August the 7th to speak with the employees?

21       A.    Right, we've already talked about that.

22       Q.    You left there, the Booker T. Washington Center,

23    right?

24       A.    Correct.

25       Q.    I don't want you to read the answer, I want you to

1    testify from memory.

2              MR. MARTINUCCI:  Well, you're asking him questions

3              about the Answer, I think he's allowed to review

4              it.

5              MS. BENSON:  I'm just basically using that draft to

6              recall his memory.

7              MR. MARTINUCCI:  Well, then just ask the question

8              instead of reading the paragraph out of the Answer.

9         Q.   What time of day did you recall speaking to Mr.

10   Sherrod?

11        A.   A.m.

12        Q.   Can you be more precise?

13        A.   Can I refer to my notes?

14        Q.   Yes.

15        A.   Thank you.  It would have had to have been between

16   our conversations -- between our interviews that started at

17   8:47, I have here.  And that afternoon the last person we

18   spoke to was at like 9:53, I can't read my own writing.  So

19   it could have been between those conversations or between

20   those interviews, anywhere from 9:53 until about whenever we

21   left, I'm not sure what time that was.

22        Q.   Did you have any other conversations with Mr.

23   Sherrod that day on August the 7th?

24        A.   It's possible, I don't recall what they were.

25        Q.   You said it's possible.

1      A.    We could have talked about the weather or anything
2    else.
3      Q.    Well, I'm not dealing with the weather here, I want
4    to deal with any other conversations that day surrounding
5    the incident of August the 6th and what to do with the
6    employees on August the 7th; did you have any other
7    conversations with Mr. Sherrod?
8      A.    I would look at that as just one conversation,
9    because we talked about the same event.  So to say did we
10   have any other conversations, yes, but it was all focused
11   around the same event.
12     Q.    You left there, the Booker T. Washington Center, at
13   what time?
14     A.    I don't know, sometime in the afternoon, sometime
15   in the late morning.
16     Q.    Late morning.  And the next contact you had with
17   Mr. Sherrod?
18     A.    That next day he called me.
19     Q.    You had no other contact on August the 7th.
20     A.    No, I don't think so, because he said he was going
21   out of town.  If I'm not mistaken, he was supposed to be
22   leaving from the Center to go pick up his family to go out
23   of town, so I didn't have any other contact with him.
24     Q.    Now, the Defense has claimed that Mr. Sherrod was
25   suspended.  Can you tell me when Mr. Sherrod was suspended?

1          A.    I don't know.

2          Q.    Was he suspended?

3          A.    There was like a period in there -- and we may have

4     just been playing with semantics, but there was a period of

5     time where we did use the term suspension.

6          Q.    That you what?

7          A.    That we used the term suspension.

8          Q.    When you say we who are you referring to?

9          A.    The Board.

10         Q.    Well, let's go back.  We're dealing with August the

11    6th, and we have a letter of resignation -- a firing, I'm

12    sorry, dated September the 24th, '02.

13         A.    Right.

14         Q.    When did the Board suspend Mr. Sherrod?

15         A.    Right, I guess, it would have been -- again, he

16    gave his verbal resignation on the 12th.  So once his letter

17    came in stating that he wasn't going to resign, I must

18    presume that it would have to have been between the 16th of

19    August and the 24th of September.

20         Q.    Well, let's go back and not have you presume.

21         A.    I have to because I don't know exactly.

22         Q.    Well, this -- I'll assume that Mr. Martinucci as he

23    was drafting the Answer and New Matter to Plaintiff's

24    Complaint consulted with you; would that be accurate?

25         A.    I don't know, did you consult with me.  I don't

1    know.

2        Q.    This was filed --

3        A.    I don't know.

4        Q.    The Answer of New Matter was filed August the 21st.

5        A.    So did we have conversations between there,

6    probably.

7        Q.    I would assume he spoke with you about this.

8        A.    Uh-huh.

9        Q.    Since you were critical?

10       A.    You keep trying to make it critical.  It was a

11   Board decision.

12       Q.    I understand that.

13       A.    So stop trying to pin it all on that this guy did

14   this.  I mean, that's the crux of your entire case, the leg

15   that you guys are standing on.  Stop trying to make it seem

16   like I made all of these decisions arbitrarily, that didn't

17   happen.  I'm sorry.

18       Q.    I understand your position and I appreciate it, but

19   I want to go back.  Since you were the vice president and in

20   that capacity engaged in certain activities, I'm assuming

21   that you provided information to Mr. Martinucci as he

22   drafted the Answer in New Matter.

23       A.    And the new what?

24       Q.    As he drafted this document, it's called Answer in

25   New Matter.

1      A.    I have no idea what it was called.

2      Q.    It was the Defendant's Answer --

3      A.    Okay.

4      Q.    -- to the Complaint.  Did you provide him with

5   information?

6      A.    Yes, I would imagine.

7      Q.    Beginning in August, 2002, how many times do you

8   think that you met with Mr. Martinucci about this case?

9      A.    I don't know.

10      Q.    Guess.

11      A.    Guess.  Twice, maybe, three times, I don't know.

12      Q.    When?  Let's take it from August, August of '02?

13      A.    Again, I don't know.

14      Q.    Did you meet with him in August?  When he drafted

15   this letter --

16            MR. MARTINUCCI:  You know what, any time that he

17            was a member of the Board our meetings are covered

18            by the attorney-client privilege, so I'm objecting

19            to it on that basis.  If you want to ask him how

20            many times we've met since he got off the Board in

21            May of 2003, go ahead.

22            MS. BENSON:  Your objection is noted for the

23            record.  And --

24            MR. MARTINUCCI:  And he can't answer the question

25            because he doesn't have the right to waive

    1            Booker T. Washington's attorney-client privilege.
    2            MS. BENSON:   Well, that's an interesting issue,
    3            isn't it.
    4        Q.   Going back.  Did you provide him with information
    5    upon which this Answer in New Matter was based?
    6        A.   Pardon me.  I'm sorry.
    7        Q.   Did you provide Mr. Martinucci information upon
    8    which this Answer in New Matter is based?
    9        A.   I believe so.
   10        Q.   Now, you said that -- your testimony is that you
   11    think if the Board suspended Mr. Sherrod it was between his
   12    letter of August 16th, 2002 and your letter of September
   13    24th, 2002.  Is there any minutes that reflect the Board
   14    suspending Mr. Sherrod?
   15        A.   I don't know.  And, again, as I stated earlier, we
   16    could have just been playing with semantics there and used
   17    the term suspension.
   18        Q.   Do you recall meetings in which the word suspension
   19    was used?
   20        A.   Several meetings, yes.
   21        Q.   Tell me when those meetings occurred?
   22        A.   I would have to say at the general Board meetings.
   23        Q.   When?
   24        A.   In August.
   25        Q.   But there was only one general Board meeting in

1    August?

2        A.    Right, we had the meetings in August and the other

3    times I don't recall.  I would have to probably say at --

4        Q.    Were there any other times?

5        A.    Probably at the executive committee meetings

6    because we did discuss potential disciplinary action, as

7    you're aware.  That term suspension could have been used.

8        Q.    When did you discuss potential disciplinary action?

9        A.    We got to go back, didn't we talk about that

10    already?

11        Q.    You only discussed it once.

12        A.    To my recollection, yes.

13        Q.    Let me ask you this here.  Who prepares the Board

14    minutes?

15        A.    The Board or the executive secretary.

16        Q.    And in 2002 who was that?

17        A.    That was Kia Terry.

18        Q.    The Board meetings, are they recorded?

19        A.    Yes.

20        Q.    And who keeps the recording of those meetings?

21        A.    That would have been -- I'm not sure if it was the

22    secretary or the executive director.

23        Q.    Are committee meetings recorded?

24        A.    No.

25        Q.    Just board minutes.

1          A.    Correct.

2          Q.    After Mr. Sherrod was let go there was an article

3    in the newspaper involving the August 6th incident about Mr.

4    Sherrod being let go.  Who among the Board had contact with

5    the media?

6          A.    I know they contacted me a couple of times.

7          Q.    Who contacted you?

8          A.    The media.

9          Q.    Who, which --

10         A.    Kevin Flowers.

11         Q.    Of the Erie Times.

12         A.    Correct.

13         Q.    Any other reporters?

14         A.    No.

15         Q.    How many times did Kevin Flowers contact you?

16         A.    I don't know, I want to say twice.

17         Q.    When did he do so?

18         A.    Sometime after August 6th --- after August 12th, I

19    mean.

20         Q.    What led Kevin Flowers to contact you after August

21    12th of 2002?

22         A.    I have no idea.

23         Q.    Kevin Flowers contacted you.

24         A.    Yes.

25         Q.    And you said contacted you more than once.

1        A.    I think twice.

2        Q.    When was the second time?

3        A.    I don't know when the second time was, but I think

4    he contacted me twice.

5        Q.    I'm sorry.

6        A.    I'm not sure when the second time was, but I think

7    he contacted me twice.

8        Q.    Do you know why Kevin Flowers contacted you the

9    first time?

10       A.    To discuss this incident, James resigning and they

11   terminated him.

12       Q.    So he called you to discuss the Plaintiff's

13   situation?

14       A.    Yes, trying to get an article.

15       Q.    Now, did he say where he had received his

16   information from?

17       A.    I do not recall.

18       Q.    The Defendant in the Answer in New Matter quotes a

19   portion of a prepared statement regarding the Plaintiff's

20   situation.  Did you make that statement to the media?

21       A.    Can I see it?

22             MR. MARTINUCCI:  Can I show him the statement?

23             MS. BENSON:   Yes.

24       A.    Am I allowed to answer from the statement.   Where

25   are we at.

1              MR. MARTINUCCI:  19.

2              MS. BENSON:  19.

3        A.    Yes.

4        Q.    So you made that statement to the media.

5        A.    Uh-huh.

6        Q.    In making that statement to the media was it in

7    writing or orally?

8        A.    That was oral, I believe.

9        Q.    Did you consult with anyone before making that

10   statement?

11       A.    Yes.

12       Q.    Who did you consult with?

13       A.    We were at, I believe -- I want to say, again, I'm

14   getting all of these mixed up as you can see.  But it was at

15   an executive committee meeting or maybe it was a general

16   Board meeting, and they informed me if I was contacted or if

17   I was to be contacted that that was the statement I was to

18   give.

19       Q.    And who told you to do that?

20       A.    I believe Mr. Faulkerson had come up with the

21   wording and the rest of us agreed that's what we would say.

22       Q.    And Mr. Faulkerson is a member of the Board of

23   Directors?

24       A.    I don't think he's there now, but he was at the

25   time.

1      Q.   What was his position on the Board at the time?

2      A.   He was the former chairperson.

3      Q.   Now, in this statement that you issued on behalf of

4 the Booker T. Washington Center, it reads -- this is the

5 first sentence. At this time our position is this is an

6 internal personnel matter under review and investigation by

7 the Board of Directors. Do you recall when that statement

8 was issued?

9      A.   No, I don't.

10     Q.   What investigation was being conducted by the Board

11 at that point?

12     A.   We were still looking into the situation of what

13 happened with the girl, as well as the appropriate course of

14 action with Mr. Sherrod. I don't even know the question

15 that the media asked that prompted that statement. Do you

16 have that anywhere?

17     Q.   But you know they were contacted because Mr.

18 Sherrod was no longer there --- you were contacted because

19 Mr. Sherrod was no longer at the Center.

20     A.   Right.

21     Q.   But this statement says that it's an internal

22 personnel matter under review and investigation by the

23 Board.

24     A.   Right.

25     Q.   What investigation took place regarding Mr.

1    Sherrod?

2        A.    That would have been information that we retrieved

3    from the event that led to our decision.

4        Q.    What investigation --

5        A.    I just answered the question.

6        Q.    No, listen to my question.  What investigation was

7    underway when Mr. Sherrod was allowed to participate in and

8    respond to any accusations?

9        A.    Again, I guess, that would have had to have come

10   from the meetings that we had concerning the incident and

11   the course of action we take with Mr. Sherrod.  I mean,

12   maybe you need to more define what you mean as

13   investigation.

14       Q.    Well, I'm reading the statement here?

15       A.    I just read it too as I was asked to when I was

16   contacted.  See the word of investigation, it's --

17       Q.    Well, it says under review and investigation by the

18   Board of Directors.  This is an official statement from the

19   Board of Directors from the Booker T. Washington Center?

20       A.    Absolutely correct.

21       Q.    Given to the media.

22       A.    Right.

23       Q.    Now, I want to go back.  I'm assuming that when

24   this statement was made it was accurate.

25       A.    I would hope so.

1      Q.    What review was underway, what review and what
2   investigation?
3      A.    I've answered that twice already.
4      Q.    Answer it a third time.
5      A.    Answer it a third time, okay.
6            MR. MARTINUCCI:  Objection asked and answered.
7            Please, move on.
8            MS. BENSON:  Noted.  I'm going to ask it as many
9            times as I want to get to this.
10     Q.    What review was taking place regarding Mr. Sherrod?
11     A.    Again, as I mentioned, the events that happened on
12  August the 6th, and the appropriate course of action that
13  was taken with Mr. Sherrod.
14     Q.    And the what now?
15     A.    The action taken to deal with Mr. Sherrod.
16     Q.    I'm sorry.
17     A.    The action to be taken to deal with Mr. Sherrod.
18     Q.    The action to be taken to deal with him.
19     A.    That's what I said three times.
20     Q.    So you interview the three people.
21     A.    Yes.
22     Q.    No one ever interviewed Mr. Sherrod.
23     A.    We had a discussion with Mr. Sherrod the day of the
24  12th.
25     Q.    Now, there was a claim by the Defendant that Mr.