1        A.    Not at this time.

2        Q.    Do you have any idea when he might have come off?

3        A.    I couldn't tell you right now.

4        Q.    Was it during this year of 2005?

5        A.    No.

6        Q.    Was it during 2004?

7        A.    I'm not sure.

8        Q.    On Wednesday, April the 28th, 2005, in a supplement

9    to the Erie Times, involving the E-generation, the Booker T.

10   Washington Center provided a sponsorship ad for Mr. Coleman.

11   Are you familiar with that ad?

12       A.    Yes.

13       Q.    Did you authorize the placement of this ad?

14       A.    Yes.

15       Q.    When was the request made for you to authorize this

16   ad?

17       A.    I don't recall.

18       Q.    Would there be documentation at the Booker T.

19   Washington Center as to when the request came in for this

20   sponsorship?

21       A.    Probably not.

22       Q.    Why do you say not?

23       A.    Because, actually, the request came from -- in from

24   the Erie Times-News when we were working on a project, and

25   basically there is no documentation saying -- any written

```
 1    format, only thing -- you can look at the cancelled check and
 2    get an idea of when we paid it.
 3         Q.   So the request came from the Erie Times-News,
 4    itself?
 5         A.   Correct.
 6         Q.   Mr. Coleman's testimony was he sent the request by
 7    e-mail to the Booker T. Washington Center.  Is he inaccurate?
 8         A.   I have no idea.  He didn't have to send it to me
 9    just because it came to the Booker T. Washington Center.
10         Q.   So as executive director, would somebody have come
11    to you and gotten approval for the sponsorship?
12         A.   Yes.
13         Q.   Did someone on staff come to you --
14         A.   Yes.
15         Q.   -- and get that approval?
16         A.   Yes.
17         Q.   Who was that individual?
18         A.   Sue Beard.
19         Q.   What position does she hold?
20         A.   She's no longer with the agency.
21         Q.   What position did she hold at the time?
22         A.   She was my executive assistant.
23         Q.   Do you know where she's at now?
24         A.   You mean address-wise, we can get that from the
25    controller.
```

1    Q.    How long was Ms. Beard your executive assistant?

2    A.    Probably -- in terms of that capacity, six months or

3    so.

4    Q.    Can you tell us when she started and when it ended.

5    A.    January of -- no.  December of '04 to June of '05.

6    Q.    Prior to Ms. Beard, did you have an executive

7    assistant?

8    A.    No.  Basically she volunteered and worked in the

9    capacity of -- whatever job needed to be done she did.

10   Q.    So she volunteered as your executive assistant?

11   A.    No.  She volunteered at the organization.  There is

12   no title.

13   Q.    Was she your first executive assistant?

14   A.    Yes.

15   Q.    With regard to this case -- as you know,

16   Mr. Martinucci had to prepare an Answer to our Complaint in

17   this case.  Did you participate and provide him with

18   information for that answer?

19   A.    To the best of our ability, yes.

20   Q.    When you say "our ability," who are you referring

21   to?

22   A.    The staff at the Booker T. Washington.

23   Q.    Identify those staff.

24   A.    I'll have to get you a roster of all the staff.

25   Q.    Give me some idea, please, and then provide me with

1   the roster for that time.

2       A.   We probably have about 12 full-time -- about 8 to 10

3   full-time staff members who are working a full-time capacity

4   at least.

5       Q.   Was there anyone in particular that was primarily

6   responsible for providing him with information or just you?

7       A.   Brian Bessetti worked with me, Anita Smith worked

8   with me because they were here since the -- during that time

9   frame.

10      Q.   You say Leah?

11      A.   Brian Bessetti --

12      Q.   And Leah?

13      A.   -- and Anita Smith were here during the -- actually,

14  I think they are the only emplyoyees that were here during

15  that time frame.  Since that time we were looking for

16  documents from a time period.  So I asked them if they had

17  any knowledge or awareness of any documentation.

18      Q.   So when the Answer to our Complaint was filed, were

19  those two individuals and yourself the primary source for the

20  Answers to our Complaint of employment discrimination?

21      A.   Correct.  And I did ask anybody on the board who had

22  any information or anything.  Anybody who had any information

23  during that time frame we were trying to get --

24      Q.   Did the board members meet with counsel personally?

25      A.   What time frame are you talking about?

1      Q.    In preparation for the Answer to our Complaint of
2    employment of discrimination?
3      A.    I don't think we had any personal contact.  It was a
4    request for information possibly.
5      Q.    Did you have personal contact as the Answer was
6    being prepared?
7      A.    I may have.  Like I said, I've had many
8    conversations with Mr. Martinucci on several things.
9      Q.    Now, I also filed a Request for Admissions, and
10    Admissions are a series of questions, and the party you give
11    them to is supposed to provide answers.  Did you participate
12    in the preparation of those answers?
13      A.    To the best of my ability, yes.
14      Q.    Were you the only individual who provided
15    Mr. Martinucci with information so that the request for
16    admissions could be completed?
17      A.    As I stated before, I talked to Mr. Bessetti and
18    Ms. Smith.
19      Q.    You spoke with them?
20      A.    In order to try to get the answers to the questions,
21    yes.
22      Q.    I also requested production of various documents.
23    Who was responsible for gathering those documents?
24      A.    As I said before, Mr. Bessetti, myself, and
25    Ms. Smith, were getting as much documentation prepared as

1   possible.

2       Q.    When Mr. Coleman left the Booker T. Washington

3   Center board of directors, describe for us the nature of his

4   relationship with the board at that time.

5       A.    I don't understand the question.

6       Q.    Tell me what you don't understand about the

7   question.

8       A.    The nature of his relationship, he was a board

9   member, he resigned, that was it.  What more can you -- what

10  more can I say.

11      Q.    What was the nature of his personal relationship

12  with the members on that board at the time that he resigned?

13      A.    Well, his relationship was at the beginning of the

14  board, I believe.

15      Q.    But you weren't on the board when he first came on,

16  were you?

17      A.    Correct.

18      Q.    Mr. Coleman resigned after our complaint of

19  employment discrimination was filed.  Did the board of

20  directors, or anyone on the board of directors, suggest that

21  Mr. Coleman resign?

22      A.    Not that I know of.

23      Q.    Did you suggest that he resign?

24      A.    No.

25      Q.    Were there people who said to Mr. Coleman that it

1    would be in the best interests of the Booker T. Washington
2    Center if he resigned?

3        A.    Not that I know of.

4        Q.    When is the last time you saw Mr. Coleman?

5        A.    I'm not sure.  I mean, I know he has stopped by one
6    time and said he was moving out of town, that was it.  It was
7    probably right before his deposition or after.  I can't give
8    you an exact time frame, but it was in -- sometime in June
9    maybe.  I'm not sure.  Like I said, I've seen him, but I
10   don't recall exactly the last time.

11       Q.    Did you speak with Mr. Coleman about his deposition?
12       A.    I told him to make sure he touches base with
13   Mr. Martinucci so that we can get this taken care of before
14   he moves out of town.

15       Q.    Have you discussed with him his deposition?
16       A.    I don't -- actually, I don't think I've had any
17   discussion with him since his deposition, no.  Not that I
18   recall.

19       Q.    When I gave my first -- excuse me, when I gave my
20   Request for Admissions -- Question No. 25.  I'll read it to
21   you and read to you the answer of that request.  This is the
22   request -- and remember, admissions are, you give a
23   statement, and the person admits, denies, or admits in part
24   and denies in part, but this is the request, No. 25, "On or
25   about August the 13th, 2002, in a meeting with the Center's

1    staff, Mr. Sean Coleman, the Center's vice president,

2    admitted calling African-American employees niggers."

3         The response at that time was, "Admitted in part,

4    and denied in part.  It is admitted that Mr. Coleman, also

5    African American, acknowledged using the word nigger or

6    niggers or some deviation of the word" --

7         MR. MARTINUCCI:  Derivation.

8    Q.   "Derivation of that word.  Upon information and

9    belief, however, it is denied that Mr. Coleman's use of this

10   word was necessarily restricted to African American

11   employees."  Let me ask you --

12        MR. MARTINUCCI:  If you're going to read the

13        answer, you're going to read it correctly and

14        completely in the record.  The answer is, "Admitted

15        in part and denied in part.  It is admitted that

16        Coleman, also African American, acknowledged using

17        the word nigger or niggers or some derivation of

18        that word.  Upon information and belief, however,

19        it is denied that Coleman's use of this word was

20        necessarily restricted to references to

21        African-American employees.  As Plaintiff is aware,

22        Coleman is no longer a member of the Defendant's

23        board of directors and has moved from the area.

24        The Defendant has been unable to contact Coleman to

25        ascertain the specific scope and context of this

```
 1              reference referred to in the Request for
 2              Admissions.  This response for Request for
 3              Admissions will be supplemented at such time as the
 4              parties are able to depose Mr. Coleman."  That's
 5              the complete answer.
 6              MS. BENSON:  Let me finish.
 7         Q.   Now, you've previously testified that you were
 8     primarily the source of information provided to
 9     Mr. Martinucci in response to discovery requests, and that
10     you also relied upon Ms. Smith, and Brian -- how do you
11     pronounce Brian's last name?
12              MR. MARTINUCCI:  Bessetti.
13         Q.   This admission contained here, where Booker T.
14     Washington Center acknowledged he used the word nigger or
15     niggers, did that come from you?
16         A.   You mean did I write that?
17         Q.   No.  I didn't ask if you wrote it.  You provided
18     information -- you've previously testified that you provided
19     information to counsel to answer Requests for Admissions.
20     Did you acknowledge --
21         A.   Did I acknowledge the fact that --
22         Q.   That he used the word nigger or niggers?
23         A.   No.  I did not acknowledge the fact that he used the
24     words.  I believe that during this time, in dealing with
25     this, there has been -- he's been involved in discussion
```

1    with -- before the deposition -- probably right after August

2    and September, whatever else, once he found out, he'd been in

3    the room with us many different times and had conversations

4    with counsel also.

5        Q.    So Mr. Coleman has?

6        A.    Yes.

7        Q.    So is it your testimony that Mr. Coleman

8    acknowledged --

9        A.    I don't know whether he did or he did not.  I'm just

10   telling you that that is what's in the admissions, that came

11   from our legal counsel, I'll leave it at that.  Are you

12   asking me if I wrote it or if I said it?  I don't know what

13   the question is.

14       Q.    I'm not asking you if you wrote it or said it.  I'm

15   going back to the response --

16       A.    Did I provide the information, is that the question?

17       Q.    That's correct.  Did you provide the information?

18       A.    Okay.  We had -- like I said before, any information

19   that's provided was not 100 percent from me.  Primarily, yes,

20   but we do have that information.  If that's what Mr. Coleman

21   states and that's what he says, I can't deny or agree with

22   it.

23       Q.    Did Anita Smith provide this information?

24       A.    Again, I can't tell you the source of exactly where

25   that information came from.  It's in there, and it's

153

1    accurate. It came from a former board member or staff
2    member.

3        Q.   You think --

4        A.   Go ahead.

5        Q.   Do you think it came from Mr. Coleman himself?

6        A.   Again, I didn't put it there, I'm not going to sit
7    down here and try to guess. Mr. Coleman -- you deposed him,
8    you could have asked him that question. I don't know.

9        Q.   Is it possible that --

10            MR. MARTINUCCI:  It doesn't matter if it's possible
11            or not.  The only thing that matters is whether or
12            not he knows.  You're asking him to speculate.
13            You've been asking him to speculate all day, and in
14            the interest of time I've been letting it go.

15            MS. BENSON:  Well, in the interest of time, and
16            also, accuracy, I can ask him to speculate under
17            the Federal Rules.

18            MR. MARTINUCCI:  No, you can't.

19            MS. BENSON:  Yes, I can.  Because as long as my
20            questions and his answers lead to possible evidence
21            that could support our claim, or your defense, I
22            can ask the question.

23        Q.   Now --

24        A.   I don't know the answer to that question.

25        Q.   With regard to the Request for Admissions, the

1   response to No. 19 -- the request, I'm sorry, to No. 19
2   states, "Plaintiff had not," meaning Mr. Sherrod --
3   "Plaintiff had not approved the field trip that led to
4   Plaintiff," meaning Mr. Sherrod, "being fired. The document
5   attached as Exhibit E is a list of the field trips approved
6   by Plaintiff."
7           The response to No. 19 is, "Defendant lacked
8   sufficient knowledge as to admit or deny the Request for
9   Admission as to whether or not the field trip in question was
10  approved by Plaintiff. It is admitted that Exhibit E is a
11  list of approved field trips, but Defendant lacks sufficient
12  knowledge as to admit or deny the Request for Admission as to
13  whether or not the list is complete."
14          Now, going back to August 6, 2002, and your
15  subsequent assumption of Mr. Sherrod's position, did you
16  learn that Mr. Sherrod had approved a list of field trips?
17      A.    In what capacity are you asking me this?
18      Q.    In any capacity, did you learn that Mr. Sherrod had
19  approved a list of field trips for the summer of 2002?
20      A.    I don't remember having the discussion with anybody
21  about that.
22      Q.    Was there any way you may have learned? For
23  instance, looking for documents?
24      A.    I didn't see a list of field trips that said
25  approved, disapproved, or anything else. I had -- that

1    wasn't what I was doing.

2        Q.    Since this case was filed, since the Complaint was

3    filed -- you are aware that Mr. Sherrod's firing centered

4    around the field trip of 2002, right?

5        A.    I wouldn't agree with that.

6        Q.    You wouldn't agree with what?

7        A.    What you just said.

8        Q.    Well, you agree that a field trip was involved on

9    August 6, 2002?

10       A.    You're asking me, was there a field trip August 6,

11   2002, if that's what they called it, then, fine, yes, there

12   could have been a field trip in 2002. I think what I'm

13   confused on your question was, I don't know if it was a

14   question, a statement, or -- I'm not really clear on what

15   you're trying -- what you're asking me.

16       Q.    Again, earlier you testified that you provided

17   counsel with information so that Answers to the Request for

18   Admissions could be completed, right?

19       A.    Correct.

20       Q.    And you relied, if necessary, on other staff, right?

21       A.    Correct.

22       Q.    Now, were you given a copy of my Request for

23   Admissions?

24       A.    Yes.

25       Q.    And so, you were familiar with the fact that the

1   request of 19 said, attached is a list of exhibit -- is

2   Exhibit E, which is a list of field trips approved by

3   Mr. Sherrod, right?

4       A.   And who's to say that that's authorized those --

5   who's to say that that's true or -- fact or fiction.  That's

6   not my responsibility.  I don't know.  That could be true;

7   that could not be true.

8       A.   In order to make sure that the response to the

9   Request for Admissions was accurate and complete, did you go

10   to staff and say, attached to this Request for Admissions is

11   Exhibit E --

12       A.   And everybody would possibly say, to the best of

13   their ability, they don't know.  I don't know.

14             MR. MARTINUCCI:  For the record, we've already been

15             in front of the Judge on Request for Admission 19,

16             and she denied your Motion to Compel on that point.

17             So I think that his answers are complete, and I

18             think that they're acceptable.

19             MS. BENSON:  I understand, and I do recall the

20             Judge's ruling.  However, I don't think his answer

21             is complete because this is the opportunity for me

22             to ask him what his knowledge is.

23             MR. MARTINUCCI:  And he's given it to you.

24             MS. BENSON:  And I want to make sure that I

25             understand his response.

1    Q.   You said that you received a copy of my Request for
2    Admissions and the attached exhibits, correct?

3        A.   Correct.

4        Q.   And you looked over Exhibit E, which contained a
5    list of field trips; is that correct?

6        A.   To the best of my ability, I don't remember Exhibit
7    E, F, G or whatever else.  All I can tell you is that whether
8    it pertains to whether or not these field trips are
9    authorized, I cannot answer the question.

10       Q.   In order to make sure that the Defendant's answers
11   were accurate and complete, did you consult with other staff
12   in a position to know whether the list of exhibits were
13   approved by Mr. Sherrod?

14            MR. MARTINUCCI:   The list of exhibits?  The list of
15            field trips?

16            MS. BENSON:   The list of field trips, I'm sorry.

17       A.   I have to say, like I said before, who -- on that
18   staffing pattern, would know whether it's true or false.

19       Q.   Well, you've previously testified that you relied
20   upon Ms. Smith --

21       A.   Right.

22       Q.   -- and Mr. Bessetti --

23            MR. MARTINUCCI:   Bessetti.

24       Q.   Bessetti, I'm sorry.

25            MR. MARTINUCCI:   You'll get it right one of these

1       days.

2               MS. BENSON:   I certainly will.

3       Q.   Now, that you relied upon them.  Did you go to them

4    and simply say, here's Exhibit E?

5       A.   I didn't get that specific.

6       Q.   Now, with regard to Request No. 20, Request No. 20

7    is, "The controller approved the trip in question."  And the

8    response -- the answer is, "Admitted that the controller was

9    aware of the field trip and permitted it."

10              Did Mr. Bessetti tell you that he approved the field

11   trip for August 6, 2002?

12      A.   I've never asked Mr. Bessetti, Mr. Bessetti, did you

13   approve a field trip on August 6, 2002.

14      Q.   So you never asked him?

15      A.   Not directly like that, no.

16      Q.   Now, just for the record, tell us the race of

17   Mr. Bessetti.

18      A.   Mr. Bessetti, according my knowledge anyway, is a

19   white male.

20      Q.   Tell us the race of Anita Smith.

21      A.   Again, according my knowledge, or my perception of

22   her, she's a white female.

23      Q.   In all of your relationships with -- excuse me just

24   a moment.  Let me just take a break here for a second.

25              (Pause in the proceedings.)

1        Q.    We're back on the record.  Going back to August

2    2002, isn't it correct that Mr. Sherrod was not under any

3    disciplinary action by the board of directors?

4                MR. MARTINUCCI:  At what time?

5                MS. BENSON:  In August 2002.

6        A.    Honestly, I'm not sure.

7        Q.    Well, you were on the -- you testified earlier that

8    you came on the board in January 2002.

9        A.    Correct.

10       Q.    All right.  So from January 2002 to August 12, 2002,

11   isn't it correct that Mr. Sherrod was not under any

12   disciplinary action by the board of directors?

13       A.    I never really studied the history of his job

14   evaluations or his performance on what actions or goals and

15   objectives.  We were just getting down to that point.  As it

16   was stated, I had just joined the board in January, I

17   probably became active in April, March, or May, and basically

18   trying to get more involved in June and July in working with

19   Mr. Sherrod, and then August came.  So, again, in answering

20   your question, I wasn't involved in any performance, as --

21   according to my -- to the best of my ability, I have to say,

22   no.  But is it correct, I don't know.

23       Q.    To the best of your knowledge, from January, when

24   you came on the board, 2002, to August 12, 2002, the board

25   had not taken any action with regard to Mr. Sherrod --

160

1    disciplining Mr. Sherrod?

2        A.    No one on the board had informed me of any

3    disciplinary action, correct.

4        Q.    And we're only dealing with when you came on.

5        A.    Correct.

6        Q.    Now, isn't it correct that you thought Mr. Sherrod

7    was a hard worker?

8        A.    I never -- that was a sure -- again, when you look

9    at that, not being involved in the day-to-day activity or

10   anything else, I didn't really get a chance to make any kind

11   of assessment.

12       Q.    Well, at board of director meetings, you received

13   reports from Mr. Sherrod, right?

14       A.    Yes.

15       Q.    And he reported on the organizational activities;

16   isn't that correct?

17       A.    I believe so, yes.  Correct.

18       Q.    Isn't it correct that, based on information that he

19   provided to the board, you thought he was doing a good job?

20       A.    Again, in -- to answer that question, it was just

21   like -- it was just as fast going to the board meetings -- I

22   mean, basically I jumped from January to August 12th.  For me

23   it was just like jumping into the fire.  Now, if you're

24   asking me did I have ample time to make an assessment of

25   Mr. Sherrod's ability, I have to say, no.

1       Q.    I would assume that you make opinions about people's
2    ability on a daily basis; isn't that correct?
3       A.    That's my job.
4       Q.    It was your job at Community Health Net, and it's
5    your job now at Booker T. Washington Center; isn't that
6    correct?
7       A.    Correct.
8       Q.    So going back to when you were appointed on January
9    2002 up to August 12, 2002, isn't it correct, from your
10   observations and what you heard and saw from Mr. Sherrod,
11   that you thought he was doing a good job?
12      A.    Again, I didn't have enough information to form an
13   opinion at that time.
14      Q.    What information would you have needed in order to
15   form an opinion?
16      A.    Information that I probably was going in the
17   direction of looking at, which was past performances, what's
18   going on, you know, how the programs are going, some of the
19   opinions of some of the employees who are working with him.
20   That's the way I would make my assessment.  And I didn't have
21   that information at the time.  Between that time frame, I
22   didn't -- again, we were building on that relationship.
23      Q.    When you say "we were building on that
24   relationship," who were you referring to?
25      A.    Mr. Sherrod and myself.  As I stated before, we met

1    in August, and that's what we were building on.

2         Q.   You met in August --

3         A.   We met right before this incident.  You remember I

4    had mentioned that we met -- again, the exact time frame, it

5    could have been July 31st.  I don't know.

6         Q.   You're referring to the meeting to discuss

7    management committee things?

8         A.   Yes.  Correct.

9         Q.   But you've been on the board since January.

10        A.   But we were just getting to the point of formulating

11   an understanding of what was going on within the

12   organization.

13        Q.   Would it be more correct to say that you were just

14   getting to that point?

15        A.   Well, we were building our relationship, yes.

16        Q.   Now, isn't it correct that you always found him

17   approachable?

18        A.   Is this a question about his character?

19        Q.   Isn't it correct that you found Mr. Sherrod

20   approachable?

21        A.   In reality, I never had the opportunity or time to

22   really approach him.  I mean, if we're talking about his

23   character or what I think about that, that's different.  But

24   I never had the opportunity to approach him.

25        Q.   You never had the opportunity to interact with

1    Mr. Sherrod?

2        A.    Not in the environment.

3        Q.    Excuse me?

4        A.    Not in the Booker T. Washington Center Environment.

5        Q.    Let's separate the two, and let's talk about it.

6    Let's talk about it in terms of personal situation.  You've

7    found him approachable, haven't you?

8        A.    I don't think anybody would say that he's not

9    approachable.

10       Q.    So would your answer be, yes, he's approachable?

11       A.    Yes, he's approachable.

12       Q.    So when you came on the board in January of 2002,

13   you felt comfortable to go to him if you wanted to know

14   something, didn't you?

15       A.    It never happened.

16       Q.    It never happened, but did you feel comfortable that

17   you could?

18       A.    I never even thought about it, honestly.

19       Q.    Other than yourself and Mr. Coleman, please identify

20   for me the other board members who dealt with the management

21   of the Booker T. Washington Center from August 12, '02 until

22   the termination letter of September 25, '02.

23            MR. MARTINUCCI:  Could you clarify what you mean by

24            "management".

25       Q.    You had previously testified that there were members

1   of the board working with staff to run the organization.

2       A.   Well, I'm not sure what -- what relationship each

3   board member had.  I do know that some board members had

4   different kinds of relationships with the staff.  But

5   according to the way I looked at it, basically, in working

6   with Anita Smith, more than likely I was the number one

7   contact person, and most of the decisions overall that were

8   made between August and September were relatively just what

9   was already planned.  So there wasn't really any major

10  management decisions made.  If anything came up like the

11  alarm system going off, it would be somebody's responsibility

12  to answer it.  That's the only decision that I think that

13  even may have come up one time.

14      Q.   So were you the major contact person with staff from

15  August the 12th until you became the interim person?

16      A.   At that time, with Anita Smith, yes.  Anita Smith

17  was the contact for overall staff, and Anita and I was in

18  contact with one another.

19      Q.   As of August the 12th?

20      A.   As soon as we decided that we had to make a move and

21  we were going to be, you know, not getting anything, yes.

22  I'm not sure if it was exactly August 12th, or it could have

23  been August 14th.  I'm just not going to sit and say as of

24  August 12th.

25      Q.   But it was during that week --

1      A.    Correct.

2      Q.    -- that you became the board's contact and Anita

3   Smith became the staff contact with the board?

4      A.    Correct.

5      Q.    Was your role to give her direction on what to do?

6      A.    Well, my role was to troubleshoot if there's any

7   problems that came up that was out of the ordinary.  But

8   everything else was already in place.  The programs were

9   there, they were doing what they were supposed to do.  I

10  didn't give directions or directives.

11     Q.    So is it correct that you basically began to play

12  the transitional role that you had proposed to the board in

13  your letter and in Exhibit 2 -- that you began to play it

14  that week of August 12, 2002?

15     A.    No.

16     Q.    Then tell me when.

17     A.    The role started, as in that letter, around October

18  6th.

19     Q.    And the role before October 6th, how was it

20  different than what is proposed in Exhibit 2?

21     A.    Let me just look at Exhibit 2 again here.

22          The role that I was playing during that time frame

23  was the role as the volunteer board member, and that's the

24  way I looked at that.  As making sure that, you know, if

25  there's any management decisions that are going to be made,

1    that I could possibly help as a volunteer board member. The

2    difference between that role and this role was that I was no

3    longer going to be working in a volunteer capacity. So,

4    therefore, in October, I was no longer working in a volunteer

5    capacity. Those are the differences between the roles.

6        Q.    Were the decisions or the issues similar, though?

7        A.    I don't think so. The decisions before that time

8    was basically: Are the lights off, yes; are the lights on,

9    no. Are we open for business today, yes; are we closed for

10   business today, yes. That was it.

11       Q.    What role did the other board members play?

12       A.    I didn't have a direct relationship with all of the

13   board members. Like I said, any board, you don't really deal

14   with all of them and what their roles were going to be. So I

15   honestly did not know at that time.

16       Q.    Did the board at any point in 2002 -- August of

17   2002, or at any subsequent -- did the board at any point on

18   August 12, 2002, or thereafter, discuss the responsibilities

19   of each board member with regard to running the agency?

20       A.    Basically went back to what I was doing what the

21   board discussed. But now you also have the regular volunteer

22   board activities where when people need to come in and sign

23   checks, or do something like that, that was a normal part of

24   day-to-day operations, which, again, I wasn't involved in at

25   that time.

1      Q.    So there was some discussion in the board about who
2    would be doing what?

3      A.    Only for -- again, the discussion was, I would be a
4    contact person if there was any questions that Anita Smith
5    could not handle.

6      Q.    What was Mr. Coleman's responsibility from August
7    the 12th, 2002 on?

8      A.    He was the vice president of the board.

9      Q.    And what were his responsibilities with regard to
10   the organization on the day-to-day basis?

11     A.    I have no clarification of what his responsibilities
12   would have been during that time.

13     Q.    When you became the transitional person in October
14   of 2002, what was Mr. Coleman's responsibilities at that
15   point?

16     A.    Vice president of the board.

17     Q.    And with regard to the day-to-day operation of the
18   organization?

19     A.    There is no -- there was no relationship to the
20   day-to-day operation of the organization.

21     Q.    Did Mr. Coleman come into the office on a regular
22   basis?

23     A.    Regular basis during that time frame, yes, I'd say.

24     Q.    How would you define "regular"?

25     A.    Maybe twice a week.

1    Q.    What would be his concerns?

2    A.    Talking about the issues of what's going on, trying

3    to figure out how we can move forward between August 12th and

4    the time that we met.  Basically what we're going to do, how

5    we're going to do it, where we're going to go.  All the

6    above.

7    Q.    Is it your testimony that prior to August 2002 you

8    only met with Mr. Sherrod once regarding the responsibilities

9    of the management committee?

10    A.    No.  My testimony was that before the incident I met

11    with him once.

12    Q.    After August 12, 2002, did the board know of your

13    contacts with Mr. Sherrod?

14    A.    Yes.

15    Q.    Did they know of them before or afterwards?

16    A.    All depends on who you talk to.  I mean, basically

17    the board knew that I was in conversation with Mr. Sherrod

18    because I had let them know, but then again, if someone

19    wasn't there, they may have found out afterwards.

20    Q.    Did you tell people informally, who were board

21    members, that you were meeting with him?

22    A.    Yes.

23    Q.    Isn't it correct that in these conversations with

24    Mr. Sherrod you were supportive of him?

25    A.    In what way are you saying "supportive"?

1    Q.    That you thought he should return to his job.

2    A.    I was in support of the organization moving forward,

3    and that if it meant that he needed to return to his job to

4    help with the transition, yes.

5    Q.    Well, isn't it correct that you thought that he

6    should return to his job and basically carry out his

7    responsibilities as executive director?

8    A.    I think that's what I just said.

9    Q.    No.  Your response said --

10   A.    Transitional.

11   Q.    -- transitional.  Isn't it correct that you, at

12   least initially, thought that he should be -- he should

13   return permanently to his job?

14   A.    I'll tie it back to what I said earlier.  My goal

15   was to make sure that the organization stayed afloat.  My

16   goal was to have James return back to his job in a

17   transitional period, which would have given ample time to

18   make a correct evaluation, and that's what I requested.

19   Is -- to say that for the time frame that I was on the Booker

20   T. Washington Center Board, I was really unable to see how we

21   got to this point.  But, if we are at this point, then given

22   ample time during the transitional period, we may be able to

23   figure out some of the things that we can improve on.

24        So now, as I state that, it was always involved in

25   the transitional period.  This was the same conversation that

1    I had with Mr. Sherrod, and I told him -- and I basically
2    said, if possible -- the transition is the key for the
3    organization's success.  If the overall board doesn't want
4    you as the executive director, that's their right.  There's
5    nothing we can say about that.  But as an organization, we
6    must look out for the organization.

7        Q.   You said something in there about an evaluation.
8        A.   No.  I'm saying that -- you asked me earlier, one of
9    your questions was, what was my opinion of Mr. Sherrod.  My
10   answer to you earlier was, I didn't have enough time to make
11   an assessment or an opinion of what his responsibilities
12   were.  But again, you know, maybe there could have been some
13   miscommunication somewhere or something else, I don't know.
14   I didn't have the answers at that time.

15       Q.   Do you recall speaking with Mr. Sherrod on August
16   12th -- in the evening of August the 12th, 2002?

17            MR. MARTINUCCI:  Objection.  Asked and answered.
18            You can answer it if you know.

19       A.   As I said before, the times, the dates, or anything
20   else -- I spoke to him on several occasions.  Exactly was it
21   August 12th in that evening or was it August 13th in the
22   evening, I don't know.  But I do know I spoke to him on
23   several occasions.

24       Q.   It seems as if you're indicating that that's a
25   possibility that you spoke to him on the 12th or the 13th.

1    Pretty close to that meeting of August 12th in the morning.

2             MR. MARTINUCCI:   What meeting in the morning?

3             MS. BENSON:   The board of directors.

4             MR. MARTINUCCI:   The one that took place at noon?

5             MS. BENSON:   That's right.  I'm sorry.  At noon.

6        A.    I don't understand that question.

7        Q.    Let me go back.  You've previously testified there

8    was a board of directors' meeting on August the 12th, 2002,

9    that you believe occurred between noon and 2:00.  My question

10   to you was did you speak with Mr. Sherrod on the evening of

11   August the 12th?

12       A.    And I said, I don't recall.  I had several

13   conversations since that meeting with Mr. Sherrod, and I

14   can't tell you the exact time frame of those conversations.

15       Q.    Is it possible, though, in light of what was decided

16   at the meeting of August 12th, that you spoke with him that

17   evening?

18       A.    What was decided?

19       Q.    That the board was terminating him.

20       A.    No.  That was decided that Mr. Sherrod resigned.

21   Because that was my issue.

22       Q.    That the board wanted him to resign or they would

23   fire him.

24       A.    No.  That was not stated during that meeting, and

25   that was not -- it never was stated, you either resign or

1    you're fired.  Never.

2        Q.   Did the management committee ever meet to receive

3    information regarding accusations of -- let me rephrase the

4    question.  Did the management committee ever meet to receive

5    accusations against Mr. Sherrod and his work performance?

6        A.   During my tenure?

7        Q.   Yes.  During your tenure.

8        A.   Mr. Sherrod --

9        Q.   And let me -- during your tenure, I'm going back to

10   August of 2002.  Did the management committee meet to receive

11   accusations against Mr. Sherrod regarding his work

12   performance in August of 2002?

13       A.   There was no meeting with the intent of evaluating

14   his work performance.  The meeting's intent was to evaluate

15   whether or not his resignation was truly tendered and that --

16   where we were going to go with the transition.  That was the

17   purpose of the management meetings after August 12th.

18       Q.   When did these meetings occur?

19       A.   Between August 12th and September 20th.

20       Q.   And who participated?

21       A.   The management committee members, some of the board

22   members, and the overall board with the overall board

23   meetings.

24       Q.   Did you call these meetings together?

25       A.   I did not call all the meetings together.

1       Q.    Who called them if you didn't?

2       A.    We did the same process as we do with every other

3   board meeting.  At that time, I believe, and she may have

4   still been there, either Kia or Anita would send out and call

5   all the board members and tell them that we were meeting.

6       Q.    Were these meetings of the management committee

7   recorded?

8             MR. MARTINUCCI:  Objection.  Asked and answered.

9       Q.    Please answer.

10      A.    Again, when you say "recorded," by tape, I -- I'm

11  not sure which meetings we're talking about in terms of

12  whether they were the management committee meetings or

13  they're -- if they're available, they would be back at the

14  Center.

15      Q.    Did you have notes on those meetings?

16            MR. MARTINUCCI:  Objection.  Asked and answered.

17      Q.    Answer the question.

18            MR. MARTINUCCI:  Again.

19      A.    I know from some of my management committee

20  meetings, and this is probably prior to August, I had taken

21  notes and I had sent them e-mail and sent them hard copies to

22  other people who were on the committee.  In reference to

23  exact meetings on -- between that time, I don't know if

24  there's any available notes or any recordings.

25      Q.    When was a decision made by the management committee

1   to recommend that Mr. Sherrod be terminated?

2       A.   The management committee never made a

3   recommendation.  The board made the recommendation.

4       Q.   At the management committee meeting or meetings --

5   isn't it correct that Mr. Sherrod was never invited to attend

6   those meetings?

7       A.   I have no idea, honestly.

8       Q.   You were chairman of the committee --

9       A.   I never invited him, if that's your question, no.

10      Q.   Isn't it true that the management committee

11  recommended an extensive severance package be paid to

12  Mr. Sherrod after meeting with him and crunching the numbers?

13      A.   No.  The management committee never made a

14  recommendation for anything.  That was a board meeting where

15  we discussed what would -- if -- if there was going to be a

16  severance package, what that severance package would be.

17      Q.   When was that meeting of the board?

18      A.   That meeting, again, was between August 12th and

19  September 20th.

20      Q.   Did the board of directors speak with Mr. Sherrod in

21  relationship to this package?

22      A.   You were in the meeting when we got the final

23  package together.  That was -- that was the communication

24  from the overall board.

25      Q.   I'm sorry, say that again.

1       A.    Exhibit 8 was the communication from the overall
2    board to Mr. Sherrod in reference to the final severance
3    package.
4       Q.    Who would you say was the lead person in the matter
5    dealing with Mr. Sherrod and the incident of the August 6th,
6    2002?
7       A.    I don't know.  I couldn't really pinpoint one
8    individual.
9       Q.    Is there any documentation anywhere that would help
10   you be able to pinpoint an individual?
11      A.    No.
12      Q.    Going to the meeting of August the 12th -- the board
13   of directors' meeting of August the 12th, who would you say
14   was the lead person in that meeting?
15            MR. MARTINUCCI:  Objection.  Asked and answered.
16      Q.    Answer the question.
17      A.    Several board members were involved.
18      Q.    Identify.
19      A.    You have Sean Coleman, Paul Gambell, Kathy Lyons,
20   Mike Butler, myself, and I don't recall if he came in after
21   this meeting or during this meeting, but I know, eventually,
22   Charles Faulkerson had a say.
23      Q.    Essentially those are the people that you've
24   identified as being present.  Now, among those people who
25   were present on August the 12th, 2002, who was the lead

1  person in the board of directors' meeting on August the 12th,
2  2002?

3      A.   Like I said, all the people I identified had a
4  voice, and they all commented or made some kind of comment
5  during the meeting.  And that's what I -- comments and
6  overall action with the board is what I denote as taking the
7  lead.  And anybody who took the helm and started talking was
8  my way of saying taking the lead.

9      Q.   Had there been a meeting of either the board of
10  directors or the executive committee or the management
11  committee on the Friday preceding August the 12th, 2002?

12     A.   I have no knowledge of any meeting.

13     Q.   You were not present?

14     A.   I believe I stated I was probably out of town during
15  that time.  I'm not sure.

16     Q.   Now, when you learned of the meeting for August the
17  12th, had you been informed that a decision had been made,
18  perhaps on that Friday, to fire Mr. Sherrod?

19     A.   No.  Not at all.

20     Q.   You'd not been informed of that?

21     A.   Before August 12th --

22     Q.   Yes.

23     A.   -- was there any conversation regarding the
24  termination of James Sherrod?

25     Q.   Yes.

1    A.    No.

2         Q.    With you. Were you informed that a decision had

3    been made to fire Mr. Sherrod before August the 12th, 2002?

4         A.    Termination of Mr. Sherrod never came up to me

5    before August 12th of 2002.

6         Q.    So that means you remember who called you and told

7    you of the meeting on August the 12th.

8         A.    What does that mean? Termination was never

9    discussed. How does that relate? I told you more than

10   likely about the meeting, Cathy Lyons is more than likely the

11   person that informed me, but she never said termination

12   because she said that -- and if she was the one that informed

13   me. We both could've gotten a call. I know I had a

14   discussion with Cathy Lyons because she said, why are we

15   going to a meeting. I said, I don't know.

16        Q.    Are you aware that a meeting occurred of either the

17   board of directors, the executive committee, or the

18   management committee, the Friday preceding August the 12th,

19   2002?

20             MR. MARTINUCCI:  He just answered that question two

21             minutes ago.

22        A.    Anything prior to August 12th in reference to this

23   matter -- basically it was part of the matter, in my opinion.

24   If somebody or any board member or anything else -- maybe it

25   was happening the same day, I don't know. On August 12th was

178

1    the first time I ever heard of anything in relationship to

2    Mr. Sherrod and, basically, his not being part of the Booker

3    T. Washington Center.  I was shocked on that day.  So,

4    therefore, I -- I'm absolutely sure there was no conversation

5    with me before that.

6         Q.   I'm not saying with you.

7         A.   Well, I didn't hear of anything before that either.

8    This is the first time that that's been even brought to my

9    attention that there was some prior meetings before that.

10        Q.   Prior to accepting your current position did you

11   ever have aspirations of heading up an agency?

12        A.   That's a broad question.

13        Q.   That's correct.  Prior to assuming your position as

14   executive director of the Booker T. Washington Center did you

15   ever have aspirations of being a CEO or head of an agency?

16             MR. MARTINUCCI:  What do you mean by "agency".

17             MS. BENSON:  Social service agency or a corporate

18             business.

19        A.   Prior to taking the position at the Booker T.

20   Washington Center, my goal, and my goal still is, to go back

21   for a Ph.D. or JD.  My aspirations, at one point in time I

22   plan on being the president of some kind of college.  Now, if

23   that happens, it happens; if it didn't, it didn't.  I kind of

24   changed that as I started to move towards what I wanted to do

25   in terms of aspirations.

1    Q.    At one point did you aspire to become the executive
2    director of the Booker T. Washington Center?
3        A.    I never have.
4        Q.    But you are.
5        A.    But you asked the question at what point, and I
6    said, I never did.
7        Q.    In your opinion, from the point that you became
8    executive director (sic) in January of 2002 until you became
9    the executive director, and I think you said that was in
10   February of 2003 --
11       A.    No.  I became January --
12       Q.    January 2003.  How did you see the agency and its
13   services?
14       A.    When I became in January 2003?
15       Q.    From the point that you became on the board, which
16   was in January of 2002, until Mr. Sherrod was let go in
17   September of 2002, how did you see the agency and its
18   services?
19              MR. MARTINUCCI:  What do you mean "how do you see"?
20              MS. BENSON:  How did he see the agency and its
21              services?
22              MR. MARTINUCCI:  What do you mean by "see"?
23       A.    I was learning about the agency during that time
24   frame.  As I said before, it was an introduction.  I had
25   no idea of Booker T. Washington Center, as I said, until I

1   joined the board.

2       Q.    Based on the information you had from January 2002

3   to September of 2002, did you have a sense that the Booker T.

4   Washington Center was carrying out its responsibilities to

5   provide social services to the community?

6       A.    That's what I was working on and getting the

7   assessment of, and that's why I was meeting with

8   Mr. Sherrod.  So I could have a better understanding of the

9   organization.  So I did -- if you're asking me between the

10  time that I started until August, I'm telling you that I was

11  still learning about the Center.

12      Q.    Now, you testified you came on in January of 2002,

13  and --

14      A.    On the board.

15      Q.    -- you met with Mr. Sherrod in August of 2002.  Did

16  the management committee have any meetings during that time

17  period?

18      A.    Yes.

19      Q.    How often?

20      A.    I'd say, basically from that time frame it was

21  eight -- let's just say that's eight months.  Let's say I

22  came on board in April, let's say we probably -- April, May,

23  June -- let's say out of five -- we probably met three of out

24  five months that I was on board.

25      Q.    During that time did you have to address matters

1    involving a specific employee?

2        A.    I don't remember addressing any -- we had just

3    gotten into it basically in August.  That was the first

4    employee issue that I had to address.

5        Q.    Do you recall what the attendance record was of the

6    other committee members?

7        A.    No, I don't.

8        Q.    Do you recall whether from the time period that you

9    came on the management committee until September 2002 --

10   whether minutes were taken of the management committee

11   meetings?

12       A.    I know -- again, probably I want to estimate maybe

13   two or three out of the five of that time frame, yes, there

14   were minutes taken of those committee meetings.

15       Q.    Were reports made by the management committee to the

16   board of directors?

17       A.    Yes.

18       Q.    Who made those reports?

19       A.    I did.

20       Q.    Were the reports prepared by you in writing, or were

21   they given orally?

22       A.    Three out of the five months were probably in

23   written format, and the rest was probably verbal.

24       Q.    Who prepared the written report?

25       A.    They were computer generated by myself.

1      Q.    You came on in January of 2002.  Tell us what your

2    attendance record was like at board meetings up to August

3    2002.

4      A.    Again, I don't recall my entire attendance, but I

5    think that I may have the first two meetings, which probably

6    would have been taking place in January and February.  I

7    think, possibly -- my first real meeting that I attended was

8    possibly March, April, May, June, and July.  Which are the

9    five months that I've been talking about.

10      Q.    Were reports ever given to you, or complaints, in

11    your capacity as chair with regard to board members?

12      A.    What type of reports are we talking?

13      Q.    Did any of the tenants of the Booker T. Washington

14    Center ever complain to you with regard to the conduct of

15    board of director members between August of 2002 and December

16    of 2002?

17      A.    I'm not sure if there was a report, but I did have a

18    conversation with one person I remember.

19      Q.    Who was that person?

20      A.    I believe that was Debbie Jamison.

21      Q.    And Ms. Jamison worked for which tenant in the

22    building?

23      A.    The WIC office.

24      Q.    What was Ms. Jamison's complaint about?

25      A.    She wanted to have more information on what was

1    going on and the conduct of what's happening in the facility.
2        Q.   Did Ms. Jamison complain to you about Mr. Sean
3    Coleman?
4        A.   Yes, she did.
5        Q.   Did Ms. Jamison complain to you about his behavior?
6        A.   Yes.
7        Q.   Did she complain to you with regard to what he said?
8        A.   Yes.
9        Q.   Did Ms. Jamison complain to you that Mr. Coleman
10   treated or referred to African Americans as niggers?
11       A.   No.
12       Q.   Did she tell you that Mr. Coleman mistreated African
13   Americans?
14       A.   No.
15       Q.   Well, tell us what she complained about Mr. Coleman.
16       A.   His profanity.
17       Q.   His profanity.  Did she give you examples of his
18   profanity?
19       A.   No.
20       Q.   She didn't tell you what language or words he used?
21       A.   Not that I recall.
22       Q.   Is it possible that she did?
23       A.   I don't recall.  I know that basically more than
24   likely she didn't because -- I'm just thinking of our
25   conversation, and she used the word profanity and

1    unprofessional conduct.  I think that's how the conversation
2    went.

3         Q.   Was any action taken with regard to this?
4         A.   Basically it was all -- it was brought to the
5    board's attention, and --

6         Q.   By whom?

7         A.   By myself.  And the question was, is this true or is
8    this false, and what are we doing in the hallways or what
9    kind of conversations are we having.  And then it was saying
10   well we -- this is conduct not becoming of a board member,
11   and we'd like it not to happen, and that was it.

12        Q.   At what meeting was this brought to the attention of
13   the board of directors?

14        A.   Must have been a meeting in between the time that
15   she told me and the time the next meeting came up.

16        Q.   So can you give me some idea of when that might have
17   been.

18        A.   I'm going to have to say between August 12th and
19   September 20th.

20        Q.   August 12th and September 20th?

21        A.   Right.  In the time frame, yes.

22        Q.   That she complained to you and that you took it to
23   the board?

24        A.   Yes.  Correct.

25             MR. MARTINUCCI:  What year?

1    A.    2002.

2    Q.    What action was taken by the board of directors?

3    A.    Again, it was an accusation, and basically, it was

4    addressed.

5    Q.    How was it addressed?

6    A.    It was addressed by saying, is this conduct

7    happening, or what's going on, how is it going on, and if

8    there's anything like this, this is unacceptable and

9    unbecoming of a board member.

10   Q.    Did the board conclude that the conduct had taken

11   place?

12   A.    I don't believe there was any conclusion that the

13   conduct had taken place.

14   Q.    Was this meeting recorded?

15   A.    I'm not sure.

16   Q.    Was Ms. Jamison present for this meeting?

17   A.    No.

18   Q.    Was Mr. Coleman present?

19   A.    I'm not sure.

20   Q.    How many full-time employees does Booker T.

21   Washington Center currently have?

22   A.    Define "full-time" for me.

23   Q.    I will take that to be anywhere from 35 hours a

24   week.

25   A.    Temporary or permanent?

1       Q.    Well, I'll let you tell me how many temporary ones
2    you have working 35 hours, and permanent, 35 hours.
3       A.    Temporary, we probably have about 20 people.
4       Q.    Working?
5       A.    Yes.
6       Q.    35 hours or more?  And how many --
7       A.    At least above 30.
8       Q.    How many permanent employees?
9       A.    Give or take, 10.
10      Q.    Of your employees, how many were there when
11   Mr. Sherrod was executive director?
12      A.    There is many changeovers and time frames, so you
13   have to look at that.  During this time frame some of them
14   may not have been employed, some of them may have been
15   employed historically.  I don't really know the answer to the
16   question, especially when it comes to the temporary.
17   According to the permanent ones, there's two.
18      Q.    Just two?
19      A.    Yes.
20      Q.    And those are?
21      A.    Mr. Bessetti and Ms. Smith.
22      Q.    Both of whom are white?
23      A.    Correct.
24      Q.    No African Americans who were there when Mr. Sherrod
25   was there in 2002 are there now?

1       A.    No.  Employees -- other employees are there.

2       Q.    I notice, on documents in which the Booker T.

3    Washington Center is provided a copy, that Attorney

4    Martinucci sends them to the controller, Brian Bessetti.   Can

5    you tell me why he receives them as opposed to you.

6       A.    I receive them.

7       Q.    So you get them also?

8       A.    Correct.

9       Q.    Can you tell me whether he, the controller, receives

10   them because he must pay a bill?  Must pay the attorney bill?

11      A.    Are you asking why he receives correspondence?

12      Q.    Yes.

13      A.    So we can stay on top of what's going on.  Just in

14   case I'm not available, he can make sure I get the

15   information.

16      Q.    Is there a reason why he would get it as opposed to

17   Ms. Smith?

18      A.    Ms. Smith sometimes gets information also.

19      Q.    How was it decided that Mr. Bessetti would get

20   copies of documentations?

21      A.    He gets the bills.

22      Q.    For legal counsel services, how are you paying them?

23   Out of what funds are you paying them?

24      A.    We're scraping the bottom of the barrel.

25      Q.    But what funds are you using to pay him?

1    A.    General funds.

2    Q.    And those general funds come from where?

3    A.    Rent revenues.

4    Q.    Who are the tenants currently in the building?

5    A.    Community Health Net, the WIC Program, the Senior

6    Center.

7    Q.    Any others?

8    A.    Not that I know of at this time.  Unless I forgot

9    one.

10    Q.    Why are you using general funds to pay legal fees?

11    A.    Because these legal fees have nothing to do with our

12    programs.

13    Q.    When Mr. Sherrod was there, he had taken out a -- an

14    insurance policy to cover board and staff errors and

15    omissions.  Was this matter referred to the insurance carrier

16    to defend?

17    A.    Yes.

18    Q.    What happened there?

19    A.    They rejected the claim because of the timing.

20    Q.    When did they reject it?

21    A.    I don't know the exact time frame.

22          MR. MARTINUCCI:  I can probably provide you with

23          that information, but the reason for the rejection

24          was because the claim had not been submitted for

25          coverage during the EEOC process.  Only at the end

```
1              of the EEOC process did I become aware that there
2              was any coverage out there, and that's the time
3              that it was submitted.  And they said, no, it's too
4              late.  We resubmitted when the Complaint was filed,
5              and they denied it again.
6         Q.   Other than the building at 18th and Holland where
7    the Booker T. Washington Center is located, what other
8    property does the Booker T. Washington Center own?
9              MR. MARTINUCCI:  I'm going to object on the basis
10             of relevance and direct Bill not to answer.  This
11             is not a deposition in aid of execution, and you're
12             going beyond information that is relevant or
13             discoverable for the purposes of the underlying
14             civil litigation.  So don't answer that question.
15        Q.   What's your rent revenues you accumulate on a
16   monthly basis?
17             MR. MARTINUCCI:  Same objection.  Same direction.
18        Q.   Who's the president of your board now?
19        A.   Rege O'Neill.
20        Q.   When did he become president?
21        A.   I believe he became president January of this year.
22        Q.   Who's the vice president?
23        A.   Curtis Jones, Jr.
24        Q.   Who's the secretary?
25        A.   Erica Jackson.
```

1      Q.    And treasurer?

2      A.    Lieutenant John McCall.

3      Q.    Lieutenant John McCall, is he in the military or the

4    police force or --

5      A.    Police force.

6      Q.    City of Erie?

7      A.    Yes, I believe so.

8      Q.    You've indicated that you don't know how to reach

9    Mr. Hamilton.  Do you know how to reach Mr. Coleman?

10     A.    I don't know at this point in time.  I believe he

11   moved out of town now.  I mean, he would have left a

12   forwarding address with you in that deposition; is that

13   correct?

14             MR. MARTINUCCI:  Subsequent to the deposition, and,

15             yes, Ms. Benson was provided with that information.

16             MS. BENSON:  My understanding, he's in town.  He

17             never left town.

18             MR. MARTINUCCI:  That's news to us.

19             MS. BENSON:  I learned that last week that he never

20             left town.

21     A.    That's news.

22     Q.    Mr. Jeffress, prior to this August 2002, how would

23   you describe your relationship with Mr. Sherrod?

24     A.    We were just getting to know one another.

25     Q.    Based on the fact that you were just getting to know

1    one another, had you formed any initial impressions at all?

2         A.    I felt that he was a good man.

3         Q.    In what way did you feel that?

4         A.    Well, I know that we belonged to the same

5    fraternity.

6         Q.    Which fraternity is that?

7         A.    Omega Psi Phi.

8         Q.    What makes that so significant?

9         A.    You belong to Omega Psi Phi Fraternity, that makes

10   you a good man.

11        Q.    Is that so, and why is that?  Since I could not join

12   for obvious reasons, why is that?

13        A.    Well, we have basically some serious principals that

14   we follow.

15        Q.    What are those principals?

16        A.    Manhood, scholarship, perseverance, and uplift.

17        Q.    I'm sorry?

18        A.    Manhood, scholarship, perseverance, uplift.

19        Q.    Would you say for that period of time he was at the

20   Booker T. Washington Center he demonstrated manhood?

21        A.    If I didn't think he demonstrated those qualities, I

22   would have never joined the board in the first place.

23        Q.    Do you think that while you were there he

24   demonstrated the skills and ability of an executive director?

25        A.    He was the executive director, and I didn't have

1    ample time to make an assessment of any of his skills or
2    abilities.
3        Q.   How long would it take you to have to do that?
4        A.   I told you -- basically, ask my wife.  It takes me
5    five years to get to know somebody.
6        Q.   Five years?
7        A.   I told my wife the first day I met her, five years.
8    Then I married her.
9        Q.   So you formed not even preliminary opinions until
10   you've known somebody for five years?
11       A.   Like I said before when you asked me about my
12   preliminary opinion, I said that we were part of the same
13   fraternity, he must be a good man.
14       Q.   And until August 12, 2002, you had no reason to
15   question Mr. Sherrod's performance, did you?
16       A.   Correct.
17            MS. BENSON:  I have no further questions.
18
19                      CROSS-EXAMINATION
20   BY MR. MARTINUCCI:
21
22       Q.   Bill, I have just a couple of quick questions for
23   you.  First of all, this is going down on a written
24   transcript, not a video transcript, so these questions are
25   going to sound silly, but ultimately they'll be important.

1    What is your race?

2        A.    African American.

3        Q.    What is your color?

4        A.    Black.

5        Q.    To your knowledge, is Mr. Sherrod also an African

6    American?

7        A.    Yes.

8        Q.    Is he also black?

9        A.    Yes.

10       Q.    What about Mr. Coleman?

11       A.    Yes.

12       Q.    To both?

13       A.    He's black and African American, correct.

14       Q.    Now, did you ever recommend support or take any

15   action against Mr. Sherrod because of his color?

16       A.    No.

17       Q.    What about because of his race?

18       A.    No.

19       Q.    Did you ever recommend, support, or take any action,

20   or not take any action, against Brian Bessetti or Anita Smith

21   because of their race?

22       A.    No.

23       Q.    With regard to that same series of questions, did

24   you ever do anything with regard to Mr. Sherrod because of

25   his color?

1     A.   No.
2         Q.   What about with regard to doing or not doing
3     anything concerning Mr. Bessetti or Ms. Smith because of
4     their color?
5         A.   No.
6         Q.   To your knowledge, has anybody taken any action
7     against Mr. Sherrod because of his race or color?
8         A.   No.
9         Q.   To your knowledge, has anybody not taken any action
10    between Mr. Bessetti or Ms. Smith because of their color?
11        A.   No.
12        Q.   What about because of Mr. Sherrod's race?
13        A.   No.
14        Q.   What about because of Mr. Bessetti's race?
15        A.   No.
16        Q.   What about because of Ms. Smith's race?
17        A.   No.
18        Q.   The three employees that were fired, that was Lester
19    Howard, Renee Coates-Smith, and Derek --
20        A.   Coleman?
21             MS. BENSON:   Johnson.
22             MR. MARTINUCCI:   Johnson.   Thank you.   I thought
23             that was it, but I wasn't sure.
24        Q.   Those were all African Americans?
25        A.   Yes.

1      Q.   Who fired them?

2      A.   To my knowledge, Mr. Sherrod.

3      Q.   Now, was it part of his responsibility, as the

4    executive director, to make those decisions?

5      A.   Yes.

6      Q.   With regard to Mr. Bessetti as the controller, whose

7    decision would it have been to take action against him?

8      A.   Mr. Sherrod's.

9      Q.   Are you aware of any allegation that anybody on the

10   board of directors told Mr. Sherrod not to take action

11   against Mr. Bessetti?

12     A.   I'm not aware of any allegations.

13     Q.   There was some question as far as whether or not the

14   use of the word nigger in a conversation between two black,

15   African-American males would raise a red flag to you.  It was

16   your testimony that it would not.

17          MS. BENSON:  Objection.  It's irrelevant.

18          MR. MARTINUCCI:  That's fine.

19     Q.   You can go ahead and answer the question.

20     A.   In the context, like I said, in terms of the

21   terminology or anything else, coming from an African-American

22   male, it could have been just a terminology that he was using

23   to describe something.  I was -- I did not take it as being

24   discriminatory in terms of when it was brought to my

25   attention.  And it was not actually being communicated as

196

1   discriminatory.  It was being communicated as this was what

2   was said.

3        Q.   Did Mr. Sherrod ever complain to you that he felt he

4   was being discriminated against on the basis of his race or

5   his color?

6        A.   Not to my --

7             MS. BENSON:  What time period are you referring to?

8             MR. MARTINUCCI:  Any time period.

9        Q.   Let me put it this way:  Any time period before the

10  filing of the EEOC charge, did Mr. Sherrod ever complain to

11  you about being discriminated against on the basis of his

12  race or color?

13       A.   No.

14            MR. MARTINUCCI:  I have no further questions.

15            MS. BENSON:  Just a few follow-up questions.

16

17                       REDIRECT EXAMINATION

18  BY MS. BENSON:

19

20       Q.   You previously testified that you came on the board

21  in January 2002.  From January 2002 to August, before August

22  12, 2002, had the board of directors dealt with any personnel

23  matter?

24       A.   Not to my knowledge.

25       Q.   Now, are you aware that the board of directors had

1   indicated to Mr. Sherrod that he needed to inform them or
2   have their support in order to fire someone?

3       A.   No.

4       Q.   You're not aware of that?

5       A.   No.  Actually, that's -- actually, that's the first
6   time that's come to my attention.

7       Q.   Now, you've just testified with regard to the use of
8   the terminology of nigger.  And that sounds so much similar
9   to what Mr. Coleman testified -- how he testified.  Did you
10  and he discuss how you would handle that?

11      A.   No.  I just think that he's, once again, an
12  African-American male, a black male.  Basically you can
13  probably pick up three more outside and they'll probably give
14  you the same definition.

15      Q.   I doubt that.

16      A.   I -- I --

17      Q.   Let me go on.  You do realize that from most African
18  Americans, probably all African Americans, the word nigger is
19  considered offensive, don't you?

20           MR. MARTINUCCI:  I'm going to object to the form of
21           the question.  I mean, you're offering an opinion
22           without any empirical support for it.

23           MS. BENSON:  Let me go back.

24      Q.   You just testified you're an African-American male.

25      A.   Yes.

1    Q.   And I guess you've heard the word nigger used in an
2    employment context, haven't you?

3        A.   I've never been in the employment environment where
4    I've really heard the word used.

5        Q.   If Mr. Coleman instructed Mr. Sherrod, in an
6    employment context, to fire those niggers, wouldn't you
7    conclude that he was referring to African Americans and
8    African Americans only?

9        A.   No.

10       Q.   Have you ever heard a white individual, in an
11   employment context, being described as a nigger?

12       A.   Yes.

13       Q.   When?

14       A.   On several occasions.

15       Q.   In an employment context?

16       A.   Yes.

17       Q.   Where at?

18       A.   Gateway Community College, Community Health Net,
19   basically.   You know, in terms of -- you said describe --
20   using it in that context, an employment environment, have I
21   ever heard.   Now, was it in an employee-related issue or
22   anything else, no.   It was outside of the scope of the job.
23   It was an employment context, but the cafeteria.

24       Q.   I'm talking about in an employment situation, have
25   you ever heard a white person being referred to as a nigger

199

1   in employment?

2       A.   No.   I've never heard a black person being referred

3   to as -- I told you earlier I didn't hear it, but outside of

4   an employee context, yes.   That's why I want to make sure I'm

5   clear on what you're asking me.   I have heard it -- the

6   description being said, whether you're white, black,

7   Hispanic, or whatever else, I have heard them use the

8   terminology.   Now, in an employment context, I haven't heard

9   it, whether you're white, black, or Hispanic.

10      Q.   So in an employment context you've not heard it at

11  all?

12      A.   No.

13      Q.   If, as Mr. Sherrod says, he was instructed by

14  Mr. Coleman to fire those niggers, would you agree that that

15  was in an employment context?

16      A.   I wouldn't think that that was an employment context

17  because that's not his responsibility to instruct him to do

18  so.   Since -- since I'm aware of that -- what his position

19  is, and I'm aware of what Mr. Sherrod's position is, you can

20  say fire anybody.   But I'm just saying that, you know, that's

21  not in an employment context because that's not his

22  responsibility to tell him to fire them.

23      Q.   The average individual, wouldn't you say, having

24  heard that would say that he had been instructed to fire

25  those three individuals?

1           MR. MARTINUCCI:  Objection.  Calls for speculation.
2        That one I'm going to direct you not to answer.
3        You're not even asking for his opinion now.  You're
4        asking for the average individual's opinion.
5           MS. BENSON:  Let me go back.
6      Q.   If you were standing there when he had been given
7   the instruction by Mr. Coleman to fire those niggers, in an
8   employment context --
9      A.   So that means we're in the boardroom.
10     Q.   No.  This means after -- excuse me, let me go back.
11   Are you aware -- you testified earlier that Mr. Coleman
12   participated with Mr. Sherrod in interviewing of Lester
13   Howard, Derek Johnson, and Renee Coates-Smith, right?
14     A.   I don't know if I testified that way because, like I
15   said, I wasn't present there.  So I don't know whether he did
16   or didn't.
17     Q.   Did you learn at any point that Mr. Coleman
18   participated in those interviews?
19     A.   I did -- again, I've heard that from -- now I know
20   Mr. Coleman I heard it from, when I interviewed Renee
21   Coates-Smith or something else, it was basically he was
22   there, yes.
23     Q.   In fact, you, as chairperson of the management
24   committee, conducted all three appeal hearings, right?
25     A.   Yes.

1      Q.    So you were aware from their appeal that Mr. Coleman
2   was part of the interviewing process, weren't you?
3      A.    I was aware he was present, yes.
4      Q.    You were aware that he asked questions?
5      A.    Again, I didn't get into that much detail.  I wasn't
6   looking at that.
7      Q.    Were you aware that he took notes?
8      A.    No, I was not.
9      Q.    So you handled these three appeals, and you did not
10  find out what his role was in those hearings -- in the
11  interview meetings?
12     A.    In my opinion, Mr. Coleman didn't have an opinion --
13  or a role in the termination of those employees.  I was not
14  present.  I was answering the appeal that they were
15  terminated, not who they were terminated by.
16     Q.    Did Mr. Coleman tell you he was present for those
17  interviews?
18     A.    I don't know if he came out and said I was present
19  for those interviews, no.
20     Q.    So going back to the appeal of Lester Howard, Renee
21  Coates-Smith, and Derek Johnson, Mr. Coleman never revealed
22  to you, as the chair of the management committee, that he was
23  present for those interviews?
24     A.    Again, I don't recall him saying to me, I was
25  present during those interviews.

1        Q.    In your committee review of those appeals, describe
2    for us Mr. Coleman's role.
3        A.    I'm not sure what his role was.  His role was a
4    member of the management committee.
5        Q.    What did he do in the meetings?
6              MR. MARTINUCCI:  During the meetings or during the
7              hearings?
8              MS. BENSON:  During the appeal.
9        A.    I don't recall, but I -- I believe that in certain
10   instances he did not start out on the meetings, but then he
11   did come in on the meetings because they weren't -- they
12   wanted to basically talk to him.
13       Q.    Because?
14       A.    The people who were being heard wanted to express
15   their opinions in front of him.  So he was called in.
16       Q.    Was he called in by you or by them?
17       A.    He was called in by me, but it was requested of
18   them.
19       Q.    Now, as part of that, did he describe for you his
20   role in the interviewing of all three of these individuals?
21       A.    No.  I -- he did not describe what his role was in
22   interviewing those individuals.  The only thing that I know
23   is that the question was asked, did you tell James to fire
24   these individuals.
25       Q.    Who asked that question?

203

| | | |
|---|---|---|
| 1 | A. | I did. |
| 2 | Q. | And what was his response? |
| 3 | A. | I never told James that. |
| 4 | Q. | So his response to you was that he never told James |
| 5 | that? | |
| 6 | A. | Correct. |
| 7 | Q. | When did the management committee meetings take |
| 8 | place? | |
| 9 | A. | Between August 12th and September 20th. |
| 10 | Q. | Let me show you what I think now would be Exhibit |
| 11 | No. 10. | |
| 12 | | (Jeffress Deposition Exhibit No. 10 marked for |
| 13 | | identification.) |
| 14 | A. | Okay. |
| 15 | Q. | Can you tell us what Exhibit No. 10 is. |
| 16 | A. | Exhibit No. 10 is Booker T. Washington Board |
| 17 | management committee minutes. | |
| 18 | Q. | What date is on Exhibit 10? |
| 19 | A. | September 3, 2002. |
| 20 | Q. | Who prepared these notes? |
| 21 | A. | It looks -- these look like notes that I would have |
| 22 | prepared. | |
| 23 | Q. | Did you prepare it? |
| 24 | A. | These look like notes that I would have prepared, |
| 25 | yes. | |

1    Q.   That you would have prepared?

2    A.   I can't tell you these are the notes, but it looks

3    like my format -- or my style that I would have done it, but,

4    yes, these -- these are some of the notes that I said that --

5    remember when I was telling you that there was probably about

6    a handful of minutes that I kept and I typed myself, this is

7    probably a copy of those minutes.

8    Q.   When did you prepare these minutes?

9    A.   I probably prepared them about a couple days -- or

10   probably right after the meeting.  These notes look like

11   notes that were probably taken on my iPAQ, which I stated

12   earlier would have a hard copy somewhere.

13   Q.   So you believe you prepared these minutes?

14   A.   Yes.

15   Q.   Was September the 3rd the actual date of the

16   meetings?

17   A.   These minutes would be -- if it's reflected in these

18   minutes, and these are the minutes that I printed out, yes,

19   it would be September 3rd.

20   Q.   Now, here, down at 1:30 p.m., it says, "Appeal

21   regarding termination of second employee," and it appears to

22   deal with Mr. Johnson.  Down at the bottom, I'll just read

23   you the last paragraph, "The committee decided that it would

24   not overturn the termination of Ms. Coates or Mr. Howard.

25   The committee felt, if Mr. Johnson's story was correct, then

1    she should not be terminated. We would seek counsel on how
2    to present each case to the individuals." Now, we know from
3    your prior testimony that Mr. Johnson was, in fact, fired.
4    Why was the committee thinking about not firing Mr. Johnson?
5        A.    One of the reasons was that -- I don't recall 100
6    percent, but I believe Ms. Coates-Smith, and also Mr. Howard,
7    were basically saying he had nothing -- no involvement or
8    something else. I actually don't recall exactly why, but I
9    do remember that they had basically -- you know, when asked
10   what their involvements were, they had said that Mr. Johnson
11   probably didn't have, but there was no -- he was a part-time
12   employee, I believe, at the time, too. So I'm not -- I don't
13   recall exactly why, at that point in time, but I do know that
14   it came from Ms. Coates-Smith and Mr. Howard in reference to
15   that, in their defense of him.
16       Q.    Why was he fired nonetheless?
17       A.    Well, again, I can't define why he was terminated.
18   I can only address the appeal.
19       Q.    What was your committee's recommendation of the
20   appeal?
21       A.    After further review, it was in the best interests
22   of -- you know, to not overturn any of the terminations and
23   to move forward from there.
24       Q.    Why was it in the agency's best interests to
25   terminate Mr. Johnson if the committee felt that he really

1    wasn't involved?

2         A.   Well, at that point in time there were no programs

3    or anything else that he was going to be involved in and

4    doing.  So as part-time employee, we weren't going to be --

5    we wouldn't have anything for him to do.

6         Q.   So you would go ahead and fire him?

7         A.   We did not fire him.  We just -- basically we had a

8    discussion with him, and that discussion led to basically not

9    continuing the relationship.

10        Q.   Did you rescind the termination?

11        A.   Again, as -- I don't recall.  I believe that we gave

12   each individual an opportunity to resign on their own.

13        Q.   But here's an individual that you're testifying did

14   nothing wrong.

15        A.   I didn't testify that they did nothing wrong, I was

16   just over -- looking at the appeal, and basically, having a

17   conversation with these individuals, we said, that, yes,

18   you're probably right.  We shouldn't use the word

19   "terminated" on these forms, or anything else.  But if you

20   would like to resign your position, then we will -- we will

21   basically look at it as a resignation rather than a

22   termination.

23        Q.   You're not sure whether Mr. Johnson was a part-time

24   or a full-time employee?

25        A.   Correct.  I believe he was part-time.

1      Q.    Are there any documents at Booker T. Washington
2   Center that would indicate to us whether he was full- or
3   part-time at that time?
4      A.    Payroll records.
5      Q.    Are there any documents that would let us know what
6   was the basis of the committee's thinking with regard to
7   Mr. Johnson not being fired?
8      A.    This is the minutes from the meeting.
9      Q.    And that's it?
10     A.    And then we met with the employees.
11     Q.    Did Mr. Johnson give you a resignation letter?
12     A.    I don't recall.
13     Q.    In his personnel file, does it show that he was
14   terminated?
15     A.    As I recall -- I don't remember his personnel file,
16   but according -- if anybody were to contact us or anything,
17   no, he was not terminated.
18     Q.    That's what you would say?
19     A.    Correct.
20     Q.    But there is no documentation that you are aware of
21   that shows otherwise?
22     A.    Not that I have my hands on at this time.
23     Q.    Now, you said you were a member of some fraternity,
24   and what were the principals?  Manhood, scholarship --
25     A.    Perseverance and uplift.

1    Q.   Does that require being honest?

2    A.   I would say it does.

3    Q.   So from your personal opinion, in an employment

4    context, if someone gives an instruction to fire those

5    niggers, would that individual be referring to African

6    Americans?

7    A.   The way I interpret it, I'd say, no.

8    Q.   The way you personally interpret it?

9    A.   That's what you asked me.

10   Q.   Even in an employment context?

11   A.   Like I said, with that being said, my interpretation

12   of -- at this time would have been, no, it wasn't racially

13   motivated.

14   Q.   I'm not asking you racially motivated.  I'm asking

15   you whether or not it would be a reference to African

16   Americans.

17        MR. MARTINUCCI:  He's answered the question --

18        MS. BENSON:  He can answer it again.

19        MR. MARTINUCCI:  -- repeatedly.

20        MS. BENSON:  He can answer it again.

21   A.   I'd say that, again, I don't -- me, personally, I

22   don't take it as a reference to African Americans.

23   Q.   Did you ever take it as a reference to just African

24   Americans?

25   A.   Did I ever, no.  Because I never really used the

 1  word, and it's never really been used around me that much.

 2       Q.   But you've heard it used.

 3       A.   Yes.  And that's why I gave you the definition that

 4  I gave you.

 5       Q.   And you've known about its use historically.

 6       A.   Historically I've been taught that the word is used

 7  for ignorant people.

 8       Q.   You've also, haven't you, been taught that the word

 9  nigger has been used to refer to individuals of African

10  decent?

11       A.   I've heard that, too, yes.

12       Q.   And you've heard --

13       A.   But I don't accept it.

14       Q.   But you've heard that that's the way the word has

15  been used, haven't you?

16       A.   I've heard, but I don't accept it.

17       Q.   I understand what you may not accept it.  You've

18  heard that, historically, the word niggers has been used to

19  refer to African Americans, haven't you?

20            MR. MARTINUCCI:  Objection.  Asked and answered.

21       Q.   Answer the question.

22            MR. MARTINUCCI:  No.  You know what, don't.

23       Q.   Answer it.

24            MR. MARTINUCCI:  No. I'm going to direct you not to

25            answer the question.