IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

James C. Sherrod          :
   Plaintiff          :
   vs.                :   Civil Action No. 04-208 Erie
Booker T. Washington      :
Center                    :
   Defendant          :


The deposition of SEAN P. COLEMAN, taken before and by

Heather E. Nass, Notary Public in and for the Commonwealth

of Pennsylvania, on Tuesday, June 28th, 2005, commencing at

9:30 a.m., in Rm. 211 , at the Erie County Court House, 140

West 6th Street, Erie, Pennsylvania 16501.


For the Plaintiff:
Edith Benson, Esquire
Benson Law Office
4683 Budd Drive
Erie, Pennsylvania 16506


For the Defendant:
Arthur D. Martinucci, Esquire
Quinn Buseck Leemhuis Toohey & Kroto
2222 West Grandview Boulevard
Erie, Pennsylvania 16506


Reported by Heather E. Nass
Ferguson & Holdnack Reporting, Inc.

2

1                          I N D E X

2    SEAN P. COLEMAN

3         Direct Examination by Ms. Benson. . . . . . . . . .3

4         Cross-Examination by Mr. Martinucci. . . . . . . 164

5         Redirect Examination by Ms. Benson. . . . . . . .169

6         Recross-Examination by Mr. Martinucci. . . . . . 174

7

8

9

10   Exhibits:

11   Plaintiff Exhibit Number 1. . . . . . . . . . . . . . 68

12   Plaintiff Exhibit Number 2. . . . . . . . . . . . . . 68

13   Plaintiff Exhibit Number 3. . . . . . . . . . . . . . 92

14   Plaintiff Exhibit Number 4. . . . . . . . . . . . . .118

15   Plaintiff Exhibit Number 5. . . . . . . . . . . . . .121

16   Plaintiff Exhibit Number 6. . . . . . . . . . . . . .156

17

18

19

20

21

22

23

24

25

1          S E A N   P.   C O L E M A N, first having been duly
2          sworn, testified as follows:

3

4                          DIRECT EXAMINATION

5    BY MS. BENSON:

6

7        Q.    Mr. Coleman, for the record state your full name?

8        A.    Sean P. Coleman.

9        Q.    What does the P. stand for?

10       A.    Paul.

11       Q.    And where are you currently residing?

12       A.    2622 Wayne Street.

13       Q.    Wayne Street?

14       A.    Wayne, yes.

15       Q.    Let me just go back for just a moment.  Of course,

16   we've met before.  My name is Edith Benson and as you know I

17   represent Mr. Sherrod who's the Plaintiff in this matter.

18   Mr. Coleman, just a few things I want to cover with you

19   before we continue on.  One, have you ever participated as a

20   witness in a deposition before?

21       A.    No.

22       Q.    So let me describe that, the deposition process

23   just a little bit.  It consists of a series of questions

24   from me and answers from you, and, of course, you've just

25   been sworn in.  Your answers will be under oath and can be

1    used subsequently at any hearing, trial in this matter.  You

2    can request an opportunity to review the transcript of the

3    proceedings.  And if there are any changes with regard to

4    your answers in the form of substance you can prepare a

5    statement indicating what changes you think should have

6    occurred, and why, with regard to your answers.  Do you have

7    any questions at this point for me with regard to the

8    description of the proceedings?

9        A.   No.

10       Q.   Now, one of the things -- there are several things

11   that I would request of you.  One, is that you wait until

12   I've completed the question before you answer.  Two, is that

13   when you respond that you do so verbally.  So for instance,

14   if the question calls for a yes or no response, provide a

15   yes or no, don't shake your head or do uh-huh.  Okay?

16       A.   Correct.

17       Q.   If you do not hear a question simply ask me to

18   repeat it.  If you do not understand a question simply ask

19   me to rephrase it or restate the question.  If you answer

20   the question I will assume you have heard it and you

21   understood it.  And so your response will be what is

22   reflected in the transcript; do you understand that?

23       A.   Correct.

24       Q.   Now, are you today at this time under any

25   medication that would affect your ability to hear any

1    question?

2        A.    No.

3        Q.    Are you today under any medication that would

4    impair your ability to understand a question?

5        A.    No.

6        Q.    Are you today under any medication that would

7    impair your ability to provide answers?

8        A.    No.

9        Q.    Now, with regard to each of those questions I'm

10   going to go back through again, but with a little bit of a

11   different twist.  And the question here is, are you today

12   under the influence of any drugs that would affect your

13   ability to hear a question?

14       A.    No.

15       Q.    Are you today under the influence of any drugs that

16   would affect your ability to understand the question?

17       A.    No.

18       Q.    Are you today under the influence of any drugs that

19   would affect your ability to provide answers?

20       A.    No.

21       Q.    Do you have any physical or mental condition that

22   would interfere with your ability to hear the question?

23       A.    No.

24       Q.    To understand the question?

25       A.    No.

1    Q.   To provide answers?

2    A.   No.

3    Q.   Now, during depositions there are times when, for

4    health reasons witnesses may need an opportunity to break

5    and I'll try to be responsive to that.  However, in the

6    interest of fairness, I should let you know that I will only

7    acquiesce to that request once you have answered my

8    question; do you understand that?

9    A.   Can you repeat it.

10   Q.   Okay.  There are times when witnesses may need a

11   break, in particular, for health reasons.  And in fairness,

12   I will certainly be prepared to acquiesce with regard to

13   that if such a need exists.  But I will object should you

14   want to leave this room when I have put a question to you

15   and before you have answered it; do you understand?

16   A.   Yes.

17   Q.   Now, just for household purposes.  If you haven't

18   noticed already, if you need to go to the restroom it's out

19   this door to your left and then to your right down the hall.

20   First you'll pass the women's and then the men's room.

21   There are also water fountains on this floor.  Okay.  Now

22   just a few other introductory type questions.  You've given

23   us your name, are you known by any nicknames?

24   A.   No.

25   Q.   Now, you stated your current address, I assume

1    that's in the City of Erie?

2        A.    Yes.

3        Q.    And when did you move to your current address?

4        A.    I believe in November of 2004.

5        Q.    Now, this -- as you know, Mr. Sherrod was dismissed

6    by the Booker T. Washington Center in September of 2002.

7    Where did you reside at that time?

8        A.    I was at 2840 Ford Avenue, that's in Erie.

9        Q.    And how long did you stay there?

10       A.    I was there for approximately -- I would say

11   probably about two-and-a-half, three years.

12       Q.    So in 2002 you had been there?

13       A.    Three years.

14       Q.    Three years.  And then after that where did you

15   move to?

16       A.    To my current address.

17       Q.    To your current address.  Did you at any time leave

18   the City of Erie from September of 2002 to the present,

19   which is June 28th, 2005?

20       A.    Yes.

21       Q.    And where did you move to?

22       A.    I didn't move, I just like traveled.

23       Q.    You traveled.  And where did you travel to?

24       A.    I've been to Penn State, Philadelphia, Buffalo,

25   Pittsburgh; I think that's pretty much it.

1     Q.   Philadelphia, Buffalo, Pittsburgh.  Which city did

2  you go to first?

3     A.   I can't recall.

4     Q.   All right.  Which city do you think you went to

5  second?

6     A.   Let me see.  I've been to Philadelphia numerous

7  times.  I was in Pittsburgh teaching at a -- or doing a

8  mentorship conference or leadership conference last summer.

9     Q.   That would be the summer of 2004.

10    A.   2004.

11    Q.   For what period of time would you say, summer?

12    A.   For a couple of days, the weekend, mid June.  And

13  then also last June I was in my best friend's wedding and

14  that was in New York.

15    Q.   New York State or New York City?

16    A.   New York City, actually Long Island, New York

17  State.  And I did training for three weeks in Buffalo for my

18  former employer and that was June.

19    Q.   That was June of 2004.

20    A.   Correct.

21    Q.   For three weeks.  So it's your testimony that you

22  never, from September of 2002 to today June 28th, 2005 moved

23  from the City of Erie, Pennsylvania.

24    A.   Correct.

25    Q.   Now, are you currently on the Board of the Booker

9

1    T. Washington Center?

2        A.    No.

3        Q.    When did you come off of that Board?

4        A.    I believe May, 2003.

5        Q.    And why did you come off?

6        A.    I wanted to focus on my practice.

7        Q.    What practice?

8        A.    Financial advisor, insurance.

9        Q.    So you chose to come off at that time.

10       A.    Correct.

11       Q.    When was the term -- on the Booker T. Washington

12   Board what is the term period?

13       A.    I don't recall.

14       Q.    So you don't know whether a board member serves one

15   year or two years?

16       A.    It varies from what I can recall.  Depending on how

17   long -- if I'm not mistaken.

18       Q.    What was your?

19       A.    I'm not particularly sure.

20       Q.    When did you go on the Booker T. Washington Center

21   Board?

22       A.    1999.

23       Q.    And how did it come that you were on the Board?

24       A.    I completed Project Blueprint in 1998, I met with

25   -- or actually seen Mr. Johnson who was the then president

1    of the organization.

2         Q.    Do you remember Mr. Johnson's first name?

3         A.    Sure, it's Jim Johnson.  He and I spoke, I knew Mr.

4    Sherrod at the time.  He and I spoke briefly, and from those

5    conversations I had joined the Board.

6         Q.    So that was in 1999 and you were there to 2003.

7         A.    Yes.

8         Q.    Now, when you came off the Board in May of 2003,

9    how did you go about announcing that you would not be on the

10   Board?

11        A.    I submitted a letter of resignation to the

12   executive director at the time.

13        Q.    And who was the executive director at the time?

14        A.    That would have been Bill Jeffress.

15        Q.    Is that also William Jeffress?

16        A.    Yes.

17        Q.    And that letter is dated.

18        A.    It should be, yes, it's dated.

19        Q.    Around 2/5/03.

20        A.    Correct.

21        Q.    Do you have a copy of that letter?

22        A.    No, I don't.

23        Q.    Did you -- in preparing that letter did you do so

24   by computer or typewriter or handwritten?

25        A.    I typed it.

1     Q.   And you didn't keep a copy?

2     A.   No.

3     Q.   Now, at the time you came off the Board were you

4 still the vice president of the Booker T. Washington Center

5 Board of Directors?

6     A.   Yes.

7     Q.   And when did you become the vice president of the

8 Board of Directors?

9     A.   I think 2001.

10    Q.   You're not sure.

11    A.   No.

12    Q.   Now, did you hold that position from 2001 until

13 2003?

14    A.   Yes.

15    Q.   Without interruption?

16    A.   Correct.

17    Q.   In addition to being vice president of the Board of

18 Directors were there any Board committees that you served

19 on?

20    A.   Yes.

21    Q.   What committees did you serve on?

22    A.   I served on the community participation committee,

23 as well as the management committee.

24    Q.   Now, are these two committees identified in the

25 Board's bylaws?

12

1      A.   Yes.

2      Q.   What's the duties of the management committee?

3      A.   Primarily just to assist in an advisory capacity.

4      Q.   Whom are you assisting?

5      A.   To the executive director.

6      Q.   Assists in an advisory capacity to the executive

7   director.

8      A.   Correct.  There are other duties in there as well,

9   I don't know exactly what they were.

10     Q.   In what areas would the committee provide

11   assistance according to the bylaws?

12     A.   Review, I believe, of finance, management, making

13   contacts, networks in the community.  Typical of most

14   management committees from my understanding.

15     Q.   In addition to the management committee -- and you

16   said that was one of the committees, what was the name of

17   the other committee?

18     A.   Community participation.

19     Q.   Did you serve on any other committee?

20     A.   No, I don't think so.

21     Q.   So from your tenure of 1999 to 2003 you only served

22   on two Board committees, the community participation

23   committee and --

24     A.   Actually, let me backtrack.  There was -- we redid

25   the bylaws at one point.  Initially I was on the executive

1    committee when I first started, and then there was a change

2    in how we defined the committees.  So I was on management --

3    I guess, I still would have been on the executive committee

4    then, an officer -- or being an officer.

5        Q.    So you're saying that in 1999 as a newly-appointed

6    board member of the Booker T. Washington Center you

7    automatically became a member of the executive committee?

8        A.    Not automatically, that was by Mr. J. or Mr.

9    Johnson.

10        Q.    You were appointed.

11        A.    Yes.

12        Q.    Do you know when you were appointed to the

13    executive committee?

14        A.    No, I don't.

15        Q.    When you were appointed to the executive committee

16    did you hold an officer position?

17        A.    No, I didn't.

18        Q.    And when did the bylaws -- is it your testimony

19    that the bylaws were reviewed; when were they revised?

20        A.    I'm not exactly sure.  I believe within -- probably

21    around 2001.  What we did was consolidate the committees,

22    because we had -- we consolidated the committee to three or

23    four, if I'm not mistaken.  Because we had numerous

24    committees prior to that and some of their activities had

25    overlapped.  So we brought some of the committees all under

1    this new structure.

2         Q.    So when did you go on the community participation

3    committee?

4         A.    I believe that would have been 2001.

5         Q.    And when did you go on the finance -- excuse me, on

6    the management committee?

7         A.    I believe the following year, maybe a little bit

8    sooner.   I'm not particularly sure.

9         Q.    You're not sure.   Okay.   What committees were in

10   existence -- Board committees were in existence when you

11   left in May of 2003?

12        A.    I believe there was management, community

13   participation, I want to say executive, and I think there

14   was a fourth one in there.   I'm not sure.

15        Q.    What committees of the Board existed in September

16   of 2002?

17        A.    I believe those same three and they had a fourth

18   one.   Again, I'm not sure of that.

19        Q.    So you believe the same committees existed.

20        A.    Right, three or four.   I'm not -- I'm still trying

21   to think if there was a fourth one.   Maybe the executive

22   committee was the one, I think was the fourth one.   But I

23   know there were at least three.

24        Q.    And those three in September of 2002 were the

25   management committee, community participation committee and

1    executive committee.

2        A.    I think.

3        Q.    Now, in September of 2000 -- let me take it back a

4    little bit further.  In August of 2002 were you on the

5    executive committee?

6        A.    Yes.

7        Q.    And what position -- did you hold an officer

8    position then on that committee?

9        A.    I was the vice president of the Board of Directors.

10       Q.    Vice president of the Board.  The executive

11   committee -- who constituted the executive committee at the

12   Booker T. Washington Center Board of Directors?

13       A.    I believe it was the officer and the committee

14   chairpeople.

15       Q.    So you all -- in August of 2002 you were on the

16   executive committee because of your position as vice

17   president of the Booker T. Washington Center Board?

18       A.    Correct.

19       Q.    Now, at that time, in addition to being vice

20   president and a member of the executive committee, did you

21   serve on any other board committees in August of 2002?

22       A.    The management committee.

23       Q.    Any other committee?

24       A.    No, I don't think so.

25       Q.    Did you hold -- with regard to the management

1    committee, did you hold an officer position at that time?

2        A.    I don't recall.

3        Q.    Who was the chair of the management committee?

4        A.    I believe that would have been Bill Jeffress.

5        Q.    Who was the chair of the executive committee?

6        A.    That would have been James Hamilton.

7        Q.    And what's Mr. Hamilton's title with regard to the

8    Board of Directors?

9        A.    He was the chairperson.

10       Q.    Of the Board of Directors.

11       A.    Correct.

12       Q.    Now, with regard to the management committee, in

13   addition to Mr. William Jeffress, who you referred to as

14   Bill, and to yourself who else served on the management

15   committee in August 2002?

16       A.    To the best of my recollection Rege O'Neill, Joe

17   Fries.    I know that there were other people, I just can't

18   remember at this time.

19       Q.    How large was that committee?

20       A.    Again, I don't recall.    It had at least four, those

21   four names.

22       Q.    Would the bylaw reflect -- the bylaws that existed

23   in August of 2002 reflect the number of people that would

24   serve on the management committee?

25       A.    I don't think so.

17

1        Q.    Would the Board minutes in August of 2002 reflect
2   the number of people that would serve on that committee?
3        A.    Again, I don't think so.  I don't know.
4        Q.    Well, where would you, as the vice president of the
5   Board of Directors, look to ensure that the management
6   committee was properly constituted; do you understand what I
7   mean?
8        A.    Well, see -- and, again, I'm not sure.  But I don't
9   believe there was a limit to whom -- or how many people can
10  serve on a committee.  So if you needed names, that
11  information should be or would be -- who served on the
12  committee would be or whatever -- what am I trying to say.
13  Because committees change, so whenever the nominations -- or
14  whoever would be asked to be on the committee or whatever
15  committee appointments would happen would be on those
16  minutes, depending on what minutes you're looking for.  But
17  that necessarily would not be on the August minutes,
18  regardless, because we may not have discussed management
19  issues.
20       Q.    What time of the year would the Board discuss board
21  organizational issues; do you understand the question?
22       A.    No.
23       Q.    It's your testimony that you had four working
24  committees; right?
25       A.    Three or four, I can't recall.

1      Q.   Three or four working Board committees.  And that
2   those committees were established based on the Booker T.
3   Washington Center Board of Directors bylaws; correct?
4      A.   Correct.
5      Q.   It's your testimony that you're not sure whether
6   those bylaws dictated the number of people for each
7   committee.
8      A.   Correct, I don't know.
9      Q.   So as Board vice chair you never reviewed the
10   bylaws to ensure that the committees were properly
11   constituted.
12      A.   Yes, I have.  I just don't remember, I don't recall
13   how many should be on a committee, if there was a number.
14      Q.   When before your -- let me ask you this question
15   here.  In August of 2002 you were engaged in -- and the
16   player in getting rid of Mr. Sherrod.  Did you in August of
17   2002 review the Board bylaws?
18      A.   Can you backtrack?  I was engaged as the player --
19   can you explain what you mean by that.
20      Q.   Yes, I'll be very happy to.  In August of 2002 you
21   were the lead player in moving towards Mr. Sherrod's
22   dismissal.  When did you review the bylaws to make sure you
23   were functioning according to those bylaws?
24           MR. MARTINUCCI:  Just for the record, I object to
25           the characterization.  He can answer the question.

19

1          You can answer the question in terms of the bylaws.

2      A.   We reviewed the bylaws --

3      Q.   No, I'm saying you.  I'm not say saying anyone

4  else, my question is directed to you.  When did you --

5      A.   And I'm answering the question.  We had reviewed

6  the bylaws --

7      Q.   No, my question is to you.

8          MR. MARTINUCCI:  Ms. Benson, let him answer the

9          question.

10         MS. BENSON:  I am going to let him answer the

11         question, but I want him to listen to my question.

12     A.   I understand your question.

13         MR. MARTINUCCI:  He heard your question, let him

14         answer it.

15     A.   Without the characterization.

16     Q.   Please listen to my question and answer my

17 question; it goes to you, not anyone else.  My question is

18 when did you personally review those bylaws to make sure you

19 were acting according to those bylaws?

20     A.   So, if I can answer your question now.  When I say

21 "we", I reviewed the bylaws with other members of the Board.

22     Q.   And when did you do that?

23     A.   We had done that through the course of this entire

24 scenario.

25     Q.   All right.  Let's take it back.  You said you had

1    done that during the course of the entire scenario.  Let's

2    take the first time you reviewed the bylaws with other Board

3    members.  When did you do it the first time?

4        A.    It would have been in August.

5        Q.    What date in August of 2002?

6        A.    I don't know.

7        Q.    Who were the Board members that you reviewed it

8    with?

9        A.    I reviewed them with the seven members of the

10    management committee.

11        Q.    Who were the --

12        A.    As well as the executive committee.

13        Q.    So you reviewed them with who now?

14        A.    Members of the management and executive committee.

15        Q.    Now, let's go back to August of 2002.  You said you

16    reviewed them, the bylaws --

17        A.    Right.

18        Q.    -- with members of the management committee.  When

19    did you do that?

20        A.    I don't know.

21        Q.    You said you reviewed them with members of the

22    executive community, when did you do that?

23        A.    I don't know, I don't know specific dates.

24        Q.    Was a meeting convened, properly convened?  You

25    know what I mean by properly convened?

1    A.   Yes.

2    Q.   Was a meeting of the executive committee properly

3  convened where the bylaws were reviewed?

4    A.   I believe so.

5    Q.   When did that occur?

6    A.   It would have had to have been in August.

7    Q.   What date in August?

8    A.   I don't know.

9    Q.   Now, the incident that this case centers around

10  occured on August the 6th, 2002.  Give me some idea of when

11  the executive committee convened and reviewed the bylaws.

12    A.   It would have been, I believe, that weekend or

13  several days up until the 12th, somewhere in between there.

14    Q.   So, somewhere between August 6th and August the

15  12th you're saying that the executive committee reviewed the

16  bylaws?

17    A.   What I'm saying is I spoke with members of the

18  executive committee, yes.

19    Q.   I want to go back just to make sure that I

20  understand your response.

21    A.   Please do.  Okay.

22    Q.   Between August the 6th and August the 12th did the

23  executive committee, itself, convene for the purposes of

24  reviewing the bylaws?

25    A.   We discussed the bylaws.  I don't understand your

22

1    questions.  You keep asking the same question, you're just
2    rephrasing it.
3         Q.   Between August the 6th and August the 12th did the
4    executive committee convene with the intent of reviewing the
5    bylaws?
6         A.   I'm not sure, I don't recall.
7         Q.   Between August the 6th and August the 12th of 2002
8    did the management committee convene with proper notice to
9    members of that committee with the intent of reviewing the
10   bylaws?
11        A.   I don't think so.
12        Q.   Now, Mr. Coleman.
13        A.   Yes.
14        Q.   I want to make sure I understand your response to
15   these questions.  Do you understand when I say properly
16   convene?
17        A.   Why don't you, like, explain exactly what you mean.
18        Q.   Well, according to the bylaws, boards are convened
19   based on notice to Board members?
20        A.   Correct.
21        Q.   Committees are convened based on notice to Board
22   members.  Was notice sent out convening the management
23   committee to discuss the incident of August the 6th, 2002?
24        A.   Yes.
25        Q.   When was notice sent out?

23

1     A.   No, actually -- hold on, let me think.  We met

2     after that incident, but I'm trying to think if that was a

3     management or full Board meeting.  So, I'm not sure.

4     Q.   Who met?

5     A.   Members of the Board.

6     Q.   When did this meeting occur?

7     A.   That would have been -- I believe it would have

8     been the following Monday.  I think that's the 12th, I

9     think.

10     Q.   It's your testimony -- you're not sure whether that

11     was a full Board meeting or some committee meeting.

12     A.   Correct.  Actually that would have been a full

13     Board meeting.

14     Q.   Now, I notice you're referring to a notebook.  What

15     notebook is that?

16     A.   The one that you have all of those copies of.

17     Q.   And what date did you look at in there?

18     A.   Actually, I didn't look at a date.  I just looked

19     at the sheet of paper right here, but I think that would

20     have been the 12th.

21     Q.   And is it your testimony that it was a full Board

22     meeting?

23     A.   I don't recall, but I think so.

24     Q.   Was notice of this meeting sent out?

25     A.   When you say "sent out" what do you mean?

1    Q.    Was written notice given to the committee or to

2    whomever?

3    A.    If it would have been it would have been via

4    e-mail.

5    Q.    So you're not sure whether notice was sent out to

6    the Board?

7    A.    Well, I'm assuming it would have to be because

8    people showed up, 11 members showed up.

9    Q.    Let me ask you this question here.  Did you

10   personally send out e-mails to the Board?

11   A.    I think I did.

12   Q.    You think you did.  Do you have copies of that

13   electronic mailing?

14   A.    No.

15   Q.    So you're not sure whether it was sent out or not?

16   A.    As I said, I think I did send an e-mail, but I

17   don't have a copy of it, the electronic mailing.

18   Q.    And you might not have.

19   A.    I think I sent out the e-mail, but I don't have

20   copies of the electronic mailing.

21   Q.    The computer that the e-mail that you believe you

22   sent out, where is that computer located?

23   A.    It would have been in my former office.

24   Q.    And where is your former office?

25   A.    5040 Peach Street.

1    Q.    And is that a building or an address -- a building

2    owned by you?

3    A.    No, that's where I use to work.

4    Q.    And name of the former employer?

5    A.    Waddell & Reed.

6    Q.    Now, is it your testimony that you're not sure

7    whether the group that gathered on August the 12th, 2002 was

8    the full Board or a committee of the Board?

9    A.    After looking at my notes I believe it was the full

10   Board because of the amount of people who had showed up.

11   Q.    Now, you've previously testified that a Board

12   committee apparently can consist of any number of people.

13   A.    Right.

14   Q.    So in light of the fact of your testimony that a

15   Board committee could consist of any number of people, could

16   the people that convened on August the 12th, 2002 have been

17   members of a committee of the Board?

18   A.    Yes.

19   Q.    So it could have been the executive committee?

20   A.    What do you mean?  I don't understand what you

21   mean.

22   Q.    You're saying that the people that convened on

23   August the 12th could have been a committee of the Board.

24   A.    No, you said the people -- the question was, the

25   people who convened could they have been members of a

1    committee, members of the Board and that's different.  Yes,

2    they could have been members of the committee, that doesn't

3    mean that's a committee meeting.

4        Q.   Well, I'm just trying to get that clear from you,

5    Mr. Coleman.

6        A.   I just answered your question.

7        Q.   No, you didn't.

8        A.   Yes, I did.

9        Q.   Now, let me go back.  The people that convened on

10   August the 12th, could they have been members of the

11   management committee?

12           MR. MARTINUCCI:  Ms. Benson, I'll object to the

13           question and ask you to rephrase it just because

14           I'm not clear right now if people meet for a Board

15           meeting they could be members of the management

16           committee or the executive committee or any other

17           committee.  Are you asking that if on that date

18           they meet as that committee?

19           MS. BENSON:  Let me go back.  I think my question

20           is clear, but I want to go back.

21       Q.   You're telling me, One, that you're not sure if you

22   sent out notice of the meeting for August the 12th.

23       A.   No, I'm telling you that I think I did send it out.

24       Q.   But you're not sure.

25       A.   I think I did send them out.

27

1    Q.   I understand what you're saying.  You "think", but
2    that means you're not sure.  Now, I'm going back to August
3    the 12th, 2002.
4    A.   Correct.
5    Q.   Could the people in that room be in attendance for
6    a management committee meeting?
7    A.   I will say, no.
8    Q.   And why would you say no?
9    A.   Because, we didn't have a committee that size.
10   There were 11 members that showed up to this meeting and I
11   don't recall any of the committees being that large.
12   Q.   Now, could those individuals in attendance on
13   August the 12th, 2002 have been there for an executive
14   committee meeting?
15   A.   It's possible.
16   Q.   So it's possible that they could have been there
17   for an executive committee meeting.
18   A.   Right.
19   Q.   Now, Mr. Coleman, do you recall calling any of the
20   Board meetings (sic) for the August 12th, 2002 meeting?
21   A.   Do I remember calling any of the board meetings for
22   the August --
23   Q.   Any of the Board members for this meeting.
24   A.   I don't recall.  I probably did, but I don't
25   recall.

28

1     Q.   Do you recall directing that anyone on staff call

2  members of the Board for this August 12th meeting?

3     A.   I don't remember.

4     Q.   Do you recall suggesting to other board members

5  that phone calls be made?

6     A.   I don't remember.

7     Q.   Now, who was responsible for calling the meeting of

8  August the 12th, 2002?

9     A.   I believe I called that meeting.

10    Q.   Let me go back a little bit, Mr. Coleman.  You had

11  said earlier that the address that you testified that you're

12  at you've been there since I think you said in 2002, so for

13  over three years, current address.  I'm sorry, your current

14  address that you're at, you've been there since when?

15    A.   November of 2004.

16    Q.   And prior to that what was the address?

17    A.   2840 Florida Avenue.

18    Q.   Now, at this -- your address 2840 Florida Avenue.

19    A.   Correct.

20    Q.   Did you share that residency with anyone?

21    A.   Yes.

22    Q.   And who did you share it with?

23    A.   My mom and my daughter.

24    Q.   And what's your mother's name?

25    A.   Mary Coleman.

29

1    Q.    And your daughter's name?

2    A.    Raysean.

3    Q.    Were you living at that address, 2840 Florida

4    Avenue on August the 6th, 2002?

5    A.    Yes.

6    MS. BENSON:  What's the question Mr. Coleman?  Let

7    me just stop and note that you're conferring with

8    Counsel and you cannot do that, you're here to

9    answer questions.  And Counsel will tell you that.

10   And that there should not be an exchange of notes

11   between the two of you and I would like to see

12   those notes at this point.

13   MR. MARTINUCCI:  Sure.  Now, first of all, he does

14   have a right to confer with Counsel.

15   MS. BENSON:  You're not his counsel.  Mr. Coleman

16   is not on the Board of the Booker T. Washington

17   Center anymore, he's just testified to that fact.

18   MR. MARTINUCCI:  Okay.

19   MS. BENSON:  So you're not his Counsel.

20   MR. MARTINUCCI:  Here's the note and here's my

21   response.  I think it's a legitimate question on

22   his part.  He wants to know what his mother's name

23   or daughter's name has to do with any of this.

24   MS. BENSON:  It can lead to additional information,

25   Mr. Coleman.

30

1      Q.   Now, when you left the Booker T. Washington Board

2   of Directors in May of 2003 whom were you living with at

3   that time?

4      A.   Same two people.

5      Q.   And whom are you living with now?

6      A.   Same two people.

7      Q.   Mr. Coleman, when you left the Board in May of 2003

8   up to the present did you maintain contact with the Booker

9   T. Washington Center?

10     A.   Yes.

11     Q.   And with whom did you maintain contact?

12     A.   With Bill, employees, a couple of my friends work

13  down there.

14     Q.   When you say Bill, you're referring to Mr.

15  Jeffress?

16     A.   Yes.

17     Q.   And you said friends who work down there.

18     A.   I have a couple of friends that work down there.

19     Q.   And what are those friends' names?

20     A.   Shawntel Hilliard (phonetic), Merl Page, that's who

21  I remember right now.

22     Q.   From May of 2003 to the present did you maintain

23  contact with any members of the Board of Directors of the

24  Booker T. Washington Center?

25     A.   Yes.

1     Q.   Now, did Mr. Jeffress know where you resided from

2  May of 2003 to the present?

3     A.   Probably not.

4     Q.   When did you say you moved to the address of 2840

5  Florida Avenue?

6     A.   I believe that was 2001, I think.

7     Q.   Did Mr. Jeffress know how to reach you if he needed

8  to contact you?

9     A.   Yes.

10     Q.   So from May of 2003 to the present he's known how

11  to contact you.

12     A.   Yes.

13     Q.   And how would he have done that?

14     A.   Phone.

15     Q.   He had your home phone number at 2840 Florida

16  Avenue.

17     A.   Correct.

18     Q.   Do you, by the way, have a cell phone?

19     A.   No.

20     Q.   Did you have one in 2003?

21     A.   No.

22     Q.   2004?

23     A.   No.

24     Q.   Now, who among the Board members of the Booker T.

25  Washington Board of Directors from May of 2003 to the

32

1    present did you have contact with?

2        A.    Mr. Hamilton, Paul Gambill, Kathy Lyons, Joe Fries,

3    Rachel Hill.

4        Q.    Did any of those individuals that you've just

5    identified know where you resided from May of 2003 to the

6    present?

7        A.    Probably, I'm not sure.  We never discussed my

8    residency.

9        Q.    Are you friends with any of those individuals that

10   you just identified?

11       A.    Yes, I'm friends with all of them.

12       Q.    Do you visit their homes?

13       A.    No.

14       Q.    Do they visit yours.

15       A.    I visited Joe's home and -- they don't visit me.

16       Q.    Joe, you mean Joe Fries?

17       A.    Yes.

18       Q.    So Mr. Paul Gambill had no idea where you lived

19   from May of 2003 to the present?

20       A.    I can't answer to what Mr. Paul Gambill knew.  Did

21   he ever visit me, no.

22       Q.    Now, I understand that you are planning on moving

23   from Erie, Pennsylvania?

24       A.    Yes.

25       Q.    When is your scheduled departure date?

1      A.   It was today, now, it's going to be this Saturday

2   or Sunday, this weekend sometime.

3      Q.   And where are you moving to?

4      A.   I moving to Delaware, right outside Philadelphia.

5      Q.   Delaware, the State of Delaware?

6      A.   Yes.

7      Q.   Outside of Delaware there is Delaware County.

8      A.   Delaware County, I'm familiar with that.

9      Q.   So you're moving to the State of Delaware?

10     A.   Correct.

11     Q.   Where in Delaware?

12     A.   Claymont.

13     Q.   Do you know at this point where you will be

14  residing in Delaware?

15     A.   Yes.

16     Q.   All right.  Can you tell us your address, please.

17     A.   It will be my sister's home and I don't know her

18  address offhand.

19     Q.   And what's her name?

20     A.   Why is that important?

21     Q.   Just answer the question, what's her name?

22     A.   Her name is Michelle.

23     Q.   Michelle.  And what's her last name?

24     A.   Coleman.

25     Q.   And she lives -- you don't have the address, but

34

1    you're moving there.

2        A.    Correct.

3        Q.    Now, will you provide me with that address?

4        A.    If necessary.

5        Q.    Okay.  Do you know her phone number?

6        A.    Yes.

7        Q.    Can you give us her phone number?

8        A.    Is it necessary right now?

9        Q.    Yes.

10       A.    Why?

11       Q.    Because you're here to testify.

12             MR. MARTINUCCI:  In case anybody needs to get in

13             touch with you for testimony later on it would be

14             relevant.

15       A.    302-793-1148.

16       Q.    Why are you moving from the Erie area?

17       A.    Better job opportunities.

18       Q.    Do you know where you will be working?

19       A.    Yes.

20       Q.    Who will you be working for?

21       A.    T. D. Waterhouse.

22       Q.    And where is that located?

23       A.    Downtown Philadelphia.

24       Q.    So you'll be working in downtown Philadelphia?

25       A.    Correct.

35

1       Q.    Do you happen to know the address?

2       A.    No, I don't.  They're moving to a new office so I

3  don't know.

4       Q.    What about a phone number?

5       A.    Don't have it offhand.

6       Q.    Will you provide that information, both the address

7  and the phone number?

8       A.    If it's necessary, yes.

9       Q.    And I make that request of you now to provide that.

10  Are you single; what's your marital status?

11      A.    Single.

12      Q.    And you've mentioned one child, do you have any

13  others?

14      A.    I have two.

15      Q.    And name your children, please.

16      A.    Again, why do you need my children's names.?

17      Q.    Just answer the question, Mr. Coleman.

18      A.    My daughter name is Raysean.

19      Q.    And how old is she?

20      A.    She's 11.

21      Q.    And her last name is Coleman?

22      A.    Yes.

23      Q.    Okay.

24      A.    And my boy is Sean Jr.

25      Q.    And how old is he?

1        A.    Little Sean is 5.

2        Q.    So, is it your testimony that from May of 2003 to

3    the present, except for little short periods of time you've

4    resided in the City of Erie?

5        A.    Yes.

6        Q.    At this address of 2840 Florida Avenue,

7        A.    Yes.

8        Q.    And the short periods of time was -- you said you

9    went to Philly on numerous occasions.

10       A.    Correct.

11       Q.    But they were just for what, visits?

12       A.    Visits, interviews, hang out.

13       Q.    You went to Buffalo how many times?

14       A.    It was for a period of three weeks for job

15    training.

16       Q.    And that was in June of 2004.

17       A.    Correct.

18       Q.    And you said you were at a weekend training

19    conference in Pittsburgh.

20       A.    Yes, I did a conference for college students.

21       Q.    And when was that?

22       A.    I can't recall, but it was a Friday, Saturday --

23    toward, I think, the last weekend in June, approximately,

24    I'm not sure.

25       Q.    Of what year, 2004?

37

1    A.   2004.

2    Q.   At the time in August of 2002 where were you

3    employed?

4    A.   In August of 2002 I was with Waddell & Reed.

5    Q.   How long had you been with Waddell & Reed?

6    A.   Since January of that year.

7    Q.   Since January of 2002.

8    A.   Correct.

9    Q.   And what was your position with Waddell & Reed?

10   A.   Financial advisor.

11   Q.   Mr. Coleman, you've previously testified that you

12   came off the Booker T. Washington Center Board in May of

13   2003 so that you could focus on your financial advisory --

14   A.   Practice.

15   Q.   -- practice.

16   A.   Correct.

17   Q.   Is there any other reason you came off?

18   A.   No.  In fact, prior to 2003 I was going to resign

19   two other times so I could focus on my business endeavors.

20   Q.   Now, you came off after this lawsuit was filed.  Is

21   there any suggestion by anyone that you should come off the

22   Booker T. Washington Center Board?

23   A.   Absolutely not.

24        MR. MARTINUCCI:  So we're clear, Ms. Benson, you

25        mean after the administrative action was filed.

38

1          MS. BENSON:  Let me go back and ask it a couple of

2          ways.

3      Q.   Was there any suggestion by anyone that you come

4  off the Booker T. Washington Center Board after this lawsuit

5  was filed?  Let me go back and change it.  I'll reword it

6  differently.  You're aware that Mr. Sherrod, prior to this

7  lawsuit, filed a complaint with EEOC.

8      A.   Correct.

9      Q.   Was there any suggestion when that lawsuit was

10 filed that you come off the Board?

11     A.   No.

12     Q.   By anyone.

13     A.   No.

14     Q.   Now, after this lawsuit was filed was there any

15 suggestion by anyone that you come off the Board?

16     A.   No.

17     Q.   Did you feel pressure after Mr. Sherrod filed his

18 complaint with EEOC to come off the Board?

19     A.   No.

20     Q.   Did you feel pressure after Mr. Sherrod filed this

21 complaint in Federal Court to come off the Board?

22     A.   No.

23     Q.   You recognize that both the -- let me ask you this

24 question here.  Are you aware that the complaint with EEOC

25 focused on you and your activities?

1    A.    What do you mean by "activities"?

2    Q.    Regarding Mr. Sherrod and his dismissal from the

3  agency.

4    A.    You have to clarify.  You say my activities, I

5  mean, it makes it appear as if I did something maverick-like

6  or on my own.  So, please, clarify what you mean by when you

7  say my activities.

8    Q.    Lets go back then.

9    A.    Yes.

10    Q.    You convened at least one meeting that we are aware

11  of, right; August 12th of 2002, you convened that meeting.

12    A.    Correct.

13    Q.    Now, were there other meetings that you convened

14  around -- concerning the incident of August the 6th of 2002?

15    A.    I don't recall.

16    Q.    Do you recall -- did you convene any meeting of the

17  executive committee after the incident of August the 6th,

18  2002?

19    A.    Say it again.

20    Q.    Did you convene any committee meetings after the

21  incident of August the 6th, 2002?

22    A.    I'm sure I did.

23    Q.    All right.  You're sure you did.  Tell us what

24  meetings you convened.

25    A.    Well, after that incident we still had other months

40

1    and other business to address.  So I'm pretty sure I set up

2    further executive committee meetings to discuss executive

3    issues.

4        Q.   Well, I just want you to focus on the incident of

5    August the 6th, 2002 and convening meetings.

6        A.   Right, you said after that date --

7        Q.   After the incident of August the --

8        A.   And I would have been a part of the Board for

9    another, what, nine months I believe, eight months.

10       Q.   We're going to take them one at a time.  Let's take

11   the month of August.

12       A.   Okay.

13       Q.   August '02, what if any meetings did you convene?

14       A.   I would have to presume -- I don't recall exactly,

15   but that particular -- whatever committee meetings we've had

16   for that month we would have had for that month.

17       Q.   So any meetings held during the month of August of

18   '02 you convened, any meetings?

19       A.   Possibly.  I can't say all of them, but I probably

20   did convene a meeting.

21       Q.   And going into the month of August of '02.  After

22   the incident of August the 6th, what meetings did you

23   convene concerning the August 6th, '02 incident?

24       A.   I know of the one, definitely, on the 12th.

25       Q.   Were there other meetings that you convened in

41

1    August?

2        A.   I'm not sure, I can't recall.

3        Q.   Now, going to the month of September '02.  What

4    meetings did you convene that dealt with the incident?

5        A.   Can I ask you a question?  When you're saying

6    convened do you mean -- explain that.  Reexplain that, would

7    you, please.

8        Q.   Mr. Coleman, you have a college degree?

9        A.   But see what you're saying, you're asking various

10   different questions.  Because when you say "convened", are

11   you saying did I actually call for a meeting?  Now, if our

12   meetings were scheduled and then I would instruct whomever

13   to file or to send out notices, are you defining that as the

14   same thing as convening?

15       Q.   Well, let's go back, Mr. Coleman, because I want to

16   make sure you and I are both clear.

17       A.   And time-out.  What does my college degree have to

18   do with me asking you to clarify a question?

19       Q.   Mr. Coleman.

20       A.   I just want clarification.

21       Q.   Mr. Coleman, let me just go back here.

22       A.   Yes.

23       Q.   Let me go back here.

24       A.   Okay.

25       Q.   Let's talk about how the Booker T. Washington

42

1    Center Board of Directors functioned, okay.  Now, you said

2    you were on there since 1999.

3        A.    Right.

4        Q.    Prior to Board meetings did notices go out to Board

5    of Director members saying that there would be meetings?

6        A.    Yes.

7        Q.    So notices went out.  Prior to the management

8    committee meetings coming together did notices go out?

9        A.    Not all of the time, we could have done a phone

10   call or an e-mail.  Now, do you mean actual postal mail, not

11   necessarily.  Because we would have to function that way for

12   committee meetings.

13       Q.    I'm sorry.

14       A.    We didn't function that way or we didn't have to

15   function that way to convene committee meetings, a notice is

16   still a telephone call.  That's why I asked for

17   clarification, I wanted to make sure we had the same

18   meaning.

19       Q.    And are you basing that on -- you said you didn't

20   function that way.

21       A.    I didn't say that, I said we didn't necessarily

22   have to function that way.

23       Q.    I want to go back to you.  Are you basing that

24   conclusion on a review of the Board's bylaws?

25       A.    No, I'm basing that on you asking me a question.  A

1    notice, are you asking a written notice, verbal notice, I

2    mean --

3        Q.    How did the Board function when there came time for

4    Board meetings?

5        A.    For Board meetings, it was a written notice.

6        Q.    So for Board meetings, written notices went out?

7        A.    Correct.

8        Q.    And that was according to the bylaws of the Board,

9    correct?

10        A.    I don't recall.

11        Q.    Now, for committee meetings how did the Board

12    function?

13        A.    Do you mean how did we send notice of the committee

14    meetings; is that your question?

15        Q.    That's right.

16        A.    Again, that could have been through telephone, it

17    could have been through e-mail, or it could have been

18    through written notice.

19        Q.    Now, is that according to the Board's bylaws?

20        A.    I don't recall.

21        Q.    Now, going back to August of 2002.  You're only

22    aware of one meeting that dealt with the August 6th

23    incident.

24        A.    I don't recall.  I know there was one that I

25    called, that was one meeting that I convened that dealt with

44

1    that.

2        Q.    All right.  And that occured on, you believe,

3    August the 12th.

4        A.    Yes.

5        Q.    Were there any other meetings, whether called by

6    you or any other Board member during the month of August,

7    concerning the incident of August the 6th, 2002?

8        A.    I don't remember.

9        Q.    Going to the month of September.  Were there any

10   meetings, whether by the Board or committees, called to deal

11   with the August 6th, '02 incident?

12       A.    I don't remember.

13       Q.    Were there any Board meetings during that month of

14   September '02?

15       A.    Yes.

16       Q.    Were there any meetings of the executive committee

17   during September '02?

18       A.    I don't recall.

19       Q.    Were there any meetings of the management committee

20   in September of '02?

21       A.    I don't recall.

22       Q.    Could there have been an executive committee

23   meeting or meetings during September of '02?

24       A.    There could have been.

25       Q.    Could there have been management committee meetings

1    during September of '02?

2        A.   It's possible.

3        Q.   Going back to August of '02.  Could there have been

4    management committee meetings during August of '02?

5        A.   It's possible.

6        Q.   Could there have been executive committee meetings

7    during August of '02?

8        A.   It's possible.

9        Q.   Now, if any such meetings occurred, would notes

10   have been taken?

11       A.   Probably.

12       Q.   Who would have taken these notes?

13       A.   Could have been the chairperson of the committee or

14   another committee member.

15       Q.   Now, you've previously testified that Mr. Jeffress

16   was the chairperson of the management committee meeting in

17   August of '02.

18       A.   Correct.

19       Q.   So, if there were any meetings that took place with

20   the management committee Mr. Jeffress would have those

21   notes?

22       A.   Not necessarily.  Because as I just said, the

23   committee chair or another member of the committee could

24   have taken notes.

25       Q.   Did the Booker T. Washington Center Board require

46

1    reports from committees to the Board of Directors?

2         A.   We did ask for committee reports, yes.

3         Q.   Was it standard practice for committees to provide

4    reports to the full Board?

5         A.   If they met.

6         Q.   Was it standard practice when these reports were

7    made that they be in writing?

8         A.   I don't remember.

9         Q.   You were on the Board since 1999 -- let's go back.

10   Was it required that Board committees report in writing to

11   the Board of Directors?

12        A.   I don't remember.  I'm not sure.

13        Q.   Was it the customary practice for Board committees

14   to report in writing to the full Board?

15        A.   I can't really say if it was customary.  Most

16   people did, but some people, since I can remember being on

17   the Board, they just gave their committee report verbally or

18   orally.

19        Q.   If they gave their report orally would that report

20   have been reflected in the Board minutes?

21        A.   It should be or it should have been.

22        Q.   Now, let's go to October of 2002.  Was there a

23   Board meeting held in October of 2002?

24        A.   Yes.

25        Q.   Did the Board discuss the August 6th, '02 incident?

1       A.    I don't remember.

2       Q.    Was there an executive committee meeting in October

3    of 2002?

4       A.    I don't recall.

5       Q.    Was there a management committee meeting in October

6    of 2002?

7       A.    I don't recall.

8       Q.    Let's take November of 2002.  Did the Board discuss

9    the August 6th, '02 incident?

10      A.    I don't remember.

11      Q.    Was there a case -- excuse me.  Was there a

12   management committee meeting in 2002?

13      A.    2002, I think so.  I'm not sure, but I think there

14   was.

15      Q.    Was there an executive committee meeting in 2002?

16      A.    I don't know.  I don't recall.

17      Q.    Let's take December of '02.  Did the Board discuss

18   the August 6th, '02 incident at a Board meeting?

19      A.    I don't recall.

20      Q.    Was there a management committee meeting in

21   December of '02?

22      A.    I think there was.

23      Q.    Did the committee discuss the August 6th, '02

24   incident?

25      A.    I don't recall.

48

1      Q.   Was there a meeting of the executive committee in

2   December of '02?

3      A.   I don't recall.

4      Q.   Let's go to January of '03.  Did the Board in

5   January of '03 discuss the August 6th, '02 incident?

6      A.   I don't recall.

7      Q.   Was there an executive committee meeting in January

8   of '03?

9      A.   I think so.

10     Q.   Did the committee discuss the August 6th, '02

11   incident?

12     A.   I don't recall.

13     Q.   Was there a management committee meeting in January

14   of '03?

15     A.   I believe so.

16     Q.   Did the committee discuss the August 6th, '02

17   incident?

18     A.   I don't recall.

19     Q.   Let's take February of '03.  Was there a Board

20   meeting in February of '03?

21     A.   Yes.

22     Q.   Did the Board discuss the August, '02 incident?

23     A.   I don't remember.

24     Q.   Was there a case management meeting -- sorry, I

25   mean a management meeting?  I'm sorry.

49

1    A.  I don't remember.

2    Q.  Was there an executive committee meeting in

3  February of '03?

4    A.  Again, I don't remember.

5    Q.  Let's take March of '03.  Was there a Board meeting

6  in March of '03?

7    A.  Yes, I believe so.

8    Q.  Did the Board of Directors discuss the August 6th,

9  '02 incident?

10    A.  I don't remember.

11    Q.  Was there a management committee meeting?

12    A.  I don't remember.

13    Q.  An executive committee meeting in March of '03?

14    A.  I don't remember.

15    Q.  Let's go to the month of April of '03.  Did the

16  Board of Directors of the Booker T. Washington Center meet

17  in March of '03 -- I'm sorry, April of '03?

18    A.  I believe so.

19    Q.  Did the Board discuss the August 6th, '02 incident?

20    A.  I don't recall.

21    Q.  Was there an executive committee meeting in April

22  of '03?

23    A.  I don't recall.

24    Q.  A management committee meeting in April of '03?

25    A.  I don't recall.

50

1    Q.    Now, you said you came off the Board in May of '03.

2    Was that prior to the last -- the May Board meeting?

3    A.    I'm not sure.  Our Board meeting is on the third

4    Tuesday, I think, of the month.  They were on the third week

5    of the month and I'm not sure if that's prior or after.

6    Q.    Did you submit your resignation in person to the

7    Board of Directors?

8    A.    No.

9    Q.    Now, I noticed in the Erie Times there was a

10   publication back in April, April the 28th of this year, that

11   dealt with -- I think it's referred to as the E Generation;

12   is that it?

13   A.    Yes, that's correct.

14   Q.    The E Generation, 12 under 40.  You're one of the

15   people pictured in that.  And I notice here that the Booker

16   T. Washington Center sponsored your page.

17   A.    They didn't sponsor my page, they took out an ad.

18   Q.    Well, they took out an ad.

19   A.    Correct.

20   Q.    I assume that you solicited them to take out this

21   ad.

22   A.    What I did was send out a general e-mail to people

23   that I know just telling them about the situation and

24   actually see what people responded.

25   Q.    And who at the Booker T. Washington Center was