51

1    responsible for the placement of this ad?

2        A.    Either Bill Jeffress or Sue Beer.

3        Q.    Bill Jeffress.

4        A.    Or Sue Beer.

5        Q.    And who is Sue Beer?

6        A.    She's like an executive assistant, I believe.

7    Something like that, in that capacity.  I'm not sure.

8        Q.    Executive assistant?

9        A.    She's a staff member at the Center.

10       Q.    Did you speak with either one personally about this

11   ad?

12       A.    I spoke with -- as I mentioned, I sent the e-mail

13   and then Ms. Beer had called me and said she wanted to come

14   in and take my picture -- or asked me to come in and take my

15   picture.

16       Q.    She wanted -- I'm sorry.

17       A.    I sent the e-mail to 50 people announcing the

18   award.  And as I mentioned, Ms. Beer had contacted me to

19   come in for a picture.

20       Q.    So you went in to the Booker T. Washington Center

21   for a picture.

22       A.    Correct.

23       Q.    When did you send the e-mail requesting sponsors?

24       A.    I have no idea.  I don't know.

25       Q.    Well, this ad was in the advertising supplement of

1    April the 28th; so, when do you think you sent the e-mail?

2        A.    Before April 28th.

3        Q.    Do you have a copy of that e-mail?

4        A.    No.

5        Q.    On which computer did you send it from?

6        A.    Think it was at Mercyhurst College.

7        Q.    When do you recall going in and taking the picture?

8        A.    I don't recall, a week, two weeks before the event.

9        Q.    So the Center had the capacity to communicate with

10    you by e-mail.

11        A.    Yes.

12        Q.    They knew your e-mail address.

13        A.    Well, I can't say "they".  Someone probably knew my

14    e-mail address.

15        Q.    So Mr. Jeffress knew your e-mail address.

16        A.    Yes.

17        Q.    As well as your phone number.

18        A.    Yes.

19        Q.    As well as the address.

20        A.    I'm not sure.  I'm assuming he probably didn't have

21    my new address, but my old address was on file down there.

22        Q.    By new address you're referring to?

23        A.    Where I stay now.

24        Q.    And you had moved to that when?

25        A.    You have a college degree, don't you know when I

53

1    moved there?  You've asked me that three times.

2       Q.   Well, that's okay, answer it again.

3       A.   November of 2004.

4       Q.   November, 2004.

5       A.   Correct.

6       Q.   Now, do you know the name of Briana Hughes?

7       A.   Yes.

8       Q.   Who is Briana Hughes?

9       A.   She was the young girl who was missing or ended up

10   missing, I believe it was August 6th of 2002.

11      Q.   Are you related to Briana Hughes?

12      A.   No.

13      Q.   Are you related to any member of her family?

14      A.   No.

15      Q.   Are you related to any current members of the

16   Booker T. Washington Board of Directors?

17      A.   No.

18      Q.   Are you related to any former members of the Booker

19   T. Washington Center Board of Directors?

20      A.   No.

21      Q.   Are you related to any current employees of the

22   Booker T. Washington Center Board of Directors?

23      A.   No.

24      Q.   Are you related to any former employees of the

25   Booker T. Washington Center Board of Directors?

54

1     A.   No.

2     Q.   Now, when did you learn you would be called for

3  your deposition to be taken?

4     A.   Probably a few weeks ago.

5     Q.   Well, today is June the 28th and you learned --

6     A.   A few weeks ago.

7     Q.   So, was that the first time you were on notice that

8  there was a possibility of you being called for a

9  deposition?

10    A.   No.

11    Q.   When did you first realize that you would be called

12  for a deposition?

13    A.   Probably -- I don't know.  Several months ago

14  possibly.

15    Q.   Well, can you -- you say several months ago, would

16  you narrow that down?

17    A.   I don't know exactly what month.

18    Q.   Well, just give me some idea.

19    A.   The end of last winter, spring, I guess.

20    Q.   Sometime in the winter of 2004.

21    A.   Well, the winter carries over to 2005, sometime

22  this year.

23    Q.   All right.  So give me roughly some idea.

24    A.   Again, a few months ago, I'm not sure when, winter,

25  spring.

1     Q.   Now, did you have any idea that you would be called

2  sometime in March of 2005?

3     A.   Called for what?

4     Q.   A deposition.

5     A.   I don't remember.

6     Q.   So, you don't recall being told that there was a

7  possibility that you would be called in March of 2005 for

8  this deposition.

9     A.   As I said, a possibility, but when, I don't know if

10  it was March, April, February, January.  But I knew it was a

11  possibility that I would be called.

12     Q.   And how did you learn of that possibility?

13     A.   Through Mr. Martinucci.

14     Q.   And how did he advise you of that possibility?

15     A.   What do you mean advise me?

16     Q.   Well, how did you come to learn from him of that

17  possibility?

18     A.   I'm not sure if I contacted him or he contacted me.

19  There was some type of contact.

20     Q.   Do you know what method of contact?

21     A.   I would have to presume telephone, I'm not sure.  I

22  think I may have called to see what was going on.

23     Q.   So, you were still interested in the case back

24  then?

25     A.   Not that I was interested in the case, but as I

56

1    mentioned, there was the -- or as you already know, there

2    was the EEOC filing and then the actual lawsuit being filed.

3    And, obviously, my name was brought up in those two

4    scenarios.

5        Q.   Have you kept in contact with Mr. Martinucci since

6    you left the Board in May of 2003?

7        A.   What do you mean kept in contact?

8        Q.   With regard to this case.

9        A.   I would drop a line and see if I was going to be

10   called anytime soon because I decided recently that I was

11   going to move -- no, not recently.  But I decided back in

12   January that I was going to look to relocate.  So

13   considering that I knew that my name had been mentioned in

14   these two scenarios, again, and I was trying to plan my

15   relocation, I wanted to make sure there wasn't a conflict

16   for me.

17       Q.   Now, I notice you brought in a notebook that you

18   made reference to and some selected pages of what I have

19   been given a copy of.  Other than reviewing that notebook

20   did you do anything else to prepare for today's deposition?

21       A.   I didn't even review the notebook.

22       Q.   You didn't look at it at all?

23       A.   No, not when I got your request with the

24   documentation -- I had I looked in, I seen that.  I looked

25   at that and it had some information in it, and I turned it

57

1    over to Mr. Martinucci and you have the copies.

2        Q.    My Notice of Deposition requests that you bring all

3    business and personal calendars for the year 2002.  Did you

4    bring any business and personal calendars for 2002?

5        A.    No.

6        Q.    How about for the year 2003?

7        A.    No.

8        Q.    2004?

9        A.    I do have 2004.

10        Q.    I'm sorry.

11        A.    I do have 2004.

12        Q.    So you did bring the calendars for 2004?

13        A.    Correct.

14        Q.    And for the year 2005 you have those calendars.

15        A.    No.

16        Q.    All right.  For the year 2004 you have.  All right.

17    Now, my Notice of Deposition to you also requested that for

18    the years 2002 through 2005 that you provide me with copies

19    of all documents, notes, memoranda, tape recordings,

20    electronic mailings, whether business or personal relating

21    to the investigation of the alleged missing persons incident

22    of August 6th; did you bring any of those?

23        A.    I don't have any of that stuff.

24        Q.    You don't have any of that stuff.  Is there anyone

25    that you know of who might have documents, notes,

1    memorandum, tape recordings, electronic mailings, whether

2    business or personal that relate to the investigation?

3        A.    Everything that I've had that related to that --

4    and, again, it was like meeting notes and stuff like that I

5    turned over to the Center.   I turned my file over to the

6    Center.

7        Q.    Who did you turn it over to?

8        A.    Again, to Mr. Jeffress.

9        Q.    And when did you turn that over to Mr. Jeffress?

10       A.    At my resignation.

11       Q.    So May of 2003?

12       A.    Correct.

13       Q.    So he should have all of that.  Now, my Notice of

14   Deposition also requests that you provide copies of all

15   documents, notes, memoranda, tape recordings, electronic

16   mailings, whether business or personal relating to the

17   suspension and firing/termination of Mr. Sherrod.  Do you

18   have any such documentation?

19       A.    No.  Again, everything that I have had -- and I'm

20   not sure exactly how big that file was, I turned it over to

21   the Center.

22       Q.    And I'm just going to go through these one by one.

23       A.    Okay.

24       Q.    Again, my Notice of Deposition requests that you

25   provide for the years 2002 through 2005 copies of all

59

1    notices of all Booker T. Washington Center Board of Director

2    meetings and all committee meetings pertaining to the

3    investigation of the August 6th, 2002 incident and the

4    subsequent suspension and firing/termination of James

5    Sherrod.  Do you have any such documentation?

6        A.   No.

7        Q.   If you had, did you turn it over to Mr. Bill

8    Jeffress?

9        A.   Yes.

10       Q.   Now, my second request was that for the same years

11   of 2002 to 2005 that you provide copies of all minutes of

12   the Booker T. Washington Center Board of Director meetings

13   and committee meetings pertaining to the investigation of

14   the August 6th, 2002 incident and the subsequent suspension

15   and firing/termination of Mr. Sherrod.  Did you have any

16   such documentation?

17       A.   Did I or do I?

18       Q.   Well, do you?

19       A.   No.

20       Q.   Did you?

21       A.   Probably.

22       Q.   And what did you do with that?

23       A.   Gave it over.

24       Q.   So you would have given Mr. Jeffress copies of

25   Board minutes and committee minutes?

1      A.    That I would have had.

2      Q.    That you would have had, you would have given it to

3   him.

4      A.    I think so.

5      Q.    Finally, my Notice requests that for the same years

6   2002 to 2005 that you provide me with copies of any other

7   documentation whether business or personal, written or

8   otherwise that may be relevant or you believe is relevant to

9   the investigation of the August 6th, 2002 incident and the

10  subsequent suspension and firing/termination of James C.

11  Sherrod.  Did you bring any of that with you today?

12     A.    Aside from the notebook, no, I don't have anything.

13     Q.    The Notice of Deposition also requests that you

14  provide copies of anything in your possession that reflects

15  the name and, if known, the address and phone number of each

16  person likely to have discoverable information that the

17  Defendant, meaning the Booker T. Washington Center, may use

18  to support or defend it's position.

19     A.    No, I don't have any.

20     Q.    You don't have anything.

21     A.    No.

22     Q.    Do you know of any person that the Defendant may

23  use or call as a witness in the case?

24     A.    Do I know of any?

25     Q.    Yes.

1    A.    I can assume the members of the Board of Directors.

2    Q.    All right.   The members of the Board of Directors

3    at that time.

4    A.    Pardon me.

5    Q.    The members of the Board of Directors at that time.

6    A.    Yes.

7    Q.    All of them.

8    A.    I'm not sure.

9    Q.    Who of those do you think that the Defendant might

10   call as witnesses at a trial in this matter, or deposition?

11   A.    I have no idea what the Defendant would do.

12   Q.    Well, you know who was active members of the Board.

13   A.    Right.

14   Q.    Who do you think that the Defendant might call as a

15   witness in a deposition or a trial?

16   A.    Again, I can only assume that they would call those

17   active Board members.   I don't know what they would do.

18   Q.    Identify those individuals that you think might be

19   called?

20   A.    Whomever was on the Board.

21   Q.    Tell us.

22   A.    Tell you who the names were.

23   Q.    Tell us who you think the Defendant might call as

24   witnesses, whether in a deposition or a trial?

25   A.    I don't see how what I think would be pertinent to

62

1    what the Defendant will or will not do.

2        Q.    Simply answer the question, Mr. Coleman.

3        A.    I did.  I don't know, I can assume members of --

4    some members of the Board.  Who they might be, I don't know.

5        Q.    Let me show you a list.

6        A.    Of Board members.

7        Q.    Of Board members.  And this list says the Booker T.

8    Washington Center Board of Directors from January 2002 to

9    December 2002.

10       A.    Okay.

11       Q.    Now, I want you to go through that list and tell me

12   who do you think might be called?

13       A.    Well, I would say that they would probably call --

14   if I was an attorney or defendant everyone on the Board.

15       Q.    Well, you and I realize that they may not call

16   everyone.  So let's narrow that down a little bit.

17       A.    I don't know that.

18       Q.    Other than you, Mr. Coleman --

19       A.    I can't be presumptuous in that manner because I

20   have no means to understand what they would do, if they were

21   in a situation, to prepare a defense.  So I would have to

22   say everyone on the Board, because everyone on the Board was

23   active or participants of the Board during January of 2002

24   to December of 2002.  I don't see why anybody would be left

25   off or who would be specialized or anything like that to

63

1    identify.

2        Q.    Let me go back, Mr. Coleman.

3        A.    Sure.

4        Q.    You are aware that prior to Mr. Sherrod filing his

5    employment discrimination complaint with EEOC he sought the

6    opportunity to come back to the agency; aren't you?

7        A.    Please clarify that for me.   Sought the

8    opportunity; what do you mean by that?

9        Q.    Well, you are aware that Mr. Sherrod had written

10    the Board of Directors questioning what was happening to

11    him.

12        A.    I don't recall seeing that document.

13        Q.    You don't recall seeing the letter.

14        A.    Do you have copy of it, I can look at it right now.

15        Q.    I would do that.

16        A.    Thank you.

17        Q.    But while I'm looking for the copy, let me ask you

18    this question here.   You were the one who signed the

19    termination letter dated September 24th, 2002, correct?

20        A.    Correct.

21        Q.    Mr. Coleman, did you -- was this letter drafted

22    with the assistance of counsel?

23        A.    Correct.

24        Q.    And who was counsel?

25        A.    Mr. Martinucci.

64

1      Q.    And did Mr. Martinucci do so after consulting with
2  you?
3      A.    What do you mean do so, draft the letter.
4      Q.    Did --
5      A.    Well, no.  The Board had instructed me to ask our
6  counsel what were possible avenues that we could take
7  concerning this situation.
8      Q.    And when did the Board instruct you to do that?
9      A.    Sometime between August and the date of that
10  letter, when exactly, I don't know.
11      Q.    Well, let's try to narrow it down.  Between August
12  of what?
13      A.    Between August 12th and September 24th.
14      Q.    So August the 12th and September 24th.  Now, would
15  such a request be reflected in Board minutes?
16      A.    I guess, I don't know.
17      Q.    Did you get -- were minutes prepared for the August
18  meeting of the Board of Directors of the Booker T.
19  Washington Center?
20      A.    I believe so.
21      Q.    Were minutes prepared for the September '02 Board
22  of Directors meeting?
23      A.    I believe so.
24      Q.    All right.  This letter of September 24th, '02
25  which is the termination to Mr. Sherrod --

65

1       A.    Correct.

2       Q.    -- was composed by whom?

3       A.    Our Counsel.

4       Q.    All right.  So he drafted it based on information

5    you provided to him.

6       A.    What do you mean information provided to him?

7       Q.    Well, let me withdraw that.  Your Counsel drafted

8    this letter and you just signed it.

9       A.    No.  As I mentioned, the Board had instructed me,

10    because I was the vice president, to review possible avenues

11    that we could pursue concerning the situation and to run

12    that by Counsel, what was the best course of action.

13       Q.    Let me go back to the Board agenda.

14       A.    Yes.

15       Q.    Who of these Board members made such a direction,

16    gave you this direction?

17       A.    It would have been -- who was at the meetings, I

18    don't know.  If you have the minutes from the meetings, but

19    that was the Board's decision.  Everyone didn't attend every

20    meeting.

21       Q.    Okay.  I understand that.

22       A.    Okay.  I just want to make sure that we're clear on

23    that.

24       Q.    But who was present?

25       A.    Right.

1        Q.    That was a critical meeting.

2        A.    Right.

3        Q.    Who was present?

4        A.    Eleven of the members here were present and then --

5        Q.    Tell me who those 11 were.

6        A.    I have no idea.  The reason I know it's 11 is

7    because that's the vote I seen in my notes.  Who they were,

8    I don't know.

9        Q.    Do your best to recall as many as you can.

10       A.    I don't want to do that, because, again, I may make

11   a mistake.

12       Q.    I'm making the request of you to do your best and

13   recall.

14       A.    Looking at this list I know I can eliminate three

15   people who I don't think were there.  Of the other ones, I'm

16   not sure who was present or not.

17       Q.    Who are the people that you eliminated?

18       A.    I don't believe Rege O'Neill, Clifton Anderson or

19   Anthony Ross.  Of the other ones I'm not sure who was not

20   there.

21       Q.    And when do you think this meeting occurred?

22       A.    What do you mean?

23       Q.    Well, the meeting that gave you directions to go

24   speak to an attorney.

25       A.    Again, it would have been between the 12th and the

67

1    date the letter was sent.

2        Q.    So, it would have been at a Board meeting -- let me

3    get this straight.  At a meeting of the Board you were given

4    direction to consult an attorney.

5        A.    Was it at a meeting of Board members -- again, I'm

6    not sure if it was a Board meeting or if it was a committee

7    meeting.  Because I don't recall what exactly went down by

8    the way of meetings that month.

9        Q.    And when did this meeting occur?

10        A.    Again, it would have been the meeting of the 12th

11    or sometime between the 12th and the 24th of September.

12        Q.    Now, it's your testimony that this letter of

13    September the 24th, '02, which is a termination letter to

14    Mr. Sherrod, was drafted by Counsel for the Booker T.

15    Washington Center?

16        A.    Yes.

17        Q.    Now, let me go back to the document I just gave you

18    listing the Board of Directors for the year January of '02

19    to December of '02.  Would you say that that's an accurate

20    reflection of the Board of Directors during that time

21    period?

22        A.    Yes.

23        Q.    I'm just going to have the stenographer mark that

24    as Plaintiff Exhibit 1.  Now, I'm going to give you a copy

25    of the termination letter and just ask you if that is the

1  copy of the letter that was sent to Mr. Sherrod advising him

2  of his termination effective immediately?

3  　　　　(Plaintiff Exhibit Number 1 marked for

4  　　　　identification.)

5  A.　Yes.

6  Q.　And I'm going to have that marked as Plaintiff

7  Exhibit Number 2.  Mr. Coleman, going back to my Notice of

8  Deposition, I asked that you bring with you a copy of your

9  letter of resignation or a resignation statement to the

10  Board of Directors.  And your previous testimony is that you

11  gave a letter of resignation to Mr. Bill Jeffress?

12  　　　　(Plaintiff Exhibit Number 2 marked for

13  　　　　identification.)

14  A.　Correct.

15  Q.　And that you don't have any such copy.

16  A.　Correct.

17  Q.　Now, did the Booker T. Washington Center Board of

18  Directors send a response acknowledging your resignation?

19  A.　I don't remember.

20  Q.　Is it a possibility that they did so?

21  A.　I don't know.  It's possible, yes, but I don't know

22  if they did.

23  Q.　Do you recall my Notice also requests that you give

24  me a copy of any minutes of the Booker T. Washington Board

25  of Directors meeting reflecting your resignation?  Did you

1    ever receive any such minutes?

2        A.   No.

3        Q.   Now, how did you go about preparing for this

4    deposition?

5        A.   What do you mean?

6        Q.   How did you go about preparing for today's

7    deposition?

8        A.   I just knew that you were going to ask me

9    questions.  I'm familiar with how depositions work.

10       Q.   How are you familiar with that?

11       A.   Because I was pre-law.

12       Q.   You told me earlier you knew nothing about

13   depositions.

14       A.   No, I did not tell you that.

15       Q.   You asked me to describe them for you.

16       A.   No, you said -- you read the ground rules of how

17   you do depositions and things of that regard and that was

18   it.  I didn't say I don't know anything about depositions.

19       Q.   I think you're not recalling the record correctly,

20   but the record will reflect itself accurately.

21       A.   Absolutely.

22       Q.   Now, did you speak with Mr. Martinucci about your

23   testimony here today?

24       A.   Yes.

25       Q.   When did you speak with him?

1    A.    Last night.

2    Q.    And for what period of time did you do so?

3    A.    About half an hour.

4    Q.    Now, did you speak with him before about your

5    testimony here today?

6    A.    No.

7    Q.    You've never spoken with him about your testimony

8    here today?

9    A.    No.

10    Q.    Did you meet with him in his office?

11    A.    Last night.

12    Q.    Did you review any documentation for your testimony

13    here today?

14    A.    He showed me a couple of things I turned over to

15    the Center and I believe that was it, a couple of notes or

16    papers that I've had.

17    Q.    What were those things?

18    A.    I can't recall.

19    Q.    You just met with him last night?

20    A.    Right.

21          MR. MARTINUCCI:  Here, I'll show you.  These are my

22          copies, though I don't have extras.

23    A.    Just to see if I remember looking at those things,

24    which I did.  I gave him my notebook, which I did look

25    through because I have some personal information in there,

1    and that was it.

2        Q.    So, one of the things you reviewed last night was

3    the termination letter of September 24th of '02?

4        A.    I didn't review it, I looked at it and noticed that

5    that was my signature and stuff, and that was it.

6        Q.    And one of the documents was a memorandum to Anita

7    Smith dated August 21st of '02 appointing her to be the

8    day-to-day manager of the Booker T. Washington Center?

9        A.    Interim, correct.

10       Q.    The interim director.

11       A.    No, not the interim director, just to manage the

12   day-to-day operation for a period of time.

13       Q.    Did the Board make a decision to appoint Ms. Smith

14   the interim manager of the Booker T. Washington Center?

15       A.    Yes, we made a decision.  I wouldn't call her

16   interim manager, she was just -- because she was there, she

17   could do --

18       Q.    What was her title?

19       A.    I don't recall what her exact title is.  What does

20   that say, title?

21       Q.    It says here, "appointment to manager on a

22   day-to-day basis".  And then it goes, "You are temporarily

23   appointed to assure the Booker T. Washington Center facility

24   is secure and ready to operate day-to-day".

25       A.    Right.

72

1     Q.   And it goes on, "We ask that you bring them to the

2     attention" -- "If you have any concerns bring them to the

3     attention of the vice chair or the management committee".

4     What title did the Board of Directors give her?

5     A.   I guess, manager of day-to-day operations.  I don't

6     recall what the title was exactly.

7     Q.   But the letter came from you.

8     A.   Right.

9     Q.   Did the Board have a meeting to discuss the

10    appointment?

11    A.   Yes.

12    Q.   When did the Board have the meeting to discuss the

13    appointment of Ms. Smith?

14    A.   I don't recall when it was.

15    Q.   Was it a full Board meeting that discussed

16    appointing Ms. Smith to temporarily replace Mr. Sherrod?

17    A.   Ms. Smith didn't temporarily replace Mr. Sherrod,

18    first of all.  Secondly, I'm not sure if it was a full Board

19    meeting or not.  But I believe the direction came from the

20    full Board for the management committee to look into that

21    for Ms. Smith.

22    Q.   Did the management committee meet to discuss this

23    matter?

24    A.   I believe so.

25    Q.   When do you think such a meeting occurred?

1     A.    Sometime between the 12th and the 21st of August.

2     Q.    Are there minutes of that meeting?

3     A.    I don't know.

4     Q.    Are there notes of that meeting?

5     A.    I don't know.

6     Q.    Who was in attendance at that meeting?

7     A.    I don't recall that either.

8     Q.    Is there any documentation that could refresh your
9  memory and who might have it?

10    A.    I don't know.

11    Q.    So, you don't know who might have documentation
12  that could reflect if meetings occurred around the
13  appointment of Ms. Smith and when.

14    A.    I would have to presume whatever members of the
15  management committee -- members of the committee at that
16  time.  And, again, other members of the Board would know
17  that as well.

18    Q.    Now, in reviewing these documents last evening with
19  Mr. Martinucci was there anything in particular pointed out
20  to you with regard to their significance?

21    A.    No, not that I can recall.

22          MR.MARTINUCCI:  Just so the record's clear, since
23          these aren't being entered as Exhibits right now, I
24          just want to identify these for the record; if I
25          could.