1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
   JAMES C. SHERROD,                  :
3           Plaintiff                 :
                                      :
4           v.                        :   Civil Action NO. 04-208 Erie
                                      :
5   BOOKER T. WASHINGTON CENTER,      :
            Defendant                 :
6

7

8

9           Deposition of WILLIAM JEFFRESS, taken before

10      and by Sondra A. Black, Notary Public in and for the

11      Commonwealth of Pennsylvania, on Wednesday, July 27,

12      2005, commencing at 9:36 a.m., at the offices of

13      Susmarski Law Office, 4030 West Lake Road, Erie,

14      Pennsylvania 16505.

15

16

17   For the Plaintiff:

18       Edith Benson, Esquire
         4683 Budd Drive
19       Erie, PA 16506

20   For the Defendant:

21       Arthur D. Martinucci, Esquire
         Quinn Buseck Leemhuis Toohey & Kroto, Inc.
22       2222 West Grandview Boulevard
         Erie, PA 16506
23

24                    Reported by Sondra A. Black
25                Ferguson & Holdnack Reporting, Inc.

1                                    I N D E X

2

3    WILLIAM JEFFRESS

4         Direct Examination by Ms. Benson.......................3

5         Cross-Examination by Mr. Martinucci.................193

6         Redirect Examination by Ms. Benson...................197

7

8    EXHIBITS

9         Jeffress Deposition Exhibit No. 1......................64

10        Jeffress Deposition Exhibit No. 2......................69

11        Jeffress Deposition Exhibit No. 3......................73

12        Jeffress Deposition Exhibit No. 4......................76

13        Jeffress Deposition Exhibit No. 5......................84

14        Jeffress Deposition Exhibit No. 6......................85

15        Jeffress Deposition Exhibit No. 7......................87

16        Jeffress Deposition Exhibit No. 8......................87

17        Jeffress Deposition Exhibit No. 9....................104

18        Jeffress Deposition Exhibit No. 10...................204

19

20

21

22

23

24

25

1          W I L L I A M  S.  J E F F R E S S, first having

2          been duly sworn, testified as follows:

3

4                        DIRECT EXAMINATION

5     BY MS. BENSON:

6

7          Q.   Mr. Jeffress, for the record, would you please tell

8     us your full name and spell your last name for us, please.

9          A.   William S. Jeffress, J-E-F-F-R-E-S-S.

10          Q.   Where do you reside?

11          A.   4500 West 38th.

12          Q.   Let me do a few things before we continue on.  I

13     want to just kind of review for you -- I'm sure that Attorney

14     Martinucci has reviewed with you a deposition.  I don't know

15     if you've ever participated in one before.

16          A.   No.

17          Q.   Let me just do a few things, and if you have any

18     questions, please speak up.

19          A.   Okay.

20          Q.   The deposition simply will consist of a series of

21     questions on my part and answers by you.

22          A.   Okay.

23          Q.   Naturally, under oath, you've just been sworn.  So

24     it's really testimony as if you were in a courtroom.  At the

25     conclusion of the deposition, you will be given an

1    opportunity to review the transcript, and if there are any

2    changes in substance or form to your answers, you can provide

3    us with that information, a statement reciting such changes

4    and the reason for the changes.  Under the rules of Federal

5    Civil Procedure you have 30 days from the point that you

6    receive the transcript to review it, get it back.  I am

7    entertaining the possibility, I don't know if I would do so,

8    to seek permission to have that shortened.  But I will make

9    that decision later on.

10        If I ask you a question, please wait until I've

11   completed the question before answering.  You must respond

12   verbally so that the court reporter can hear your answer.  So

13   rather than shaking your head or --

14       A.   Correct.

15       Q.   -- just answer verbally.  If you do not have a -- do

16   not hear a question, please have me repeat it.  If you do not

17   understand a question, please have me restate it or rephrase

18   it.  If the question is answered, I will assume that you both

19   heard the question and you understood it.

20        Now, let me ask you, and this series of questions is

21   not intended to embarrass you or to pry into your private

22   life, but just to make sure you understand what is going on

23   here today, whether or not you are on any medication that

24   could impair your ability to hear a question, are you?

25       A.   No.

1      Q.    Are you under any medication that would impair your

2   ability to understand a question?

3      A.    No.

4      Q.    Are you under any medication that would impair your

5   ability to provide answers?

6      A.    No.

7      Q.    Now, the questions I'm going to ask you are somewhat

8   similar to what I just asked you, but rather than talk about

9   are you under any medication, the question is whether or not

10  you have any condition that would affect your ability to hear

11  a question?

12     A.    No.

13     Q.    Do you have any condition that would affect your

14  ability to understand a question?

15     A.    No.

16     Q.    Do you have any condition that would affect your

17  ability to provide answers?

18     A.    No.

19     Q.    Now, sometimes witnesses, for health reasons, need

20  to break at a particular time, to take medicine or something

21  like that, do you have any such reason that would require you

22  to seek a break during the deposition?  For health reasons?

23     A.    No.

24     Q.    Now, if you do need a break, just please let me

25  know, and I will try to accommodate you.  But I would ask you

1    to keep in mind the following:  One, if you make that request

2    after I have asked a question, then I will insist that you

3    provide your answer before we break; two, if you break, you

4    are not to discuss the deposition with Attorney Martinucci

5    during the break.

6        A.    Is he not my attorney?

7        MR. MARTINUCCI:  I object to that instruction

8        because I'm his attorney.

9        MS. BENSON:  Well, my concern is to make sure that

10       you understand that you are not to be conferring

11       with regard to your answers, and your answers

12       should be honest and in accordance with what you

13       know.

14       A.    I'm not sure if that's a directive or whatever,

15   but --

16       MR. MARTINUCCI:  Is it a question?  Are you go

17       asking him if he's going to answer truthfully?

18       MS. BENSON:  No.  It's a question to make sure that

19       the integrity of the deposition is protected, and,

20       therefore, if there's a break during the

21       deposition, then I would expect you not to discuss

22       the deposition at that time.

23       MR. MARTINUCCI:  I'll discuss with my client what I

24       want to discuss.

25       MS. BENSON:  And he will discuss whatever, and I

1            will, on the record, if you have had a discussion,

2            then I'll bring that out.

3            MR. MARTINUCCI:  That's fine.  But the substance of

4            the discussion isn't going to be part of the

5            record.

6       Q.   Now, you were given notice of a deposition to be

7   taken on July the 8th and did not show.  Can you please tell

8   me what was your schedule for July the 8th.

9            MR. MARTINUCCI:  I'm going to object to that

10           question, and I'm going to respond to it.  The

11           reason that the deposition did not occur on July

12           8th is because it did not fit in my schedule.  It

13           was not anything to do, as far as I know, with

14           regard to Mr. Jeffress' schedule.  I did not

15           inquire about his schedule on that date.

16           I had previously told you, on June 28th, Ms.

17           Benson, that I was not available for Mr. Jeffress'

18           deposition on July 8th, and I told you at that time

19           that I would see whether or not he was available on

20           July 12th.  I subsequently informed you via e-mail

21           that I was available on July 12th.  You told me you

22           were looking at July 8th.  I responded to you that

23           that day was not good for me.

24           The last exchange that we had before you sent

25           out the notice of deposition was on July 5th, when

1    I was in New York City and you knew I was in New

2    York City.  At that point in time you sent me an

3    e-mail at about 1:34 or 1:38 in the afternoon, and

4    I responded within an hour, indicating to you that,

5    no, I would not be available for a deposition on

6    July 8th.  The notice came out nonetheless.  The

7    deposition was scheduled for a date and a time I

8    had I told you I was not available.

9         When I returned to my office on July 7th, I saw

10    that the notice had come in.  I e-mailed you

11    immediately upon receiving the notice and told you

12    that we would not be there because it was not

13    something that fit within my schedule.

14    MS. BENSON:  Thank you for that.

15    Q.   And let me just ask the question again,

16    Mr. Jeffress, what was your schedule on July the 8th?

17    MR. MARTINUCCI:  I object to the question, and I'm

18    going to direct him not to answer.

19    MS. BENSON:  And then I'm going to request that he

20    does.  Your objection is noted for the record.

21    MR. MARTINUCCI:  I'm directing him not to answer.

22    MS. BENSON:  But your objection is noted for the

23    record.

24    MR. MARTINUCCI:  That's fine, and I'm directing him

25    not to answer.  So move on to your next question.

1          MS. BENSON:  Your objection is noted.

2     Q.   Mr. Jeffress, I'll come back to that later on.  I

3     assume you have a calendar that lists your appointments.  Do

4     you have a calendar where you list your appointments for your

5     business day?

6     A.   Yes.

7     Q.   And that calendar would reflect any activity on July

8     the 8th?

9     A.   I'm not sure.  I haven't looked at it in a while.

10    Q.   But should it?

11    A.   It may or may not.  I'm not sure.  I haven't looked

12    at it.

13    Q.   The calendar that you maintain for business

14    purposes, do you maintain that -- that sets out your schedule

15    for that day or that week?

16    A.   I don't maintain that schedule, no.

17    Q.   Who maintains it?

18    A.   I have -- actually, staff maintains it.

19    Q.   And when you say "staff," who are you referring to?

20    A.   Anybody employed by the Booker T. Washington Center

21    who schedules an appointment for me.

22    Q.   Are there more than one individual who's --

23    A.   Yes.

24    Q.   Would you please identify those individuals.

25    A.   Okay.  You have Anita Smith, you have Brian

1  Bessetti.

2     Q.   Excuse me.  What's Ms. Smith's title at the Booker

3  T. Washington Center?

4     A.   Anita Smith, she's a case manager.  Brian Bessetti,

5  he's controller.  Maggie Melendez, she's program assistant.

6  Shontell Heirs (phonetic), he's program coordinator.  Aiella

7  Crockett (phonetic), she's a program assistant.  Laveneous

8  Gambell (phonetic) is a program assistant.  Did I stay Maggie

9  Melendez?

10          MR. MARTINUCCI:  I think you did.

11     Q.   Yes, you did.

12     A.   I think that would be it.

13     Q.   So all those individuals maintain your calendar?

14     A.   All those individuals have access to my calendar,

15  yes.

16     Q.   They have access to it?

17     A.   And, therefore, if they schedule a meeting with me,

18  I ask them to see if it's available, and they maintain it,

19  yes.

20     Q.   You said if they schedule a meeting with you.

21     A.   In regards to other people or anything that goes on

22  with my schedule.

23     Q.   Do you have a secretary?

24     A.   At this time I do not, no.

25     Q.   You said "at this time."

1    A.    Correct.

2    Q.    When did it come about that you no longer had a

3    secretary?

4    A.    Actually, I've never had a secretary.

5    Q.    At the Booker T. Washington Center?

6    A.    Correct.  We had -- actually, we had a -- what was

7    the title of her position now.  I don't know if it was

8    secretarial duties may have been included in some of the

9    responsibilities, but Stacey Reynolds was -- and I can't tell

10   you off the top of my head what the -- she could have been a

11   program assistant or she could have been a program assistant

12   with secretarial responsibilities, but she was the last

13   person with secretarial responsibility.

14   Q.    With secretarial responsibilities?

15   A.    Correct.

16   Q.    Were those responsibilities for you?

17   A.    No.  They were for the organization.

18   Q.    For everyone who worked at the organization?

19   A.    For the organization in reference to correspondence

20   or anything else, yes.

21   Q.    Ms. Reynolds' office, how -- can you tell me in what

22   proximity was it to your office.

23   A.    Can you say two doors down.

24   Q.    Now, would she be the person, if someone wanted to

25   talk with you, that would come to you if you were not -- come

1    to her -- go to her if you were not available?

2        A.    Are you talking historically, or are you talking to

3    date?  I'm not sure which -- what part are you talking?

4        Q.    I'm talking historically.

5        A.    Historically, no.

6        Q.    Who would that person be?

7        A.    Any staff member who works for the Booker T.

8    Washington Center.

9        Q.    Now, Ms. Reynolds is no longer with the Center?

10       A.    Correct.

11       Q.    When did she leave the Center?

12       A.    I'd have to go back to the exact time frame.  I'm

13   not sure.

14       Q.    Can you give us some idea, generally, when she left?

15       A.    Time has flown by, so I'm going to generally guess

16   and say it's -- I -- I can't answer the exact -- I'm just

17   going to say it's been probably less than a year ago.

18       Q.    So you think she left in the year 2004?

19       A.    I'd have to go back and look.

20       Q.    Well, let me ask you this here.  You're currently

21   executive director of the Booker T. Washington Center, right?

22       A.    Correct.

23       Q.    Now, when did you assume that position?

24       A.    I believe, and dates are not always accurate, it was

25   January of 2002.

1      Q.   January 2002.  You said, "Dates are not always

2   accurate."  What do you mean by that?

3      A.   No.  I'm saying that unless I go back and look at my

4   notes or my schedule -- I can't accurately tell you what it

5   was until I look at my notes or schedules.

6      Q.   So in preparing for today's deposition you didn't go

7   back and look at your notes?

8      A.   I didn't know you were going to ask me what date and

9   time.  I was, you know -- but basically it was -- I believe

10   it's accurate at this time, but like I said, it's one of

11   those things where -- January 1st of 2002, I'm pretty sure.

12      Q.   Is when you started there as executive director?

13      A.   Correct.

14      Q.   Now, is there anything that you could refer us to

15   that would give you the exact date?

16      A.   Payroll records.

17      Q.   Who would have those payroll records?

18      A.   You could talk to the controller.

19      Q.   And the controller --

20      A.   At the Booker T. Washington Center.

21      Q.   And that controller is?

22      A.   Brian Bessetti.

23      Q.   Now, prior to becoming the executive director of the

24   Booker T. Washington Center, you served on the Booker T.

25   Washington Center Board of Directors; is that correct?

1      A.    Yes.

2      Q.    When did you begin serving on the Booker T.

3  Washington Board of Directors?

4      A.    I believe January of 2001.

5      Q.    Can you tell us how you came to be on the Booker T.

6  Washington Board of Directors.

7      A.    I believe Ms. Lyons had a conversation with Mr.

8  Sherrod.

9      Q.    Who's Ms. Lyons?

10     A.    Ms. Lyons was a board member, and said that she knew

11  a person who would be interested in serving on the board of

12  the Booker T. Washington Center, who would be a good fit.

13     Q.    Do you have Ms. Lyons' first name?

14     A.    Cathy Lyons.

15     Q.    Is Ms. Lyons still on the board of directors?

16     A.    Yes, she is.

17     Q.    Where does Ms. Lyons work?

18     A.    I can't tell you what her title is, but she works

19  for Family Health Council.

20     Q.    Is that here in Erie, Pennsylvania?

21     A.    Yes.

22     Q.    Now, you said you believe that she had a

23  conversation with Mr. Sherrod, and that led to your

24  appointment on the board of directors in January of 2001; is

25  that correct?

1       A.   I believe she had a conversation with Mr. Sherrod,
2   then Mr. Sherrod contacted me.
3       Q.   Now, once you went on the board of directors, did
4   you serve on any committees of the board of directors?
5       A.   Yes.  I -- it was the management committee.
6       Q.   Any other committee of the board of directors?
7       A.   No.
8       Q.   Did you hold any officers' positions on the board of
9   directors?
10      A.   No.
11      Q.   Now, when did you begin to serve on the management
12  committee?
13      A.   I believe it started somewhere in May of 2001.
14      Q.   In addition to yourself, in May of 2001, who else
15  served on the management committee?
16      A.   Mr. Charles Faulkerson, he was on the committee.
17  Mr. Coleman -- Mr. Sean Coleman, I believe -- now, when I say
18  they served on the committee, I believe any officer could
19  have served on any committee.  So, therefore, they served on
20  the committee.  Ms. Claudette McAdory.
21      Q.   Anyone else?
22      A.   Mr. Joe Fries.  And I believe that was it.
23      Q.   Now, you said that Mr. Faulkerson and Mr. Coleman,
24  you believe, served on the committee.  So are you sure of
25  that?

1    A.    I said that any -- they were -- no, I can't say I'm

2    sure.    I can just say that, you know, anybody who was on the

3    board had the ability to come in and serve on the committee.

4    Q.    Let me just make sure I'm clear.    Your previous

5    testimony was any officer.    Now you're saying any board

6    member.

7    A.    Anybody could come into a meeting and be a part of

8    the committee.    Any officer automatically was a part of the

9    committee.

10    Q.    And would this be set out in your Booker T.

11    Washington Center bylaws?

12    A.    I'm not sure.

13    Q.    Did there ever come a time when you became the

14    chairman of the management committee?

15    A.    Yes.

16    Q.    When did you become chairman of the management

17    committee?

18    A.    I think sometime -- probably within a month --

19    probably June, sometime around there, by default because no

20    one else was there.

21    Q.    No one else was there, I'm --

22    A.    To take on the responsibility of the chairman of the

23    management committee.

24    Q.    Were you appointed to that position or elected to

25    that position?

1       A.   I'm not sure.

2       Q.   Now, you believe it was in June of 2001 that you

3  became chairman.  As chairman of that committee, did you --

4  let me just rephrase the question.  When you became a member

5  of the management committee, what was the governing document

6  that directed the responsibilities of that committee?

7       A.   I'm not sure.

8       Q.   During the summer -- excuse me, did the committee

9  meet in May of 2001?

10      A.   Say -- I didn't hear you.

11      Q.   Did the committee meet in May of 2001?

12      A.   I'm not sure.

13      Q.   Did the committee meet in June of 2001?

14      A.   I can probably go back and check, but I'm not sure.

15      Q.   What would you check to be sure?

16      A.   My -- my personal notes.  Basically, when I was

17 going to the meetings, I tried to keep some personal notes

18 and some recollection of what the committee was doing.

19      Q.   Where would these personal notes be located?

20      A.   They could be on disk.  I'm -- again, I'm not sure

21 because I recently moved, and I've changed, since that time,

22 three different computers.  So it's either on a disk or on

23 one of my hard drives.

24      Q.   At your residence or at the Booker T. Washington

25 Center?

1    A.   This would have been my personal computer and my

2    personal disk.

3    Q.   So those are located at your residence?

4    A.   Yes.  On my old computer.  Possibly.  Like I said,

5    it's either on the disk or there, and it's possible to have a

6    hard copy of some of the notes that I have taken.

7    Q.   So if we took from July of 2001 to December of 2001,

8    can you recall if the committee met July, August, September,

9    October, November, December of 2001?  With the management

10   committee.

11   A.   I was not part of the committee at that time.

12   Q.   Well, you testified that you became a member of the

13   committee in May of 2001.

14   A.   I thought I testified that I became a member of the

15   committee in May of 2001.

16   Q.   Right.

17   A.   Okay.  So right -- I'm thinking.  I'm going back to

18   a different hat.  May of 2001, and -- I know for a fact we

19   met in August of 2001, and at that time -- in September I

20   think I was removed off of the committee.

21   Q.   So let me make sure I have your testimony

22   accurately.  You became a member of the management committee

23   in May of 2001.

24   A.   Correct.

25   Q.   You do not recall if the committee met in May of

1    2001 or June 2001; is that correct?

2         A.    There was several committee meetings.  Again, if I

3    could go back to my notes and look at when they took place, I

4    would probably be -- give you a more accurate answer.  I know

5    I took personal notes.  And, again, I say May of 2001, which

6    is a guess of when I became part of the committee.  Because I

7    know for the fact that in January and February -- I don't

8    think that I attended the first two meetings.  And then --

9    January, February -- March, April, it is a possibility that I

10   could have attended a management meeting, but I don't really

11   recall at this time.  Then, when you look at May, I do know

12   that by May I was on the management committee.  And if there

13   was a meeting in May, which I think there was, the management

14   committee did meet -- again, I can't tell you exactly when or

15   who was there at this time, but I do know, like I said, I did

16   have some personal notes that I did take for the meetings

17   that I did attend and that I did chair.

18        Q.    So let me ask you this question here.  For every

19   meeting that you attended of the management committee, you

20   took personal notes?

21        A.    Yes.

22        Q.    Were those notes in writing or did you type them

23   into your computer, a laptop?

24        A.    Those notes were typed into my iPAQ.

25        Q.    So during the meeting you had your iPAQ and you

1    typed in the notes at that time?

2        A.    I wrote the notes in, correct.

3        Q.    And you still have those notes?

4        A.    I may have copies of the notes, yes.

5        Q.    Now, you testified that you were removed from the

6    management committee in September of 2001.

7        A.    Yes.

8        Q.    Why were you removed?

9        A.    I believe I was removed from the committee because

10   we were trying to figure out what we were going to be doing

11   in the interim.  And at that time I was actually still trying

12   to work out what we were going to be doing in the interim of

13   our current problems.

14       Q.    Who removed you from the committee?

15       A.    I guess the overall board because once I was removed

16   from the committee, I kind of took over as interim director.

17       Q.    Now, did the board of directors of the Booker T.

18   Washington Center have a meeting in which a decision was made

19   to remove you from the management committee?

20       A.    I'm not sure.  I don't recall.

21       Q.    Is there any documentation somewhere that would help

22   you answer the question I just put to you?

23       A.    I'm -- I'm not sure.

24       Q.    Is there a possibility that there is some

25   documentation somewhere?

1      A.    There is a possibility, yes.

2      Q.    Where might this documentation be?

3      A.    Paperwork, old notes.

4      Q.    And who might have possession of this documentation?

5      A.    It may be in some of the files that we -- who might

6  have possession.  As I said, it's paperwork and old notes.  I

7  may have some -- I -- I know I -- again, it'll take time to

8  find the paperwork and old notes that I have.

9      Q.    Why would it take time?

10     A.    Because there's been a lot of transition and time

11  has passed.

12     Q.    Well, you've known for some time that you were going

13  to be deposed.

14     A.    And I've been working on trying make sure I can find

15  old notes, but just because you go to look for stuff doesn't

16  mean you know where you placed them.

17     Q.    Now, Mr. Jeffress, I gave a first notice -- you've

18  known even before I gave you the first formal notice.  But I

19  gave a notice of your deposition, one was scheduled for June

20  15, 2005.

21     A.    Yes.

22     Q.    Another one for July 8, 2005, and then today.  So

23  you've known for some time that you were going to be deposed,

24  right?

25     A.    Yes.

1      Q.   Now, you say that you were removed from the

2   management committee, but you're not sure how your removal

3   came about.

4      A.   It came about because I was going to be moving into

5   a position of interim.  And therefore --

6      Q.   Interim what?

7      A.   Interim administrator to make sure that the Center

8   was moving forward.

9      Q.   Would that be interim executive director?

10     A.   Not at this time.  It was just, as the management

11  committee pointed out, I was -- it didn't say interim

12  executive director.  It was just saying, if there was any

13  problems at the Booker T. Washington Center, I would be the

14  person to be contacted.

15     Q.   What was your title?

16     A.   I did not have a title.

17     Q.   When did you assume the responsibility of interim?

18     A.   October.

19     Q.   October of what year?

20     A.   I believe we're still in 2002 here.

21     Q.   So it was October --

22     A.   Or is that 2001 -- excuse me, October of 2001.

23     Q.   Do you recall when -- let me go back and rephrase

24  the question.  What was the responsibilities of the

25  management committee?

1        A.    The responsibilities of the management committee.

2    When I came on board, I don't think that they had a

3    definition of what the responsibilities were.  I think that

4    we were in the process of working on that.

5        Q.    So when you came -- are you -- let me make sure I

6    understand your answer.  You said when you came on board you

7    don't think the responsibilities of the management committee

8    were defined.  Are you referring to when you came on the

9    board of directors as opposed to being placed on the

10   management committee?

11       A.    When I came on the board of directors, there was,

12   again, no clear indication on what it was -- I was still

13   being introduced.  I was in an introductory period.  Where I

14   was learning more about what responsibilities the board had,

15   and what responsibilities that the different committees would

16   be doing.  They were in the process of looking at the

17   committees and seeing because I believe they weren't running

18   as functional as they would have liked.  So, therefore, we

19   were in the process of planning, when I became chair, of

20   basically trying to define our role.  That's the way I looked

21   at it.

22       Q.    Let me ask you this here.  When you became a member

23   of the board of directors in January 2001, did you receive,

24   at that time or thereafter, copies of the Booker T.

25   Washington Board of Directors' bylaws?

1    A.    I believe it was inside of my orientation package.

2    Q.    What else was inside of your orientation package?

3    A.    A list of the board members; a history of the

4  Center; geographic boundaries, I believe, in terms of what

5  was the service area.  And I think I said a history.

6    Q.    Now, were bylaws included in that package?

7    A.    I believe they were included in the package, yes.

8  The old bylaws, yes.

9    Q.    And those were the bylaws that the board of

10  directors were functioning under when you arrived; isn't that

11  correct?

12    A.    Correct.

13    Q.    Did the bylaws identify the management committee as

14  being a committee of the board of directors?

15    A.    I'm not sure.

16    Q.    Your previous testimony is that you became a member

17  of the management committee in May of 2001.

18    A.    Approximate time, yes.

19    Q.    At that time did you review the responsibilities of

20  that committee?

21    A.    Yes.

22    Q.    And how did you go about about reviewing the

23  responsibilities of that committee?

24    A.    I believe I may have looked at old notes or -- or

25  talked to people.  I did look at the section of -- again, I'm

24

1    not sure if that section was included in the bylaws or if it

2    was just included inside of my packet.  That's where I need

3    to have that clarification.  I'm not sure.  As you go through

4    a new orientation package, I didn't define exactly what tab I

5    was flipping through.  But somewhere in the tab it did

6    describe the management committee.

7         Q.   When you say "tab," was this material in a notebook?

8         A.   This material was in a binder.

9         Q.   And it had tabs in it dividing each section?

10        A.   Correct.

11        Q.   So within this binder, it's your testimony that

12   there was a description of the responsibilities of the

13   management committee?

14        A.   I believe so, yes.

15        Q.   Do you still have that binder?

16        A.   No.

17        Q.   Now, when you became chairman of the committee in

18   June of 2001, other than yourself and the possible officers,

19   it's your testimony that any officer could serve, were the

20   only other members Ms. McAdory and Mr. Fries?

21        A.   I believe that we could have had Mr. Rege O'Neill.

22   I'm not sure, though.

23        Q.   Is there any documentation anywhere that would help

24   you be sure as to who were the members of this committee in

25   June of 2001?

1     A.   I don't think so.  I do know that there -- at one

2   point in time there was a list of who was on the management

3   committee, but I'm not sure where that document would be.

4     Q.   And who had this list?

5     A.   I believe Mr. Charles Faulkerson had it.

6     Q.   What was Mr. Faulkerson's role at that time?

7     A.   A board member.

8     Q.   Did he hold any officer position?

9     A.   Ex-chairman.

10     Q.   So in June of 2001 he was the ex-chairman of the

11   board of directors?

12     A.   I believe so, yes.

13     Q.   State for us the responsibilities of the management

14   committee.

15     A.   It's to work with the administration to make sure

16   that the policies and procedures are being followed and see

17   if there's any other administrative responsibility that needs

18   to be improved.

19     Q.   Policy and procedures with regard to all issues or

20   just personnel matters?

21     A.   Management issues, administrative issues.

22     Q.   Give me some examples of what you mean by

23   "management issues."

24     A.   Human resources, personnel, salaries, benefits,

25   wages.  That's the way I interpret it.

1      Q.    Would that also involve disciplinary action against

2    employees?

3      A.    That never came up, actually, but it would

4    probably -- if it came to the board, it would probably go

5    through the management committee, I guess.  But I don't think

6    it was defined that way.

7      Q.    Let me see if I can give you an example.  If an

8    employee was disciplined in any way and wanted to question

9    that action, would the matter be referred to the management

10   committee?

11     A.    Yes.

12     Q.    So if someone was given a reprimand and wanted to

13   appeal to the board, the matter would be referred to the

14   management committee?

15     A.    I can't accurately say that that was the procedure,

16   but that would be the procedure that I would suggest, yes.

17     Q.    That would be the procedure that you would suggest?

18     A.    Correct.

19     Q.    If someone was suspended and wanted to challenge

20   that action, would that matter be referred to the management

21   committee?

22     A.    That would be the procedure I would recommend, yes.

23     Q.    You would be recommending that on the basis of what?

24     A.    My past experiences.

25     Q.    At the Booker T. Washington Center?

1    A.    No.  In life.

2    Q.    If someone was fired, would that matter be referred

3    to the management committee?

4    A.    If they were appealing, I would say, yes.

5    Q.    And you're basing that on what now?

6    A.    My personal experience and knowledge.

7    Q.    Now, you said that you reviewed a description of the

8    management committee responsibilities.

9    A.    Yes.

10    Q.    Did that description provide for referral of

11    personnel appeals to the management committee?

12    A.    I'm not sure.

13    Q.    Now, you said you started serving on that committee

14    in June of '01 to you said September of '01.

15    A.    No.  I didn't say that.  You said June of '01.  I

16    said May of '01.

17    Q.    I'm sorry, you became chairman -- I'm sorry, let me

18    correct it.  You said you started serving on there May of

19    '01, became chairman in June of '01.

20    A.    Approximately, yes.

21    Q.    And was removed from the committee in September of

22    '01.  Now, you've also testified that your removal was around

23    the time of Mr. Sherrod being let go; is that correct?

24    A.    It was after that fact, yes.

25    Q.    Now, would it help you if I told you that

1    Mr. Sherrod was let go in '02?  Would it help you just in

2    terms of a time frame?

3        A.   Yes.  Because I -- like I said, time has gone by

4    very fast.  The months and years have gone by.

5        Q.   So let's take it again.

6        A.   Okay.

7        Q.   You went on the management committee when?

8        A.   If he was let go in '02, so that means I became part

9    of the board in '02.  And that means that I was part of the

10   board of May -- January of '02 to September of '02.

11       Q.   So you come on the board in January of '02.  Does

12   that then mean that you became a member of the management

13   committee in May of '02?

14       A.   Somewhere around that time, yes.

15       Q.   And chairman in June of '02 or somewhere around that

16   time?

17       A.   Correct.

18       Q.   And then you were removed from the management

19   committee in September of '02?

20       A.   Yes.  I was removed from the board somewhere at the

21   tail end -- like I said before, I took on -- and, again,

22   dates and times -- the exact dates and times are not there,

23   but I was removed from the board because of taking over

24   interim responsibilities.

25       Q.   When you were removed from the board to assume these

1    interim responsibilities, was there a board meeting at which

2    this matter was discussed?

3        A.    I'm not sure if there was an official board meeting.

4    I believe we -- the board itself was kind of in a meeting

5    mode because of the situation.  So overall the board did make

6    the decision.  But during that time I'm not sure exactly was

7    it a regularly-scheduled meeting or was it a called meeting.

8    I'm not sure.

9        Q.    Let me go back to when you were first appointed to

10    the board of directors in January of '02.

11        A.    Yes.

12        Q.    When the board of directors met, were notices given

13    to the board of directors of meetings?

14        A.    I can't tell about the overall board.  I just know

15    when I received any orientation package I believe I had

16    the -- the dates were listed in the orientation package.  But

17    I'm not even sure -- again, I may have even missed the first

18    meeting or two, or something like that.  I just know that I

19    received my dates with my orientation packet.

20        Q.    Now, were minutes kept of board of directors'

21    meetings?

22        A.    If I look back on that time frame, I was just going

23    to the meetings.  I do know that there were tapes being

24    recorded.  So if you want to call the recordings being

25    minutes, then I do know that there was being -- each meeting

1    was recorded, yes.

2        Q.    The board of directors' meetings were recorded.    Who

3    was responsible for the recording of the board of directors'

4    meetings?

5        A.    At that time I -- I do not know.

6        Q.    So from January '02 until October of '02, you were

7    aware that the meetings were being recorded?

8        A.    Each -- yes.

9        Q.    So the meetings of the board of directors were

10    recorded in August of '02?

11        A.    I'm not sure.

12        Q.    How would you be able to find out?

13        A.    Basically check to see which tapes are there.

14        Q.    Who would have possession of these tapes?

15        A.    At this time I know some of the historical tapes or

16    anything else -- Anita Smith may have some of the historical

17    tapes.

18        Q.    "Historical tapes" --

19        A.    Meaning '02.    This is '05, historical meaning in the

20    past.

21        Q.    Anita Smith, is it part of her responsibilities to

22    keep the minutes of board meetings?

23        A.    No.    When -- during that -- at that time it was not

24    part of her -- I don't know if it was or not.    I couldn't

25    tell you.

1      Q.   When you say "that time," what are you referring to?

2      A.   I'm referring to August of the time frame that

3  you're talking about.

4      Q.   Okay.  Why do you think Ms. Smith would have those

5  tapes, if there are tapes in August of '02?

6      A.   At that time -- Ms. Smith had probably anything that

7  was going on in the facility at that time.

8      Q.   And why would she been the one to have that?

9      A.   She was the most senior person on staff there.  In

10  terms of seniority, meaning that time frame being there,

11  knowledge of the organization.

12      Q.   Now, going back to August of '02, did the board meet

13  in August of '02?

14      A.   Yes.

15      Q.   How many times did the board of directors of the

16  Booker T. Washington Center meet in August of '02?

17      A.   I don't recall.

18      Q.   Was it more than once?

19      A.   Yes.

20      Q.   Now, how would we go about finding out how many

21  times the board of directors met in August of '02?

22      A.   I'm not sure.

23      Q.   Were you present at every meeting?

24      A.   I'm not sure.

25      Q.   Did you receive notice of every meeting?

1      A.   I'm not sure.

2      Q.   Were notices of the meetings in August of '02 sent

3  out?

4      A.   I'm not sure.

5      Q.   How would we be able to find out if notices of the

6  meetings of the board of directors that occurred in August of

7  '02 were sent out?

8      A.   I'm not sure.

9      Q.   Is there anyone at the Booker T. Washington Center

10  charged with the responsibility of maintaining the official

11  records of the board of directors?

12      A.   At that time, I would not know.

13      Q.   Well, you've been the director since -- well, you

14  became, in an interim capacity, in September or October of

15  '02.  Who's been responsible for maintaining the official

16  records of the board of directors since you became the

17  interim?

18      A.   Staff.

19      Q.   What staff?

20      A.   Myself and Anita Smith.

21      Q.   So would you or Ms. Smith have copies of notice of

22  board of directors' meetings?

23      A.   Since the time that I've been executive director,

24  yes.

25      Q.   Which one?  Both of you?

1      A.    Since the time that I've been executive director?

2      Q.    Yes.

3      A.    We keep them in a book.  So we both have access to

4    the book.

5      Q.    You're taking that -- when you say "since the time

6    that I've been executive director," are you taking that back

7    to September of '02?

8      A.    I've been executive director since January.

9      Q.    January of --

10     A.    Since I have my dates right now, January of '03.

11     Q.    '03 you became executive director?

12     A.    Yes.

13     Q.    So when you were functioning in an interim capacity,

14   you did not maintain the records regarding the board of

15   directors?

16     A.    I personally did not maintain them, no.

17     Q.    Did Ms. Smith?

18     A.    I believe we worked with -- there was no defined --

19   I don't believe there was a defined, but they were being

20   noted that we were working on them.  So I can't tell you the

21   definition of who -- or define who was working on them.

22     Q.    Working on what now?

23     A.    You said the minutes.

24     Q.    Yes.

25     A.    When I was interim, I knew that they were taken care

1   of.

2      Q.   You knew that they were taken care of.  Were they

3   taken care of by someone under your direction?

4      A.   They may have been.  I'm not sure.

5      Q.   You say now you maintain a notebook of the board

6   minutes.

7      A.   Correct.

8      Q.   Do you maintain a record of notices of board

9   meetings?

10      A.   We have, but I can't tell you for sure whether or

11   not they're inside of that book.  Basically they're computer

12   generated.

13      Q.   And you began making sure that notices of board of

14   directors' meetings, and the minutes of those meetings were

15   maintained, beginning when you became executive director in

16   January of '03?

17      A.   Correct.

18      Q.   Why did you do that?

19      A.   There was a need -- there was a directive that this

20   should be done.

21      Q.   Who was the directive from?

22      A.   The auditors.

23      Q.   What auditors?

24      A.   Booker T. Washington Center's auditors.

25      Q.   What auditor are you referring to?

1      A.    Accounting auditors.

2      Q.    The accounting auditors?

3      A.    Yes.  Recommended.

4      Q.    What are the name of those auditors?

5      A.    We'd have to make a call to get the exact name.  I

6   have a lot of accountants that I work with, so all the names

7   get mixed up.

8      Q.    So you're saying auditors came in and recommended

9   that this be done?

10     A.    Correct.

11     Q.    When did the auditors come in?

12     A.    I'm not sure, but I believe it could have been

13  December.

14     Q.    Of what year?

15     A.    '02.

16     Q.    Now, prior to the auditors directing that these

17  records be maintained, notices of board of directors'

18  meetings and the minutes --

19     A.    They did not direct notices.  They just said

20  minutes.

21     Q.    But you are maintaining both?  You began maintaining

22  both?

23     A.    Mainly the minutes, but again, the notices are

24  computer generated.

25     Q.    And who generates those from the computer?

1       A.    Anita Smith.

2       Q.    Now, there was this period of time from September of

3   '02 to January of '03 when you were in an interim capacity.

4       A.    Yes.

5       Q.    Who was responsible for sending out notices of board

6   of directors' meetings?

7       A.    If I had my timing right, I would say Stacey

8   Reynolds.

9       Q.    And if you don't have your timing right, who would

10  have been responsible?

11      A.    For the period of time that I was interim director,

12  we went off of the dates according to what was already

13  established.

14      Q.    Now, assuming it was Ms. Reynolds, would

15  Ms. Reynolds have acted at your direction to send out notice

16  of board of directors' meetings?

17      A.    Yes.

18      Q.    Would Ms. Reynolds have been responsible for making

19  sure that board of directors' meetings were recorded?

20      A.    With that -- I'll clarify with Ms. Reynolds.

21  Ms. Reynolds was working closely with Ms. Smith to ensure

22  that the minutes -- I mean, the notices were being sent out.

23  And in the capacity of making sure that the minutes were

24  recorded, we went to basically confirm that the tape recorder

25  was on, and the tape recorder would record the minutes.  And

1    I would have Ms. Smith then dictate from the minutes -- or

2    not dictate.  Type out the minutes from the dictation off of

3    the recorder.

4        Q.   Now, prior to you assuming the position that you've

5    just identified as the interim executive director position --

6    prior to you assuming that, who held a similar-type position?

7        A.   The -- I guess, and when I say "I guess," it's

8    because if you're referring to Ms. Kia Terry, I believe she

9    would have held the position of typing up the minutes.  I'm

10   not sure because I've never really walked through and did it

11   and worked with her and talked to her at that point in time.

12       Q.   Let me go back.  Mr. Sherrod was last at the Booker

13   T. Washington Center as executive director in August of '02.

14   Who assumed responsibility for his duties after he was no

15   longer there?

16       A.   In August of '02, when Mr. Sherrod left, basically

17   at that time we had the board, which I was a part of, which

18   was the management committee, which we were supposed to stay

19   in contact with the staff to make sure the day-to-day

20   functions were going on.

21       Q.   So the management committee was responsible for the

22   day-to-day operation of the Booker T. Washington Center in

23   conjunction with staff?

24       A.   To make sure the day-to-day operations were going,

25   yes.

1    Q.   Anyone, specifically, you've just -- anyone,

2    specifically, at that time was responsible on the management

3    committee to have contact with staff?

4    A.   There was -- it was never a defined, you know --

5    Q.   Now, let me take you to back to the composition of

6    the management committee during August of '02.  Who was on

7    the committee in August of '02?

8    A.   As I said, as I recall, and again, the definition of

9    the committee was very vague, but Claudette McAdory, Joe

10   Fries, myself, Charles Faulkerson, Sean Coleman.

11   Q.   So in August of '02, the members of that committee

12   was Ms. McAdory, Mr. Fries, and are you identifying

13   Mr. Coleman and Mr. Faulkerson as members by virtue of the

14   fact that they were officers of the board of directors?

15   A.   I've identified -- well, Mr. Faulkerson, I don't

16   believe was an officer at that time.  He was a board member

17   who wanted and had to take part in the committee, but I don't

18   think he was an officer.

19   Q.   You said he was a board member who what?

20   A.   Wanted to take part in the committee.

21   Q.   When did Mr. Faulkerson express a desire to take

22   part in the management committee?

23   A.   I'm not sure.  He's always been a part -- been

24   wanting to take part in it.  I'm not sure exactly when.

25   Q.   When you became on the board of directors in January

1   of '02 -- did Mr. Faulkerson express an interest in being a

2   member of the management committee in January of '02?

3        A.   Always wanted to be a part of it.

4        Q.   Is that reflected in board minutes?

5        A.   I'm not sure.

6        Q.   Did he express an interest in February of '02 about

7   wanting to be a member of the committee?

8        A.   I'm not sure.

9        Q.   Did he express an interest in March of '02 about

10  wanting to be a member of the management committee?

11       A.   As I stated, Mr. Faulkerson was a person who

12  expressed an interest in anything and everything, and he

13  probably would have been be able to say that he had an

14  interest -- I can't tell you exactly when, what months, what

15  time frames, but I do know he's expressed an interest to be a

16  part of anything that goes on at the Center.

17       Q.   Now, these interests, were they expressed in board

18  of directors' meetings?

19       A.   He would always give his recommendation and what his

20  opinion was, yes.

21       Q.   Well, that's different now than expressing an

22  interest on being a member of the management committee.  Did

23  he, in board of directors' meetings, express an interest in

24  being appointed to the management committee?

25       A.   I'm not sure.  All I know is that the committees

1    were not closed.  So therefore, whenever he wanted to express

2    an interest -- any board member could show up to a committee

3    meeting because the committees were not closed.

4        Q.   Now, does the bylaws provide that any board member

5    showing up at management committee meetings had the right to

6    vote in management decision -- in the management committee

7    decisions?

8        A.   Well, I don't know if when you say any board member

9    has the right to vote --

10       Q.   Well, I'm -- you have a management committee --

11       A.   Yes.

12       Q.   -- that meets.

13       A.   Yes.

14       Q.   And you say anyone can come.  My question to you is,

15   does the bylaws indicate who has the right to vote?

16       A.   I don't know if the bylaws indicate that the

17   committees have to vote.  I don't know if the bylaws say

18   anything about voting in committees.

19       Q.   Now, in August of '02, the management committee

20   dealt with several personnel matters surrounding the

21   termination of Mr. Sherrod and three other staff members;

22   isn't that correct?

23       A.   No, that's not correct.

24       Q.   Then, did the management committee meet at all to

25   discuss personnel issues in August of '02?

1  A. Yes.

2  Q. Now, management committee vote on matters involving

3 personnel issues in August of '02?

4  A. No.

5  Q. In August of '02, when the management committee met,

6 were these meetings tape-recorded?

7  A. I'm not sure if all the meetings were tape-recorded.

8  Q. So some of the meetings of the management committee

9 were tape-recorded?

10  A. I'm not sure if they were management committee

11 meetings or board meetings.

12  Q. Where can you look to determine whether or not these

13 meetings were management committee meetings or board of

14 directors' meetings so you can become more definitive in your

15 answer?

16  A. I'm not sure, honestly.  I can try, again, if -- I

17 couldn't define whether it was the management committee

18 meeting or the board meeting.  I do know that there were

19 several meetings, and I do know that during the board

20 meetings the meetings are taped.

21  Q. Well, let's go to the management committee meetings,

22 and I want to deal with those again.  Are the meetings of the

23 management committee recorded?

24  A. Were the meetings of the management committee

25 recorded, I'm not sure.

1      Q.   As chairman of the management committee, did you

2    provide notice of any meetings that occurred in August of

3    '02?

4      A.   Personal phone calls, yes.

5      Q.   How many meetings did the management committee have

6    in August of '02?

7      A.   I'm not sure.

8      Q.   More than one?

9           MR. MARTINUCCI:   Objection.   Asked and answered.

10     Q.   Please answer it again.

11     A.   I'm not sure.

12     Q.   The only method of notice was by phone call?

13     A.   For the management committee meetings?

14     Q.   Yes.

15     A.   I believe, yes.

16     Q.   What led you to provide notice solely by phone call?

17     A.   Timing.

18     Q.   Did you review the bylaws to make sure that you were

19   acting in accordance with the bylaws?

20     A.   I'm not sure.

21     Q.   You were dealing with an important matter; weren't

22   you?

23     A.   Can you ask the question again the same way.

24     Q.   You were dealing with an important --

25     A.   No.   The question before that.

1      Q.    Did you review the bylaws -- let me do this here, I

2      think it would be better, how about just read it for us.

3            (Record read back.)

4      Q.    Understand the question now?

5      A.    No.  I need you to ask it again.

6      Q.    Going to August of '02, you said you gave notice to

7      the members of the management committee of meetings.  My

8      question to you is, did you review the bylaws to make sure

9      you were acting consistent with the bylaws in providing

10     notice to the members of that committee?

11     A.    That's the part that I was looking for.  I did not,

12     in a sense, look at bylaws in notifying anybody in regards to

13     the meetings.  And the reason being is that it was a short

14     notice, we needed to meet, and we needed to have a

15     discussion, therefore, I did what I would do personally.  I

16     did not go through and look at bylaws and say, how do you

17     call on a meeting, how do you notify people of meetings.

18     Q.    Do you understand the importance that bylaws play in

19     the governing of an organization?

20     A.    I understand the importance of what bylaws play, but

21     again, when you look at any committee or any organization,

22     whenever you are in a time constraint, you basically have, in

23     my opinion, the authority to say, hey, we need to meet.  And

24     therefore, you may not have the same kind of steps you take

25     to meet, and I don't think -- and I'm not sure and clear on

1    it, but I don't think that the bylaws are that detailed to

2    spell out if there is a meeting you have to conduct it in

3    this fashion.

4         Q.   Mr. Jeffress, in August of 2002, the Booker T.

5    Washington Center let its executive director go.  Would you

6    say that was an important decision?

7         A.   I'd say that's an incorrect statement.

8         Q.   Well, how would you describe it then?

9         A.   In August of 2002 --

10        Q.   2002.

11        A.   -- Mr. Sherrod was in a meeting with the board, and

12   Mr. Sherrod resigned from his position during a board

13   meeting.  That's how I would describe it in August of 2002.

14        Q.   Let me go on.  In August of 2002, the board of --

15   the Booker T. Washington Center was without an executive

16   director; isn't that correct?

17        A.   If it's correct that Mr. Sherrod resigned, yes.

18        Q.   Answer my question.

19        A.   I'm not sure.

20             MR. MARTINUCCI:  He did.

21        Q.   Listen to the question, please answer it.

22        A.   Okay.

23        Q.   Would you say it's important for any organization to

24   have people in leadership positions?

25        A.   You said listen to your question.  That's not the

1   same question.

2       Q.   I'm going to rephrase it.  I'll bring you back,

3   don't worry about it.

4       A.   I just want to make sure we're on the same page.

5       Q.   Don't worry about it.  I'll bring you back.  Isn't

6   it important for an organization to have a leader?

7       A.   Leadership is important, yes.

8       Q.   Right.  And in August of 2002, whether you want to

9   view Mr. Sherrod as resigning or being fired, the point of it

10  is that the executive director's position was vacant; isn't

11  that correct?

12      A.   I don't think that's a yes or no question.

13      Q.   It calls for a yes or no answer.

14      A.   Then I'd have to say, no, that's not correct.  Your

15  statement's not correct.

16      Q.   Now, isn't it important -- excuse me, in August of

17  2002, isn't it correct that the board demanded that

18  Mr. Sherrod resign or be fired?

19      A.   No.

20      Q.   In a meeting that occurred with the board of

21  directors on August 12th or 13th, 2002, isn't it correct that

22  the board of directors demanded that Mr. Sherrod resign or be

23  fired?

24      A.   That's not correct.

25      Q.   Was that meeting recorded?

1          A.    I'm not sure.

2          Q.    Were you present at that meeting?

3          A.    Yes, I was.  If we're talking about the same

4     meeting.  The last meeting that Mr. Sherrod sat in with the

5     full board.

6          Q.    Was that meeting on August the 12th or 13th of 2002?

7          A.    I'm not sure.

8          Q.    Where can you find documentation that would help you

9     determine what the date of that meeting was?

10         A.    I'm not sure.

11         Q.    You're not sure of the date.  You're not sure if the

12    meeting was recorded.  Did a meeting of the board of

13    directors occur in August of 2002?

14         A.    Yes.  That Mr. Sherrod was present.

15         Q.    Now, at that time didn't the board of directors

16    demand that Mr. Sherrod resign or be fired?

17         A.    No.

18         Q.    Who was present at that meeting?

19         A.    I know Cathy Lyons, Mike Butler, Debbie Smith, Paul

20    Gambel, Sean Coleman.  Those are the ones that I'm sure.

21         Q.    How was notice given of this meeting?

22         A.    I'm not sure.  I believe it was made by phone.

23         Q.    Who made the phone calls?

24         A.    I'm not sure.

25         Q.    What was the total composition of the board at the

1    time?

2         A.    I'm not sure.

3         Q.    If this meeting was recorded, who would have

4    possession of that tape?

5         A.    Anita Smith possibly.

6         Q.    If not Ms. Smith, who else would have possession?

7         A.    I'm not sure.

8         Q.    Was there more than one meeting of the board of

9    directors in August of 2002?

10        A.    I'm not sure.

11        Q.    Where can you find data that would help you be sure?

12        A.    I'm not sure.

13        Q.    Would you have your personal notes?

14        A.    It's possible, yes.

15        Q.    Now, earlier you have testified that you would take

16   notes at the management meeting using your -- iPod, did you

17   say?

18        A.    IPAQ, yes.

19        Q.    IPAQ.  Would you do the same thing at board of

20   directors' meetings?

21        A.    Sometimes I -- I'm not sure, really.  It depends

22   on -- it wasn't the same meeting contacts in my opinion,

23   so --

24        Q.    I'm sorry?

25        A.    It wasn't the same kind of meeting.  In the board

1    meetings, I wasn't being responsible for making sure where we

2    were going.  In the management committee meetings, when I did

3    take my notes on my iPAQ, it was because I felt that I needed

4    to keep track of what was going on.

5         Q.   Is it possible that you, nevertheless, at board of

6    directors' meetings took notes on your iPAQ?

7         A.   It's always possible, yes.

8         Q.   So you may have notes of meetings of the Booker T.

9    Washington Board of Directors' meetings on that?

10        A.   Not on it now.  I said, I may have hard copies of

11   some of the stuff because, again, change, what do you call

12   it, computers.

13        Q.   Now, in August of 2002, who was the president of

14   Booker T. Washington Center Board?

15        A.   In August of 2002, I believe it was James Hamilton.

16        Q.   Who's vice chairman of the board of directors?

17        A.   I believe that was Sean Coleman.

18        Q.   Who was secretary?

19        A.   I believe it was Debbie Smith.

20        Q.   And who was treasurer?

21        A.   I believe it was Rege O'Neill.

22        Q.   Did those individuals make up the executive

23   committee of the board of directors?

24        A.   They -- they were a part of the executive committee,

25   correct.

1    Q.    And who else were a part?

2    A.    Committee chairs.

3    Q.    How many committees did the board of directors have?

4    A.    I'm not sure, but I believe it was at least three to

5    four.

6    Q.    Would you please name them.

7    A.    Management committee, public relations committee --

8    management, public relations, program committee, and I -- I

9    think that was it.  It could -- there's a possibility there

10    could be more, but those are the only three that I can

11    recall.

12    Q.    Let's go back to August of 2002.  What led to

13    Mr. Sherrod no longer being at the Booker T. Washington

14    Center?

15    A.    Mr. Sherrod said during the meeting, if you guys

16    want my resignation, you can have it.

17    Q.    Now, how did this meeting come about?

18    A.    This meeting came about through a phone call, and I

19    attended the meeting.  During this meeting -- during this

20    meeting the conversation went, what's going on.  What's

21    happening.  It doesn't seem like we're moving forward.  And

22    it was -- it was an information gathering meeting, I thought.

23    Q.    You thought the meeting was an information gathering

24    meeting?

25    A.    Right.