1  active with regard to the August 6, 2002 incident?

2      A.   I really couldn't tell you because that's each
3  individual board member, and I didn't have a conversation in
4  regards to each individual board member.

5      Q.   How would you describe Mr. Coleman's role with
6  regard to the August 6, 2002 incident?

7      A.   He was vice president of the board.

8      Q.   And?

9      A.   And he had conversations with Mr. Sherrod.

10     Q.   Any other activity that you're aware of that he
11 engaged in?

12     A.   In reference to?  I -- again, I -- I haven't seen --
13 I didn't see any other activity.  I didn't witness any other
14 activity.  Everything that was --

15     Q.   Did you hear about any of Mr. Coleman's activity
16 regarding the August 6, 2002 incident?

17     A.   I heard that Mr. Coleman -- I'm not sure if he said
18 he was possibly related to the person or he knew somebody who
19 was related to the person that the incident happened to.
20 That's what I heard, yes.

21     Q.   Now, at what point did the board decide to retain
22 counsel?

23     A.   When the board found out that James was saying that
24 he did not resign, he was not going to hand in a resignation
25 letter.

1    Q.    Had discussions involving a severance package
2    occurred prior to that decision?
3    A.    I don't recall.  It's kind of all blurred together.
4    Q.    Might discussions have occurred?
5    A.    The discussions that would occur wouldn't have been
6    entailing a severance package.  It would have been saying,
7    you know, basically what time does he have left on his
8    vacation time and any other time that he's eligible for.
9    That wouldn't have been a severance package.  That would have
10   been just a -- basically a -- it is just a departure of
11   employment.
12   Q.    Now, I know prior to coming to the Booker T.
13   Washington Center you worked for Community Health Net, right?
14   A.    Correct.
15   Q.    What was your position at Community Health Net?
16   A.    Director of human resources.
17   Q.    Community Health Net, as all of us are aware based
18   on reading the papers, is engaged in a bankruptcy, right?
19   A.    Correct.
20   Q.    When did they file the bankruptcy?
21   A.    This is '05, correct?
22   Q.    Yes.
23   A.    Therefore, they filed bankruptcy July -- no.  Excuse
24   me.  I believe it was the end of May of '04.
25   Q.    Now, you said you've had several conversations --

1    you've had at least one conversation, maybe more, with
2    Mr. Hamilton regarding Mr. Sherrod.
3         A.   Correct.
4         Q.   When you had your first conversation with
5    Mr. Hamilton regarding Mr. Sherrod, what was his response?
6              MR. MARTINUCCI:  His response to what?
7              MS. BENSON:  To what was going on.
8         A.   He's got to come in here and meet with him.
9         Q.   Mr. Hamilton said he had to meet with Mr. Sherrod?
10        A.   Correct.
11        Q.   Would it be correct to say that Mr. Hamilton thought
12   that Mr. Sherrod was being treated unfairly?
13        A.   I wouldn't know.
14        Q.   You had a conversation with him?
15        A.   He wouldn't know how he was being treated until he
16   talked to Mr. Sherrod at that time.  So I wouldn't know what
17   he was thinking.  All he was trying to do was get the facts.
18        Q.   Mr. Hamilton state to you his opinion that
19   Mr. Sherrod was being treated unfairly?
20        A.   Not that I recall.
21        Q.   Did he state to you that Mr. Sherrod, in his
22   opinion, should not have been fired?
23        A.   Not that I recall.
24        Q.   Did he have any questions of you regarding what was
25   going on?

1   A.   He had questions, and I told him the questions I
2   can't answer you can get straight from James himself.
3   Q.   What were the questions he had?
4   A.   How's James doing. You know, what's going on.
5   Stuff like that.
6   Q.   So he wanted to know what was going on, and how was
7   Mr. Sherrod doing?
8   A.   Right.
9   Q.   Going back to the August 12, 2002 board meeting, and
10  you followed Mr. Sherrod into his office.
11  A.   Yes.
12  Q.   Isn't it correct that Mr. Sherrod was sitting there
13  writing out questions for the board?
14  A.   I don't know. I just know he was frustrated.
15  Q.   Now, you acknowledge that he went back into the
16  boardroom with questions, right?
17  A.   Yes.
18  Q.   Now, isn't it correct that you said to Mr. Sherrod,
19  on entering his room, that if he didn't want to resign, he
20  didn't have to resign?
21  A.   I don't recall saying something like that.
22  Q.   Did you say --
23  A.   I recall saying, what's going on. Do you know
24  exactly what you just did.
25  Q.   Is it possible that you said to Mr. Sherrod, if you

1   don't want to resign, you don't have to resign?
2       A.  I don't think it's possible.  Because I said, do you
3   know what you just did, and in that context, I wouldn't then
4   go back and say, you don't have to.  You did it, why would I
5   say you don't have to.
6       Q.  Didn't you tell Mr. Sherrod that he -- didn't
7   Mr. Sherrod tell you that he was not going to resign, and
8   that he told you, make sure that the board knew -- didn't he
9   tell you that he was not going to resign?
10      A.  No.
11      Q.  Isn't it correct that Mr. Sherrod told you that he
12  would take a leave, but he would not resign?
13      A.  What time frame are you talking about?
14      Q.  August the 12th, 2002.  Isn't it correct, when you
15  followed him into that office --
16      A.  No.
17      Q.  -- he told you he would not resign --
18      A.  August 12th of 2002, when I walked in that office,
19  we did not have the conversation in regards to I'll take a
20  leave and I'm not resigning.
21      Q.  Isn't it correct that you took his keys -- you took
22  his keys, and you went back into the room where the board of
23  directors was meeting?
24      A.  I don't recall taking -- first of all, I didn't take
25  any keys.  No, that's not correct.

1   Q. Are you aware that Mr. Coleman went to Mr. Sherrod's
2   home the evening of August the 12th, 2002?
3   A. He could have. I don't know.
4   Q. Is it possible that he did?
5   A. I just said he could have. I don't know.
6   Q. Did he tell you that he met with Mr. Sherrod on
7   August the 12th of that evening?
8   A. I don't recall what date or time he met with
9   Mr. Sherrod, but I do know that he met with Mr. Sherrod on
10  several occasions.
11  Q. Were you aware that Mr. Coleman participated in
12  interviews with the staff who were supervising the field trip
13  of August the 6th, '02 when that little girl supposedly was
14  left behind at the theater?
15  A. When are you asking about my awareness?
16  Q. I'm asking you, were you aware.
17      MR. MARTINUCCI: At what point in time?
18      MS. BENSON: All right. Let me rephrase.
19  Q. When did you become aware that Mr. Coleman
20  participated in interviews of the three staff people who were
21  supervising the field trip of August 6, '02?
22  A. I don't -- I don't recall, but I do know it was
23  after the fact of a lot of stuff. It came out after -- after
24  the fact of August 12th. After the fact of probably August
25  16th. I probably became aware of this probably sometime in

1   September.
2   Q.   How did you become aware?
3   A.   Listening to discussions.
4   Q.   From whom?  Involving whom?
5   A.   I'm not sure.  It could have been Mr. Sherrod.  It
6   could have been Mr. Coleman.  It could have just been overall
7   board meeting.
8   Q.   When did you become aware that three people were
9   fired as a result of that little girl supposedly missing?
10  A.   I'm not sure if it was during the board meeting or
11  if it was when they filed for an appeal.  I'm not sure which
12  one.
13  Q.   Which board meeting are you referring to in that?
14  A.   I'm not sure -- again, I'm not sure if -- I know
15  James was still present, so I'm not -- I'm not -- I'm not
16  sure.  I don't recall the exact time frame of the
17  terminations or how they took place.  All I know is that I
18  recall the appeals of the termination, and that's all I can
19  recall.  I wasn't involved in the terminations.  I was only
20  involved in when they came back to appeal.
21  Q.   And as chairperson of the management committee, you
22  heard the appeals, right?
23  A.   Yes.
24  Q.   Those appeals were by Lester Howard?
25  A.   Yes.

1    Q.    Renee Coates-Smith, I believe?
2    A.    I believe so.
3    Q.    And Derek Johnson?
4    A.    Correct.
5    Q.    Now, were you aware that Mr. Coleman conducted a
6    staff meeting on August the 13th, 2002?
7    A.    Again, when are you asking me in terms of time
8    frame?  When I became aware of this?
9    Q.    Yes.  When did you become aware of it?
10   A.    I don't recall.  I'm going to probably end up saying
11   sometime -- I don't recall the exact time frame when I became
12   aware of it.  But it wasn't -- it wasn't before, and it
13   wasn't directly after.
14   Q.    Did the board, at its meeting of August 12, 2002,
15   direct Mr. Coleman to conduct a staff meeting?
16   A.    I don't recall.
17   Q.    When did you learn of the staff meeting?
18   A.    Probably heard it during discussions again, which I
19   don't recall what time frame.
20   Q.    Do you recall who you had these discussions with?
21   A.    Again, it could have been with -- and this could
22   have been way after the fact, but it could have been with
23   either Anita Smith or James Sherrod, or I could very well
24   have overheard it in the board meeting.  I don't really
25   recall.

132

1    Q.   When do you recall learning that Mr. Coleman had
2    directed Mr. Sherrod to fire Lester Howard, Renee
3    Coates-Smith, and Derek Johnson?
4    A.   I don't recall what meeting, but I believe that was
5    when I had a conversation with James Sherrod.
6    Q.   When do you recall learning that Mr. Coleman, in
7    directing Mr. Sherrod to fire those three individuals, told
8    him, fire those niggers?
9    A.   When I had a conversation with Mr. Sherrod, and I
10   think that that was -- I don't even recall when that
11   conversation took place, but I know it was after August,
12   and -- probably in September.
13   Q.   So you're saying after August the 12th?
14   A.   It wasn't -- that conversation didn't take place in
15   August.
16   Q.   Why are you so certain that it didn't take place in
17   August?
18   A.   I didn't say I was certain that it took place.  I'm
19   just -- basically I know that all the conversations that we
20   had -- the majority of our conversations that took place in
21   terms of historical stuff was probably at a later time.
22   August we were basically dealing with how we can work through
23   the transition.
24   Q.   So you're saying, after receiving Mr. Sherrod's
25   letter of August 16th, which is Exhibit No. 4, that you

```
 1   didn't have a conversation with Mr. Sherrod in which he said
 2   to you -- in which you learned that Mr. Coleman had directed
 3   that all those niggers be fired?
 4            MR. MARTINUCCI:  Wait.  So we're clear here, you're
 5            asking him if he had any conversation with
 6            Mr. Sherrod about this subject after August 16th?
 7            MS. BENSON:  Let me rephrase it.
 8       Q.   You're saying you learned from Mr. Sherrod that he
 9   was directed by Mr. Coleman to fire all those niggers?
10       A.   That information came from Mr. Sherrod, correct.
11       Q.   When are you saying that this information came from
12   Mr. Sherrod?
13       A.   As I said, I don't recall, but I'm pretty -- like I
14   said, I don't recall, but if I had to say or I had to give
15   you an answer, I'd probably have to say sometime in
16   September.
17       Q.   Do you have any documentation that would provide us
18   with definitive information as to when this conversation may
19   have occurred?
20       A.   I didn't document that information because, when it
21   was -- when it was brought to me, I didn't look at it as an
22   issue.  So, therefore, I didn't document anything in terms
23   of -- it didn't raise any red flags to me.  I basically do
24   recall saying -- after getting that information from
25   Mr. Sherrod, having this conversation with Mr. Coleman, and
```

1    Mr. Coleman said, I had never said that, and that's it.
2         Q.   Now, you've testified that at Community Health
3    Net -- you were still holding your position there as head of
4    human resources, right?
5         A.   Correct.
6         Q.   When you heard that Mr. Coleman had given
7    Mr. Sherrod directive to "fire all those niggers," it did not
8    raise a red flag?
9         A.   Raise a red flag?
10        Q.   Yes.
11        A.   Why would it raise a red flag to me?
12        Q.   For discrimination.
13        A.   On what grounds?
14        Q.   Stop and think about it.
15        A.   I'm thinking about it.
16        Q.   In employment context, you are a -- let's get
17   this -- be careful here.
18        A.   Right.
19        Q.   You've testified here that in your professional
20   capacity --
21        A.   Which I was not operating in.
22        Q.   I understand.  But that doesn't separate the fact --
23   I'm assuming that as a human resource director --
24        A.   Which is I was not operating in.
25        Q.   I understand that.  Listen to my question.

1       A.  Okay.

2       Q.  You had employment as a human resource director at
3   Community Health Net -- that's your testimony, right?

4       A.  Yes.

5       Q.  And in that capacity, you were responsible for
6   making sure Community Health Net did not violate any laws
7   that prohibited discrimination; isn't that correct?

8       A.  Correct.

9       Q.  Now, I assume you got that position based on some
10  training and some experience and some knowledge of the law,
11  correct?

12      A.  Correct.

13      Q.  I assume that as a board member of the Booker T.
14  Washington Center you recognize you had a fiduciary duty to
15  Booker T. Washington Center; is that correct?

16      A.  Correct.

17      Q.  So in that capacity, as a member of the board of
18  directors, you would make sure, wouldn't you, that the Center
19  observed all laws pertaining to discrimination?

20      A.  If it was brought to my attention that there was
21  some discrimination taking place, yes, I would.

22      Q.  If someone had informed you that a directive had
23  been given to fire all those niggers, wouldn't that raise a
24  red flag?

25      A.  In what context?  If I'm on the basketball court and

1  someone said I heard he said fire all those niggers, I'm not
2  going to do that.  If I see five black males going together,
3  they may have just used the wrong terminology.  I'm not going
4  to make assumptions.  That's what you're asking me to make is
5  assumptions.
6      Q.   No, sir, I'm not.  Please listen to the question.
7      A.   I'm listening.
8      Q.   Renee Coates-Smith, Lester Howard, and Derek Johnson
9  were employees of the Booker T. Washington Center in August
10 of 2002; isn't that correct?
11     A.   I believe so.
12     Q.   And those three individuals were responsible -- were
13 responsible for the field trip of August the 6th, 2002; isn't
14 that correct?
15     A.   I couldn't tell you if that was correct or not.
16     Q.   Well --
17     A.   They were involved in the incident.  I'll stand by
18 that.
19     Q.   And as chairman of the management committee you
20 handled their appeals?
21     A.   Correct.
22     Q.   So if a directive was given to fire all those
23 niggers, it was in an employment context; wasn't it?
24     A.   I don't know.  I didn't give the directive; I didn't
25 hear the directive.

```
 1     Q.   My question to you is, if a directive was given?
 2     A.   If a directive was given to fire those employees, it
 3   all depends on who's saying it, and what terminology.  This
 4   is a secondhand question.
 5     Q.   You're not answering my question.  You're not
 6   answering my question.  If a directive was given by
 7   Mr. Coleman to fire all those niggers, it was in an
 8   employment context; wasn't it?
 9     A.   Mr. Coleman didn't have the authority to do so.
10     Q.   Who had the authority to fire?
11     A.   The executive director.
12     Q.   Now, the board of directors expect the executive
13   director to carry out orders that they give him; don't they?
14          MR. MARTINUCCI:  Who on the board of directors?
15          MS. BENSON:  Let me finish.
16          MR. MARTINUCCI:  I thought you had finished.
17          MS. BENSON:  No.  Let me finish.
18     Q.   No.  My question was, the board of directors expect
19   Mr. Sherrod, as executive director, to carry out orders given
20   to him; isn't that correct?
21     A.   Orders given to him?
22     Q.   Yes.
23     A.   I don't think that they would -- in reference to
24   policies and procedures?
25     Q.   Answer the question.
```

```
 1        A.   I'm asking you to define it more.  Orders given to
 2   him in what context?
 3        Q.   Let's take it little bit by little bit.
 4             And let me just say, I've noticed for quite some
 5   time you keep looking over to Mr. Martinucci.
 6        A.   No.  He's sitting right there.  I don't have to look
 7   at him.  I don't need him to answer my questions.  I can
 8   answer my own questions.  I'm not looking for his guidance.
 9   I'm looking directly at you.
10        Q.   You're not looking directly at me when you're
11   turning your eyes at him.
12        A.   Yeah, because some of your questions to me are just
13   like, didn't we answer that.  I mean, basically, if I'm
14   looking at him, I'm like, listen, can't we move on.  That's
15   why I'm looking -- you want to know why I'm looking at him,
16   I'm looking at him like, listen, let's move on.
17             MR. MARTINUCCI:  He wants me to object more.
18        Q.   I understand that, and I think you've -- let me ask
19   you this question here.  Because I would assume you prepared
20   for this deposition.
21        A.   I prepared for it?  No.  That's probably one of the
22   reasons -- basically, some of the questions you asked me or
23   anything else, what's there to prepare for.  I'm going to
24   come here and tell you the truth.
25        Q.   You didn't meet with Mr. Martinucci?
```

```
 1       A.   I met with Mr. Martinucci so he could tell me what
 2  date and time that I was supposed to be present.
 3       Q.   And that was it?  You never discussed your
 4  deposition?
 5       A.   This is me.  This is my personality.  He told me
 6  basically, Bill, you go in there and be yourself.
 7       Q.   All right.  Did you review any documents in order to
 8  prepare for your deposition?
 9       A.   Didn't touch a document.  He had his books and his
10  papers just right there, and I said, listen, hey, I'm going
11  to go in there and I'm going to be myself.  This is who I am.
12  This is what happened.
13       Q.   So you're saying you didn't review any documents?
14       A.   What documents would I have reviewed?  Basically, if
15  he would have shown me a date, time -- let me think for a
16  second, anything that he showed me.  I don't recall him
17  showing me anything.  There was no review.  It was basically
18  saying, hey --
19       Q.   I'm not asking you whether he showed you anything.
20  I'm asking what you reviewed.
21       A.   Okay.  What documents would I have reviewed?
22  Basically, anything that I would have given to you, I've
23  already given to him, and he's already given to you.  So what
24  would I have reviewed?  Did I have these documents and
25  exhibits in front of me to review, no, I did not.
```

1       Q.   Now, you were told that your testimony would be
2  under oath.
3       A.   And my testimony is under oath.
4       Q.   And you were told that you would be expected to
5  provide truthful information.
6       A.   Correct.
7       Q.   Were you told by Mr. Martinucci that that
8  information should be complete?
9            MR. MARTINUCCI:  I'm going to object at this point
10           in time because now you're asking him what his
11           attorney told him.
12           MS. BENSON:  All right.  Then I'll rephrase it.
13      Q.   Are you aware that your testimony here today should
14 be accurate?
15      A.   That's what I went under oath for.
16      Q.   Are you aware that your testimony here today should
17 be complete?
18      A.   To the best of my ability.
19      Q.   Are you aware that your testimony here today should
20 be -- should be able -- let me -- are you aware that your
21 testimony here today should lead me, if at all possible, to
22 other evidence?
23      A.   I'm not going to -- I'm not going to say that.
24           MR. MARTINUCCI:  You're asking him for something
25           that's, I think, beyond what he would understand.

141

```
 1              MS. BENSON:  Then I'll rephrase it.
 2        Q.    Are you aware that your testimony here today should
 3   lead me to other potential witnesses?
 4        A.    You should know all the witnesses by now.
 5        Q.    Simply answer my question, please.
 6        A.    I didn't speculate anything about what you were
 7   going to do.
 8        Q.    Well, then let me advise you.  Your testimony here
 9   today should not only be based on what you know, but what you
10   believe others know, or where I can find information that
11   could leave me to evidence that could possibly support
12   Mr. Sherrod's claim or your defenses.
13        A.    Well, ask the question, and I'll give you the
14   answer.  That's the way -- that's the way I'm interpreting
15   this whole deposition.  You ask the question, I give you the
16   answer truthfully --
17        Q.    I'm not fighting with you.
18        A.    -- and that's it.  No.  I'm just trying to give you
19   my opinion that if you ask me a question, I'm going to give
20   you the answer truthfully.  Am I correct?  Is that what you
21   want?
22        Q.    I want the truth from you, and I want it to be
23   complete --
24              MR. MARTINUCCI:  To the best of his knowledge and
25              recollection.
```

1    Q.   I want it to be complete.
2         Now, let's go back.  You're saying that you only
3    learned from Mr. Sherrod of Mr. Coleman's directive?
4    A.   I heard Mr. Sherrod tell me something.  That's the
5    only person that told me this.
6    Q.   And you've not heard it from anybody else?
7    A.   I heard -- whatever I heard from anybody else, they
8    heard from Mr. Sherrod just like I heard it from.
9    Q.   Are you sure of that?
10   A.   I'm sure what I know is that they said -- anybody
11   who did say anything, and like I said, I don't recall exactly
12   who said what, but it was a whole bunch of he said/she said
13   this type of thing, but, again, it originated and said, this
14   is what I was told.
15   Q.   When you left Community Health Net, was it because
16   you feared that in light of Community Health Net financial
17   problems --
18   A.   They didn't have any financial problems when I left
19   them.  They didn't have --
20        MR. MARTINUCCI:  Let her ask the full question.
21   Q.   That in light of Community Health Net financial
22   problems that you would no longer have your position?
23   A.   No.
24   Q.   Mr. Coleman testified that he's no longer on your
25   board of directors.  Can you tell us when he came off?