# BOOKER T. WASHINGTON CENTER
## INCIDENT REPORT

PERSON FILING REPORT: _Anita Smith_     DATE: _8-6-02_

DATE OF INCIDENT: _8-6-02_     TIME OF INCIDENT: _4:50 p.m_

PERSONS INVOLVED: _Summer Camp Staff - Missing Youth_

**Circle One:**     Accident     Mis-Conduct     (Staff Related)

A brief description of incident: (Valerie Hughes) _A parent came to pick up her child_ (Brinna Hughes) _from the agency and her child wasn't here. She left her cell phone number and said she would go look for her and to call if we heard anything._

Was medical attention needed?:  Y _____   N _✓_     If yes, explain: _____

_____

_____

Action taken by Staff: _Sonda Jamison took initial information. She called James Sherron for Renee Coates Smith phone number. She called Renee and tried to call Derek Johnson but his cell phone wasn't operating._

* A copy of this report is to be placed in child's file and a copy to be given to the Executive director for informational purposes.

_Anita Smith_     _8-6-02_
Signature     Date



**DEPOSITION EXHIBIT**

7/27/05 SAB

Incident 8-6-02

Action by Staff continued:    James called back with Renee's phone number. Sonda called Renee - Renee said she would try to contact Derek to see if he knew where the child was. Renee called back, At this time, Sonda had left for the day (5pm) so I was covering the front desk + phone. I told Renee the family wanted to talk with her and she really should come back to the agency to do so. She said she would return. I called RANDY DAVIS and explained the situation to him. I ASKED him to come to the agency to help me cover the emergenc He SAID he would. I also called Brian Bessetti to inform him of the incident since he was covering for James who was on vacation.

Family members of the missing child kept returning for updates. I kept calling phone numbers as requested by the family. Renee came back and talked with the family. She said she did not know if the child was on the van when they returned from the field trip.

At 5:45 p.m. I received a call. The party asked to speak with Aunt Valerie. I located that person and the caller notified her that the child had been left at the Millcreek mall movie theatre. She walked some blocks to a relatives house from the ___ ___ she was safe and ok.

the area looking for the child.) to inform him of the outcome. I also called Brian to update him as well. (aw)

In order to better serve the BTW community I am proposing to the Executive Committee that I be allowed to step down as Chair of the Management Committee and the BTW Board. This will enable me to assist in the facilitation of a smooth transition with its current Executive Director Mr. James Sherrod. I would act as a consultant to the board working as a part of a transitional team. The transitional team would be made up of interested board members, Mr. Sherrod, and myself.

Since this transition would require me to take personal time and vacation time from my current employment situation, I would request to be compensated approximately $30/hour for my time.

In this role I would be allowed to work with Mr. Sherrod ensuring that proper policy and procedures are in place for all programs and that the day-to-day operations and decision are being made in the best interest of the BTWC. During this transition I would report to the board all activities

This proposal would give the board the opportunity to continue serving the community with its current needs, have a smooth transition regarding the leadership of the organization, and have ample time to recruit and orient its new leadership.

Letter from
Mr. Jeffress to
Board.



DEPOSITION EXHIBIT



# BOOKER T. WASHINGTON CENTER

**1720 Holland Street • Erie, Pennsylvania 16503**
**Phone (814) 453-5744 • Fax (814) 453-5749**

*SERVING THE ERIE COMMUNITY SINCE 1923*

September 24, 2002

James C. Sherrod
917 East 33rd Street
Erie, PA 16504

**Re:    Termination of Employment**

Dear Mr. Sherrod:

This letter constitutes formal notice of the termination of your employment as the Executive Director of the Booker T. Washington Center. Your termination is effective immediately.

As you know, your employment with the Center was "at will." This is plainly stated in the letter setting forth the terms and conditions of your employment. Accordingly, either party could terminate the employment relationship between you and the Board, at any time and for any or no reason at all. In this particular instance, the Board has determined that this action is both necessary and appropriate.

We have explained that the Board felt that you did not treat a situation seriously enough, and did not immediately take reasonable steps to investigate the matter. We also expressed our displeasure with the fact that a number of the policies you relied upon to terminate the employees directly involved in the situation do not, in fact, exist. As we discussed, the creation and maintenance of these policies were your responsibility, and your failure to have established these policies was a failure on your part to perform an essential function of your job.

The Board deems this to be unsatisfactory job performance, as well as failure to perform your job within working hours, both of which are grounds for disciplinary action up to and including termination.

You will be paid for any accrued an unused vacation time as well as any remaining time worked but not paid (if any), during the next payroll period. Your health care and other insurance coverages will cease, effective midnight, September 30, 2002. Under Pennsylvania law, however, you may have the right to convert these group policies to individual ones within 30 days of your termination. You should contact the respective insurance carriers for information on how to do this.

Very truly yours,

BOOKER T. WASHINGTON CENTER, INC.

By: *Sean P. Coleman, Vice-President*



DEPOSITION EXHIBIT 3  4/27/05 SAB

August 16, 2002


James Hamilton
2284 Pinnacle Court
Erie, Pennsylvania 16506

Dear Mr. Hamilton:

Per the Special Meeting of the Board of Directors held on Monday, August 12, 2002, at the Booker T. Washington Center, in which I was asked to resign my position as Executive Director of the Agency, please be advised that I have not submitted my resignation since that meeting.

Furthermore, let me affirm through this communication that I have not received any correspondence relative to why I was asked to vacate my office, turn in my Agency keys, or any other protocols for the action in which exist.

Lastly, be assured that the process and steps taken to phase me out of my position are not acceptable. The appointment of an Interim-Director (Anita Smith) versus appointing someone to be responsible for agency matters (which is what usually occurs when I'm away from the Agency) is definitely a harsh and suggestive move.

It is my hope that a more careful and observant process will be utilized whenever the Board of Directors issues or takes their next step in this situation, which has left me locked out.

Sincerely,



James C. Sherrod
Executive Director


cc: BTWC Board of Directors



Exhibit "B"

# BOOKER T. WASHINGTON CENTER

### Functions of the Program Committee

The Program Committee shall be the principal arm of the Board to advise the Board concerning:

A.  **Community Needs And Resources**

    (1)    Studying the nature and extent of the social needs and wants of the target population.

    (2)    Reviewing periodically the local operating programs and identifying the gaps (unmet needs) between what is necessary and what is currently available.

    (3)    Inventorying local resources capable of responding to these unmet needs (e.g., business, labor, and industry; foundations; governments; etc.).

    (4)    Identifying program goals and formulating sources of action to coordinate the fulfillment of these unmet needs.

B.  **Program Priorities**

    (1)    Establishing the order (priorities) in which unmet needs are addressed.

    (2)    Overseeing the development of a general three-year plan, and a specific one-year action program, by which BTWC focuses on the most critical unmet needs and coordinates an adequate community response.

C.  **Proposal Review**

    (1)    Receiving and studying program proposals to assure that no possible duplication of services or effort is contained therein.

    (2)    Insuring that proposals incorporate the best available ideas at the most reasonable cost and the most community-responsible manner.

    (3)    Reviewing, in conjunction with the Management Committee, the capabilities and past performance of prospective program operating agencies so as to assess the competence to conduct such within the requirements of community service agencies and the policies of BTWC.


DEPOSITION
EXHIBIT
5

Functions of the Program Committee Continued

      D.      Program Evaluation

          (1)     Establish a Program Progress Review system for the evaluation of all BTWC programs on a regular basis and in line with all Funding Source Guidelines.

          (2)     Recommend corrective action to the Board and Staff on program operating problems encountered with follow through.

          (3)     Review general program performance and prepare periodic reports to the Board and the Community on accomplishments and progress to date.

# BOOKER T. WASHINGTON CENTER

### Functions of the Community Participation Committee

The Community Participation Committee shall be the principal arm of the Board Concerning:

A.    **Communication With Target Area Residents**

   (1)    Inviting, soliciting, receiving, and considering the expression of suggestions, criticisms, etc., from target area residents and program participants.

   (2)    Determining the most practical and meaningful ways to strengthen communications to and from the target areas.

   (3)    Reconsidering annually the composition of the Board of Directors in order to recommend appropriate changes in representation so as to accommodate new voices and interest.

B.    **Relations With Agency Boards And Other Community Planning And Action Groups**

   (1)    Promoting direct communication with Agency Boards and other community planning and action groups (i.e. NAACP, United Way, GECAC, YMCA, etc.) by authorizing committee members to attend meetings as official representatives, securing copies of minutes, exchanging progress reports, and program summaries, etc.

C.    **Compliance With Community Service Agencies (CSA) Requirements**

   (1)    Receiving and reviewing the Articles of Incorporation, Bylaws, and other instruments that establish and define the mechanisms by which the policy boards of Agencies operate so as to insure compliance with pertinent CSA requirements and BTWC policies.

# BOOKER T. WASHINGTON CENTER

## Functions of the Management Committee

The Management Committee shall be the principal arm of the Board Concerning:

A.  **Financial Operations**

    (1)    Determining that the accounting systems in operation represents the most practical and effective one available.

    (2)    Insuring that the proper financial records are kept, reports issued, audits periodically performed, and audit findings complied with expeditiously.

    (3)    Monitoring and reporting to the Board of Directors on the monthly financials reports of BTWC and its subcontractors, together with recommendations for appropriate action, if warranted, to safeguard the expenditure of funds.

B.  **Personnel Operations**

    (1)    Restudying periodically with personnel system, including recruitment means, salary/job comparability, and compensation plans.

    (2)    Considering, as appropriate, revisions of and modifications to current personnel policies and practices.

    (3)    Promoting self-development and personal growth among all employees of BTWC and providing the leadership to monitor employee progress.

    (4)    Conducting hearings, as necessary, of personnel complaints and grievances when all other remedies have been exhausted.

    (5)    Serving, as required, to effect the hiring of specified staff personnel.

C.  **Contractual Relations**

    (1)    Monitoring the performance of contracts, the satisfactory compliance with all applicable conditions and requirements, and the fulfillment of reporting obligations.

    (2)    Review all contracts and make recommendations to Board for appropriate action.

Functions of the Management Committee Continued

       (3)     Review all audit reports and make recommendations to board for appropriate action.

       (4)     Advising the Program Committee of contractor performance and an assessment of capabilities.

D.    **General Administration**

       (1)     Assuring that BTWC is effectively discharging its responsibilities as grantee to both the funding sources and subcontracting agencies.

From the BTWC Personnel Policies, the Management Committee is responsible for:

       (1)     Overseeing the total operations in relation to the BTWC Personnel Policies.

       (2)     Recommend changes in the Personnel Policies to the Board of Directors.

       (3)     Investigate all complaints concerning alleged discriminatory practices.

       (4)     Recruit, interview, and recommend a candidate for Executive Director to the Board.

       (5)     Approve job descriptions and salary schedules

       (6)     Approve salary adjustments which take place more than once a year and over 5.5%.

       (7)     Approve the carry over of vacation time from year to year.

       (8)     Approve any leave without pay over ninety days.

       (9)     Along with the Board officers, annually evaluate the Executive Director and report to the Board Chairman.

     (10)    Approve suspension of an employee over ten days up to thirty days.

     (11)    Authorize a Grievance Appeal Committee, receive the recommendation from the Committee, and make a final decision on the grievance.

# BOOKER T. WASHINGTON CENTER
# BOARD OF DIRECTORS



**Executive Committee**

- James Hamilton
- Sean Coleman
- Rege O'Neill
- Debra Smith
- Tom Antolik *
- Charlotte Gavin *
- William Jeffress *

**Management Committee**

- William Jeffress *
- Sean Coleman **
- Clifton Anderson
- Joseph Fries
- Rege O'Neill

**Program Committee**

- Tom Antolik *
- Debra  Smith **
- Michael Butler
- Charles Faulkerson
- Claudette McAdory
- Anthony Ross

**Community Participation Committee**

- Charlotte Gavin *
- Paul Gambill **
- Henry Howze
- Cathy Lyons
- John Williams

\* Committee Chairperson
\*\* Committee Co-Chairperson

DEPOSITION
EXHIBIT

**Booker T. Washington Center**

**Board of Director's Final Decision [Resignation of James Sherrod, Executive Director]**

**September 16, 2002 - 3:00 p.m.**

Dear James:

James, we wanted to have this final meeting with you today to tell you the terms of the severance package the Board is willing to offer you, and to make sure you understand why it is we have decided to take this direction.

We have refrained from commenting publicly on this situation because we truly believe that this is a private personnel matter. It is not something that needs to be addressed in the newspaper, and we prefer that it not be.

We believe that you understand our concerns already, but in case you do not, you should be aware that our decision was based on what we see as a lack of leadership on your part. While you were not personally involved in the Brinna Hughes matter, you were responsible for creating an environment in which such an incident could occur.

During our investigation of this incident, we found that, despite the fact that three employees were written up for violating safety policies and procedures, no such policies in fact exist. We found that there were no guidelines in place for employee responsibility and accountability on field trips like the one on August 6, 2002. These policies are your responsibility, plain and simple. As executive director, you are the person charged with setting the ground rules and establishing minimum acceptable levels of conduct and performance. You did not do that here.



DEPOSITION
EXHIBIT

We also found your personal response to the situation to be unsatisfactory. The investigation that should have been conducted by you immediately upon learning of the situation actually had to be initiated by me. When we first spoke, the situation was reported as a minor incident, and you did not seem to take it seriously. In fact, you had not even contacted the child's family and did not even know how to get in touch with them at that point in time.

Without belaboring the point, this is all unacceptable. Your conduct before the incident, and your reaction to it, was not that of a leader. Because of this, we strongly believe that a change is necessary.

As I said, I believe you understood all of this already. Your resignation has been submitted and accepted, and that could be the end of it. In fairness to you, though, we thought it appropriate to offer you a severance package.

Keep in mind, we have no formal policy or program on severance here, and there is no legal requirement that we offer you one. However, in exchange for your execution of a release agreement—including a confidentiality clause—we are willing to offer you an 8 week severance package, and pay the cost of health care for you and your family for a total of 90 days from your resignation. The terms are spelled out in this agreement. Please take a few minutes to read it over, and let me know if you have any questions.

James, this is our only offer. We are not prepared to negotiate over any of these terms, and if you walk out the door without signing the agreement, the offer is rescinded. If you sign this, there will be no more media stories. We don't want to hear any more about the situation from you, or anyone speaking on your behalf. We will construe anything along those lines as a breach of the agreement and will act accordingly.

Now, that having been said, please take another minute or two to make your decision, and let us know how you intend to proceed.

## AGREEMENT AND GENERAL RELEASE

The Booker T. Washington Center, on behalf of itself, its successors and assigns, and the employees, officers, directors and agents thereof (collectively referred to throughout this Agreement as "the Center"), and James C. Sherrod ("Sherrod"), agree that:

1.    Sherrod's last day of employment with the Center shall be August ___, 2002.  He has submitted a letter of resignation effective that date, which has been accepted by the Center's Board of Directors.

2.    In consideration for signing this Agreement and General Release and compliance with the promises made herein, the Center agrees to provide the following severance benefits:

- ◆  Continuation of salary, paid in normal payroll installments and subject to all normal, statutory, withholdings, for a period of eight (8) weeks (four (4) pay periods);

- ◆  Continuation of health care benefits for a period of ninety (90) days, beginning August ___, 2002; and

- ◆  The Center shall agree to not oppose Sherrod's application for unemployment compensation benefits following the expiration of the salary continuation period.

3.    Sherrod understands and agrees that he would not receive the monies and/or benefits specified in paragraph "2" above, except for his execution of this Agreement and General Release and the fulfillment of the promises contained herein.

4.    Sherrod knowingly and voluntarily releases and forever discharges the Center, of and from any and all claims, known and unknown, which Sherrod, his heirs, executors, administrators, successors, and assigns have, may have, or may have had against the Center at any time prior to the date of execution of this Agreement and General Release, including, but not limited to, any alleged violation of:

- ◆  The National Labor Relations Act, as amended;

- ◆  Title VII of the Civil Rights Act of 1964, as amended;

- ◆  The Civil Rights Act of 1991;

- ◆  Sections 1981 through 1988 of Title 42 of the United States Code;

- ◆  The Employee Retirement Income Security Act of 1974, as amended;


DEPOSITION EXHIBIT

- The Immigration Reform and Control Act, as amended;

- The Americans with Disabilities Act of 1990;

- The Fair Labor Standards Act, as amended;

- The Occupational Safety and Health Act, as amended;

- The Family and Medical Leave Act;

- The Pennsylvania Human Relations Act, as amended;

- The Pennsylvania Wage Payment and Collection Law, as amended;

- The Pennsylvania Minimum Wage Act, as amended;

- Pennsylvania Equal Pay Law, as amended;

- Any other federal, state or local civil or human rights law or any other local, state or federal law, regulation or ordinance;

- Any public policy, contract, tort, or common law; or

- Any allegation for costs, fees, or other expenses including attorneys' fees incurred in these matters.

5.      Sherrod waives his right to file any charge or complaint on his own behalf and/or to participate in any charge or complaint which may be made by any other person or organization on his behalf before any federal, state, or local court or administrative agency against the Center, except as such waiver is prohibited by law. Should any such charge or complaint be filed Sherrod agrees that he will not accept any relief or recovery therefrom. Sherrod confirms that no charge, complaint, or action exists in any forum or form. Except as prohibited by law, in the event that any such claim is filed, it shall be dismissed with prejudice upon presentation of this Agreement and General Release and Sherrod shall reimburse the Center for the costs, including attorney's fees of defending any such action.

6.      Sherrod waives any right to in any way voluntarily assist any individual or entity in commencing or prosecuting any action or proceeding including, but not limited to, any administrative agency claims, charges or complaints and/or any lawsuit against the Center or to in any way voluntarily participate or cooperate in any such action or proceeding, except as such waiver is prohibited by law.

7.      Sherrod agrees not to disclose any information regarding the existence or substance of this Agreement and General Release, except to an attorney with whom Sherrod chooses to consult

regarding his consideration of the Agreement and General Release, his immediate family, or his tax consultant, all of whom shall likewise be subject to this confidentiality requirement. The parties agree that this confidentiality provision is essential to the Agreement and General Release, and that any breach of this provision by Sherrod constitutes a material breach of this paragraph, for which breach the Center would be entitled to injunctive relief and all remedies available at law or equity.

8.       The parties agree that they shall not disparage each other or, as between Sherrod and the Center, its agents, servants or employees.

9.       In the event it is necessary for the Center to seek judicial enforcement of any portion of this Agreement, or to bring an action against Sherrod for breaching this Agreement, Sherrod shall be liable to the Center for all costs and counsel fees incurred by the Center in such action.

10.      Sherrod understands that this agreement assumes no right to future employment with the Center. Sherrod agrees that he will not seek future employment with the Center at any time in the future.

11.      Should any provision of this Agreement and General Release be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, including the general release language such provision shall immediately become null and void, leaving the remainder of this Agreement and General Release in full force and effect. However, if any portion of the general release language were ruled to be unenforceable for any reason, Sherrod shall return the consideration paid hereunder to the Center.

12.      Sherrod agrees that neither this Agreement and General Release nor the furnishing of the consideration for this Release shall be deemed or construed at any time for any purpose as an admission by the Center of any liability or unlawful conduct of any kind.

13.      This Agreement and General Release may not be modified, altered or changed except upon express written consent of both Parties wherein specific reference is made to this Agreement and General Release.

3

14.     This Agreement and General Release sets forth the entire agreement between the parties hereto, and fully supersedes any prior agreements or understandings between the parties.

15.     This Agreement shall be construed in accordance with the laws of the Commonwealth of Pennsylvania.  The parties agree that the state and federal courts of the Commonwealth of Pennsylvania shall have jurisdiction over any dispute arising out of this Agreement, and that such of those courts as may be sitting in the County of Erie shall be the appropriate venue for any dispute arising under this Agreement.

_____
James C. Sherrod

_____
Date

Signed and sworn before me this
_____ day of September, 2002.

_____
Notary Public

Document #132409

4

**Edith Benson, Esq.**
4683 Budd Drive
Erie, PA 16506
(814) 838-3670

September 25, 2002

**Hand Delivered**

Arthur D. Martinucci, Esq.
Quinn Buseck Leemhuis Toohey & Kroto
2222 West Grandview Blvd.
Erie, PA. 16506

Re: James C. Sherrod, Executive Director
     Booker T. Washington Center

Dear Mr. Martinucci:

On Monday, September 16, 2002, my client, Mr. James C. Sherrod, and I met with Mr. William Jeffress and Mr. Sean Coleman of the Booker T. Washington Center Board of Directors. During the meeting we were informed that you had drafted certain documents (a letter and a general release) that were presented to us for Mr. Sherrod's review and signature.

Please be informed that we rejected the Board's offer and indicated our desire for Mr. Sherrod to return to his position and have staff and Board work with outside experts to deal with organizational and Board matters.

Mr. Jeffress and Mr. Coleman promised to take our request to the Board of Directors. To date, I have not heard from the Board. Please advise me if you are representing the agency beyond the drafting of documents and if so, when can you and I meet. While reluctant, if necessary, my client and I are prepared to take legal action.



May I hear from you by Friday, September 27, 2002.


Sincerely,


Edith Benson, Esq.


Cc:   Booker T. Washington Center Board of Directors

## BTW BOARD MANAGEMENT COMMITTEE MINUTES
Date: September 3, 2002
Location: BTW Board Room
Time: 12:00 PM

12:00 PM -Committee members review agenda items
**12:15 PM**
**Committee meets with first employee to appeal termination**
Present: Renee Coates-Smith, Attorney. Greg Karle, Regis, Paul Gamble,
Charles Faulkerson, William Jeffress

Attorney Address: Greg Karle-900 State Street, Erie, PA 16501

Recapture event: 24 kids departed, 2 vehicles, Returned 23

Renee counted the kids; they went to Rita's for ice cream

2 years employed
Turned in list of field trips
Discussion on chaperoning kids

Call from Sanya Re: Daughter missing
Someone called and said she was at her aunts house
Offered to have mother talk to staff

Shawn quoted: Told James to handle those N

**1:15 PM Appeal regarding termination of third employee**
Present: Derek Johnson, Regis, Paul Gamble, Charles Faulkerson,
            William Jeffress
6 kids in his van green, About 24 or 23

**1:40 PM Appeal regarding termination of second employee**
Present: Lester Howard, Regis, Paul Gamble, Charles Faulkerson,
            William Jeffress
Lester 7years- 7 weeks out of the office
Sat in the lobby, did not let other staff know he was present, was sure he saw the
child at the end of the movie

The Committee decided that it would not overturn the termination of Ms. Coates
or Mr. Howard. The committee felt if Mr. Johnson 's story was correct then he
should not be terminated. We would seek counsel on how to present each case
to the individuals.

**2:00 PM-Adjourned**

