IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES C. SHERROD, )<br>    **Plaintiff** )<br>    v.       )<br>         )<br>BOOKER T. WASHINGTON CENTER, )<br>    **Defendant.** ) | C.A. No. 04-208 ERIE<br>District Judge McLaughlin<br>Magistrate Judge Baxter |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I. RECOMMENDATION**

It is respectfully recommended that Defendant's Motion For Summary Judgment [Document # 25] be granted.

**II**. **REPORT**

  **A. Relevant Procedural and Factual History**

Plaintiff, an African-American, brings this employment discrimination action against his former employer, Booker T. Washington Center ("BTWC"), claiming that he was terminated from his employment on the basis of his race. In particular, Plaintiff asserts claims of (i) race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. ("Title VII"), and section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); (ii) race discrimination in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"); (iii) violation of Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.1, et seq. ("PaWPCL"); and (iv) defamation of character.[1]

Plaintiff, an African-American, was hired as the Executive Director of BTWC effective November 9, 1998. (See engagement letter attached as Exhibit 1 to Document # 25). According to his engagement letter, Plaintiff was to "serve at the will and direction of the Board of

---

[1] Plaintiff has since withdrawn his defamation claim. (See Document # 28, Plaintiff's Memorandum, at p. 9).

Directors and the Board retain[ed] the right to terminate [Plaintiff's] employment with or without cause." (Id.). As Executive Director, Plaintiff's duties included "[o]verall conduct and management of the affairs and operations of BTWC," formulating "plans, policies and procedures," and "all hiring, training, evaluation, promotion and termination of agency staff." (See job description attached as Exhibit 3 to Document # 25).

On August 6, 2002, children attending BTWC's summer camp were taken on a field trip to the Millcreek Mall movie theater, supervised by three African-American employees of BTWC. After returning from the field trip, it was discovered that one of the children was mistakenly left behind and had, subsequently, walked several miles from the Millcreek Mall to the home of one of her relatives. (See incident report attached as Exhibit 4 to Document # 25). At the time of the incident, Plaintiff was on vacation and had left BTWC's controller, Brian Bessetti ("Bessetti"), a Caucasian, in charge of the facility. (Complaint at ¶ 10).[2]

At approximately 10:30 p.m. on the night on the incident, Plaintiff received a telephone call at his home Sean Coleman ("Coleman"), an African-American and Vice-President of BTWC's Board of Directors, who, according to Plaintiff, began his conversation with the question, "[w]hat the fuck are those niggers doing?" (See transcript of Plaintiff's deposition attached as Exhibit 5 to Document # 25 ("Plaintiff's depo."), at p. 21). After Plaintiff asked Coleman what he was talking about, Coleman allegedly responded, "[t]hose fucking niggers took a kid on the field trip and she was lost." (Id.). The next day, Plaintiff and Coleman interviewed the employees responsible for supervising the field trip. (Plaintiff's depo. at pp. 66-67). Sometime after the interviews were completed, Plaintiff alleges that Coleman instructed him to "fire all of those niggers," which Plaintiff understood to mean the three African-American employees who supervised the field trip. (Plaintiff's depo. at p. 24). As a result, Plaintiff terminated the three African-American employees by letter dated August 7, 2002. (Plaintiff's depo. at p. 70). Bessetti was not interviewed about the incident, nor was he

---

[2] Plaintiff was on vacation during the week of August 5, 2002 through August 9, 2002. (Document # 25, Exhibit 5 at p. 57).

2

terminated as a result of the incident. (Plaintiff's depo. at pp. 27, 69-70).

On Saturday, August 10, 2002, Coleman telephoned Plaintiff and informed him that a Board meeting would be held to discuss the incident when Plaintiff returned to work from his vacation on August 12, 2002. (Plaintiff's depo. at pp. 72-73). Plaintiff recalls that there were approximately seven board members present at the meeting on August 12, 2002, consisting of four African-American males, one African-American female, and two Caucasian males. (Plaintiff's depo. at pp. 73-74).[3] At the Board meeting, Plaintiff informed the Board members that Coleman had used the term "niggers" in reference to the three African-American employees who were terminated. (Plaintiff's depo. at pp. 76-77). After Plaintiff discussed the incident, Bessetti joined the meeting and Plaintiff was asked to leave. (Plaintiff's depo. at pp. 82-84). After thirty to forty-five minutes, Plaintiff was called back into the meeting and asked to resign. (Plaintiff's depo. at p. 82). Plaintiff refused to offer his resignation, walked out of the meeting, and went back to his office. (Plaintiff's depo. at pp. 82, 85). Plaintiff then gave his keys to Bill Jeffress ("Jeffress"), Chairman of BTWC's Management Committee, and left the agency. (Plaintiff's depo. at p. 85; Plaintiff's Affidavit attached to Document # 28, at ¶ 33).

On August 16, 2006, Plaintiff sent a letter to James Hamilton, President of BTWC's Board of Directors, reiterating that he had not submitted his resignation. (Plaintiff's letter dated August 16, 2002, attached to Document # 28). Subsequently, by letter dated September 16, 2002, Plaintiff received the "Board's Final Decision," accepting Plaintiff's purported resignation and offering Plaintiff a severance package.[4] In particular, the letter offered the following explanation of the Board's decision:

---

[3] At the time, the entire Board consisted of 16 members, 13 of whom were African-American.. (Document # 25, Exhibit 12).

[4] It is unclear from the record when or how Plaintiff was deemed to have offered his resignation, but Plaintiff has consistently denied having submitted his resignation. For purposes of the pending summary judgment motion, this Court will accept Plaintiff's representation that he did not resign. Nevertheless, the September 16, 2002, letter remains instructive as to the reasons offered in support of the Board's decision that Plaintiff should no longer remain as Executive Director.

3

> ... our decision was based on what we see as a lack of leadership on your part. While you were not personally involved in the [missing child incident], you were responsible for creating an environment in which such an incident could occur.
>
> During our investigation of this incident, we found that, despite the fact that three employees were written up for violating safety policies and procedures, no such policies in fact exist. We found that there were no guidelines in place for employee responsibility and accountability on field trips like the one on August 6, 2002. These policies are your responsibility, plain and simple. As executive director, you are the person charged with setting the ground rules and establishing minimum acceptable levels of conduct and performance. You did not do that here.
>
> We also found your personal response to the situation to be unsatisfactory. The investigation that should have been conducted by you immediately upon learning of the situation actually had to be initiated by me. When we first spoke, the situation was reported as a minor incident, and you did not seem to take it seriously. In fact, you had not even contacted the child's family and did not even know how to get in touch with them at that point in time.
>
> Without belaboring the point, this is all unacceptable. Your conduct before the incident, and your reaction to it, was not that of a leader. Because of this, we strongly believe that a change is necessary.

(Board of Directors' Final Decision dated September 16, 2002, attached to Document # 28).

Plaintiff rejected the severance package offered by the Board. (Plaintiff's Affidavit attached to Document # 28, at ¶ 36). As a result, Plaintiff was notified by Coleman by letter dated September 24, 2002, that he had been terminated from his position as BTWC's Executive Director, effective immediately. (Document # 25, Exhibit 17). Although Coleman acknowledged in his letter that Plaintiff was an "at-will" employee and, thus, could be terminated for any reason, he stated that Plaintiff's termination was "both necessary and appropriate," based on the reasons previously cited by the Board in its "final decision" issued on September 16, 2002. Jeffress, an African-American, was ultimately hired to replace Plaintiff as Executive Director in or around December 2002. (See transcript of Coleman's deposition attached as Exhibit 7 to Document # 25 ("Coleman's depo."), at p. 154).

Plaintiff asserts that his termination was based on his race. Plaintiff seeks declaratory and injunctive relief, compensatory damages for lost income and benefits, punitive damages, attorney fees and costs. Plaintiff also requests a jury trial.

BTWC has filed a motion for summary judgment [Document # 25], asserting that Plaintiff has failed to set forth a *prima facie* case of race discrimination and, in any event, was terminated for a legitimate, nondiscriminatory reason  Plaintiff has filed a response to BTWC's summary judgment motion, claiming that he has set forth a *prima facie* case of race discrimination and that BTWC's stated reasons for terminating him were merely a pretext for race discrimination. [Document # 28].  This matter is now ripe for consideration.

**B.     Standard of Review**

Federal Rule of Civil Procedure 56(c)  provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990), *quoting* Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).  The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance -

which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### C.    Discussion
#### 1.    Race Discrimination Claims
##### a.    Standard of Proof

Plaintiff has brought race discrimination claims under Title VII, Section 1981, and the PHRA. The Third Circuit has held that the legal standard applicable to a Section 1981 case is identical to the standard in a Title VII case. Tucker v. Merck & Co., Inc., 2005 WL 1176565, *1 (3d Cir. 2005), citing Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999). Similarly, courts have uniformly interpreted the PHRA consistent with Title VII. See Harris v. SmithKline Beecham, 27 F.Supp.2d 569, 576 (E.D.Pa. 1998); Clark v. Commonwealth of Pennsylvania, 885 F.Supp. 694, 714 (E.D.Pa. 1995); Violanti v. Emery Worldwide A-CF Co., 847 F.Supp. 1251, 1257 (M.D.Pa. 1994). Thus, Plaintiff's race discrimination claims will be analyzed under the standard applicable to a Title VII case.

Title VII cases are analyzed according to the burden-shifting framework that was first established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973). Plaintiff must first establish a *prima facie* case of discrimination by proving the following four basic facts: (i) he is a member of a protected class; (ii) he was the subject of an adverse employment action; (iii) he was qualified for the position in question; and (iv) he was discharged under circumstances that give rise to an inference of unlawful discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 356-57 (3d Cir. 1999). Proof of these basic facts raises an inference of discrimination, which is given the force and effect of a rebuttable presumption. Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

Once a *prima facie* case is established, the employer must then articulate a legitimate, non-discriminatory reason for the adverse employment action. Burdine, 450 U.S. at 254. The employer need not persuade the court that it was actually motivated by the proffered reasons, but needs only to raise a factual issue as to whether it discriminated against the plaintiff. Id. at 254-55. This burden is satisfied if the employer "simply 'explains what [it] has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 25, n.2 (1978). Thus, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine, 450 U.S. at 257.

Once the employer has met its relatively light burden by articulating a legitimate reason for the adverse employment decision, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's proffered explanation is pretextual. Id. Plaintiff may meet this burden either directly, by persuading the court that the employer's action was more likely motivated by a discriminatory reason, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. See McDonnell Douglas, 411 U.S. at 804-805.

Throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff. See Burdine, 450 U.S. at 253-256. Plaintiff may meet this burden if his "*prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.

133, 148 (2000).

### b. *Prima facie* Case

BTWC argues that Plaintiff has failed to set forth a *prima facie* case of race discrimination because he cannot meet the second and fourth elements of his *prima facie* burden. In particular, BTWC contends that Plaintiff cannot demonstrate he was qualified for the Executive Director position, nor can he demonstrate that he was discharged under circumstances that gave rise to an inference of unlawful discrimination.

#### i. Qualification to Serve as BTWC's Executive Director

BTWC claims that Plaintiff's performance evaluations indicate that "[h]e was, at best, a marginal Executive Director, at least in the eyes of the Board of Directors." (Document # 26, BTWC's Brief, at p. 13). In particular, BTWC points out that there were "serious issues" identified in Plaintiff's March 2001 evaluation, which caused the Board to rate Plaintiff's performance as "need[ing] improvement;" however, in November 2001, Plaintiff's rating improved to "acceptable." (Document # 25, Exhibits 2(b) and 2(c)). In addition, Plaintiff testified that he was later evaluated in February or March 2002, at which time he received a positive rating and a pay raise. (Plaintiff's depo. at p. 65). These facts belie BTWC's claim that Plaintiff "failed to perform his job adequately" and was, thus, unqualified for his position as Executive Director.[5] Moreover, prior to being hired as BTWC's Executive Director, Plaintiff had been employed in the social service field for fifteen years, most recently as Director of Operations of the Bayfront NATO Martin Luther King Center, a social service agency that

---

[5] In support of its argument that Plaintiff could be found unqualified based upon unsatisfactory job performance, BTWC cites the case of Spangle v. Valley Forge Sewer Authority, 839 F.2d 171, 173-74 (3d Cir. 1988). While the legal principle for which Spangle is cited is accurate, the facts of that case are markedly different from the present case, as the plaintiff's performance appraisals in Spangle, "without exception,...reported his performance of his supervisory and managerial duties to be unsatisfactory." 839 F.2d at 173. Moreover, the plaintiff in Spangle was seeking to attain a higher position for which he was deemed unqualified due to his unsatisfactory performance of the supervisory duties of his inferior position. 839 F.2d at 174. Thus, BTWC's reliance upon Spangle is misplaced.

provides services to low-income individuals similar to those served by BTWC. (Plaintiff's depo. at p. 64). As a result, this Court finds that Plaintiff has met his burden of proving that he was qualified for his position as BTWC's Executive Director.

### ii.     **Inference of Discrimination**

BTWC contends that Plaintiff cannot meet his burden of proving that he was discharged under circumstances that gave rise to an inference of unlawful discrimination.[6] On this point, the Court agrees. Simply stated, Plaintiff, an African-American, was discharged by a 16-member Board of Directors, of which 13 members were African-American, and was ultimately replaced by Jeffress, an African-American. Furthermore, according to Plaintiff's deposition testimony, the three individual Board members who he felt disliked him and may have advocated his dismissal - Charles Faulkerson, Coleman, and Paul Gambill - were also African-American. (Plaintiff's depo. at pp. 14-15).

The only facts upon which Plaintiff bases his claim that he was discriminated against are Coleman's use of the term "niggers" in reference to the three African-American employees Plaintiff was instructed to terminate, and BTWC's failure to take any disciplinary action against Bessetti, a Caucasian. (Plaintiff's depo. at pp. 6-7, 27). Upon inspection, neither of these facts creates an inference that Plaintiff was terminated because of his race.

---

[6]

The record is clear that there is no direct evidence that Plaintiff was terminated because of his race, a fact Plaintiff acknowledged during his deposition:

>   A.   I received a letter in the mail outlining the termination somewhere around September 26, 27th of 2002, saying I was terminated.
>   Q.   And did it say you were terminated because you were African American?
>   A.   It didn't state that in the letter, no.
>   Q.   Has anybody else ever stated that to you?
>   A.   No.
>   Q.   You don't have any written documents or anything like that that would suggest that that was the situation.
>   A.   I don't have any written documents in my possession that would suggest that I was terminated because of my race....

(Plaintiff's depo. at pp. 8-9).

9

The record evidence and Plaintiff's own allegations indicate that Coleman used the term "nigger" only in reference to the three African American employees who were terminated as a result of the field trip incident. The record is devoid of any allegations or evidence that Coleman used the term "nigger" to refer to Plaintiff, or that any similar terms were used by any other Board member in connection with BTWC's decision to terminate Plaintiff as Executive Director. This Court cannot infer that Plaintiff was unlawfully terminated because of his race based on allegedly racial comments that were directed toward other employees by a member of the same protected class as Plaintiff, especially when the person who allegedly made the remarks was only one member of a sixteen member Board of Directors, most of whom were also of the same protected class as Plaintiff. Such an inference would exceed the bounds of reason. See, e.g., Rajbahadoorsingh v. Chase Manhattan Bank, NA, 168 F.Supp.2d 496 (D.V.I. 2001)(finding that, where plaintiff and decision-maker were of same race, "it is hard to fathom how [decision-maker's] statements could be construed to show that [plaintiff's] termination was racially motivated"); Dungee v. Northeast Foods, Inc., 940 F.Supp. 682 n. 3 (D.N.J. 1996)(finding that decision-maker being member of plaintiff's protected class "weakens any possible inference of discrimination"); Rooks v. Girl Scouts of Chicago, 1996 WL 459941 at * 3 (7th Cir. 1996)("there can be no compelling evidence of age discrimination because [the decision maker] herself is also in the protected category"); Toliver v. Community Action Comm'n to Help the Economy, Inc., 613 F.Supp. 1070 (S.D.N.Y. 1985), aff'd 800 F.2d 1128 (2d Cir.), cert. denied, 479 U.S. 863 (1986)(holding that, given the composition of the 11-person decision-making board (6 of whom were African-American), inference raised by African-American plaintiff that his termination was due to race discrimination was implausible); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 1002 (5th Cir. 1996)(en banc)("[in] a Title VII case alleging discrimination because of race, proof that all of the decision makers were members of the same race as the complaining employee would considerably undermine the probability that race was a factor in the employment decision").

Similarly, this Court cannot reasonably infer from the lack of disciplinary action taken against Bessetti that Plaintiff's termination was racially motivated. To establish the fourth

10

prong of a prima facie case of race discrimination based on disparate treatment, Plaintiff must demonstrate that **similarly situated** non-protected persons were treated more favorably than him. Weldon v. Kraft, Inc., 896 F.2d 793, 797 (3d Cir. 1990); Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987) (emphasis added).  "[T]o be deemed 'similarly situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).  See also Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)(proposed comparable employees must be similarly situated in all "material respects"); Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803 (6th Cir. 1994)(stating that "[i]n order for two or more employees to be considered similarly-situated ... the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the employees who he alleges were treated more favorably"); Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988)(plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his own); Dill v. Runyon, 1997 WL 164275 (E.D.Pa. Apr. 3, 1997).

Here, although Bessetti was acting as Plaintiff's temporary replacement as Executive Director at the time of the incident, his primary position with BTWC was Finance Director.  In fact, the primary reason he was placed in charge of the Center in Plaintiff's absence was because he held the position as Finance Director, which fell directly below the position of Executive Director on BTWC's organizational chart. (Plaintiff's depo. at p. 57; Document # 28, Exhibit 19).[7]  However, unlike Plaintiff, Bessetti had no authority to establish policies and procedures for the Center, or to hire, fire, or discipline employees. (Plaintiff's depo. at pp. 28-29; Document # 25, Exhibit 3 at ¶¶ 2, 6).  Thus, he could not be held to the same standards as Plaintiff. Furthermore, the incident in question did not reflect on Bessetti's ability to perform his job as

---

[7] As a result, while Plaintiff's direct supervisor was BTWC's Board of Directors, Bessetti's was Plaintiff himself.

11

Finance Director and provided no justification to terminate him from that position. Consequently, differentiating or mitigating circumstances existed that would distinguish BTWC's treatment of Bessetti from the treatment Plaintiff received as a result of the incident in question.

Based on the foregoing, Plaintiff has failed to show that he and Bessetti were similarly situated in all "material respects" and, thus, has failed to establish the fourth element of his prima facie case. As a result, BTWC's motion for summary judgment should be granted with regard to Plaintiff's race discrimination claims under Title VII, Section 1981, and the PHRA.

### c. Pretext

Alternatively, even if it is deemed that Plaintiff has presented a prima facie case of discrimination, he has the ultimate burden of proving by a preponderance of evidence that BTWC's legitimate, non-discriminatory reasons set forth in both its letter of termination and the Board's notice of final decision were actually pretexts for race discrimination.[8] Burdine, 450 U.S. at 257. To do so, Plaintiff must *either* (i) discredit the proffered reasons, either circumstantially or directly, or (ii) adduce evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). As discussed below, Plaintiff has failed to meet this burden.

### a. Discrediting BTWC's Proffered Reasons

To discredit a legitimate reason proffered by an employer, the plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

---

[8] The reasons set forth in the Board's notice of final decision, dated September 16, 2002 (Document # 28, Attachment 13), and BTWC's letter of termination, dated September 24, 2002 (Document # 25, Exhibit 13), are deemed to be legitimate, non-discriminatory reasons for Plaintiff's termination, and, thus, Defendant has met its burden of production in this regard.

12

factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 765 (citation omitted); Fucci v. Graduate Hospital, 969 F.Supp. 310, 316 (E.D.Pa. 1997).

Plaintiff has submitted the following documentary evidence apparently aimed at discrediting BTWC's proffered reasons for his termination: (i) Plaintiff's sworn affidavit touting his own work performance and his handling of the field trip incident (Document # 28, Attachment 4); (ii) a sworn affidavit from Randy Davis ("Davis"), a former employee of BTWC during Plaintiff's tenure as Executive Director (Document # 25, Exhibit 16); and (iii) a sworn affidavit from Keyia M. Terry ("Terry"), Plaintiff's former Executive Secretary during his tenure as BTWC's Executive Director (Document # 25, Exhibit 15).[9]

After careful review, this Court finds the documentary evidence submitted by Plaintiff to be unavailing. In particular, Plaintiff's own sworn statements that, at the time of the field trip incident, his "performance was not in question," he was "not under any disciplinary action," he "received pay raises during [his] tenure as Executive Director," and he "was in good standing with the Board of Directors," are not dispositive. (See Document # 28, Attachment 4 at ¶¶ 7-10). "[Plaintiff's] view of his performance is not at issue; what matters is the perception of the decision maker.... The fact that an employee disagrees with an employer's evaluation of him does not prove pretext." Billet v. CIGNA, Corp., 940 F.2d 812, 825 (3d Cir, 1991)(citations omitted). "[A]n employer's articulated reasons are not incredible simply because the employee asserts that such is the case." Id. at 828. See also Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1304 (7th Cir. 1991)(inquiry regarding genuineness of employer's nondiscriminatory reason for terminating plaintiff "is limited to whether the employer's belief was honestly held"); Holder v. City of Raleigh, 867 F.2d 823, 829 (4th Cir. 1989)("[a] reason honestly described but poorly founded is not a pretext"); Hicks v. Arthur, 878 F.Supp. 737, 739 (E.D.Pa. 1995), aff'd, 72 F.3d 122 (3d Cir. 1995)(that a decision is ill-informed or ill-considered does not make it

---

[9] It's worth noting that the sworn affidavits of Davis and Terry were actually submitted by BTWC as exhibits attached to its motion for summary judgment; however, it is plain from their format and content that they were prepared by or on behalf of Plaintiff and, thus, will be included in this Court's examination of whether Plaintiff has provided enough evidence to meet its ultimate burden of persuasion.

13

pretextual).

The affidavits of Davis and Terry were apparently prepared by or on behalf of Plaintiff to counter BTWC's proffered reason that Plaintiff was terminated due, in large part, to his failure to implement policies and procedures establishing guidelines for employee responsibility and accountability on field trips. In particular, Davis's affidavit states, in pertinent part:

> 9. The Booker T. Washington Center has operated the Summer Day Camp Program or similar type programs for most of its 80-year history.
>
> 10. As a result of the type of programs it has run through the years, including the Summer Day Camp Program, the Booker T. Washington Center has policies/procedures/practices in place governing these programs.
>
> 11. Staff members are aware of these policies/procedures/practices, especially those governing their area of service.
>
> 12. Staff in the Summer Day Camp Program was required, among other things, to keep track of all participants.

(Document # 25, Exhibit 16 at ¶¶ 9-12).

With regard to Plaintiff's role in imparting relevant policies and procedures to staff, Terry's affidavit states:

> 12. Prior to the start of the Summer Day Camp Program, as part of the agency normal operating procedure, [Plaintiff] met with Summer Day Camp Program staff to discuss the program, including staffing, activities, responsibilities and procedures.

(Document # 25, Exhibit 15 at ¶ 12).

Viewed in the best possible light, the above sworn statements suggest that BTWC's Board of Directors was wrong or mistaken when it stated that no relevant policies existed and that Plaintiff had failed to establish guidelines for employee responsibility and accountability on field trips. Nevertheless, "[t]o discredit the employer's proffered reason, ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765 (citations omitted). "In simpler terms, [Plaintiff] must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix

14

Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997). Plaintiff has failed to meet this burden. Moreover, Plaintiff has provided insufficient evidence to counter the Board's other proffered reason for Plaintiff's termination - that he failed to "treat [the field trip incident] seriously enough, and did not immediately take reasonable steps to investigate the matter." (Document # 25, Exhibit 13).

      It is Plaintiff's ultimate burden to prove by a preponderance of evidence that BTWC's proffered reasons were not its true reasons, but were a pretext for discrimination. While the Court recognizes that requiring such proof "places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.'" Id. at 765, quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992). In this case, Plaintiff has simply failed to provide any evidence to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 765, citing Ezold, 983 F.2d at 531. Thus, Plaintiff has not met his burden of proving that BTWC's proffered reasons for terminating him were, in actuality, a pretext for race discrimination.

### b.     Evidence of Discrimination

      As an alternative to discrediting BTWC's proffered reasons for his termination, Plaintiff has presented little, if any, evidence to show that discrimination was more likely than not a motivating factor in the decision to terminate him. In fact, as previously discussed, the evidence of record, taken as a whole, does more to dispel the notion that Plaintiff's race was a motivating factor behind his termination. In particular, it is worth reiterating that Plaintiff, an African-American, was terminated by a 16-member Board of Directors, 13 of whom were African-American, and was ultimately replaced as Executive Director by another African-American. Furthermore, the three members of the Board who Plaintiff believed were primarily responsible for his termination were also African-American. These facts belie any inference that may be

15

drawn from Plaintiff's allegations that his race was the motivating factor that led to his termination.

For the foregoing reasons, Plaintiff has failed to meet his ultimate burden of proving that BTWC's proffered reasons for his termination were merely a pretext for race discrimination and, therefore, BTWC's motion for summary judgment should be granted with regard to Plaintiff's race discrimination claims under Title VII, Section 1981, and the PHRA.

### 2. Pennsylvania Wage Payment and Collection Law Claim

The PaWPCL provides, in pertinent part:

> Whenever an employer separates an employee from the payroll, or whenever an employee quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

43 Pa.C.S.A. § 260.5.

Plaintiff claims that BTWC "violated this statutory requirement by failing to pay plaintiff his salary from August 12-September 24, 2002." (Complaint at ¶ 25). However, by his own admission, Plaintiff did not work at BTWC after August 12, 2002, and, thus, did not earn any wages during the period of time for which Plaintiff seeks compensation. (Document # 28 at ¶ 29).

The "WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." Weldon v. Kraft, Inc., 896 F. 2d 793, 801 (3d Cir. 1990)(citations omitted). As in Weldon, Plaintiff has provided no evidence to indicate that BTWC had either an express or implied contractual obligation to pay wages to a salaried employee during a period of suspension that ultimately resulted in termination. As a result, BTWC's motion for summary judgment should be granted with regard to this claim.

### III.  CONCLUSION:

For the foregoing reasons, this Court respectfully recommends that Defendant's Motion For Summary Judgment [Document # 25] be granted.

In accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to timely file objections may constitute a waiver of any appellate rights.

S/Susan Paradise Baxter<br>
SUSAN PARADISE BAXTER<br>
Chief U.S. Magistrate Judge

Dated: July 24, 2006

cc:   The Honorable Sean J. McLaughlin
      United States District Judge